# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT, <br><br>Plaintiffs, <br><br>v. <br><br>MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico, <br><br>Defendants. | No. 24-CV-0471 |

**MOTION FOR TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

|   |   |   | Page |
|---|---|---|---|
| TABLE OF CONTENTS | | | 2 |
| TABLE OF AUTHORITIES | | | 3 |
| I. | INTRODUCTION | | 5 |
| II. | FACTS | | 5 |
| III. | STANDARD FOR OBTAINING RELIEF | | 7 |
| IV. | PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS | | 7 |
| | A. | The Legal Framework of Second Amendment Challenges | 7 |
| | B. | The Plain Text Covers Plaintiffs' Conduct | 8 |
| | C. | The Act is Not Consistent with the Nation's History and Tradition of Firearms Regulation. | 10 |
| | D. | Interest Balancing is Not Appropriate in the Second Amendment Context | 12 |
| | E. | The Act Is Not a Regulation of Commercial Sales. | 13 |
| | F. | The Act Applies only to Law-Abiding Citizens | 13 |
| | G. | Conclusion | 14 |
| V. | THE REMAINING FACTORS FAVOR ENTRY OF INJUNCTIVE RELIEF | | 14 |
| | A. | Plaintiffs Have Suffered Irreparable Harm | 14 |
| | B. | The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief | 15 |
| VI. | A BOND IS NOT NECESSARY | | 16 |
| VII. | CONCLUSION | | 17 |

## TABLE OF AUTHORITIES

**Case**                                                                                              **Page(s)**

*American Hosp. Ass'n v. Harris*,
   625 F.2d 1328 (1980) .................................................................................... 15

*Aposhian v. Barr*,
   958 F.3d 969 (10th Cir. 2020) ...................................................................... 15

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023) ...................................................................... 14

*Crowe & Dunlevy, P.C. v. Stidham*,
   640 F.3d 1140 (10th Cir. 2011) .................................................................... 6

*District of Columbia. v. Heller*,
   554 U.S. 570 (2008) ........................................................................... 7, 8, 10

*Elrod v. Burns*,
   427 U.S. 347 (1976) ..................................................................................... 14

*Ezell v. City of Chi.*,
   651 F.3d 684 (7th Cir. 2011) .................................................................. 9, 15

*Free the Nipple-Fort Collins v. City of Fort Collins*,
   916 F.3d 792 (10th Cir. 2019) ..................................................................... 15

*Gen. Motors Corp. v. Urban Gorilla*, LLC,
   500 F.3d 1222 (10th Cir. 2007) ..................................................................... 7

In *Chamber of Com. of U.S. v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ...................................................................... 15

*Luis v. United States*,
   578 U.S. 5 (2016) ............................................................................................ 9

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010) ....................................................................................... 7

*Midwest Title Loans, Inc. v. Ripley*,
   616 F. Supp. 2d 897 (S.D. Ind. 2009) ........................................................ 16

*Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*,
   460 U.S. 575 (1983) ....................................................................................... 9

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022) ............................................................ 7, 8, 9, 10, 11, 12, 13, 16

*Newsom v. Albemarle Cnty. Sch. Bd.*,
   354 F.3d 249 (4th Cir. 2003) ................................................................................. 16

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................................................................... 15

*People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*,
   350 F. Supp. 3d 1129 (D.N.M. 2018) ..................................................................... 7

*Preminger v. Principi*,
   422 F.3d 815 (9th Cir. 2005) ................................................................................. 15

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 5017253 (D. Colo. 2023) ....................................................................... 17

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 8446495 (D. Colo., 2023) ....................................................................... 12

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) ................................................................................. 9

*Utah Licensed Beverage Ass'n v. Leavitt*,
   256 F.3d 1061 (10th Cir. 2001) ............................................................................. 16

*Western Watersheds Project v. Michael*,
   869 F.3d 1189 (10th Cir. 2017) ............................................................................. 9

## **Statutes**

42 U.S.C. § 1983 ................................................................................................................ 6

N.M. Const. Art. V, § 4 .................................................................................................... 6

N.M. Stat. § 30-7-7.3 ........................................................................................................ 5, 8

U.S. Const. Amend. II ....................................................................................................... 7

## **Other Authorities**

Colorado House Bill 23-1219 ........................................................................................... 11

# MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Plaintiffs move the Court to enter a Temporary Restraining Order and a Preliminary Injunction. As grounds for this motion, they state:

## I.   INTRODUCTION

This action challenges the constitutionality of N.M. Stat. § 30-7-7.3 (the "Unlawful Sale of a Firearm Before Required Waiting Period Ends Act" or the "Waiting Period Act"), enacted by the Legislature of the State of New Mexico and signed into law by Governor Michelle Lujan Grisham on March 4, 2024. The Waiting Period Act is effective as of May 15, 2024. With limited exceptions, the Waiting Period Act makes it unlawful for any person who sells a firearm to a purchaser to deliver the purchaser's property to them until a minimum of seven calendar days after the sale has occurred, even if a clean background check comes back immediately.[1] As such, the Waiting Period Act is unconstitutional under the Second Amendment to the United States Constitution as made applicable to the states by the Fourteenth Amendment. House Bill 129 (HB 129) is the bill that became the Waiting Period Act. A copy of HB 129 is attached as Exhibit A.

## II.   FACTS

1.   Plaintiffs Paul Samuel Ortega and Rebecca Scott are both adult residents of New Mexico who have been negatively impacted by the Waiting Period Act's unconstitutional burden on the Second Amendment rights of law-abiding citizens who purchase firearms. On May 15, 2024, Mr. Ortega went to Calibers Shooting Sports Center in Albuquerque for the purpose of acquiring a Glock 21 Gen4 .45 handgun. Ms. Scott similarly went to Big R Store in Farmington for the

---

[1] The provisions of the Waiting Period Act do not apply to: (1) a buyer who holds a valid federal firearms license, (2) a buyer who holds a valid New Mexico concealed handgun license, (3) a law enforcement agency, (4) a transaction between two law enforcement officers; and (5) a transaction between immediate family members.

5

purpose of acquiring a Smith & Wesson M&P EZ Shield 380 handgun. Both cleared their federal instant background checks authorizing them to acquire these firearms. At this point, both Mr. Ortega and Ms. Scott attempted to acquire possession of the firearms so that they could transport them back to their residences. However, both were told that due to the Waiting Period Act, their firearms had to remain in the custody of the respective gun stores for the next seven days. The gun store employees informed Mr. Ortega and Ms. Scott that the Waiting Period Act's requirements were the only reason that they could not take possession of their firearms after clearing their federal background checks and rendering, or attempting to render, full payment for them.[2]

2. Defendant Michelle Lujan Grisham is the Governor of the State of New Mexico. This action is brought against her in her official capacity. The New Mexico Constitution states that the "supreme executive power of the state shall be vested in the governor, who shall take care that the laws be faithfully executed." N.M. Const. Art. V, § 4. Courts have long recognized the practice of naming the governor of a state, in their official role as the state's chief executive, as the proper Defendant in cases where a party seeks to enjoin state enforcement of a statute, regulation, ordinance, or policy that is violative of federal law. *See Crowe & Dunlevy, P.C. v. Stidham*, 640 F.3d 1140, 1154 (10th Cir. 2011).

3. Defendant Raúl Torrez is the Attorney General of the State of New Mexico. This action is brought against him in his official capacity, to the extent that any injunction against the Waiting Period Act must include the Attorney General as a party to this matter.

4. Defendants are or will enforce the unconstitutional provisions of the Waiting Period Act against Plaintiffs under color of state law within the meaning of 42 U.S.C. § 1983.

---

[2] The declarations for Paul Samuel Ortega, Rebecca Scott, and Robert Pohl (Calibers employee) are attached as Exhibits B, C and D.

### III. STANDARD FOR OBTAINING RELIEF

5.     To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *See Gen. Motors Corp. v. Urban Gorilla*, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007). The requirements for issuance of a TRO are essentially the same as those for a preliminary injunction order. *See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd.*, 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018).

### IV. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

**A.     The Legal Framework of Second Amendment Challenges**

6.     The Second Amendment to the United States Constitution declares that "the right of the people to keep and bear arms shall not be infringed." U.S. Const. Amend. II; *see also District of Columbia. v. Heller*, 554 U.S. 570 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); and *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). The right to keep and bear arms recognized in the Second Amendment is made applicable to the states by the Fourteenth Amendment. *McDonald*, 561 U.S. at 777. In *Bruen*, the Court set forth the following standard for resolving Second Amendment challenges: "[1] When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. [2] The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

7.     Additionally, Plaintiffs are part of "the people" that the Second Amendment protects. They are law abiding American citizens. For both Plaintiffs, the NICS background check indicated that the gun stores could proceed with the transactions, and both Mr. Ortega and Ms. Scott rendered full payment for their firearms. But, because of the prohibitions of the Waiting Period Act, the gun

stores could not "transfer ownership, possession or physical control of the firearm[s] . . to the buyer[s] before the end of the required seven-calendar-day waiting period." N.M.S. § 30-7-7.3.

**B.     The Plain Text Covers Plaintiffs' Conduct**

8.     Plaintiffs desire to obtain possession of firearms that they have purchased for lawful purposes—including self-defense in their homes. The Waiting Period Act prohibits Plaintiffs from doing so without being subjected to an arbitrary, unnecessary, burdensome, and useless delay.  The right to "keep" arms necessarily implies the right to obtain arms.  After all, "keep" means to possess or "have weapons." *Heller*, 554 U.S. 570, 582 (2008).  By the Waiting Period Act's very terms, it prevents individuals from taking "possession" of their firearms. N.M. Stat. § 30-7-7.3. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing bearable arms – "the Constitution *presumptively* protects that conduct." *Id.*, 597 U.S. at 24 (emphasis added).  Plaintiffs have met their burden under *Bruen*, and the Waiting Period Act is presumptively unconstitutional.

9.     Now, some may attempt to argue that while the plain text of the Second Amendment may protect the keeping of a firearm, it does not extend to obtaining one in the first place; and the Waiting Period Act is therefore not presumptively unconstitutional.  But this argument is incorrect. First, the Waiting Period Act slices too thinly—under the statute, a "customer" pays "a seller" for a firearm, passes a background check, and maintains the exclusive right to obtain that exact firearm 7 days later. As described above, the gun store employees who assisted Mr. Ortega and Ms. Scott with their firearms purchases did not dispute that both had passed their federal background checks and had paid or attempted to pay the purchase price for their firearms.  It was only because of the Waiting Period Act that they could not subsequently "carry" these firearms for 7 full days. Their right to keep and bear arms was thus infringed directly.

10. Second, constitutional rights necessarily include those rights attendant to exercising them. *See, e.g.*, *Minneapolis Star and Tribune Co. v. Minnesota Com'r of Revenue*, 460 U.S. 575 (1983) (a tax on the use of ink and paper directed at newspapers violated the First Amendment); *Western Watersheds Project v. Michael*, 869 F.3d 1189, 1194 (10th Cir. 2017) (collecting resource data on public lands was protected by First Amendment). Indeed, all rights "implicitly protect those closely related acts necessary to their exercise." *Luis v. United States*, 578 U.S. 5, 26 (2016) (Thomas, J., concurring in the judgment). The right to keep and bear arms obviously implies the right to obtain them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011)). What good would it be to say that Americans can keep and bear arms, but have no right to obtain them in the first place? It is impossible to exercise one's Second Amended-protected rights without the ability to actually obtain an arm.

11. The fact that the Waiting Period Act has carved out multiple exceptions where its provisions do not apply, also does not save it from being presumptively violative of the Second Amendment. These limited exceptions to the rule are of little help to the vast majority of New Mexicans who do not fall into one of these favored categories. Whether there are exceptions to the general rule is irrelevant. The Supreme Court has never held that a gun control law needs to impact all or even most people's Second Amendment rights to implicate the text. In fact, in *Bruen*, the Court did not concern itself with whether the law impacted all, most, or even just some New Yorkers' Second Amendment rights; but rather, simply with the critical question of whether the Second Amendment's text covered "carrying handguns publicly for self-defense." *Bruen*, 597 U.S. at 32. Thus, even though New York did not completely bar the practice, but instead subjected it to a

discretionary licensing regime that impacted most but not all New Yorkers, the text was nevertheless implicated.

12. In this case, the Waiting Period Act does not apply to all people and to all avenues for the acquisition of firearms (for example, transfers between immediate family members is not covered), but it nevertheless puts restrictions on the Plaintiffs' ability to obtain firearms. This burden on Plaintiffs' right to keep and bear arms certainly implicates the text of the Second Amendment. *Cf. Heller*, 554 U.S. at 629 (leaving options open in one area "is no answer" to closing them in another).

13. In summary, the Second Amendment's plain text covers Plaintiffs' conduct – i.e., possessing bearable arms. Accordingly, "the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 17 (emphasis added). Plaintiffs have demonstrated their burden under *Bruen's* "step one". The Waiting Period Act is presumptively unconstitutional.

**C.  The Act is Not Consistent with the Nation's History and Tradition of Firearms Regulation.**

14. The State may attempt to rebut the presumption of unconstitutionality only by demonstrating that the Act is consistent with the Nation's historical tradition of firearms regulation. But it is impossible for the State to meet this burden, because there is no historical tradition of firearms being regulated in this manner, either at the time of our founding and the ratification of the Second Amendment, or during the Reconstruction era and the ratification of the Fourteenth Amendment.

15. In fact, the first waiting period law was not enacted until 1923, and involved only a one-day waiting period for handgun sales in California. *See* Professor David B. Kopel's Written

Testimony on Colorado House Bill 23-1219, *To Delay the Acquisition of Firearms*.[3] Under *Bruen*, analogies from the 1920s are far too late to offer a historical analogue to the issue of waiting periods. *Bruen*, 597 U.S. 1, 66, n.28 ("As with their late-19th-century evidence, the 20th-century evidence presented by respondents and their amici does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence.").

16. "In some cases, [the historical] inquiry will be fairly straightforward. For instance, when a challenged regulation addresses a general societal problem that has persisted since the 18th century, the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. In *Heller*, D.C.'s flat ban on the possession of handguns was a regulation that the Founders themselves could have adopted to confront the social problem that D.C. identified, i.e. handgun violence in urban areas. *Bruen*, 597 U.S. at 26. And since none of the Founding era regulations identified by D.C. was analogous to its ban, the ban was unconstitutional.

17. In the legislative analysis for HB 129, New Mexico referred to impulsive gun violence as the issue that it sought to address (the creation of a waiting period "might delay immediate access to a firearm, preventing impulsive acts of gun violence, including suicide and homicide"). *See* Sec. IV 1(b) of the 2024 Legislative Session Agency Bill Analysis for House Bill 129. This goal establishes that the Act is a regulation on the right to keep and bear arms, and not a commercial regulation designed to primarily affect trade and business enterprises.

---

[3] https://davekopel.org/Testimony/HB23-1219%20Kopel%20testimony%20on%20forced%20delays%20in%20gun%20acquisition-Mar6.pdf

18. But the problem of impulsive gun violence dates from the invention of guns, and the Founders themselves could have adopted regulations to confront this problem.[4]

19. Thus, the Waiting Period Act addresses a general societal problem that has persisted since long before the 18th century. The fact that there is a complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the Waiting Period Act is "inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26.

20. Separately, no historical regulation is analogous to a modern-day waiting period. None ever regulated all purchasers based on the same "how and why" that are relevant to a modern-day waiting period, as *Bruen* requires.

21. Moreover, incidental factual circumstances do not provide the required historical analogue for firearms regulations; in other words, even if in the past it were practically difficult for individuals living in rural areas to obtain a firearm quickly, this does not satisfy *Bruen*'s demanding test for an analogous historical firearms *regulation*.

**D.     Interest Balancing is Not Appropriate in the Second Amendment Context**

22. The State may argue that the "ends justify the means" by offering the opinion that waiting periods for firearm purchases promote the important governmental interest of public safety. *See* Sec. IV 1(b) of the 2024 Legislative Session Agency Bill Analysis for House Bill 129[5]. In other words, the means that the legislature chose (an arbitrary waiting period for the acquisition of firearms by law abiding citizens) promotes an important end (public safety). However, this means-

---

[4] In one District Court case rejecting a waiting period challenge, the Court nevertheless impliedly recognized that impulsive gun violence was known to the Founders, even if it was "less prevalent" than today. *See Rocky Mountain Gun Owners v. Polis*, --- F.Supp.3d ----2023 WL 8446495, * 16 (D. Colo. Nov. 13, 2023) ("[I]mpulsive gun homicides were much less prevalent at the time of the founding…"). Yet this is a concession that while impulsive gun violence may have been less prevalent in 1789 than 2024, such violence was still "a general societal problem."

[5] The analysis cited is from the New Mexico Department of health.

end argument is simply irrelevant to the resolution of Plaintiffs' Second Amendment challenge. *Bruen*, 597 U.S. at 22-23 (repeatedly and emphatically rejecting means-end analysis in the Second Amendment context).

### E.   The Act Is Not a Regulation of Commercial Sales.

23.   The Waiting Period Act is not a commercial regulation since the very purpose of the law is to limit the ability of a purchaser to obtain a firearm, and places duties on sellers only as a means of regulating the purchaser's activity. Under the law, the seller can go forward with accepting money for the firearm (receiving "proceeds" after the background check), but ownership and control of the firearm cannot be transferred to the purchaser—referred to by the Act as a "customer"—during the seven-day waiting period. As outlined above, in passing HB 129, New Mexico was driven by a desire to prevent "impulsive acts of gun violence" by those who purchase firearms, not by those who sell them. The legislature was not concerned about firearms violence by firearm sellers.

24.   Moreover, the fact that the Waiting Period Act contains exceptions for (1) buyers who hold a valid federal firearms license (2) buyers who have concealed handgun licenses; (3) law enforcement agencies; (4) two law enforcement officers under certain circumstances; and (5) between immediate family members, demonstrates that there are some classes of purchasers for which New Mexico does not think a seven-day waiting period is necessary. If the Waiting Period Act were a true commercial regulation, it would not maintain exceptions based on the category of purchaser.

### F.   The Act Applies only to Law-Abiding Citizens

25.   The Second Amendment "elevates above all other interests" the right of *law-abiding* citizens to use firearms for self-defense. *Bruen*, 597 U.S. at 26. Because of this, the Waiting Period

Act is particularly suspect because, by definition, it burdens the rights of <u>only</u> those citizens who have a "clean background" (as confirmed through their background check) from taking possession of their firearms for a period of seven calendar days. N.M.S. § 30-7-7.3.  In other words, the waiting period affects only those buyers who can prove that they are a law-abiding citizen—anyone else is excluded due to a failure of a background check. Thus, the Act imposes a particular burden on Second Amendment rights.

G.  **Conclusion**

26.  In summary, Plaintiffs have met their burden under *Bruen's* "plain text" step.  The plain text of the Second Amendment covers their conduct (i.e., acquiring arms for lawful purposes). The Waiting Period Act burdens Plaintiffs' rights under the plain text, and is therefore presumptively unconstitutional. The State cannot carry its burden under *Bruen's* "history and tradition" step, because there is no 18th-century (or even 19th-century) history or tradition of forcing people who are not even suspected of any wrongdoing to wait to exercise their right to possess arms they have acquired.  Accordingly, the State will not be able to rebut the presumption of unconstitutionality, and Plaintiffs will prevail on the merits.

V.  **THE REMAINING FACTORS FAVOR ENTRY OF INJUNCTIVE RELIEF**

A.  **Plaintiffs Have Suffered Irreparable Harm**

27.  Plaintiffs have established that they will prevail on the merits of their constitutional claim. Violation of constitutional rights per se constitutes irreparable injury.  *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury). Recently, the Ninth Circuit applied the *Elrod* principle in the Second Amendment context. *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023).  In *Baird*, the court held that in cases involving a Second Amendment claim, a likelihood of success

on the merits usually establishes irreparable harm. *Id.*, at 1048. Moreover, such a likelihood, "strongly tips the balance of equities and public interest in favor of granting" an injunction. *Id. See also Ezell v. City of Chicago*, 651 F.3d 684, 699 (7th Cir. 2011) (also applying principle in Second Amendment context); and *Free the Nipple-Fort Collins v. City of Fort Collins*, 916 F.3d 792, 805 (10th Cir. 2019) ("Most courts consider the infringement of a constitutional right enough and require no further showing of irreparable injury."); *Aposhian v. Barr*, 958 F.3d 969, 990 (10th Cir. 2020) (collecting cases). "Cases have also noted that irreparable harm is often suffered when 'the injury can[not] be adequately atoned for in money,' or when 'the district court cannot remedy [the injury] following a final determination on the merits.'" *American Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (1980) (citations omitted).

**B.     The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief**

28.     Finally, the balance of harms and public interest factors favor injunctive relief.[6]  A plaintiff's likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors decisively in their favor, because "public interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird*, 81 F.4th at 1042 (quoting *Preminger v. Principi*, 422 F.3d 815, 826 (9th Cir. 2005)).  In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors, courts must be mindful that even if a state is pursuing a legitimate goal (in that case deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*.  "Moreover, the public interest will perforce be served by enjoining

---

[6] These factors merge when the government is the opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

29. Defendants may argue that the Waiting Period Act furthers an important governmental interest. But even if the Act did further an important policy goal, that fact would be irrelevant under *Bruen*. Indeed, such an argument would effectively amount to a backdoor means-end test of the type rejected by *Bruen*. 597 U.S. at 22-23 (rejecting means-end scrutiny in Second Amendment cases). "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.* at 17. *Bruen's* rejection of means-end scrutiny would be nullified if courts were to eschew such scrutiny while examining the merits of a Second Amendment claim, only to bring such scrutiny right back in when determining whether to grant a remedy for a constitutional violation. Moreover, "[w]hile the public has an interest in enforcing laws that promote safety or welfare, the public has no cognizable interest in enforcing laws that are unconstitutional. Indeed, the public interest is best served by preventing an unconstitutional enforcement." *Midwest Title Loans, Inc. v. Ripley*, 616 F. Supp. 2d 897, 908 (S.D. Ind. 2009), *aff'd sub nom*. *Midwest Title Loans, Inc. v. Mills*, 593 F.3d 660 (7th Cir. 2010) (cleaned up) (citing *Newsom v. Albemarle Cnty. Sch. Bd.*, 354 F.3d 249, 261 (4th Cir. 2003)).

## VI. A BOND IS NOT NECESSARY

30. Courts in the Tenth Circuit have wide discretion under Rule 65(c) in determining whether to require security and may, therefore, impose no bond requirement. *See New Mexico Cattle Growers' Ass'n v. United States Forest Serv.*, 2023. WL 2185698, at *3 (D.N.M. Feb. 22, 2023) (internal citations and quotation marks omitted). A bond is unnecessary in a case that seeks to

enforce a constitutional right against the government. *See Rocky Mountain Gun Owners v. Polis*, 2023 WL 5017253, at *20 (D. Colo. Aug. 7, 2023). Therefore, Plaintiffs respectfully request that no bond requirement be imposed.

## VII.   CONCLUSION

31.   For the foregoing reasons, plaintiffs respectfully request the Court to enter a temporary restraining order and a preliminary injunction of the Waiting Period Act.

DATED: May 15, 2024

Respectfully submitted,

*/s Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
Email:

Michael D. McCoy
Sean D. Nation
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
mmccoy@mslegal.org

Joseph Greenlee
Erin M. Erhardt
**National Rifle Association of America**
11250 Waples Mill Road
Fairfax, VA 22030
Email: jgreenlee@nrahq.org
Email: eerhardt@nrahq.org

*Attorneys for Plaintiff*