## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

      **Plaintiffs,**

**vs.**                                           **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

      **Defendants.**

## GOVERNOR LUJAN GRISHAM'S RESPONSE TO PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

Defendant Governor Michelle Lujan Grisham, by and through her counsel of record, hereby submits her response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction (the "Motion") [Doc 2].

## INTRODUCTION

New Mexico, like the country as a whole, is experiencing historic levels of gun violence. In an effort to combat this public health crisis, the Governor signed into law House Bill 129 in early 2024, which imposes a seven-day waiting period on most gun purchases. Such waiting periods have been proven to significantly reduce impulsive gun suicides and homicides. Plaintiffs—two gun collectors financially backed by the National Rifle Association—now seek to block this common sense safety measure and prevent New Mexico from using its broad police power to protect its citizens on the basis that the waiting period allegedly violates their Second Amendment Rights.

The Court should soundly reject Plaintiffs' dangerous request to preliminarily enjoin the waiting period and disrupt the status quo during the pendency of this suit. Plaintiffs cannot demonstrate a substantial likelihood of success on the merits because (1) the plain text of the Second Amendment does not protect the right to immediately acquire newly purchased firearms, (2) the waiting period is a presumptively lawful condition and qualification on the sale of arms, and (3) the waiting period is consistent with the Nation's history and tradition of firearms regulations. Additionally, Plaintiffs fail to show any irreparable harm warranting extraordinary preliminary injunctive relief because (1) they inexplicably waited months to bring this lawsuit— literally filing it the day the law went into effect—and should not be indulged in their self-inflicted inconvenience, (2) they cannot show a likely violation of their Second Amendment rights, and (3) the waiting period has not impacted their ability to defend themselves. Finally, Plaintiffs cannot show that the minimal burden of having to wait a week to obtain newly purchased firearms outweighs the benefits of potentially saving nearly one hundred New Mexicans from impulsive gun violence every year.

## BACKGROUND

### I.    Gun violence in New Mexico

Both the country and New Mexico have witnessed a concerning increase in gun violence over the years, with implications that extend beyond mere statistics. In 2022, the most recent year for which complete data is available from the Centers for Disease Control and Prevention, 48,204 people died from gun-related injuries in the United States—more gun-related deaths than in any other year on record aside from the previous year.[1] This represents a 35% increase in gun-related

---

[1]    *Firearm Mortality by State*, Ctrs. for Disease Ctr. & Prevention, https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm (last visited May 17, 2024); *CDC Provisional Data: Gun Suicides Reach All-time High in 2022, Gun Homicides Down*

homicides from 2019. *See* Johns Hopkins, *supra* note 1. Gun-related suicides has likewise steadily increased year after year since 2006. *See id.* Most of these are impulsive acts that are contemplated for less than 24 hours prior.[2]

Sadly, the situation is worse here in New Mexico. Over the past two decades, New Mexico's gun death rates rose from seventh highest nationwide in 1999 to *third highest* in 2022, with the age-adjusted gun death rate increasing by 87% between 2010 and 2021.[3] Much of this increase has happened within the past few years. For example, there was a 70% increase in homicides with a firearm from 2018 to 2021. *See* N.M Dep't of Health, *supra* note 2, at 7. Likewise, the number of patients in New Mexico's trauma centers with gun injuries has increased by 39% between 2019 and 2022. *See id.* at 4-5.

## II.     The passage of House Bill 129

In early 2024, the New Mexico Legislature introduced House Bill 129, which sought to impose a minimal waiting period on the sale of firearms. *See* H.B. 129, 56th Leg., 2nd Sess. (N.M. 2024). House Bill 129 addressed two primary issues: (1) preventing impulsive firearm homicides and suicides and (2) closing or narrowing the "Charleston loophole" in which firearm purchasers can receive a firearm without completing a federal background check should the background check

---

*Slightly from 2021*, Johns Hopkins Univ. (July 27, 2023), https://publichealth.jhu.edu/2023/cdc-provisional-data-gun-suicides-reach-all-time-high-in-2022-gun-homicides-down-slightly-from-2021; John Gramlich, *What the data says about gun deaths in the U.S.*, Pew Research Ctr. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/.

[2] *Duration of Suicidal Crises*, Harvard Sch. of Pub. Health, https://www.hsph.harvard.edu/means-matter/means-matter/duration/ (last visited May 20, 2024).

[3] *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico*, at 5, N.M. Dep't of Health (Sept. 28, 2023), https://www.nmhealth.org/publication/view/report/8463/; *Ctrs.* for Disease Ctr. & Prevention, *supra* note 1.

results not come back within three business days.[4] After undergoing a series of changes during the legislative session, the Legislature passed House Bill 129 on February 12, 2024.[5] Subject to certain exceptions, the final version of House Bill 129 makes it unlawful for any seller to "transfer of ownership, possession or physical control of the firearm from the seller to the buyer before the end of the required seven-calendar day waiting period." H.B. 129 § 1(C).[6] The Governor signed House Bill 129 on March 4, 2024. *See* N.M. Legislature, *supra* note 4. House Bill 129 was subsequently codified as NMSA 1978, Section 30-7-7.3 (2024). Because House Bill 129 had no specified effective date, it was set to become effective May 15, 2024. *See* N.M. Const. art IV, § 23.

In passing House Bill 129, New Mexico joined at least a dozen other states that require waiting periods for commercial firearms sales. New Mexico's seven-day waiting period falls squarely in the middle in terms of its length. Rhode Island, Maryland, and New Jersey also have seven-day waiting periods. *See* R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a) (7 days for all firearms); Md. Code Ann., Pub. Safety, § 5-123(a) (7 days for regulated firearms); N.J. Stat. Ann. § 2c:58-2(a)(5)(a) (7 days for handguns). Colorado, Florida, Illinois, and Vermont have three-day waiting periods. *See* Colo. Rev. Stat. § 18-12-115; Fla. Stat. § 790.0655(1)(a); 720 Ill. Comp. Stat. 5/24-3(A)(g); Vt. Stat. Ann. tit. 13, § 4019a. California, Hawaii, Minnesota, and Washington have longer

---

[4] *House Consumer Affairs*, at 2:52 p.m., N.M. Legislature, https://bit.ly/4dJKUsC (statements of House Bill 129 sponsor, Representative Andrea Romero); *Fiscal Impact Report*, at 3-4, Leg. Fin. Comm. (Feb. 13, 2024), https://www.nmlegis.gov/Sessions/24%20Regular/firs/HB0129.PDF. The Court may consider House Bill 129's Fiscal Impact Report in determining legislative intent. *See Butkus v. Pub. Employees Ret. Ass'n*, 2024-NMCA-041, ¶ 14, __ P.3d __.

[5] *2024 Regular Session - HB 129*, N.M. Legislature, https://www.nmlegis.gov/Legislation/ Legislation?Chamber=H&LegType=B&LegNo=129&year=24 (last visited May 16, 2024).

[6] The waiting period may be extended up to twenty calendar days if the seven calendar-day waiting period has expired without the completion of a required federal instant background check. *Id.* § 1(A).

waiting periods. *See* Minn. Stat. § 624.7132 (eff. 8/1/23) (30 days for handguns, assault weapons); Haw. Rev. Stat. § 134-2(a), (e) (14 days for all firearms); Wash. Rev. Code § 9.41.092(2) (10 business days for semiautomatic rifles); Cal. Penal Code § 26815(a) (10 days for all firearms); D.C. Code § 22-4508 (10 days for all firearms).

### III.    The instant lawsuit

On May 15, 2024—the day House Bill 129 went into effect—Plaintiffs filed the instant action against the Governor[7] and Attorney General. Plaintiffs are two firearm collectors who tried to purchase firearms on May 15 but were told they would have to wait seven days pursuant to Section 30-7-7.3. *See* Motion, Exhibits B-C. Plaintiffs claim Section 30-7-7.3's seven-day waiting period violates the Second Amendment. [Doc. 1] In addition to seeking declaratory and permanent injunctive relief, Plaintiffs also filed a request for temporary restraining order and preliminary injunction—despite being well aware of the passage of House Bill 129 and its impending implementation months ago.[8]

---

[7] The Governor, sued here in her official capacity, enjoys 11th Amendment immunity from any claims for prospective relief because she does not "have a particular duty to enforce the statute in question and a demonstrated willingness to exercise that duty." *Peterson v. Martinez*, 707 F.3d 1197, 1205 (10th Cir. 2013) (cleaned up). However, for the purpose of defending Section 30-7-7.3 from Plaintiffs' claims for declaratory and injunctive relief, the Governor agrees to waive her sovereign immunity and consents to be sued in this Court, only in this case, only in her official capacity, and only for prospective relief. *See MCI Telecomms. Corp. v. Pub. Serv. Comm'n of Utah*, 216 F.3d 929, 935 (10th Cir. 2000) ("[A] state may waive its sovereign immunity by consenting to suit in federal court.").

[8] Although Defendants do not yet have any specific evidence that the two individual plaintiffs in the lawsuit were aware of House Bill 129's passage, the organization bankrolling this lawsuit, the National Rifle Association, was undoubtedly aware of it. *See Breaking: NRA Files Legal Challenge on Mandatory Waiting Periods in New Mexico!*, NRA-ILA (May 15, 2024), https://www.nraila.org/articles/20240515/breaking-nra-files-legal-challenge-on-mandatory-waiting-periods-in-new-mexico; Emma Colton, *NRA prepares for battles against blue state governor 'torching the Constitution' with gun control*, Fox News (Jan. 17, 2024), https://www.foxnews.com/politics/nra-prepares-legal-battles-blue-state-governor-torching-

## DISCUSSION

### I.    Standard of review

"A preliminary injunction is an extraordinary remedy, the exception rather than the rule." *Mrs. Fields Franchising, LLC v. MFGPC*, 941 F.3d 1221, 1232 (10th Cir. 2019) (cleaned up). To obtain preliminary injunctive relief, a movant must show that "(1) the moving party will suffer irreparable injury unless the injunction issues; (2) the threatened injury to the moving party outweighs whatever damage the proposed injunction may cause the opposing party; (3) the injunction, if issued, would not be adverse to the public interest; and (4) there is a substantial likelihood that the moving party will eventually prevail on the merits." *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992). "The [second] and [third] factors 'merge' when, like here, the government is the opposing party." *Aposhian v. Barr*, 958 F.3d 969, 978 (10th Cir. 2020). The movant *must* satisfy his or her burden for *each* one of these prerequisites. *See Diné Citizens Against Ruining Our Env't*, 839 F.3d 1276, 1281-82 (10th Cir. 2016). Because preliminary injunctive relief is an "extraordinary remedy, . . . the right to relief must be clear and unequivocal." *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006).

Plaintiffs bear an even higher burden when mounting a facial challenge, as they do here, which is "generally disfavored as 'facial invalidation is, manifestly, strong medicine that has been employed by the Supreme Court sparingly and only as a last resort.'" *Golan v. Holder*, 609 F.3d 1076, 1094 (10th Cir. 2010) (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998)). This is a "heavy burden." *Id.* (quoting *Finley*, 524 U.S. at 580). Plaintiffs "must 'establish that no set of circumstances exists under which the law would be valid,' or show that the law lacks

---

constitution-gun-control. It is likely that firearm collectors like Plaintiffs were also aware of House Bill 129's passage. *See* Motion, Exhibit B ¶ 4, Exhibit C ¶ 4.

'a plainly legitimate sweep.'" *Antonyuk v. Chiumento*, 89 F.4th 271, 313 (2d Cir. 2023) (quoting *Ams. for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021).

## II.  Plaintiffs seek a disfavored preliminary injunction

"Because the limited purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held," the Tenth Circuit specifically disfavors "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *Schrier v. Univ. of Colorado et.al.*, 427 F.3d 1252, 1258-59 (10th Cir. 2005) (cleaned up). Therefore, "a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro Espirita Beneficente Uniao do Vegetal ("O Centro") v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004).

Plaintiffs' requested injunctive relief is disfavored because it would require the Court alter the status quo and grant Plaintiffs substantially all the relief that they could recover at the conclusion of a full trial. First, Plaintiffs' request for relief would upset the status quo because Section 30-7-7.3 is now in effect. *See Rocky Mountain Gun Owners v. Polis*, 2023 WL 8446495, at *7 (D. Colo. Nov. 13, 2023) ("The Governor is correct that, because Plaintiffs seek to enjoin a law that is in effect, the injunction they seek would disrupt the status quo and is thus disfavored."). Second, Plaintiffs seek virtually all the relief they could be awarded at the end of trial on the merits because they are requesting the same injunctive relief sought in their Complaint: an injunction enjoining Defendants from enforcing Section 30-7-7.3. *Compare* [Doc. 1 ¶ 29], *with* Motion ¶ 31;[9]

---

[9] That Plaintiffs may also seek (likely nominal) damages and attorneys' fees does not compel a different result. *See Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1023 (D.N.M. 2020) (Browning, J.), *aff'd sub nom. Legacy Church, Inc. v. Collins*, 853 Fed. Appx. 316 (10th Cir.

*see Peterson v. Kunkel*, 492 F. Supp. 3d 1183 (D.N.M. 2020) (holding that the plaintiffs' requested preliminary injunction was disfavored because it was an exact overlay of the relief sought in their complaint); *Legacy Church*, 472 F. Supp. 3d at 1023 (concluding that a request to preliminarily enjoin the enforcement of a public health order "would supply [plaintiffs] with all the relief [they] could hope to win from a full trial"). Accordingly, this Court should closely scrutinize Plaintiffs' request for preliminary injunctive relief and require Plaintiffs to "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms[.]" *O Centro*, 389 F.3d at 975.

## III.   Plaintiffs are not entitled to a preliminary injunction

### A.   Plaintiff cannot demonstrate a strong likelihood of success on the merits

#### 1.   The plain text does not cover Plaintiffs' desired conduct

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the United States Supreme Court adopted a new two-part test for Second Amendment claims, in which courts must first ask "whether the Second Amendment's plain text covers an individuals' conduct." *Id.* at 2129-30. If "the challenged law regulates activity falling outside the scope of the right as originally understood . . . the analysis can stop there; the

---

2021); *see also Strickland v. Madden Sales & Serv.*, No. 19-918 MV/JFR, 2020 U.S. Dist. LEXIS 95430, at *8 (D.N.M. May 8, 2020) (holding that the defendant's motion for a preliminary injunction seeking enforcement of a non-compete agreement was disfavored because it sought all the relief that it could recover at the conclusion of a full trial on the merits and even though it sought monetary damages, the "primary objective" of its counterclaims was to enforce the non-compete agreement). The Governor also notes that Plaintiffs' suit—brought against Defendants solely in their official capacities—is barred to the extent they seek damages. *See Taylor v. Lujan Grisham*, 544 F. Supp. 3d 1191, 1202 (D.N.M. 2021) (Browning, J.) ("State officials sued in their official capacity for damages are not 'persons' for purposes of § 1983." (citing *Hafer v. Melo*, 502 U.S. 21, 27 (1991), and *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989)).

regulated activity is categorically unprotected." *Bruen*, 597 U.S. at 18. This approach is "rooted in the Second Amendment's text, as informed by history." *Id.* at 19. A court must therefore give the Second Amendment's text its "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation." *District of Columbia v. Heller*, 554 U.S. 570, 576-77 (2008). Thus, it is Plaintiffs' burden to establish that the Second Amendment's plain text, as understood to ordinary citizens in the founding generation, protects a right to immediately acquire firearms. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at *7; *see also United States v. Reyna*, 2022 WL 17714376, at *4 (N.D. Ind. Dec. 15, 2022) ("For Step One to have any meaning, the regulated conduct must be defined specifically enough that it can meaningfully compare to the Second Amendment's plain text — a plain text that is more complex than mere possession."); *see also Bevis v. City of Naperville*, 85 F.4th 1175, 1194 (7th Cir. 2023) (noting that "plaintiffs . . . have the burden" on *Bruen*'s textual inquiry).  They fail to do so.

Section 30-7-7.3 does not implicate the plain text of the Second Amendment. First, it does not plausibly infringe on Plaintiffs' right to "bear Arms," as that phrase "has a meaning that refers to carrying for a particular purpose—confrontation." *Heller*, 554 U.S. at 584; *see also Bruen*, 597 U.S. at 32 (holding the word "'bear' naturally encompasses public carry"). Nor does it infringe on Plaintiffs' right to "keep Arms." Historically, "'[k]eep arms' was simply a common way of referring to possessing arms[.]" *Heller*, 554 U.S. at 583. Unlike the laws at issue in *Heller* and *McDonald*, which precluded individuals from possessing handguns in their homes, Section 30-7-7.3 does not make possession of any weapon illegal. No New Mexican will be deprived of their firearms by the law. And it places no limits or regulations on the firearms that are kept by an individual. Instead, it merely delays delivery of commercially sold firearms.

Notably, many states and localities enacted licensing requirements for owning or discharging firearms in the 18th and 19th centuries. *See* Exhibit A ¶¶ 40-76. And "licensing by its nature thwarts any ability to acquire or use firearms on demand." *Id.* ¶ 42. So even if the Second Amendment protects some right to acquire firearms, it has never protected a right to acquire firearms without delay. Indeed, *Bruen* itself recognized that the Second Amendment does not protect a right to immediate firearm acquisition, stating that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . which often require applicants to undergo a background check or pass a firearms safety course"—things which necessarily delay an individual's ability to acquire a firearm. *Bruen*, 597 U.S. at 38 n.9. Although the Court left the door open to "shall-issue regimes where, for example, lengthy wait times in processing license applications . . . deny ordinary citizens their right to public carry," Plaintiffs have not argued that the seven-day waiting period is "lengthy." *Id.* Instead, Plaintiffs maintain that *any* waiting period is unconstitutional. But *Bruen* "seems to acknowledge the facial constitutionality of regimes requiring background checks and attendant waiting periods . . . , so long as the waiting periods are not 'lengthy.'" *McRorey v. Garland*, 23-cv-00047-O, 2023 WL 5200670, at *5 (N.D. Tex. Aug. 14, 2023) (rejecting constitutional challenge to "potential ten-business-day waiting period"), *aff'd* 99 F.4th 831 (5th Cir. 2024). *Bruen* itself thus rejects Plaintiffs' position that they have a right to acquire firearms on demand.

Plaintiffs present no historical evidence that the plain text of the Second Amendment was originally understood to guarantee a right to immediately acquire purchased firearms. Instead, Plaintiffs assert that "[t]he right to 'keep' arms necessarily implies the right to possess arms one has acquired." Motion ¶ 8. However, a right to possess something (i.e., to "keep" it) is not the same as the right to acquire it, let alone the right to acquire it without delay. *See, e.g., United States v.*

*12 200-Ft. Reels of Super 8mm Film*, 413 U.S. 123 (1973) (right to possess obscene materials did not extend to right to import those same materials, even when sought only for personal possession). A delay in exercising a right is therefore not necessarily an unconstitutional infringement of that right. To the contrary, "[t]he Supreme Court has permitted waiting periods of varying duration in several other constitutional contexts, including before obtaining a marriage license, and permits for gathering to protest or parade." *Silvester v. Harris*, 843 F.3d 816, 832 (9th Cir. 2016) (Thomas, C.J., concurring).[10]

Moreover, Plaintiffs' implied-rights argument is contrary to *Bruen* and *Heller*. The Court was clear: courts must determine whether "the Second Amendment's *plain text* covers an individual's conduct." *Bruen*, 142 S. Ct. at 2129-30 (emphasis added). Plaintiffs' focus on implied rights necessarily disregards the actual text of the Second Amendment and its scope as revealed by historical understandings. Nowhere in the Court's Second Amendment jurisprudence has it sanctioned such a disregard for the Amendment's plain text or the creation of implied rights. *See, e.g.*, *Bruen*, 142 S. Ct. at 2127 ("In *Heller*, we began with a 'textual analysis' focused on the 'normal and ordinary' meaning of the Second Amendment's language." (cleaned up)). Accordingly, Plaintiffs' argument that the Second Amendment "implicitly includes the right to acquire" firearms "is quite-clearly not a 'plain text' analysis, required under *Bruen*." *Def. Distributed v. Bonta*, No. CV 22-6200-GW-AGRx, 2022 WL 15524977, at *4 (C.D. Cal. Oct. 21, 2022). Here, by labeling the so-called "right to acquire" firearms an "implie[d] right," Plaintiffs

---

[10] While *Silvester* was decided pre-*Bruen*, it is still good law to the extent its analysis focused on history and tradition. *See Bruen*, 597 U.S. at 19 (stating that the first step of the pre-Bruen framework "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history").

concede that the right is not found in the plain text of the Second Amendment. This dooms their claim under *Bruen*.

In sum, Plaintiffs clearly fail to meet their initial burden, and the Court need not proceed further in its analysis. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at *8 ("From this reading of the plain text, it is clear the relevant conduct impacted by the waiting period—the receipt of a paid-for firearm without delay—is not covered"); *Knight v. City of New York*, 2024 WL 1126309, at *6 (S.D.N.Y. Jan. 17, 2024), *report and recommendation adopted in part*, *Knight v. City of New York*, 2024 WL 1096991 (S.D.N.Y. Mar. 13, 2024) (concluding that 90-day waiting period did not implicate the plain text of the Second Amendment because it does not prevent individuals form keeping or bearing arms).

### 2.     The waiting period is a valid condition and qualification on the sale of arms

Even if Plaintiffs *could* meet their initial burden, Section 30-7-7.3 is a presumptively lawful condition and qualification on the sale of arms. The Supreme Court has repeatedly emphasized that the right protected by the Second Amendment is "not unlimited." *Heller*, 554 U.S. at 595. "[I]ndividual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599) (emphasis omitted). Accordingly, the *Heller* Court stated that it should not be read to "cast doubt on . . . laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786. Such laws are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 627 n.26.

Notably, three justices concurred specifically in *Bruen* to emphasize the continuing validity of this presumptively lawful category of regulatory measures. *See Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring, joined by Roberts, C.J.) (quoting *Heller*, 554 U.S. at 626-27); *see also*

*id.* at 72 (Alito, J., concurring) (stating that *Bruen* did not "disturb[] anything that we said in *Heller* or *McDonald* about restrictions that may be imposed on the possession or carrying of guns") (cleaned up)). Further, the Tenth Circuit affirmed that *Bruen* did not implicitly overturn *Heller*'s list of presumptively lawful category of firearms regulations and that presumptively lawful regulations are valid without having to consider the historical tradition of firearm regulation. *See Vincent v. Garland*, 80 F.4th 1197, 1201-02 (10th Cir. 2023) (affirming law barring felons from possessing firearms); *accord United States v. Roberts*, 23-cr-00057-TMBKFR-1, __ F. Supp. 3d __, 2024 WL 50889, at *5 (D. Alaska Jan 4, 2024) ("[T]he *Bruen* court did not repudiate—and indeed preserved—*Heller*'s list of "'presumptively lawful' firearm regulations.").[11]

Section 30-7-7.3—which only applies only to firearm "sellers" and "buyers"—is a presumptively lawful commercial regulation. "*Bruen*, *McDonald*, and *Heller* preserved the idea that the government could '[impose] conditions and qualifications on the commercial sale of arms.'" *United States v. Marique*, 647 F. Supp. 3d 382, 385 (D. Md. 2022) (quoting *Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring)); *see also United States v. Tilotta*, No. 3:19- cr-04768-GPC, 2022 WL 3924282, at *6 (S.D. Cal. Aug. 30, 2022) ("[T]he natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted"); *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *11 ("Because [the challenged waiting-period law] imposes a condition on the commercial sale of a firearm, the Act is presumptively lawful under *Heller*[.]"); *Silvester*, 843 F.3d at 829 (Thomas, C.J., concurring) ("As a longstanding qualification on the commercial sale of arms under [*Heller*], a ten-day waiting period is presumptively lawful.").

---

[11] Following *Bruen*, there is some uncertainty as to whether the presumptively lawful category exists at the first or second step of the *Bruen* analysis. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at *10. Under either approach, Section 30-7-7.3 is presumptively lawful.

Notably, the Fifth Circuit recently upheld a background check law that imposes an expanded waiting period as a presumptively lawful regulation. In *McRorey*, the Fifth Circuit considered a challenge to a federal law providing for enhanced background checks for firearm purchasers under 21, which can create a waiting period of up to 10 days before delivering a firearm. 99 F.4th at 835. The court upheld the denial of a preliminary injunction against the law, finding that it "falls into that category" of presumptively lawful regulations. *Id.* at 836. As the court observed, "In *Heller*, the Court described conditions and qualifications on the commercial sale of arms as presumptively lawful. *Bruen* did nothing to disturb that part of *Heller*." *Id.* (cleaned up). And while the Fifth Circuit acknowledged that "there is some point at which a background check becomes so lengthy that it is 'put towards abusive ends' or subject to *Bruen*'s historical framework as a de facto prohibition on possession," it concluded "a period of 10 days does not qualify." *Id.* at 840. Plaintiffs give this Court no reason to reach a different conclusion here.

### 3. The waiting period is consistent with history and tradition

Lastly, even if Plaintiff *could* meet their initial burden that the plain text of the Second Amendment covers the right to immediately acquire a purchased firearm *and* Section 30-7-7.3 was not a presumptively lawful commercial regulation, a seven-day waiting period is consistent with this Nation's history and tradition of firearm regulation. Under *Bruen*'s second step, "[t]he government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. This inquiry considers whether there is "historical precedent" from before, during, and after the enactment of the Second and Fourteenth Amendments that "evinces a comparable tradition of regulation" in a similar manner as the present-day restriction. *Id.* at 27.

Two primary metrics are relevant for determining whether a modern regulation is "relevantly similar" to a historical regulation: "how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry." *Id.* But the Court made it "clear" that analogical reasoning under the Second Amendment is not "a regulatory straightjacket." *Id.* Due to "unprecedented societal concerns" and "dramatic technological changes," "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.* at 27. Accordingly, Defendants need only demonstrate that **Section 30-7-7.3** has "a well established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30.

This case presents a clear example of both "unprecedented societal concerns" and "dramatic technological changes" that have altered the "regulatory challenges" from what preoccupied the Founders or the Reconstruction generation. *Id.* at 27. The issues that Section 30-7-7.3 primarily seeks to address (i.e., impulsively purchasing a firearm to commit a homicide or suicide) involve both "unprecedented societal concerns" and "dramatic technological changes" because "firearms were not as readily available for purchase and . . . impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed." *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *16; *see* Exhibit B ¶¶ 5-56. The same goes for impulsive gun suicides.[12] As Professor Robert Spitzer notes:

---

[12] Exhibit B ¶¶ 52-55; *compare Suicide Data and Statistics*, Ctrs. for Disease Ctr. & Prevention, https://www.cdc.gov/suicide/facts/data.html (last visited May 19, 2024) (stating that firearms are the most common method of suicide), *with* Eric Ruben, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 Minn. L. Rev. (forthcoming 2024) (manuscript at 150),

> No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. . . . When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.

Exhibit A ¶¶ 9-10; *accord Silvester*, 843 F.3d at 827 ("Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time."). In other words, "[t]hough delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history." *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring). Accordingly, the Court should use reasoning by analogy to determine Section 30-7-7.3's constitutionality. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at *16.

Two types of historical analogues stand out here given their "how" (i.e., temporarily delaying the transfer of a firearm) and "why" (i.e., to avoid impulsive gun violence): laws involving intoxicated persons and licensing regimes. As one district court recently observed after relying on Professor Spitzer's declaration listing laws from multiple states ranging from 1623 to 1893 that prevented the sale of arms to intoxicated individuals and the possession of firearm by intoxicated individuals, "our Nation had a historical tradition of regulating the carrying and use of firearms by intoxicated individuals." *Rocky Mountain Gun Owners*, 2023 WL 8446495, at **17-18; *accord* Exhibit A ¶¶ 15-39; *see generally Antonyuk*, 89 F.4th 271, 303-04 (explaining that even a few instances of historically comparable regulations can be sufficient to meet *Bruen*'s second

---

https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4710807 (concluding "that firearms still did not account for nearly the proportion of suicides [in the 1800's] that they do today").

step, particularly in the absence of evidence that the regulations' lawfulness was disputed). And the *Rocky Mountain* court found that these were proper analogues because they "both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm." *Rocky Mountain Gun Owners*, 2023 WL 8446495, at **17-18; *see* Exhibit A ¶ 15.

The *Rocky Mountain* court also concluded that licensing regimes were a proper analogue "because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens." *Id.* *19. [13] As the court explained, "Waiting periods are similar to 'shall-issue' licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met" and they "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Bruen*, 142 S. Ct. at 2138 n.9); Exhibit A ¶ 14. Respectfully, this Court should reach the same conclusion and hold that Section 30-7-7.3 is consistent with history and tradition based on these two categories of historical analogues.

### B.     Plaintiff cannot demonstrate irreparable harm

"[A] showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction[.]" *First W. Capital Mgmt. Co. v. Malamed*, 874 F.3d 1136, 1141 (10th Cir. 2017) (cleaned up). Here, the Court should reject, or at the very least substantially discount, any claims of irreparable harm given that Plaintiffs *inexplicably waited months* to file

---

[13] The court did not detail the history of the Nation's licensing laws "[b]ecause the Supreme Court in *Bruen* indicated that there is a sufficient historical basis for 'shall-issue' licensing regimes." *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *19 (citing *Bruen*, 142 S. Ct. at 2138 n.9). However, as Professor Spitzer details, there is a long and widespread history of licensing laws dating back to the 1600's. *See* Exhibit A ¶¶ 40-99.

this action despite being aware of the passage of House Bill 129.[14] *See supra* note 7 and accompanying text; *GTE Corp. v. Williams*, 731 F.2d 676, 679 (10th Cir. 1984) ("[D]elay is an important consideration in the assessment of irreparable harm for purposes of injunctive relief."); *see also Benisek v. Lamone*, 138 S. Ct. 1942, 1944 (2018) ("A party requesting a preliminary injunction must generally show reasonable diligence."); *Wreal, Ltd. Liab. Co. v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months—though not necessarily fatal—militates against a finding of irreparable harm."); 11A Fed. Prac. & Proc. Civ. § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." (cleaned up)).

Putting aside Plaintiffs' delay, Plaintiffs fail to demonstrate irreparable harm. The only alleged irreparable injury Plaintiffs cite in the Motion is the temporary loss of their Second Amendment rights. *See* Motion ¶ 27. However, as Defendants explain above, Plaintiffs fail to establish a likelihood of succeeding on the merits of their Second Amendment claim. Plaintiffs, therefore, cannot rely on any *per se* irreparable harm based on the purported loss of their constitutional rights. *See Logan v. Pub. Emps. Ret. Ass'n*, 163 F. Supp. 3d 1007, 1030 (D.N.M. 2016) ("[A] plaintiff who cannot demonstrate a substantial likelihood of success is not entitled to a presumption of irreparable harm." (citing *Schrier*, 427 F.3d at 1266)). But even if Plaintiffs *could* establish a likelihood of success, they still fail to show irreparable harm from a seven-day waiting period when they both already own firearms. *See Bevis*, 85 F.4th at 1202-03 (saving "for another day" the question of "whether an alleged Second Amendment violation gives rise to a presumption

---

[14] Perhaps cynicism now carries the day, but it appears more than likely that Plaintiffs manufactured an emergency in hopes of getting this Court to provide extraordinary relief that they know they are not entitled to.

of irreparable harm, and if so, whether any such presumption is rebuttable or ironclad"); *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *20 (finding no irreparable harm when the plaintiffs "have alleged no harm associated with the right of self-defense"); Motion, Exhibit B ¶ 4, Exhibit C ¶ 4. Accordingly, the Court must deny the Motion. *See Malamed*, 874 F.3d at 1141.

### C. The balance of the equities and public interest weigh heavily against granting a preliminary injunction

Assuming, *arguendo*, Plaintiffs demonstrated a strong likelihood of success and an irreparable injury, they fail to clearly demonstrate that the threatened injury outweighs the harm that preliminary injunctive relief would cause Defendants and the public.[15] It cannot be gainsaid that the State (and the public) has a compelling interest in preventing impulsive murders and suicides.[16] And research clearly demonstrates that waiting periods, such as the one the Governor signed into law, would prevent many of these unnecessary deaths.[17] For example, one peer

---

[15] Plaintiffs argue that "interest balancing is not appropriate in the Second Amendment context." Motion at 12. However, "*Bruen* did not consider whether a preliminary injunction should be granted, and thus it did not apply the test established in [*Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)], which requires this Court to consider the public interest in determining whether to temporarily enjoin enforcement of a law." *Kipke v. Moore*, 2023 WL 6381503, at *17 (D. Md. Sept. 29, 2023).

[16] Plaintiffs assert that Defendants do not have any "interest in enforcing a law that is likely constitutionally infirm." Motion ¶ 28 (quoting *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010)). However, this argument holds no water when Plaintiffs fail to show any likely constitutional infirmity, as they do here. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at *21.

[17] *See* Michael Luca, *Handgun waiting periods reduce gun deaths*, Proceedings of the Nat'l Acad. of Sciences (Nov. 14, 2017), https://www.pnas.org/doi/epdf/10.1073/pnas.1619896114; Zachary Dunton, et al., *The Association Between Repealing the 48-Hour Mandatory Waiting Period on Handgun Purchases and Suicide Rates in Wisconsin*, Archives of Suicide Research, 26(3), https://www.tandfonline.com/doi/abs/10.1080/13811118.2021.1886209 (concluding that that the repeal of the 48-hour waiting period on handgun purchases in 2015 is correlated with the increase of firearm-related suicides among Wisconsin residents of color and Wisconsinites residing in urban counties); Bradley Kawano, et al., *Restrictive Firearm Laws and Firearm-Related Suicide*, 236 Am. College of Surgeons 37 (2023) (concluding that States with background checks,

reviewed study concluded that "waiting periods reduce gun homicides by roughly 17%."[18] That translates to saving *nearly 100 New Mexicans every year. See* Ctrs. for Disease Ctr. & Prevention, *supra* note 1. As the *Rocky Mountain Gun Owners* court concluded, balancing Plaintiffs' minimal and fleeting "harms" against the public interest in saving lives "is not remotely close." *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *22. This Court should similarly conclude.

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction.

---

mandatory waiting periods, and prohibited possession were associated with lower suicide rates for all firearm types compared with states without these laws); Christoph Koenig & David Schindler, *Impulse Purchases, Gun Ownership, and Homicides: Evidence from a Firearm Demand Shock*, The Review of Econ. & Stat. (Sept. 2023), https://direct.mit.edu/rest/article/105/5/1271/107404/ Impulse-Purchases-Gun-Ownership-and-Homicides (finding evidence that waiting period laws "can substantially reduce homicides by preventing impulsive purchases"); Michael D. Anestis, et al., *Handgun Legislation and Changes in Statewide Overall Suicide Rates*, AJPH Research (April 2017), https://ajph.aphapublications.org/doi/pdf/10.2105/AJPH.2016.303650 (finding "significant differences in suicide rate changes from 2013 to 2014 in states with mandatory waiting periods and universal background checks relative to states without such laws"). In addition to these studies, Stanford Law Professor John J. Donohue recently submitted an affidavit in support of Vermont's waiting period law and concluded that "substantial empirical evidence illustrates that waiting periods prior to the purchase of weapons . . . will reduce suicides – particularly among young adults – and would be expected to reduce the risk of the type of episodes seen in recent years of enraged individuals buying firearms on the way to commit mass violence and other criminal act." Expert Report and Affidavit of John J. Donohue [Doc. 24-6], ¶ 23, *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, No. 2:23-cv-00710 (D. Vt. May 14, 2024). Professor Donohue's declaration may be found here: https://storage.courtlistener.com/recap/gov. uscourts.vtd.36167/gov.uscourts.vtd.36167.24.6.pdf. The Court may (and should) consider this affidavit even though it was filed in another case given the difficulties in finding and retaining experts in such a truncated timeline. *See Hernandez v. Lujan Grisham*, 494 F. Supp. 3d 1044, 1067 n.2 (D.N.M. 2020) (Browning, J.) (finding declarations filed in another court "persuasive").

[18] *See* Luca, *supra* note 17; *see also Rocky Mountain Gun Owners*, 2023 WL 8446495, at *21 (finding the Luca study persuasive).

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

## CERTIFICATE OF SERVICE

I hereby certify that on June 4, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Holly Agajanian*
Holly Agajanian