**EXHIBIT A**

1   ROB BONTA
    Attorney General of California
2   MARK R. BECKINGTON
    PAUL STEIN
3   Supervising Deputy Attorneys General
    SEBASTIAN BRADY
4   KEVIN L. KELLY
    ROBERT L. MEYERHOFF
5   Deputy Attorneys General
    State Bar No. 298196
6     300 South Spring Street, Suite 1702
      Los Angeles, CA  90013-1230
7   Telephone:  (213) 269-6177
    Fax:  (916) 731-2144
8   E-mail:  Robert.Meyerhoff@doj.ca.gov
    *Attorneys for Defendant Rob Bonta in his*
9   *official capacity as Attorney General of the*
    *State of California and Defendant Allison*
10  *Mendoza in her official capacity as Director*
    *of the Bureau of Firearms*

11              IN THE UNITED STATES DISTRICT COURT

12              FOR THE SOUTHERN DISTRICT OF CALIFORNIA

13

14

15

16  **CLAIRE RICHARDS, ET AL.,**           Case No. 3:23-CV-00793

17                          Plaintiffs,   **EXPERT REPORT AND**
                                          **DECLARATION OF PROFESSOR**
18              **v.**                    **ERIC RUBEN**

19  **ROB BONTA, IN HIS OFFICIAL CAPACITY**
20  **AS ATTORNEY GENERAL OF**
    **CALIFORNIA, ET AL.,**

21

22                          Defendants.

23

24          **EXPERT REPORT AND DECLARATION OF**
                    **PROFESSOR ERIC RUBEN**

25          I, Eric Ruben, declare under penalty of perjury that the following is true and

26  correct:

27

28

                                    1

The California Department of Justice has asked me to provide an expert opinion pertaining to firearms waiting periods and related restrictions in the United States in the above-captioned matter. This expert report and declaration ("Declaration") provides that opinion, and is based on my own personal knowledge and experience; if I am called as a witness, I could and would testify competently to the truth of the matters discussed in this Declaration.

## BACKGROUND AND QUALIFICATIONS

1.     I am a legal scholar whose work spans the fields of legal history, legal empirics, criminal law, constitutional law, and legal ethics. A true and correct copy of my curriculum vitae is attached as **Exhibit A** to this declaration.

2.     I received a Bachelor of Arts degree from Dartmouth College in 2003, graduating *magna cum laude*, and a Juris Doctorate degree from New York University School of Law ("NYU Law") in 2007, graduating *cum laude*.

3.     Since 2023, I have served as an Associate Professor of Law with tenure at the Dedman School of Law at Southern Methodist University ("SMU Law"). From 2019 to 2023, I was an Assistant Professor of Law at SMU Law. From 2018 to 2019, I was an Adjunct Professor of Law at NYU Law. Since 2014, I have served as a fellow at the Brennan Center for Justice at NYU Law.

4.     I have taught law school courses at SMU Law or NYU Law on criminal law, professional responsibility, the Second Amendment, and the regulation of weaponry in democratic societies.

5.     My research investigates how the substantive law regulates violence and the instruments of violence. I draw heavily on criminological, sociological, and public health research, and deploy methodologies including doctrinal, historical, and empirical analysis.

6.     I have written extensively about firearm regulations, defensive force, and the right to keep and bear arms. That work has appeared in leading law journals, including the CALIFORNIA LAW REVIEW, DUKE LAW JOURNAL,

GEORGETOWN LAW JOURNAL, HARVARD LAW REVIEW FORUM, IOWA LAW REVIEW, SOUTHERN CALIFORNIA LAW REVIEW, VIRGINIA LAW REVIEW ONLINE, YALE LAW JOURNAL, and YALE LAW JOURNAL FORUM. My work has served as the basis for written and oral testimony before the U.S. Senate Judiciary Committee, amicus briefs, and popular commentary appearing in various outlets including *ABC News*, *MSNBC*, *CNN*, *Atlantic*, *New York Times*, *Vox*, *Wall Street Journal*, *Washington Post*, *USA Today*, and *NPR*.

7.     My scholarship on the Second Amendment has been cited in numerous federal and state court opinions, including both the majority and dissenting opinions in *New York State Rifle & Pistol Association v. Bruen*, 597 U.S. 1 (2022). It also informed an amicus brief I co-filed in *United States v. Rahimi*, 143 S.Ct. 2688 (2023). *See* Brief of Second Amendment Law Scholars as Amici Curiae in Support of Petitioner, *United States v. Rahimi*, 143 S.Ct. 2688 (2023) (No. 22-915).

8.     My next article, forthcoming in the MINNESOTA LAW REVIEW, is entitled *Scientific Context, Suicide Prevention, and the Second Amendment After Bruen*. Among other things, it explores the historical legal treatment of suicide, contextualizing that legal treatment against the backdrop of religion and medicine. This declaration draws on my research for that project.

### RETENTION AND COMPENSATION

9.     I have been retained by the California Department of Justice to render expert opinions in this case. I am being compensated at a rate of $500 an hour for my work on this declaration, and at a rate of $750 an hour for time spent on depositions or testimony. My compensation is not contingent on the results of my expert analysis or the substance of my opinions or testimony in this matter.

### BASIS FOR OPINION AND MATERIALS CONSIDERED

10.     The opinions I provide in this report are based on my review of the complaint filed in this lawsuit, my review of the statutes at issue in this lawsuit, and my education, expertise, and research into relevant legal history—including a

1  variety of scholarly works, laws, cases, popular and learned commentaries, and
2  various other related materials I have reviewed in forming my opinions.  The
3  opinions contained herein are made pursuant to a reasonable degree of professional
4  certainty.

5                    **SCOPE OF ANALYSIS AND PROFESSIONAL OPINION**

6         11.    I have been retained by the California Department of Justice to provide
7  my professional opinion on the legal treatment of suicide prevention at the
8  Founding and today, contextualizing that treatment to better understand why
9  different approaches were pursued during both time periods.

10        12.    Suicide history is an extensive topic. My declaration focuses on
11  aspects of that history that I believe are most relevant in comparing modern-day
12  efforts at means restriction, such as post-firearm-purchase waiting periods, to
13  historical practices and understandings.

14        13.    Based on extensive reviews and analysis of the relevant evidence, it is
15  my professional opinion that:

16        • In the Founding era, against a backdrop of the dominant
17           moral/religious view of suicide at the time, the law's treatment of
18           suicide was focused on after-the-fact criminal punishment.
19        • Founding-era medicine and science, which generally misunderstood
20           the causes of mental illness and suicide, exerted less influence than
21           religion on suicide prevention policy.
22        • Over time, the societal approach to suicide followed a process of
23           secularization, decriminalization, and medicalization. Along with these
24           trends, twentieth-century scientific research has illuminated the crucial
25           relationship between access to lethal means and suicide risk. It is this
26           scientific understanding, which is the result of population-level
27           analyses unavailable and likely unimaginable at the Founding, that

28

4

informs suicide-prevention measures like the firearm waiting period law at issue here.

## I.   THE RELIGIOUS AND MORAL TREATMENT OF SUICIDE AT THE FOUNDING AND ITS CORRESPONDING CRIMINALIZATION

14.     America has grappled with the problem of suicide since the Colonial Era.  The first newspaper printed in America—on September 25, 1690—recounted a suicide on the front page, beginning a pattern of frequent newspaper complaints about how regular suicide was becoming. That article also highlighted a predominant way that suicide was understood at the time: through religion. The article provided a then-familiar explanation: "The Devil [then] took Advantage of the Melancholy which he thereupon fell into."[1]

15.     Though some cultures took different approaches, even sanctioning suicide,[2] Founding-era American suicide law reflects the strong moral opposition to suicide that itself was rooted in the dominant Christian teachings of the time. Before the rise of secular, scientific understandings, pre-modern societies often viewed suicide and mental illness through the lens of religion. They expressed concern that mental illness was a result of demonic possession and that evil spirits would be released upon an individual's self-destruction.[3] That general view was

---

[1] RICHARD BELL, WE SHALL BE NO MORE: SUICIDE AND SELF-GOVERNMENT IN THE NEWLY UNITED STATES 16 (2012) (citing Publick Occurences (Boston), Sept. 25, 1690)). Bell notes that American interest in suicide at the Founding is also reflected in the fact that one-third of all American novels published between 1789 and 1800 built plots around suicides. *Id.* at 60. The very first American novel, William Hill Brown's *The Power of Sympathy*, featured three characters contemplating suicide. *Id.* at 59.

[2] *See, e.g.*, Thomas J. Marzen, et al., *Suicide: A Constitutional Right?*, 24 DUQUESNE L. REV. 1, 17 (1985) (discussing ancient Chinese and Indian approval of the suicide of widows); *see also Washington v. Glucksberg*, 521 U.S. 702 (1997) (citing Marzen, et al.'s analysis).

[3] Daniel M. Crone, *Historical Attitudes Toward Suicide*, 35 DUQ. L. REV. 7, 7 (1996) ("Most of the ancient societies seemed to regard suicide with a horror that

5

incorporated into early Christian teachings that "greatly dominated Western attitudes" and connected melancholy and suicide with the workings of the devil.[4] As one historian wrote, "[i]t was Satan, condemned to despair for eternity, who filled humans with desperation by distancing them from divine grace."[5] Influential Christian scholars such as Martin Luther linked their opposition to suicide to their opposition to the devil.[6]

16.    Community standards of morality are closely intertwined with criminal law.[7] Suicide, deemed an immoral act against God, was also considered a crime before and at the Founding. Leading jurists from Matthew Hale to William Blackstone juxtaposed the religious wrongfulness of suicide and its criminality. Matthew Hale explained that "[n]o man hath the absolute interest of himself but: 1. God almighty hath an interest and propriety in him, and therefore self-murder is a sin against God. 2. The king hath an interest in him, and therefore the inquisition in case of self-murder is *felonice and voluntarie seipsum interfecit and murderarit*

---

was often associated with fear of the evil spirits that suicide was believed to set loose."); A.M. Foerschner, *The History of Mental Illness: From Skull Drills to Happy Pills*, 2 INQUIRIES J. (2010), http://www.inquiriesjournal.com/articles/1673/the-history-of-mental-illness-from-skull-drills-to-happy-pills.

[4] Marzen et al., *supra* note 2, at 26, 29.

[5] MARZIO BARBAGLI, FAREWELL TO THE WORLD 53 (Lucina Byatt trans., 2015) (1938); *see also* JENNIFER MICHAEL HECHT, STAY: A HISTORY OF SUICIDE AND THE PHILOSOPHIES AGAINST IT 46-58 (2013) (discussing how in medieval Christianity, "suicide became viewed as [connected to] the devil's temptations").

[6] HECHT, *supra* note 5 at 60 ("In 1544, writing about a woman who had killed herself, Luther speculated that she had been possessed and that she might be considered a victim of the devil.")

[7] *See* Henry M. Hart, Jr., *The Aims of the Criminal Law*, 23 LAW & CONTEMP. PROBS. 401, 405 (1958) (observing how criminal law declares "a formal and solemn pronouncement of the moral condemnation of the community"); United States v. Cordoba-Hincapie, 825 F. Supp. 485, 491 (E.D.N.Y. 1993) (Weinstein, J.) ("It was inevitable that the development of the criminal law, based as it is upon general and evolving societal mores, would track the development of prevailing views about moral wrongdoing.").

*contra pacem domini regis* [feloniously and voluntarily killed and murdered himself against the peace of the lord king]."[8] William Blackstone characterized suicide as "[a] double offence; one spiritual, in invading the prerogative of the Almighty, and rushing into his immediate presence uncalled for; the other temporal, against the king, who hath an interest in the preservation of all his subjects; the law has therefore ranked this among the highest crimes, making it a peculiar species of felony committed on one's self."[9] As a corollary to criminalizing suicide, the criminal law also criminalized aiding and abetting suicide.[10]

17.    The religious-moral opprobrium and corresponding criminalization of suicide was adopted in the American colonies. A Massachusetts statute in 1661 criminalized the "damnable Practice" of suicide that showed "how far Satan doth prevail."[11] Those adjudicated to have died by suicide in sound mind "shall be buried in some Common high-way . . . and a Cart-load of Stones laid upon the Grave as a Brand of Infamy."[12] Massachusetts was not alone; colonial legislatures in New Hampshire, Rhode Island, New Jersey, Maryland, Virginia, South Carolina, and North Carolina also followed the English practice of punishing willful suicide, or felo-de-se, with a dishonorable burial, such as in a potter's field, as well as forfeiture of goods.[13]

---

[8] MATTHEW HALE, HISTORIA PLACITORUM CORONAE: THE HISTORY OF THE PLEAS OF THE CROWN 411-12 (1736).

[9] 4 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 189 (1765).

[10] Later, when suicide itself was decriminalized, assisting suicide became a separate substantive offense. *See Washington v. Glucksberg*, 521 U.S. 702, 774 n.13 (1997) (Souter, J., concurring) (quoting State of New York, report of the Law Revision Commission for 1937, p. 831) ("Since liability as an accessory could no longer hinge upon the crime of a principal, it was necessary to define it as a substantive offense.").

[11] BELL, *supra* note 1 at 18.

[12] *Id.* at 18.

[13] *Id.* at 19; *see also Glucksberg*, 521 U.S. at 712-13 (discussing early Rhode

7

18.     At the Founding, in the case of a suspected suicide, a coroner, accompanied by an inquest jury, investigated the deceased's death and the jury issued a posthumous verdict regarding whether a suicide had taken place; if so, the punishment included forfeiture of goods.[14] If the inquest jury determined that the deceased was insane at the time of the act, however, there would be no forfeiture.[15]

19.     Over time, inquest jurors in America increasingly attributed suicide to causes that would not result in forfeiture. According to one account, "no more than 20 percent of inquest verdicts after 1780" were for felo-de-se, compared with "more than 80 percent of decisions before 1720."[16] The move away from forfeiture for suicides accelerated after the Revolution when four states outlawed forfeiture of property as a punishment for suicide.[17] The shift away from forfeiture as a punishment is generally understood as reflecting concern about punishing families for the decedent's offense, not as reflecting a view that suicide was not morally condemnable.[18]

20.     Through the 1800s, states decriminalized suicide, through law or practice, at the same time that mental health and suicide became increasingly

_____

Island law).

[14] SAMUEL MILLER, THE GUILT, FOLLY, AND SOURCES OF SUICIDE: TWO DISCOURSES 68–69 (1805) (stating the jury's duties, and noting that "the punishment of suicide prescribed by the common law of England is twofold—ignominious burial . . . and forfeiture of all the criminal's goods and chattels to the king.").

[15] *Id.* at 68 (encouraging jurors not to illegitimately declare a decedent's "lunacy").

[16] BELL, *supra* note 1, at 20.

[17] *Id.* (describing the actions of the states of New Jersey, Maryland, Virginia, and North Carolina).

[18] *See id.* (attributing much of "this tidal shift in judgment" to "petty officials and reluctant volunteers . . . simply submitting to rising pressure from increasingly acquisitive neighbors eager to assume ownership of their loved ones' property"); *Glucksberg*, 521 U.S. at 713 (crediting the "growing consensus that it was unfair to punish the suicide's family for his wrongdoing").

secularized and medicalized.[19] Thomas Marzen and coauthors observed how "[d]ecriminalization occurred because of a concern for the despondency or mental disorder that was believed to prompt such deeds . . . ."[20]

21.    Meanwhile, reducing access to suicidal means was not a primary focus of suicide prevention efforts at the Founding, though at least one advertisement urged pharmacists to take care when prescribing arsenic. In particular, in March 1800, Boston's *Columbian Centinel* published a column repeating "observations" from the Royal Humane Society in London ranging from how to avoid lightning to resuscitating still-born babies.[21] One of the column's "cautions" advised druggists to "limit the sale of arsenic to buyers accompanied by 'two or more creditable persons' who could 'testify to the vender [sic] the purpose for which its use is designed.'"[22] There is no record of compliance by pharmacists to this advice.[23]

## II.   FOUNDING ERA MEDICAL PERSPECTIVES ON MENTAL ILLNESS AND SUICIDE

22.    Today, as discussed below in ¶ 34 to ¶ 41, secular, scientific understandings of mental illness and suicide prevention guide policymakers, including with respect to reducing access to lethal means. To contextualize why there was not a similar focus at the Founding, it is relevant to consider the relatively

---

[19] *See* Marzen, et al., *supra* note 2, at 98-99; Helen Y. Chang, *A Brief History of Anglo-Western Suicide: From Legal Wrong to Civil Right*, 46 S.U.L. REV. 150, 168 (2018) (observing that once "the association between mental health treatment and suicide became more substantiated, the criminality of suicide became less defensible").

[20] Marzen et al., *supra* note 2, at 99; *see also id.* (quoting Commonwealth v. Wright, 11 Pa. D. 144, 146 (1902)) ("Calling suicide self-murder is a curt way of justifying an indictment and trial of an unfortunate person who has not the fortitude to bear any more the ills of this life. His act may be a sin, but it is not a crime; it is the result of disease. He should be taken to a hospital and not sent to a prison.").

[21] 33 COLUMBIAN CENTINEL (Boston), Mar. 22, 1800.

[22] *Id.*

[23] BELL, *supra* note 1, at 287 n.23.

rudimentary state of medical science at the time as regards mental illness and suicide prevention.

23.     From the fifth century to not long before the Second Amendment's enactment, the dominant theory of physical and psychological disease was the "humoral theory," which maintained that "health was a function of the proper balance of four humors: blood, black bile, yellow bile, and phlegm."[24] Under this conception, depression, or as it was then known, "melancholy," was frequently attributed to an excess of black bile.[25]

24.     English scholar Robert Burton's 1621 book, *The Anatomy of Melancholy*, describes the humoral theory as it applied to melancholy.[26] Burton attributed melancholy to a range of causes, both "supernatural" (including "God," "Devils," "Witches," and "Stars") and "natural" (including "our temperature . . . which we receive from our parents," "diet, retention and evacuation," "bad air," "solitariness," "immoderate exercise," "passions and perturbations of the mind," "imagination," "shame and disgrace," and "overmuch study").[27] Whatever the cause, the somatic effect was the "corruption of humours, which produce [melancholy] and many other diseases."[28]

25.     Burton's proposed solutions sought to rebalance the humors. "Purges" required consuming substances that caused either vomiting ("upward" purges) or diarrhea ("downward" purges).[29] Burton also recommended intentionally bleeding

---

[24] *Humoral Theory*, APA DICTIONARY OF PSYCHOLOGY, AM. PSYCH. ASS'N, https://dictionary.apa.org/humoral-theory (last visited Jan. 2, 2024).

[25] George Dunea, *Review, The Anatomy of Melancholy*, 335 BR. MED. J. 351, 351 (2007); *see also Humoral Theory*, *supra* note 24  (noting that black bile was associated with melancholy).

[26] ROBERT BURTON, THE ANATOMY OF MELANCHOLY (New York Farrar & Rinehart ed. 1927) (1577–1640).

[27] *Id.*at 157–282.

[28] *Id.* at 210.

[29] *Id.* at 574–80.

patients either by cutting or by applying leeches.[30] Indeed, bloodletting was the first recommended medical intervention "[w]here the melancholy blood possesseth the whole body with the brain."[31]

26.     By the 1700s, the humoral theory of medicine was becoming discredited,[32] but new theories and solutions reflected continuity with the humoral theory in various ways. Benjamin Rush wrote the first American textbook on what is now known as mental illness, *Medical Inquiries and Observations Upon the Diseases of the Mind*, in 1812.[33] Rush became known as "the father of American psychiatry."[34]

27.     Rush attributed mental illness to disease in the blood vessels of the brain.[35] To remedy that disease, Rush prescribed different solutions, many of which mirrored the solutions that were embraced under the humoral theory. Bloodletting was the first remedy prescribed, which results in "relief . . . by the loss of blood from the haemorrhoidal vessels, and by other accidental haemorrhages."[36] "After bleeding, if it be required," doctors should move on to the other treatments like purges to "bring away black bile, and sometimes worms."[37] In addition, Rush

---

[30] *Id.* at 584–85.

[31] *Id.* at 600.

[32] Indeed, according to one review, "the 1000 year old humoral theory of disease . . . was beginning to be discredited" even when Burton wrote his tome on melancholy. Dunea, *supra* note 25, at 351.

[33] *See* Benjamin Rush, M.D., Medical Inquiries and Observations Upon the Diseases of the Mind (1812); *see also* Stephen Fried, Rush: Revolution, Madness and the Visionary Doctor Who Became a Founding Father 451 (2018) (observing that *Medical Inquiries and Observations Upon the Diseases of the Mind* was "the first American book specifically on mental illness and addiction").

[34] *Dr. Benjamin Rush, "Father of American Psychiatry"*, Penn Medicine, https://www.uphs.upenn.edu/paharc/features/brush.html.

[35] Benjamin Rush, Medical Inquiries and Observations, Upon the Diseases of the Mind 24-25 (4th ed. 1830).

[36] *Id.* at 97.

[37] *Id.* at 98.

recommended ingesting "aloes, jalap, and calomel," each of which is now known to be toxic, [38] to promote diarrhea.[39] He incorrectly attributed the resulting bloody stool to mental illness and not the toxic substances he prescribed.[40] Rush also recommended emetics to promote vomiting and thereby "remove morbid excitement from the brain, and thus restore the mind to its healthy state."[41] In addition to bloodletting, purges, and emetics, patients were to consume "little nourishment"[42] and drink warm sherry wine and diluted porter.[43] In the alternative, people suffering from mental illness should take opium, a "noble medicine" that "has many advantages over ardent spirits," like operating faster and "not pollut[ing] the breath."[44] Rush recommended warm baths, cold baths, and exercise, as well as trying to increase salivation.[45] Salivation could be increased by ingesting mercury to "abstract[] morbid excitement from the brain to the mouth" and thereby "chang[e] the cause of our patient's complaints, and fix[] them wholly upon his sore mouth,"[46] ultimately "restor[ing] the mind to its native seat in the brain."[47] Doctors should not converse with patients about their melancholy because that would only worsen the condition.[48]

---

[38] *See e.g.*, Xiaoqing Guo & Nan Mei, Aloe Vera*: A Review of Toxicity and Adverse Clinical Effects*, 34 J. ENV'T SCI. & HEALTH, PART C. ENV'T CARCINOGENESIS & ECOTOXICOLOGY REVS. 77 (2016) (discussing toxicity of aloe vera); Guenter B. Risse, M.D., PhD., *Calomel and the American Medical Sects During the Nineteenth Century*, 48 MAYO CLINIC PROC. 57–58 (Jan. 1973) (discussing Rush's recommendations regarding jalap and calomel).
[39] RUSH, *supra* note 35, at 98.
[40] Risse, *supra* note 38, at 58-59.
[41] RUSH, *supra* note 35, at 98.
[42] *Id.*
[43] *Id.* at 99.
[44] *Id.* at 100-101.
[45] *Id.* at 101-03.
[46] *Id.* at 103.
[47] *Id.* at 103.
[48] *Id.* at 115.

28.     Rush's treatments were not the only ones used by practitioners at the Founding. One medical practitioner, Thomas Gale, published a book in 1802 called *Electricity, or the Ethereal Fire, Considered*, which espoused "medical electricity" to cure a wide variety of ailments, including mental illness.[49] Gale complained that bloodletting only offered "temporary relief," but "strong electric shock" could more effectively "restore an equilibrium in the circulations."[50] Gale "found, by experience, that gentle shocks through every part of the system upon the nerves, and through the stomach, and down the back of the head, upon the top of the head, through the brain to the feet, have assisted in restoring a person to the use of reason."[51]

29.     Meanwhile, other doctors looked to anatomical causes besides blood disease to explain mental illnesses. Jean-Etienne-Dominique Esquirol (1772-1840), an influential French doctor, for example, "championed a theory that lodged 'mental life solely in the nervous system,'"[52] and many in the medical community similarly came to view mental illness as related to a breakdown of the nervous system (hence, "nervous breakdown").[53] To be sure, *some* illnesses, like epilepsy and dementia, have connections to neurological disorders.[54] But throughout the

---

[49] THOMAS GALE, ELECTRICITY, OR THE ETHEREAL FIRE, CONSIDERED 70-71 (1802).

[50] *Id.* at 124.

[51] *Id.* at 125.

[52] JOHN C. WEAVER, A SADLY TROUBLED HISTORY: THE MEANINGS OF SUICIDE IN THE MODERN AGE 35 (2009) (quoting JAN GOLDSMITH, CONSOLE AND CLASSIFY: THE FRENCH PSYCHIATRIC PROFESSION IN THE NINETEENTH CENTURY (Cambridge U. Press 1987)).

[53] *See From Nerves to Neurosis*, SCIENCE MUSEUM, (June 12, 2019), https://www.sciencemuseum.org.uk/objects-and-stories/medicine/nerves-neuroses (discussing the popularization of the term "nervous breakdown" to describe a medical disorder).

[54] *See id.* (discussing how German neurologists of the early 1900s came to "distinguish[] neurological diseases from neuroses").

13

1800s, the list of perceived neurological disorders was quite different than doctors accept today. For example, a common diagnosis beginning in 1886 was "neurasthenia," whose "[c]ommon mental symptoms" included depression.[55]

30.    The state of medical science at the Founding influenced limited approaches to stopping suicide attempts that were already in motion. For example, humane societies at the Founding recommended taking down a person who was attempting to hang themselves and immediately bleeding them.[56] Such efforts and others conducted by Founding-era humane societies do not appear to have had a meaningful impact on suicide prevention.[57] Overall, "[m]ost failed suicides . . . were not thwarted; they were botched. They did not fail because of a stranger's or a neighbor's intervention but because the methods chosen were not sufficiently lethal."[58]

31.    Firearms were, no doubt, lethal, but the evidence we have suggests they were not used as frequently for suicide at the Founding compared to today. To be sure, the government did not systematically collect data on the prevalence of different means of suicide until the mid- to late-1800s, making it impossible to know with modern-day precision the breakdown of different methods. According to press coverage, which is admittedly an imprecise proxy, three means of suicide—drowning, poison, and hanging—accounted for about half of reported-upon suicides

---

[55] Ruth E. Taylor, *Death of neurasthenia and its psychological reincarnation: A study of neurasthenia at the National Hospital for the Relief and Cure of the Paralysed and Epileptic, Queen Square, London, 1870–1932*, 179 BRITISH J. PSYCHIATRY 550, 550 (2001) (citing F. G. GOSLING, BEFORE FREUD: NEURASTHENIA AND THE AMERICAN MEDICAL COMMUNITY, 1870–1910 (U. Ill. Press 1987)).

[56] BELL, *supra* note 1, at 94.

[57] Three decades' worth of records documenting people saved by the Humane Society of the Commonwealth of Massachusetts "described exactly seven as unmistakably suicidal," six of them by drowning, though the actual number of disrupted suicide attempts is likely higher given ambiguity in the records. *Id.* at 98–99.

[58] *Id.* at 96.

in early America.[59] Even in the mid-1800s, after handgun technology improved, evidence suggests that firearms did not account for nearly the proportion of suicides that they do today.[60] The first U.S. census to report suicide by method was in 1860.[61] That census reported that 112 people died by suicide by firearm, compared to 306 by hanging and 137 by poison.[62]

32.     In the mid-1800s, some prominent researchers cast doubt on the efficacy of bloodletting. Pierre Charles Alexandre Louis, a French doctor "considered the founder of modern epidemiology," was at the forefront of that effort.[63] Louis's *Research on the Effects of Bloodletting in Some Inflammatory Diseases* was published in French in 1828 but then expanded into a book, translated into English, and published in the United States in 1836.[64] In it, Louis compared the results of 77 patients who had been bled at different times in order to treat pneumonia.[65] He found that those who were bled later in the disease had a higher survival rate than those who were bled earlier in the disease, a finding he concluded

---

[59] *Id.* ("According to newspaper coverage, about half of the reported suicides in early national America were attempted or completed by drowning, asphyxiation, or poisoning.").

[60] An 1845 review of suicides reported in a New York City newspaper during the course of a year counted sixty-four suicides by hanging, compared to twenty-six by firearm. *See* E. K. Hunt, *Statistics of Suicide in the United States* 1 AM. J. INSANITY 225, 230 (1845).

[61] BELL, *supra* note 1, at 252.

[62] SECRETARY OF THE INTERIOR, STATISTICS OF THE UNITED STATES (INCLUDING MORTALITY, PROPERTY, &C.,) IN 1860; COMPILED FROM THE ORIGINAL RETURNS AND BEING THE FINAL EXHIBIT OF THE EIGHTH CENSUS 253 (1866).

[63] THEODORE H. TULCHINSKY & ELENA VARAVIKOVA, THE NEW PUBLIC HEALTH 12 (3d ed. 2014).

[64] Alfredo Morabia, *Pierre-Charles-Alexandre Louis and the Evaluation of Bloodletting*, 99 J. ROYAL SOC'Y MED. 156, 158–59, 160 n.5 (2006) (discussing Louis's experiments with bloodletting).

[65] *Id.* at 158.

was "startling and apparently absurd."[66] Though Louis did not discount entirely the usefulness of bloodletting, he concluded that its salutary effects were limited.[67]

33.     Beginning in the late 1800s and into the 1900s, researchers like Sigmund Freud began to acknowledge the psychological determinants of suicidal behavior.[68] In the mid-1900s, American researchers "would take the lead" from their French counterparts in suicide studies.[69] As historian John C. Weaver has described, "[c]ontemporary political, academic, and medical research currents in the United States furthered an abundance of innovative studies" with the assistance of a "surge of statistical manuals."[70] As a result of increasing scientific innovation, new medicines, therapies, and interventions were established.

## III.    MODERN TREATMENT OF SUICIDE IN LAW AND MEDICINE AS RELATES TO MEANS RESTRICTION

34.     Today, scientific methods, more than religious or pseudo-scientific beliefs, inform societal and legal approaches to suicide prevention. One of the most relevant discoveries, as it relates to firearm regulations targeting suicide prevention, is the relationship between access to common, lethal suicidal means and suicide rates.

---

[66] Id.

[67] P. CH. A. LOUIS, RESEARCHES ON THE EFFECTS OF BLOODLETTING IN SOME INFLAMMATORY DISEASES, AND THE INFLUENCE OF TARTARIZED ANTIMONY AND VESICATION IN PNEUMONITIS 13 (1836) ("Thus, the study of the general and local symptoms, the mortality and variations in the mean duration of pneumonitis, according to the period at which bloodletting was instituted; all establish narrow limits to the utility of this mode of treatment.").

[68] Taylor, *supra* note 55, at 550. For one example, see Sigmund Freud, *On the Grounds for Detaching a Particular Syndrome from Neurasthenia under the Description Anxiety Neurosis* (1895), *reprinted in* 3 STANDARD EDITION OF THE COMPLETE WORKS OF SIGMUND FREUD 90 (trans. and ed. J. Strachey).

[69] WEAVER, *supra* note 52, at 23, 62.

[70] Id. at 62-63.

16

35.     The research supporting means restriction as a method for suicide prevention first arose in the context of reducing suicidal means other than firearms, like domestic gas asphyxiation.[71] Asphyxiation from high carbon monoxide concentrations in domestic gas was the leading cause of suicide in the United Kingdom between the early 1900s and the early 1960s.[72] Suicidal people would close windows and turn on unlit gas jets, or stick their heads into turned-on, unlit ovens.[73] Death by this method was "almost entirely due to carbon monoxide poisoning," with coal-based gas at the time containing about 14 percent carbon monoxide.[74] After the introduction of oil-based gas, and then natural gas, however, the carbon monoxide content plummeted, rendering domestic gas asphyxiation much less fatal.[75]

36.     Contemporaneous with the drop in carbon monoxide levels in home gas, researchers noticed that suicide rates declined.[76] Norman Kreitman, who studied the connection between carbon monoxide poisoning and suicide,

---

[71] *See* Deborah Azrael & Matthew J. Miller, *Reducing Suicide Without Affecting Underlying Mental Health*, in THE INTERNATIONAL HANDBOOK OF SUICIDE PREVENTION 637–41 (Rory C. O'Connor & Jane Pirkis, eds., 2016) (discussing methods of suicide and their relationship to means restriction).

[72] R. D. T. Farmer, *Suicide by Different Methods*, 55 POSTGRADUATE MED. J. 775, 778 (1979); *accord* N. Kreitman and S. Platt, *Suicide, Unemployment, and Domestic Gas Detoxification in Britain*, 38 J. OF EPIDEMIOLOGY AND CMTY. HEALTH 1, 1 (1984) (further developing Farmer's findings).

[73] *See, e.g.*, ANNE STEVENSON, BITTER FAME: A LIFE OF SYLVIA PLATH 296 (1989) ("The smell of gas was unmistakable. Forcing open the door to the kitchen, they found Sylvia sprawled on the floor, her head on a little folded cloth in the oven. All the gas taps were full on.").

[74] Kreitman & Platt, *supra* note 72, at 1; Norman Kreitman, *The Coal Gas Story*, 30 BRIT. J. PREV. SOC. MED. 86, 87 (1976). *See also id.* ("Since the lethal agent in domestic gas is carbon monoxide it is convenient to refer to the former simply as CO suicides.").

[75] Kreitman & Platt, *supra* note 72 (discussing the hypothesis that the reduction in suicides was from reduced availability of carbon monoxide in domestic gas).

[76] Kreitman, *supra* note 74, at 88-89.

17

documented an increase in suicide by other means among men and women aged 15-24, but the dramatic decrease in home gas suicides dwarfed those increases.[77] Meanwhile, some age groups, like the elderly, experienced especially pronounced suicide rate declines.[78] Kreitman observed that "the close temporal association between the declining [carbon monoxide] content of domestic gas and the fall in suicides due to this agent while those from other causes have followed a quite different trend, lead to the conclusion that there is a direct causal relationship between the two phenomena."[79]

37.     Kreitman's subsequent work highlighted how the experience in Britain was anomalous when compared to other European countries where carbon monoxide poisoning was not a primary means of suicide.[80] He also observed that unemployment—a social condition usually correlated with increased suicide rates—rose by about 50 percent at the same time suicide rates dropped by 34 percent between 1961 and 1971, implying that the impact of the means restriction at issue (reduced access to carbon monoxide) may have been even greater than observed at first glance.[81] The usual research focus at the time was on the relationship between suicide, on the one hand, and psychiatric morbidity or social factors, on the other.[82] Kreitman concluded that "[i]t would appear that an additional variable—namely, availability of method—may now have to be added."[83]

---

[77] *Id.* at 88.

[78] *Id.*

[79] *Id.* at 92.

[80] Kreitman & Platt, *supra* note 72, at 3-4 ("It seems then, that in relation to the other countries of Europe, as analysed by Sainsbury et al, or with respect to the group of developed countries examined by Boor, the United Kingdom is conspicuously anomalous." (footnotes omitted)).

[81] *Id.*

[82] *Id.* at 5.

[83] *Id.*

Expert Report and Declaration of Professor Eric Ruben
(Case No. 3:23-CV-00793)

38.     Subsequently, researchers observed similar effects in different parts of the world following the removal of common suicidal means. One set of studies, for example, evaluated the effects of removing access to highly toxic pesticides on suicide rates in South Asia. Globally, pesticide poisoning, not firearm discharge, is the most common means of suicide.[84] This was true of Sri Lanka, which "had one of the highest suicide rates in the world" in the 1990s.[85] After the Sri Lankan government imposed bans on highly toxic pesticides frequently used for suicide, however, far fewer people died by pesticide ingestion and the overall suicide rate dropped by 50 percent.[86]

39.     When Kreitman conducted his studies, he commented that "[v]irtually nothing is known" about *why* limiting access to suicidal means brings down suicide rates in light of alternative means.[87] Subsequent studies have started to fill in the gaps, including by documenting the impulsivity of many suicide attempts[88] and the generally positive prognosis following a failed attempt.[89] As public health researchers Deborah Azrael and Matthew Miller summarize:

---

[84] José M Bertolote et al., *Suicide, Suicide Attempts and Pesticides: A Major Hidden Public Health Problem*, 84 BULL. WORLD HEALTH ORG. 260, 260 (2006) (extrapolating from recent analyses that "pesticide ingestion [is] the most common method of suicide on a worldwide basis").

[85] Azrael & Miller, *supra* note 71, at 643.

[86] *Id.*

[87] Kreitman, *supra* note 74, at 92.

[88] *See, e.g.*, Thomas R. Simon et al., *Characteristics of Impulsive Suicide Attempts and Attempters*, 32 SUICIDE & LIFE-THREATENING BEHAV. 49, 52 (2001) (providing results of a study of 153 nearly lethal suicide attempts among thirteen to thirty-four-year-olds in Houston, Texas which found that 24 percent of study participants spent less than five minutes between the decision to attempt and the attempt).

[89] *See, e.g.*, David Owens et al., *Fatal and Non-Fatal Repetition of Self-Harm*, 181 BRITISH J. OF PSYCHIATRY 193, 193–94 (2002) ("[I]t seems that a reasonable estimate of non-fatal repetition [of suicide attempts] is 15-16% at 1 year with a slow rise to 20-25% over the following few years.").

19

The argument that restricting access to a highly lethal method can save lives rests on three well-established observations. . . . First, many suicidal crises are fleeting. . . . Second, the method people use in suicidal acts depends, to a vital extent, on the method's ready availability, over and above—and perhaps even independent of—the attempter's assessment of a method's intrinsic lethality. . . . Third, the prognosis if one survives a suicide attempt is excellent. . . . [F]ewer than 10% of people who attempt suicide and live later go on to die by suicide.[90]

40.    Today, in contrast to at the Founding, firearms are the most commonly used method in U.S. suicides, despite being used in a relatively small proportion of suicide attempts.[91] According to provisional data, 26,993 people in the United States took their lives by self-inflicted gun shots in 2022, the highest number since the Centers for Disease Control began recording suicide data in 1968.[92] Moreover, 2022 was not an outlier year; the gun suicide rate—7.65 per 100,000 in 2022—has been on an upward trajectory since 2006,[93] further cementing the United States' status as the country with the highest gun suicide rate in the world.[94]

41.    While suicide has long been a societal problem, contemporary perspectives on the nature of mental illness and the increasingly scientific understanding of how to reduce suicide rates help shed light on any absence of

---

[90] *See* Azrael & Miller, *supra* note 71, at 638-39.

[91] *See* PHILIP J. COOK & KRISTIN A. GOSS, THE GUN DEBATE: WHAT EVERYONE NEEDS TO KNOW 42 (2020) (describing statistics); Andrew Conner, Deborah Azrael, and Matthew Miller, *Suicide Case-Fatality Rates in the United States, 2007 to 2014*, 171 ANNALS OF INTERNAL MED. 885, 888 (2019) (estimating that firearms accounted for 4.8 percent of suicide attempts but 50.6 percent of suicide deaths).

[92] *CDC Provisional Data: Gun Suicides Reach All-time High in 2022, Gun Homicides Down Slightly from 2021*, JOHN HOPKINS BLOOMBERG SCH. OF PUB. HEALTH (Jul. 27, 2023), https://publichealth.jhu.edu/2023/cdc-provisional-data-gun-suicides-reach-all-time-high-in-2022-gun-homicides-down-slightly-from-2021.

[93] *Id.*

[94] *See* Champe Barton & Daniel Nass, *Exactly How High Are Gun Violence Rates in the U.S., Compared to Other Countries?*, THE TRACE (Oct. 5, 2021), https://www.thetrace.org/2021/10/why-more-shootings-in-america-gun-violence-data-research (noting that the U.S. was the "global leader" in gun suicides).

means restrictions during the Founding era. In light of subsequent research—unavailable and in many ways inconceivable at the Founding—regarding the relationship between access to lethal means of suicide and suicide rates, and the proportion of overall suicides caused by gun shots, researchers and policymakers have focused on the connection between access to firearms and suicide rates, and the potential to reduce suicide rates by policies that reduce immediate access to firearms, such as waiting periods.[95]

## DECLARATION UNDER PENALTY OF PERJURY PURSUANT TO 28 U.S.C. § 1746

I declare under penalty of perjury that the foregoing is true and correct, and if called as a witness would testify competently to the above.

Executed in Dallas, Texas on March 11, 2024.

/s/ Eric Ruben

Eric Ruben

---

[95] *See, e.g.*, *Effects of Waiting Periods on Suicide*, RAND, (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/waiting-periods/suicide (surveying studies of waiting periods' effect on suicide rates).

21

**EXHIBIT A**

**ERIC RUBEN**
SMU Dedman School of Law
3315 Daniel Avenue • Dallas, TX 75205
214-768-2581 • eruben@smu.edu
http://ssrn.com/author=2436317

**ACADEMIC EXPERIENCE**

**SMU Dedman School of Law**, Dallas, TX
 *Associate Professor of Law* (with tenure), May 2023-present
 *Assistant Professor of Law*, August 2019-May 2023
 *Courses*: Criminal Law; Professional Responsibility; Second Amendment and Weapons Regulation
 *Honors*: Robert G. Storey Distinguished Faculty Fellow, 2023-2024; Elected Graduation Hooder, 2022, 2023

**Brennan Center for Justice at New York University School of Law**, New York, NY
 *Fellow*, December 2014-Present

**New York University School of Law**, New York, NY
 *Adjunct Professor*, January 2018-January 2019
 *Course*: The Regulation of Weaponry in Democratic Society

**EDUCATION**

**NEW YORK UNIVERSITY SCHOOL OF LAW**, New York, NY
J.D., May 2007, *cum laude*
 *New York University Law Review*, Articles Editor
 Florence Allen Scholar (top 10% after 4 semesters)
 Law Students for Human Rights, Board Member and Treasurer
 Administrative and Regulatory State, T.A. for Prof. Peggy Cooper Davis

**DARTMOUTH COLLEGE**, Hanover, NH
B.A. in Government, Minor in Mathematics, June 2003, *magna cum laude*
 Honors in writing and philosophy; recipient of Lombard Post-Graduate Fellowship

**JUDICIAL CLERKSHIP**

**The Honorable Julio M. Fuentes, U.S. Court of Appeals, Third Circuit**, Newark, NJ
 *Judicial Clerk*, August 2007-August 2008

**ACADEMIC PUBLICATIONS**

*Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 MINN. L. REV. (forthcoming 2024)

*One Year Post-*Bruen*: An Empirical Assessment*, 110 VA. L. REV. O. 20 (2024) (with Rosanna Smart & Ali Rowhani-Rahbar)

ERIC RUBEN                                                          MARCH 2024

*Originalism-by-Analogy and Second Amendment Adjudication*, 133 YALE L.J. 99 (2023) (with Joseph Blocher)
- *cited in* various briefs submitted in United States v. Rahimi, No. 22-915 (U.S. Aug. 21, 2023)
- *cited in* Ocean State Tactical, LLC v. Rhode Island, __ F.4th __, 2024 WL 980633 (1st Cir. Mar. 7, 2024); Lara v. Comm'r Pennsylvania State Police, 91 F.4th 122 (3d Cir. 2024); Range v. Att'y Gen. United States of Am., 69 F.4th 96 (3d Cir. 2023) (Krause, J., dissenting)

*Self-Defense Exceptionalism and the Immunization of Private Violence*, 96 S. CAL. L. REV. 509 (2023)

*Public Carry and Criminal Law After* Bruen, 135 HARV. L. REV. F. 505 (2022)
- *formed basis for* quotes in the New York Times and Washington Post, as well as interview on Vox's Today Explained podcast

*"Second-Class" Rhetoric, Ideology, and Doctrinal Change*, 110 GEO. L.J. (2022) (with Joseph Blocher)
- *companion piece* published in the Washington Post
- *featured in* episodes of Strict Scrutiny and Vox's The Most Dangerous Branch podcasts

*Law of the Gun: Unrepresentative Cases and Distorted Doctrine*, 107 IOWA L. REV. 173 (2021)
- *cited in* the brief filed by the Giffords Law Center to Prevent Gun Violence in *New York State Rifle & Pistol Ass'n v. Bruen*, No. 20-843 (U.S. Apr. 26, 2021)

*The Gun Rights Movement and "Arms" Under the Second Amendment*, BRENNAN CTR. FOR JUST. (2021)

*An Unstable Core: Self-Defense and the Second Amendment*, 108 CALIF. L. REV. 63 (2020)
- *cited in* various briefs including those filed by Criminal Law Scholars and United States Senators in *Bruen*, *supra*

*You Can Lead a Horse to Water:* Heller *and the Future of Second Amendment Scholarship*, 68 DUKE L.J. O. 1 (2018) (with Joseph Blocher)

*From Theory to Doctrine: An Empirical Analysis of the Right to Keep and Bear Arms After* Heller, 67 DUKE L.J. 1433 (2018) (with Joseph Blocher)
- *cited in* various briefs including one filed by Second Amendment Law Professors in *Bruen*, *supra*
- *cited in Mance v. Sessions*, 896 F.3d 390 (5th Cir. 2018)
- *featured in* the New York Times, Wall Street Journal, and USA Today, among others

*Justifying Perceptions in First and Second Amendment Doctrine*, 80 LAW & CONTEMP. PROBS. 149 (2017)

*Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017) (with Darrell A. H. Miller)

*Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J. F. 121 (2015) (with Saul Cornell)
- *cited in* the majority opinion and quoted in the dissenting opinion in *Bruen*, *supra*
- *cited in* various briefs including those filed by the NAACP Legal Defense & Education Fund and New York State in *Bruen*, *supra*
- *cited in Young v. Hawaii*, 992 F.3d 765 (9th Cir. 2021), among others
- *companion piece* published in The Atlantic

Eric Ruben                                                                                March 2024

**Work-in-Progress**

*Numeracy and Constitutional Interpretation*

*Gun-Free Zones* (with Ali Rowhani-Rahbar & Rosanna Smart)

*Felons, Firearms, and Restoration*

**Edited Volumes**

*Protests, Insurrection, and the Second Amendment*, Brennan Ctr. for Just. (2021)

*Second Generation of Second Amendment Law and Policy*, 80 Law & Contemp. Probs. 1 (2017) (with Darrell Miller)

## Grants

**Arnold Ventures**, "Gun-Free Zones: Legislative Landscape and Relationship with Firearm Violence," Co-Principal Investigator with Ali Rowhani-Rahbar (Lead) and Rosanna Smart, ~$600,000 (2024-2026)

## Academic Presentations

"Social and Non-Physical Impacts of Guns," Everytown for Gun Safety Research Convening (February 2024)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," William & Mary Law School (January 2024)

"One Year Post-*Bruen*: An Empirical Assessment," National Research Conference for the Prevention of Firearm-Related Harms (November 2023)

"Scientific Context, Suicide Prevention, and the Second Amendment After *Bruen*," Minnesota Law School (October 2023)

"One Year Post-*Bruen*: An Empirical Assessment," Fordham Law School (October 2023)

"Public Carry and Gun-Free Spaces After *Bruen*," Southeastern Association of Law Schools Conference (July 2023)

"The Second Amendment and the Supreme Court After *Bruen*," Brennan Center for Justice at New York University School of Law (May 2023)

"Gun Laws in Tennessee: Understanding the Current Landscape," University of Tennessee College of Law (April 2023)

"The History of the Second Amendment: How We Got to Bruen–and Where We Go from Here," UCLA Criminal Justice Law Review Symposium (October 2022)

"Felons, Firearms, and Restoration," N.Y.U. L. Rev. & Duke Ctr. for Firearms Law Symposium (September 2022)

"Felons, Firearms, and Restoration," Duke Law School Firearms Law Workshop (June 2022)

"Public Carry and Criminal Law after *Bruen*," Harvard Law Review Symposium (March 2022)

"Self-Defense Exceptionalism," UC Davis Law Review Symposium (October 2021)

"Gun Law Reform: The Current Legal Landscape," NYU School of Law Symposium (March 2021)

"The Gun Rights Movement and 'Arms' Under the Second Amendment," Brennan Center Workshop (February 2021)

"Unrepresentative Litigation and Constitutional Distortion: The Case of the Gun-Centric Second Amendment," Drexel University School of Law Faculty Workshop (November 2020)

"An Unstable Core: Self-Defense and the Second Amendment," Video Interview, Duke Law (May 2020)

"'The Second Amendment Is Not a Second-Class Right': A Case Study in Constitutional Rhetoric," AALS Conference (January 2020)

"Mistake, Self Defense, and the Role of the Jury: Framing the Botham Jean/Amber Guyger Case," SMU Dedman School of Law (flash class) (October 2019)

"The Second Amendment After *Heller* and *Caetano*: Overlooked Implications for the Future of Weapons Regulation," Duke Law School Workshop (August 2019)

"The Second Amendment and Self-Defense," Hastings School of Law (January 2019); New York University School of Law (April 2018); and University of New Hampshire School of Law (April 2018)

"Guns and Free Speech," New York University School of Law (November 2017)

"Justifying Perceptions in First and Second Amendment Doctrine," Guns in a Civil Society Summit, Washington Alliance for Gun Responsibility (November 2017) and Symposium on Second Generation of Second Amendment Law & Policy, New York University School of Law (April 2016)

"Preemption and Firearms Law," Constitutional Governance Practicum at the Columbia Law School (September 2017)

"The Second Amendment: A Discussion," Fordham Law Chapter of the American Constitutional Society (September 2017)

"Discussion on Second Amendment Jurisprudence and Advocacy," NYU Law Chapter of the American Constitution Society (March 2016)

"An Introduction and Discussion on the Second Amendment," Cardozo Law Chapter of the American Constitution Society (March 2016)

"The Second Amendment: Gun Rights in America," John Jay College, New York, NY (November 2015)

ERIC RUBEN                                                          MARCH 2024

## SELECTED PUBLICATIONS, PRESENTATIONS, AND MEDIA APPEARANCES FOR A GENERAL AUDIENCE

**Publications**

*Second Amendment Meets Domestic Violence in the Supreme Court*, BRENNAN CENTER BLOG (November 2023)

"Research Priorities for Gun Violence Prevention After *Bruen*," RAND (with Ali Rowhani-Rahbar and Rosanna Smart) (May 2023)

Written Testimony, Senate Judiciary Committee, "Protecting Public Safety After New York State Rifle & Pistol Association v. Bruen," Washington, D.C., March 15, 2023

*A Smarter Path to Gun Safety Through Property Rights*, N.Y. DAILY NEWS (July 2022)

*Three Supreme Court Cases to Watch Beyond Abortion Rights*, BRENNAN CENTER BLOG (with Alicia Bannon and Harry Isaiah Black) (June 2022)

*A Right to Conceal and Carry?*, BRENNAN CENTER BLOG (with Emil Mella Pablo) (May 2022)

*No, Courts Don't Treat the Second Amendment as a "Second-Class Right,"* WASH. POST (November 2021) (with Joseph Blocher)

*First Major Second Amendment Case Before the Supreme Court in Over a Decade Could Topple Gun Restrictions*, THE CONVERSATION (October 2021)
> Republished in over a dozen other publications across the country and online, including MarketWatch, Iowa Capital Dispatch, Houston Chronicle, St. Louis Post-Dispatch, Idaho Press-Tribune, NewsBreak, and The Raw Story

*Claiming Self-Defense Isn't a Get-Out-of-Jail-Free Card*, BRENNAN CENTER BLOG (July 2020)

*The Supreme Court's Second Amendment Surprise*, BRENNAN CENTER BLOG (June 2020)

*What the Supreme Court's Latest Second Amendment Ruling Means for Future Cases*, BRENNAN CENTER BLOG (May 2020)

*The Supreme Court Shouldn't Disrupt the Judicial Consensus on the Second Amendment*, SCOTUSBLOG (November 2019) (with Joseph Blocher)

*Is the Handgun America's "Most Popular" Self-Defense Weapon? It's a Crucial Question at the Supreme Court*, BRENNAN CENTER BLOG (November 2019)

*Misguided 'Second Amendment Protection Acts' Have the Opposite Effect of Their Intent*, BRENNAN CENTER BLOG (June 2019) (with Adam B. Sopko)

*What to Know About the Supreme Court's First Gun Case in 9 Years*, THE TRACE (April 2019) (print interview)

*The Second Amendment Allows for More Gun Control Than You Think*, VOX.COM (May 2018) (with Joseph Blocher)

ERIC RUBEN                                                                         MARCH 2024

*There Is No Constitutional Bar to Further Gun Control*, N.Y. TIMES (June 2016)

*Exaggerated Claims of "Judicial Nullification" in Gun Cases*, THE JURIST (May 2016)

*Justice Scalia, the Second Amendment, and Judicial Conservatives*, CASETEXT (February 2016)

*The Slave-State Origins of Modern Gun Rights*, THE ATLANTIC (September 2015) (with Saul Cornell)

**Presentations**

Testifying Witness, Senate Judiciary Committee, Senate Judiciary Committee, "Protecting Public Safety After New York State Rifle & Pistol Association v. Bruen," Washington, D.C., March 15, 2023

"*NYSRPA v. Bruen*—Challenges and Responses to NY's Concealed Carry Laws," New Yorkers Against Gun Violence (November 2022)

"From *Heller* to *Bruen*: The Past and Future of the Second Amendment," Potomac Law Group PLLC (July 2022)

"Public Carrying of Firearms: Understanding the Impact of the Supreme Court's Decision," John Hopkins Center for Gun Violence Solutions (July 2022)

"Guns vs. Speech: Does the 2nd Amendment Threaten the 1st?," Brennan Center for Justice Live Event (September 2021)

"The Second Amendment and State Efforts in Gun Violence Prevention," American Constitution Society Northeast Regional Convening (October 2019)

"The Gun Shop," Fulbright Film Series Panel Discussion (February 2018)

"The Second Amendment and Gun Laws: A Primer for Advocates," New York Lawyer Chapter of the American Constitution Society (October 2017)

"When the First and Second Amendment Collide," League of Women Voters Gun Safety Committee (September 2017)

"*Binderup* and the Future of As-Applied Second Amendment Challenges," Consortium for Risk-Based Firearm Policy (February 2017)

"2nd Amendment - Protecting Rights, Protecting People," The Liberty Series, Union League of Philadelphia (January 2017)

"As-Applied Second Amendment Challenges," Second Amendment Litigation and Jurisprudence Conference, Washington, D.C. (December 2016)

"David v. Goliath: The Gun Violence Prevention Movement and Challenging the NRA," Annual RebLaw Conference, Yale University Law School (February 2016)

**Media Appearances**

John Simerman, *Concealing Guns Without a Permit: Some New Orleans Officials Fear the Worst*, NEW ORLEANS ADVOCATE (March 2024) (print)

ERIC RUBEN                                                          MARCH 2024

Lydia Wheeler, *Bump Stock Ban Brings Agency Power Dispute to Supreme Court*, BLOOMBERG NEWS (February 2024) (print)

Heather Hollingsworth, Summer Ballentine & Jim Salter, *Could Missouri's 'Stand Your Ground' Law Apply to the Super Bowl Celebration Shooters?*, AP NEWS (February 2024) (print)

Marco Poggio, *For Immigrants, Gun Rights Debate Goes Beyond Firearms*, LAW360 (January 2024) (print)

Michael Heise, *The Bruen Decision After One Year: An Empirical Look*, EMPIRICAL LEGAL STUDIES BLOG (December 2023) (print)

David W. Chen, *Courts Strike Down Gun Control Measures in Two States*, N.Y. TIMES (November 2023) (print)

Tom Brune, *Supreme Court Wrestles with Gun Limits After Ruling in New York Case*, NEWSDAY (November 2023) (print)

Michael Smerconish, SIRIUS XM POTUS 124 (November 2023) (radio)

Henry Gass, *Second Amendment Rights for Abusers? Justices Seem Skeptical*, CHRISTIAN SCIENCE MONITOR (November 2023) (print)

Caroline Love, *Can Alleged Domestic Abusers Keep Their Guns? The Supreme Court May Decide the Answer*, KERA NEWS (November 2023) (print and radio)

Marco Poggio, *Justices Skeptical of Keeping Domestic Abusers Armed*, LAW360 (November 2023) (print)

Tom Brune, *Supreme Court Gun Case Could Prompt New Challenges to New York Laws*, NEWSDAY (November 2023) (print)

*Should Domestic Abusers Lose Gun Rights?*, VOX'S TODAY, EXPLAINED (November 2023) (podcast)

Adam Liptak, *Supreme Court's Devotion to Gun Rights Faces a Challenging Test*, N.Y. TIMES (November 2023) (print)

Abbie VanSickle, *Texas Man at Center of Supreme Court Case Says He No Longer Wants Guns*, N.Y. TIMES (November 2023) (print)

Reena Diamante, *Supreme Court to Weigh Constitutionality of Gun Restrictions on Accused Domestic Abusers*, SPECTRUM NEWS (November 2023) (print and television)

Andrew Goudsward and Nate Raymond, *US Supreme Court Ruling May Help Hunter Biden Fight Gun Charge*, REUTERS (October 2023) (print)

Bloomberg Law Podcast with June Grasso, *Supreme Court to Rule on Guns for Domestic Abusers*, BLOOMBERG RADIO (September 2023) (radio and podcast)

Marco Poggio, *Access to Justice Cases to Watch This Term*, LAW360 (September 2023) (print)

*Carbon Capture is Coming to the King Ranch*, TEXAS STANDARD (August 2023) (radio)

ERIC RUBEN                                                                        MARCH 2024

Bloomberg Law Podcast with June Grasso, *Landmark Young People's Climate Ruling*, BLOOMBERG RADIO (August 2023) (radio and podcast)

Marco Poggio, *Justices Eye Intersection Of Domestic Violence, Gun Rights*, LAW360 (July 2023) (print)

*Supreme Court Conservatives Could Further Erode Gun Control in Next Term*, THE GUARDIAN (June 2023) (print)

Caroline Love, *Supreme Court Decides to Hear North Texas Case on Guns and Domestic Violence*, KERA NEWS (June 2023) (print)

Avalon Zoppo, *Justices Take Up Gun Case That Puts Landmark 2nd Amendment Ruling to the Test*, NATIONAL LAW JOURNAL (June 30, 2023) (print)

Joseph Stepansky, *How a US Supreme Court Ruling Is Transforming Gun Control*, AL JAZEERA (May 2023) (print)

Terrence T. McDonald, *Ruling on New Jersey Gun Law Shows Democrats Didn't Do Their Homework*, N.J. MONITOR (May 2023) (print)

*The Daniel Perry Case Shows Contradictions of Gun Enthusiasts in Texas*, ECONOMIST (April 2023) (print)

Peter Charalambous', *How Two Decades of Gun Culture Helped Shape America's 'Stand Your Ground' Laws*, ABC NEWS (April 2023) (print)

Caroline Love, *More Domestic Abusers Can Keep Guns After 5th Circuit Court Ruling — Risking Deadly Consequences*, KERA NEWS (April 2023) (print and radio)

Alex Swoyer, *Chaos in the Courts After Justices' Ruling that Firearm Regs Must Align with Nation's Founding*, WASHINGTON TIMES (April 2023) (print)

*Is That Really Legal*, with Eric Ruben (April 2023) (podcast)

Michael Macagnone, *Senate Hears About Legal Fallout from Supreme Court Gun Decision*, ROLL CALL (March 2023) (print)

*Senators Seek Solutions to Address Gun Violence in the Country Due to Supreme Court Decision*, FOX 2 (March 2023) (television and print)

Wisconsin Public Radio, *How Court Ruling on Domestic Violence Restraining Orders Shapes U.S. Gun Law*, NPR WISCONSIN (February 2023) (radio)

Briana Vannozzi, *Legal Challenges Delay Murphy's Gun Control Laws*, NJ SPOTLIGHT NEWS (February 2023) (television)

Scott Reeder, *Choosing Which Laws to Enforce*, ILLINOIS TIMES (January 2023) (print)

The John Howell Show, *Questions Surrounding the Assault-Style Weapons Ban: Will it Hold Up in Court?*, WLS CHICAGO (January 2023) (radio)

ERIC RUBEN                                                                    MARCH 2024

Peter Charalambous, *At Least 74 Illinois Sheriff's Departments Vow to Defy State Assault Weapons Ban*, ABC NEWS (January 2023) (print)

June Grasso, *Jackson Joins Supreme Court's Million Dollar Book Club*, BLOOMBERG LAW SHOW (January 2023) (radio and podcast)

Frank Main and Tina Sfondeles, *Why Illinois' New Assault Weapons Ban Might Not Hold Up in Court*, CHICAGO SUN TIMES (January 2023) (print)

Douglass Dowty, *Can You Bring a Gun to the Zoo? On a Bus? Syracuse Judge Eagerly Rewrites NY Firearms Law*, SYRACUSE POST STANDARD (December 2022) (print)

William Melhado, *Texas Judge Rules that Disarming Those Under Protective Orders Violates Their Second Amendment Rights*, TEXAS TRIBUNE (November 2022) (print)

Debra Cassens Weiss, *In "Scorching" Opinion, Federal Judge Considers Appointing Historian to Help Him in Gun Case*, ABA JOURNAL (November 2022) (print)

Avalon Zoppo, *Judge May Appoint Historian After Justices' Turn to New Test in Gun Rights Cases*, NAT'L L. J. (November 2022) (print)

Keegan Hamilton, *Ghost Guns Are Causing Chaos in American Courts*, VICE NEWS (October 2022) (print)

Michael Waldman, *Guns Don't Belong at Polling Locations*, BRENNAN CTR. FOR JUST. (October 2022) (print)

Dana Difilippo, *New York Court Rulings Signal Trouble for New Jersey's Fresh Attempt to Regulate Guns*, N.J. MONITOR (October 2022) (print)

S.P. Sullivan, *N.J. Is Seeking Tough Restrictions for Carrying Guns in Public. Will They Hold up in Court?*, STAR-LEDGER/NJ.COM (October 2022) (print)

Kery Murakami, *Court Fights Begin Over Gun Bans in Places Like Subways and Bars*, ROUTE FIFTY (October 2022) (print)

Jonah E. Bromwich, *Court Gives New York State More Time to Argue for Its Gun Law*, N.Y. TIMES (October 2022) (print)

*Second Amendment Expert Discusses NY Gun Law Court Challenge*, SPECTRUM NEWS N.Y. 1 (October 2022) (television)

Jonah E. Bromwich, *Federal Judge Blocks N.Y. Gun Law, Finding Much of It Unconstitutional*, N.Y. TIMES (October 2022) (print)

Scott Neuman, *The 'Gun Dude' and a Supreme Court Case that Changed Who Can Own Firearms in the U.S.*, NPR (August 2022) (print)

Brandon Tensley & Eva McKend, *The Fight to Curb Gun Violence Without Inflaming Racial Biases*, CNN (July 2022) (print)

*What Can We Do About Gun Control?*, LAW DISRUPTED (July 2022) (podcast)

Chip Brownlee, *The Real Significance of the Supreme Court's Gun Decision*, THE TRACE (July 2022) (print)

Nusaiba Mizan, *Fact-check: Can Texans 'Too Dangerous to Carry a Loaded Gun in Public' Now Carry?*, AUSTIN AMERICAN-STATESMAN (July 2022) (print)

Marco Poggio, *How Bruen Ruling Will Change Gun Restrictions Scrutiny*, LAW 360 (July 2022) (print)

Naheed Rajwani-Dharsi, *How the New Federal Gun Law Will - and Won't - Affect Texas*, AXIOS DALLAS (June 2022) (print)

Wisconsin Public Radio, *What the Supreme Court's Ruling on a New York Gun Law Means for How We Apply the Second Amendment*, NPR WISCONSIN (June 2022) (radio)

Studio Tulsa, *Interview regarding Bruen*, NPR TULSA (June 2022) (radio)

Roque Planas, *Bombshell Supreme Court Gun Ruling Opens Up New State Battles*, HUFF POST (June 2022) (print)

Eric Lipton et al., *States Rush to Revamp Laws After Supreme Court's Gun Ruling*, NEW YORK TIMES (June 2022) (print)

Mark Weiner, *What Supreme Court Ruling Means for New Yorkers and Handgun Owners*, SYRACUSE POST-STANDARD (June 2022) (print)

Kaila Philo, *The Supreme Court Just Made It a Whole Lot Easier to Conceal-Carry a Gun*, GRID (June 2022) (print)

Chip Brownlee & Tom Kutsch, *What You Need to Know About the Senate Gun Reform Bill*, THE TRACE (June 2022) (print)

TV and Radio Interviews Regarding *Bruen*, June 23-24, 2022
 WPIX 11 NEW YORK (television)
 *Good Morning America*, ABC (television)
 *Morning Edition*, NPR (radio)
 *ABC News Prime*, ABC (television)
 *Balance of Power*, BLOOMBERG RADIO (radio)
 *All Things Considered*, NPR (radio)
 CBS RADIO (radio)
 CNN (television)

Michael Macagnone, *Supreme Court Bolsters Right to Carry Handgun in Public*, Roll Call (June 2022) (print)

Nicole Narea, *Blue States' Gun Control Efforts Hinge on the Supreme Court*, VOX (June 2022) (print)

John Fritze, *Should Guns Be Banned in Bars, Hospitals? Supreme Court Could Spur New 2nd Amendment Fight*, USA TODAY (June 2022) (print)

Brian Pascus, *Adams' Team Braces for Landmark Supreme Court Ruling on Guns*, CRAIN'S NEW YORK (June 2022) (print)

Timothy L. O'Brien, *An Executive Order That Might Actually Stop Gun Violence*, BLOOMBERG NEWS & WASHINGTON POST (June 2022) (print)

Ellen loanes, *What's in the Bipartisan Plan for Gun Control*, VOX (June 2022) (print)

Nusaiba Mizan, *Fact-check: How many mass shootings have occurred since Uvalde tragedy?*, AUSTIN AMERICAN-STATESMAN (June 2022) (print)

Kery Murakami, *Supreme Court Could Make it Harder For States and Localities to Keep Guns Off Streets*, ROUTE FIFTY (June 2022) (print)

Alex Thomas, *Gun Companies Are More Vulnerable to Lawsuits Than You Think*, NEW REPUBLIC (June 2022) (print)

Ellen loanes, *What Does the Second Amendment Mean in 2022?*, VOX (June 2022) (print)

*NBC News Now with Joshua Johnson*, NBC NEWS (June 2022) (television)

Josh Clancy, *America and Guns—Did It Have to Be This Way?*, THE TIMES (May 2022) (print, England)

*Velshi on MSNBC*, MSNBC (May 2022) (television)

Jess Bidgood, *From Concealed Carry to Eliminating Permits, Gun Restrictions Have Loosened Since Sandy Hook*, BOSTON GLOBE (May 2022) (print)

Sherryn Groch & Billie Eder, *Why Can't America Fix Its Gun Crisis?*, SYDNEY MORNING HERALD (May 2022) (print)

Emilie Burditt, *Gun Laws, Reform Following School Shooting in Uvalde, Texas*, WISCONSIN PUBLIC RADIO (May 2022) (radio)

*Trump urges mental health initiatives at NRA event*, NEWSNATION PRIME (May 2022) (television)

*Interview Regarding Uvalde Shooting* FRANCE 24 (May 2022) (television, France)

Timothy L. O'Brien, *Uvalde Families Should Take Gunmakers to Court*, WASHINGTON POST and BLOOMBERG NEWS (May 2022) (print)

*Debate por el control de armas: el callejón sin salidaal que EE.UU. vuelve tras la matanza en Texas*, EL MERCURIO (May 2022) (print, Chile)

Kevin T. Dugan, *The NRA won after Sandy Hook, but today the gun lobby is in disarray and gun safety is slowly making gains in states*, NEW YORK MAGAZINE (INTELLIGENCER) (May 2022) (print)

Tyler Kingkade, *Uvalde shooting renews push for 'red flag' laws — 4 years after Texas Republicans blocked one*, NBC NEWS (May 2022) (print)

*NBC News Now with Joshua Johnson*, NBC News (May 2022) (television)

Annie McDonough, *SCOTUS could soon overturn New York's gun law. Here how the state could respond*, CITY AND STATE (May 2022) (print)

Eric Ruben                                                                                    March 2024

*Interview Regarding the Uvalde Shooting*, Times Radio (May 2022) (radio, England)

*Coverage of the Uvalde Shooting*, CTV News, (May 2022) (television, Canada)

Lindsay Whitehurst, Michael Tarm, & James Anderson, *Buffalo shooter's previous threat raises red-flag questions*, AP News (May 2022) (print)

Kevin McCoy, *Gun Rights Groups' Wave of Lawsuits Could Change America's Relationship With Firearms*, USA Today (February 2022) (print)

Brandan Pierson, *Manslaughter Charges Against Michigan Shooter's Parents Break New Legal Ground*, Reuters (December 2021) (print)

*Kyle Rittenhouse and the "Self-Defense" Defense*, Vox's Today, Explained (November 2021) (podcast)

*The Supreme Court, Concealed Carry, and How Your Laws Might Change*, New Books Network (November 2021) (podcast)

Kiara Alfonseca, *Arbery, Rittenhouse Cases Spotlight Self-Defense and Vigilantism*, ABC News (November 2021) (print)

Marc Fisher & Mark Berman, *After Rittenhouse: Will Deadly Clashes Multiply as the Right to Self-Defense Expands?*, Wash. Post (November 2021) (print)

Willy Lowry, *Rittenhouse and Arbery Cases Expose Deep Rifts on Gun Rights and Vigilantism in US*, The National (November 2021) (print)

*The Claim of Self-Defense Raising Concerns in Recent Court Cases*, KCBS San Francisco (November 2021) (radio)

Shaila Dewan, *Can Self-Defense Laws Stand Up to a Country Awash in Guns?*, N.Y. Times (November 2021) (print)

Interview, NYC's WPIX 11 TV (November 2021) (television)

Jonah E. Bromwich & Ashley Southall, *What Happens if the Supreme Court Strikes Down New York's Gun Law?*, N.Y. Times (November 2021) (print)

Bob Ortega, *Fears of Unlikely Federal Gun-Control Measures Lead to Raft of State Laws*, CNN.com (November 2021) (print)

*U.S. Supreme Court Firearms Case Could Reshape Gun Control in America*, NPR Detroit (WDET) (November 2021) (radio)

Interview, Houston's ABC 13 KTRK TV (November 2021) (television)

Noah Goldberg, *Supreme Court Appears Likely to Shoot Down New York Gun Law*, N.Y. Daily News (November 2021) (print)

*La Cour Supreme des États-Unis Examine un Dossier Majeur sur les Armes à Feu*, LE FIGARO (November 2021) (print)

Noah Goldberg, *Supreme Court Could Nix New York Gun Law that Limits Right to Carry Guns in Public*, N.Y. DAILY NEWS (November 2021) (print)

Amelia Thomson-DeVeaux, *How the Supreme Court Could Make It Easier to Carry Guns in Public*, FIVETHIRTYEIGHT (November 2021) (print)

Devin Dwyer, *Gun Owners Ask Supreme Court to Back Concealed Carry for Self-Defense*, ABC NEWS LIVE (November 2021) (television and print)

*US Supreme Court to Hear High-Stakes Gun Rights Case*, VOICE OF AMERICA (November 2021) (print)

Tiana Headley, *New York Is America's Latest Battleground Over Gun Rights*, THE RIVER (November 2021) (print)

Robert Gavin, *Law Beat: Supreme Court Ready for Possible Landmark Gun Case from Rensselaer County*, ALB. T. UNION (October 2021) (print)

Marcia Coyle, *'Originalists' Gorsuch, Kavanaugh, Barrett Under Microscope in 2nd Amendment Case*, NAT'L L.J. (October 2021) (print)

*The Attitude With Arnie Arneson*, WNHN (October 2021) (radio)

*SCOTUS Returns for Blockbuster Term*, ABC NEWS LIVE (October 2021) (television)

*This Week with George Stephanopoulos*, ABC NEWS (October 2021) (television)

Dan Frosch and Elizabeth Findell, *Air Force Found Largely Responsible for Texas Church Shooting*, WALL STREET JOURNAL (July 2021) (print)

Yanqi Xu, *Fourth Circuit Ruling: Federal Laws Banning Handgun Sales to Young Adults Violate Second Amendment*, NC POLICY WATCH (July 2021) (print)

Erik Larson, *California Gun Laws Reviled by NRA Face Pivotal Court Test*, BLOOMBERG NEWS (June 2021) (print)

*Agenda Svijet*, HRT (May 2021) (television)

Jennifer Mascia, *The Supreme Court's Next Big Gun Case, Explained*, THE TRACE (May 2021) (print)

*"The Week" with Joshua Johnson*, NBC PEACOCK TV (April 2021) (television)

*Open Carry Laws, Public Safety, and* Young v. Hawaii, LAWYER 2 LAWYER (April 2021) (podcast)

Jolana Humpalova, *To Limit or Not to Limit? Weapons Divide America, It Has the Most in the World*, SEZNAM ZPRÁVY (April 2021)

Matt Reynolds, *Lawyers Involved in the Gun Debate Are Primed for the Supreme Court to Take the Next Big Case*, ABA JOURNAL (December 2020) (print)

Stephen Gutowski, *Gun Lawsuits Flood in After Barrett Supreme Court Confirmation*, WASHINGTON FREE BEACON (December 2020) (print)

Olivia Li, *On Guns, Barrett's Philosophy Leaves Little Room for Public Safety*, THE TRACE (September 2020) (print)

Greg Stohr, *Gun Cases Could Prompt Supreme Court to Bolster Second Amendment*, BLOOMBERG NEWS (June 2020) (print)

Annie McDonough, *What Does SCOTUS' Second Amendment Case Mean for New York?*, CITY & STATE NEW YORK (April 2020) (print)

*U.S. Supreme Court Leaves Bump Stock Ban in Place*, CT PUBLIC RADIO (March 2020) (radio)

*Virginia Assault Weapon Bill Shot Down by Senate Committee*, KCBS (February 2020) (radio)

Kaley Johnson, *White Settlement Church Shooter Had a Long Criminal History. So How Did He Get a Gun?*, FORT WORTH STAR-TELEGRAM (January 2020) (print)

*2020 Will Be a Big Year for the Gun Issue*, THE TRACE (January 2020) (print)

Adam Liptak, *After Long Gap, Supreme Court Poised to Break Silence on Gun Rights*, N.Y. TIMES (December 2019) (print)

*Supreme Court Watchers See Chief Justice as Possible Fifth Vote to Dismiss Major Gun Case*, THE TRACE (December 2019) (print)

Richard Wolf, *Supreme Court May Expand Second Amendment Rights Despite Repeal of Disputed Gun Restrictions*, U.S.A. TODAY (December 2019) (print)

John Kruzel, *Supreme Court Poised to Hear First Major Gun Case in a Decade*, THE HILL (December 2019) (print)

Matt Cohen, *Gun Violence Costs Americans Billions Every Year. A California Mayor Has a Plan to Make Gun Owners Pay for It*, MOTHERJONES.COM (August 2019) (print)

Jennifer Mascia, *What to Know About the Supreme Court's First Gun Case in 9 Years*, THE TRACE (April 2019) (print)

*A Historic Ruling on Guns, Ten Years Later*, 1A, NPR (June 2018) (radio)

Jon Schuppe, *Low-Crime Village Bans Military-Style Guns, Citing Parkland and Other Mass Shootings*, NBCNEWS.COM (April 2018) (print)

Andrew Wong, *Why the US Is So Different From the UK and Australia When It Comes to Gun Control*, CNBC.COM (March 2018) (print)

Kiran Alvi, *US: Most Mass Shootings Not Committed by Mentally Ill*, ALJAZEERA.COM (November 2017) (print)

Jared Keller, *Is The End of the Assault Rifle Nigh?*, PACIFIC STANDARD (February 2017) (print)

ERIC RUBEN                                                                          MARCH 2024

*Does the Second Amendment Leave Any Room for Gun Control Laws?*, TAKE TWO, KPCC (Southern California Public Radio) (June 2016) (radio)

*Guns in the Spotlight: Do Americans Really Need an Assault Weapon to Protect Themselves?*, Paul Henry Show, TV3 (New Zealand) (June 2016) (television)

## OTHER LEGAL EXPERIENCE

**Morvillo Abramowitz Grand Iason & Anello, P.C.**, New York, NY
  *Litigation Associate*, November 2008-November 2014

**U.S. Department of State, Office of the Legal Advisor**, Washington, D.C.
  *Summer Intern*, May-June 2007

**Davis Polk & Wardwell LLP**, New York, NY and Madrid, Spain
  *Summer Law Clerk*, May-August 2006 (offer extended)

**Civil Association for Equality and Justice (ACIJ)**, Buenos Aires, Argentina
  *Legal Intern*, May-August 2005

## UNIVERSITY SERVICE

Appointments Committee, SMU Dedman School of Law (2023-present)
Academic Standards Committee, SMU Dedman School of Law (2022-2023)
Admissions/Financial Aid Committee, SMU Dedman School of Law (2022-2023)
SMU Law Hooder (2022, 2023) (selected by vote of graduating 3Ls)
SMU Law AALS Representative (2020, 2021, 2022, and 2023)
Curriculum/Academic Standards Committee, SMU Dedman School of Law (2020-2022)
Teaching Committee, SMU Dedman School of Law (2020-2022)
Faculty Advisor, 1L Inn of Court, SMU Dedman School of Law (2020-2021)
Faculty Advisory Board, Deason Criminal Justice Reform Center (2019-present)
Endowed Lectures and Faculty Forum Committee, SMU Dedman School of Law (2019-2020)
Faculty Secretary, SMU Dedman School of Law (2019-2020)

## REFEREE ACTIVITY

YALE LAW JOURNAL
STANFORD LAW REVIEW

## BRIEFS AND OTHER ADVOCACY

Brief of Second Amendment Law Scholars as Amici Curiae in Support of Petitioner, United States v. Rahimi, No. 22-915 (U.S.) (August 21, 2023)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York State Rifle & Pistol Ass'n v. Bruen, No. 20-843 (U.S.) (July 20, 2021)
  • cited in dissenting opinion

Statement of Professors of Constitutional Law to Senate Judiciary Committee: The Right to Keep and Bear Arms and the Constitutionality of Expanded Background Checks (March 22, 2021)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Defendant-Appellee, Wade v. The Board of Regents of the University of Michigan, MSC No. 156150 (Mich. Sup. Ct.) (March 1, 2021)

Brief of Second Amendment Law Professors as Amici Curiae in Support of Neither Party, New York
State Rifle & Pistol Ass'n v. City of New York, No. 18-280 (U.S.) (May 14, 2019)
- cited in dissenting opinion