## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT,<br><br> Plaintiffs,<br><br> v.<br><br>MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico,<br><br> Defendants. | No. 24-CV-0471-JB/SCY |

## REPLY IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ........................................................................................................... i

TABLE OF AUTHORITIES ................................................................................................... ii

I.    INTRODUCTION ........................................................................................... 1

II.    LEGAL STANDARD ..................................................................................... 1

III.    AN INJUNCTION IS NOT DISFAVORED IN THIS CONTEXT ............................ 2

IV.    PLAINTIFFS SATISFY BRUEN'S STEP ONE ........................................................ 7

    A.    The Plain Text of the Second Amendment Covers Plaintiffs' Conduct ................. 3

    B.    The Defendants Mis-Frame the Right at Issue as the "Immediate" Access to Firearms. ................................................................................................................ 4

V.    THE WAITING PERIOD ACT IS NOT A PRESUMPTIVELY LAWFUL COMMERCIAL REGULATION ............................................................................... 4

VI.    THE WAITING PERIOD ACT IS NOT IN LINE WITH THE HISTORY AND TRADITION OF FIREARMS REGULATIONS ........................................................ 5

    A.    Intoxication Laws are a Poor Analogy to the Waiting Period Act ....................... 5

    B.    Licensing Regimes are not a Historical Analogue to the Waiting Period Act ..... 6

    C.    Firearms Were Common at the Founding, Yet There Were No Waiting Period Laws ..................................................................................................................... 7

    D.    If the Court Finds the Historical Record to be Indeterminate, the Plaintiffs have Demonstrated a Likelihood of Success on the Merits ........................................... 8

VII.    PLAINTIFFS ARE SUFFERING IRREPARABLE HARM, AND THE BALANCE OF HARMS AND PUBLIC INTEREST FACTORS SUPPORT ENTRY OF INJUNCTIVE RELIEF ............................................................................................... 9

    A.    Plaintiffs are Suffering Irreparable Harm Due to the Waiting Period Act .......... 9

    B.    The Balance of Harms and Public Interest Factors Support of Entry of Injunctive Relief ................................................................................................. 11

VIII.    CONCLUSION ............................................................................................. 12

**TABLE OF AUTHORITIES**

**Case**                                                                                                    **Page(s)**

*Antonyuk v. Chiumento*,
   89 F.4th 271 (2d. Cir. 2023) .................................................................................................. 5

*Baird v. Bonta*,
   81 F.4th 1036 (9th Cir. 2023) ............................................................................................... 11

*Bevis v. City of Naperville, Ill.*,
   657 F. Supp. 3d 1052 (N.D. Ill. 2023) ................................................................................... 9

*D.C. v. Heller*,
   554 U.S. 570 (2008) ............................................................................................................... 3

*Elrod v. Burns*,
   427 U.S. 347 (1976) ............................................................................................................. 10

*Ezell v. City of Chi.*,
   651 F.3d 684 (7th Cir. 2011) ............................................................................................... 10

*Gen. Motors Corp. v. Urban Gorilla*, LLC,
   500 F.3d 1222 (10th Cir. 2007) ............................................................................................. 1

*Hill v. Colorado*,
   530 U.S. 703 (2000) ............................................................................................................... 4

*Duarte v. United States,*
   2024 WL 2068016 (9th Cir. 2024) ........................................................................................ 6

In *Chamber of Com. of U.S. v. Edmondson*,
   594 F.3d 742 (10th Cir. 2010) ............................................................................................. 11

*League of Women Voters of North Carolina v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ................................................................................................. 2

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ............................................................................................................. 10

*McRorey v. Garland*,
   2023 WL 5200670 (N.D. Tex., 2023) .................................................................................... 4

*Miller v. Bonta*,
   2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) ........................................................................ 8

*New York State Rifle & Pistol Association, Inc. v. Bruen*,
   597 U.S. 1 (2022) ...................................................................................................... 1, 3, 8, 11

*Rocky Mountain Gun Owners v. Polis*,
   2023 WL 5017257 (D. Colo. Aug. 7, 2023) .......................................................................... 9

*SCFC ILC, Inc. v. VISA USA, Inc.*,
   936 F.2d 1096 (10th Cir.1991) ................................................................................... 2

*Schrier v. University of Colorado*,
   427 F.3d 1253 (10th Cir. 2005) .................................................................................. 2

*Teixeira v. Cnty. of Alameda*,
   873 F.3d 670 (9th Cir. 2017) .................................................................................... 10

*United States v. Marique*,
   647 F.Supp.3d 382 (D. Md. 2022) .............................................................................. 5

*United States v. Price*,
   635 F.Supp.3d 455 (S.D. W.V. 2023) ......................................................................... 5

*Utah Licensed Beverage Ass'n v. Leavitt*,
   256 F.3d 1061 (10th Cir. 2001) ................................................................................ 11

## **Statutes**

Colorado House Bill 23-1219 .............................................................................................. 5

New Mexico House Bill 129 ............................................................................................... 9

**I.      INTRODUCTION**

Simply put, because there is no historical analogue to the New Mexico Waiting Period Act either at the Founding or for 150 years after the Founding, Plaintiffs are likely to prevail on the merits. *See New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 19 ("[T]he government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms."). Defendants primarily rely on the argument that a waiting period law will save some number of lives. But no amount of policy debate on the supposed wisdom of the Waiting Period Act can change the constitutional analysis.

Defendants' efforts to use means-ends scrutiny as a way of getting around the Second Amendment was expressly rejected in *Bruen*. *Id.* at 17 ("[T]he Courts of Appeals have coalesced around a 'two-step' framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. Today, we decline to adopt that two-part approach."). To the extent that Defendants or their experts attempt to introduce such evidence, the Court should disregard it as irrelevant.

At the end of the day, the government either meets or fails its burden under *Bruen*. Defendants have not presented anything that would indicate they have met their burden to find a historical analogue for the 7-day waiting period that is consistent with the nation's historical tradition of firearms regulation. Plaintiffs are constitutionally and irreparably harmed by the Waiting Period Act, and the balance of equities tips in their favor. Therefore, this court should grant a preliminary injunction.

**II.     LEGAL STANDARD**

To obtain a preliminary injunction, the movant must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest. *See Gen. Motors Corp.*

*v. Urban Gorilla*, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007).  All four of the requirements for a preliminary injunction order weigh in favor of such relief here.

### III.    AN INJUNCTION IS NOT DISFAVORED IN THIS CONTEXT.

Contrary to Defendants' assertions, an injunction based on a constitutional challenge to a law, sought on the effective date of the law, does not truly disrupt the status quo.  In fact, if there was a disruption to the status quo, that disorder occurred when the Waiting Period Act went into effect and altered the longstanding practice of how law-abiding residents of New Mexico acquire a firearm.  Rather than disrupting the status quo, the injunction requested in this case would reestablish it and preserve the relative positions of the parties until a decision on the merits could be reached.

In support of their argument that an injunction is disfavored in this case, the Defendants cite *Schrier v. University of Colorado*, 427 F.3d 1253 (10th Cir. 2005), but that case dealt with a mandatory rather than a prohibitory injunction.  The Tenth Circuit has long characterized an injunction as mandatory, rather than prohibitory, "if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  *Id.* at 1266 (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 936 F.2d 1096, 1099 (10th Cir.1991)).  That is not the case here.  Restoring the status quo does not require Defendants to take any affirmative steps or act in a particular way that would require supervision by the Court.  An injunction would simply prevent Defendants from continuing to enforce an arbitrary waiting period that did not even exist until last month.  Thus, while obtaining a preliminary injunction certainly requires that Plaintiffs establish the relevant elements outlined above, their request in the instant matter is not disfavored. *Cf. League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 236 (4th Cir. 2014) (where a group filed a challenge "on the very same day" that same-

2

day voter registration was eliminated, the court held that "[w]ithout doubt, this is the language and stuff of a prohibitory injunction seeking to maintain the status quo").

In their response, Defendants also rely on a series of First Amendment related cases for the proposition that facial challenges generally are disfavored. Response Br. at 6. In addition to offering no analysis as to how these cases apply in the context of a motion for a preliminary injunction—particularly against a law that applies uniformly to almost all firearm transfers in New Mexico—the cases are intuitively inapposite. Plaintiffs seek to enjoin the Waiting Period Act so that they can exercise their own, personal constitutional rights under the Second Amendment. Their challenge is no more disfavored than those in *District of Columbia v. Heller*, 554 U.S. 570 (2008), or *Bruen* itself. *Accord Heller*, 554 U.S. at 581 ("We start . . . with a strong presumption that the Second Amendment right is exercised individually and belongs to all Americans.").

The Court should thus approach this dispute without any "disfavoring" of the preservation of Plaintiffs' constitutional rights through injunctive relief. Maintaining the status quo while Plaintiffs challenge the Waiting Period Act is important and will ensure that otherwise law-abiding citizens are not caught in the dragnet of this law which impermissibly burdens their Second Amendment rights.

### IV. PLAINTIFFS SATISFY *BRUEN*'S STEP ONE.

**A.  The Plain Text of the Second Amendment Covers the Plaintiffs' Conduct**

The right to "keep" arms necessarily implies the right to obtain arms. After all, "keep" means to possess or "have weapons." *Heller*, 554 U.S. at 582. By the Waiting Period Act's very terms, it prevents individuals from taking "possession" of their firearms. Therefore, because the Second Amendment's plain text covers Plaintiffs' conduct—*i.e.*, possessing bearable arms—"the Constitution presumptively protects that conduct." *Bruen*, 597 U.S. at 24. Plaintiffs have met their burden under *Bruen*, and the Waiting Period Act is presumptively unconstitutional.

### B. Defendants Mis-Frame the Right at Issue as the "Immediate" Access to Firearms

Defendants argue that the Waiting Period Act does not take away someone's ability to keep and bear arms—it simply delays it, and for that reason, the Second Amendment is not even implicated. But this sort of logic would never withstand scrutiny in the context of any other fundamental right. For example, imagine a mandatory 7-day delay on offering a political stump speech—to prevent a candidate from engaging in impulsive rhetoric. Even though this law would not "take away" anyone's right to speak—only delay it—it would still clearly implicate the First Amendment. *Cf. Hill v. Colorado*, 530 U.S. 703, 745 (2000) (Scalia, J., dissenting) ("The strictures of the First Amendment cannot be avoided by regulating the act of moving one's lips; and they cannot be avoided by regulating the act of extending one's arm to deliver a handbill, or peacefully approaching in order to speak.").

The Defendants mis-frame the right at issue as one of "immediate acquisition." Not so. Plaintiffs do not challenge the time it takes for a Federal Firearms Licensee to conduct a background check to ensure that a purchaser is not a prohibited possessor. *See McRorey v. Garland*, 23-cv-00047-O, 2023 WL 5200670, at *5 (N.D. Tex., 2023) (A waiting period associated with a background check is consistent with the nation's historical tradition of firearms regulation). Plaintiffs instead challenge the imposition of an arbitrary delay in exercising their Second Amendment rights that continues *even after successfully completing a background check*. At a minimum, that delay burdens Plaintiffs' Second Amendment rights, and implicates the Second Amendment's plain text.

### V. THE WAITING PERIOD ACT IS NOT A PRESUMPTIVELY LAWFUL COMMERCIAL REGULATION

The Defendants argue the Waiting Period Act is a "commercial regulation" that is presumptively lawful. It is not. Its very purpose is to impose a burden on the exercise of the individual right to keep and bear arms, and the Court should reject the effort as trickery by the

4

Defendants. *Cf. United States v. Price*, 635 F.Supp.3d 455, 460 (S.D. W.V. 2023) ("[A] blatant prohibition on possession" of a firearm is not a commercial regulation.); *United States v. Marique*, 647 F.Supp.3d 382, 385 (D. Md. 2022) (commercial regulations are those that do not intrinsically "implicate an individual's right of possession").  Though the Waiting Period Act may impose criminal penalties on sellers for noncompliance, it also imposes the same penalties on the buyer. Moreover, its terms apply equally to both private and commercial transfers.  But, most importantly for our analysis here, it imposes a clear burden on the buyer's right of armed self-defense. Even a "commercial regulation" is not presumptively constitutional if it is merely a pretext for burdening an individual right to keep and bear arms.  *Antonyuk v. Chiumento*, 89 F.4th 271, 316 (2d. Cir. 2023).

## VI. THE WAITING PERIOD ACT IS NOT IN LINE WITH THE HISTORY AND TRADITION OF FIREARMS REGULATIONS

Defendants argue that even if the Court reaches *Bruen*'s Step Two, the Waiting Period Act is in line with the historical tradition of the nation's firearms regulation. It is not. As outlined in the Plaintiffs' Opening Brief, the first waiting period enacted in the United States was not until 1923. *See* Professor David B. Kopel's Written Testimony on Colorado House Bill 23-1219, *To Delay the Acquisition of Firearms*. In an attempt to overcome the clear lack of a historical tradition of imposing arbitrary waiting periods, Defendants turn to ill-fitting analogies.  These arguments fail.

### A. Intoxication Laws are a Poor Analogy to the Waiting Period Act.

Defendants rely on pre-Founding and Founding-era laws regulating firearm usage by intoxicated persons.  Response Br. at 16.  Those laws are particularly poor analogies because they did not, as the Waiting Period Act does, assume that everyone is always intoxicated, and require them to wait seven days after passing a background check to sober up.[1]  In fact, the intoxicated

---

[1] Expert Report and Declaration of Professor F. Lee Francis. *See* Exhibit A ¶¶ 19-37.

individual could acquire the firearm as soon as they sobered up.

In the case of intoxication laws from the Founding era, there were undoubtedly numerous reasons "why" public officials would have wanted to prevent intoxicated individuals from obtaining firearms—the likelihood of careless and negligent discharge, the suspicious nature of anyone becoming intoxicated and only then seeking to purchase a gun, and of course, that people often make bad decisions while intoxicated.

The intoxication laws Defendants reference in their Response Brief applied to individuals, not to the *entire* population of the colony or state that enforced them. And they did not impose 7-day delays.

**B. Licensing Regimes are not a Historical Analogue to the Waiting Period Act**

Similarly, licensing requirements do not provide a historical analogue to the Waiting Period Act. The first licensing regime in the United States was the 1911 Sullivan Act in New York, which is entirely too late to be an appropriate analogue. Moreover, the Sullivan Act only required licensing for concealed carry. The first federal licensing was enacted in 1938, the National Firearms Act, which required sellers of firearms to receive a federal license.

While Defendants rely on a compilation of laws gathered by Professor Robert Spitzer, it is clear that the "licensing" laws Professor Spitzer collected are of a different kind than at issue here. For one, they were not universal licensing regimes. Instead, they were most often regimes rooted in racism and bias regarding disfavored racial groups. *Duarte v. United States*, 2024 WL 2068016, at *20-26 (9th Cir. 2024) (rejecting race and religious-based licensing as a proper analogue). Nearly every true licensing system came into being in the twentieth century. As such, they are too distant from the Founding to be relevant to the analysis. Moreover, and as Professor Lee notes in his Report:

> [N]one of the [licensing regimes cited by Professor Spitzer] actually required one to postpone taking possession of a firearm. Even when a permit or license [was]

6

> required to hunt, Spitzer has shown no evidence that the individual would be required to wait for any period of time before taking possession of his firearm....

Exhibit A ¶ 63.

   C. **Firearms Were Common at the Founding, Yet There Were No Waiting Period Laws**

Defendants simply err by asserting that firearms – the obtaining or use of them – were not part of general American society at the time of the Founding. They were.[2] Firearms were freely available for purchase at shops. Indeed, virtually every able-bodied male during the Colonial and Founding eras were *required* to acquire arms. *See* <u>Backgrounds of Selective Service: Military obligation: the American tradition, a compilation of the enactments of compulsion from the earliest settlements of the original thirteen colonies in 1607 though the Articles of Confederation, 1789</u>, Parts 2–14 (Arthur Vollmer ed., 1947) (providing hundreds of militia laws requiring all able-bodied males to acquire and possess arms). The federal Uniform Militia Act of 1792 required every "free able-bodied white male citizen" to be enrolled in the state militia. Those militiamen were required to acquire a firearm:

> That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock, a sufficient bayonet and belt, two spare flints, and a knapsack, a pouch with a box therein to contain not less than twenty-four cartridges, suited to the bore of his musket or firelock, each cartridge to contain a proper quantity of powder and ball: or with a good rifle, knapsack, shot-pouch and powder-horn, twenty balls suited to the bore of his rifle, and a quarter of a pound of powder; and shall appear, so armed, accoutred [sic] and provided, when called out to exercise, or into service, except, that when called out on company days to exercise only, he may appear without a knapsack.

Public Acts of the Second Congress, 1st Session, Chapter 33.

It cannot be true that nearly every adult male for roughly 200 years was required to possess firearms, and *at the same time* firearms were rare in that same place.

It is important to understand the historical context that led to the Uniform Militia Act of 1792. The Founders had just come out of the American Revolution, where famously the

---

[2] *See* Exhibit A ¶¶ 8-12.

Minutemen had used their own firearms to engage in combat with the British Army. Even after the ultimate defeat of the British Empire, concern over maintaining a standing army led to the disbandment of most of the Continental Army in 1783. In its place, the founding generation relied on militias for collective defense – as they always had. Imposing an arbitrary waiting period for those seeking to acquire firearms so that they could defend themselves, their states, and their country would have been seen as anathema to the Founders.

Early America saw several armed rebellions: Shay's Rebellion, the Whiskey Rebellion, Fries's Rebellion, the 1838 Mormon War, Bleeding Kansas, Dorr's Rebellion, John Brown's Revolt, the Utah War, and multiple armed confrontations with Native Americans. All of these events occurred between the Founding and the ratification of the Fourteenth Amendment. The Founders knew and understood that firearms could be used for violent purposes, yet they imposed no waiting period to acquire a firearm.

### D. If the Court Finds the Historical Record to be Indeterminate, the Plaintiffs have Demonstrated a Likelihood of Success on the Merits

"The constitutional imperative is on the government to not infringe the right to keep and bear arms. The correct starting orientation is that no arm may be prohibited." *Miller v. Bonta*, — F. Supp. 3d —, 2023 WL 6929336, *36 (S.D. Cal. Oct. 19, 2023) (quotation marks omitted). In other words, the fact that history may be contradictory or indeterminate leads to a clear doctrinal result—the constitutional challenge succeeds. *See Bruen*, 597 U.S. at 26 ("The Second Amendment is the very product of an interest balancing by the people and it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms for self-defense. It is this balance—struck by the traditions of the American people—that demands our unqualified deference.") (emphasis added and cleaned up); *id*. at 34 ("[T]he burden falls on respondents to show that New York's proper-cause requirement is consistent with this Nation's historical

tradition of firearm regulation.").

The Second Amendment context is no different than other areas of law where constitutional rights are squarely at issue—unless the government can persuade the Court that it has met its burden, which it hasn't here. *Accord Bevis v. City of Naperville, Ill.*, 657 F. Supp. 3d 1052, 1066 n.6 (N.D. Ill. 2023) ("*Bruen* indicates that judges, not party elected experts, will assess the Second Amendment's history."). Thus, to the extent that the Court is unsure as to whether Defendant has satisfied its onerous burden under *Bruen* Step Two, the appropriate next step is to find that Plaintiffs are likely to succeed on the merits, because the government has in fact failed to meet its heavy burden.

### VII. PLAINTIFFS ARE SUFFERING IRREPARABLE HARM, AND THE BALANCE OF HARMS AND PUBLIC INTEREST FACTORS SUPPORT ENTRY OF INJUNCTIVE RELIEF.

#### A. Plaintiffs are Suffering Irreparable Harm Due to the Waiting Period Act

In their Response Brief, Defendants assert that because Plaintiffs delayed seeking a preliminary injunction for "months . . . despite being aware of the passage of House Bill 129", Plaintiffs claim of irreparable harm is undermined. Response Br. 17. But this is an odd assertion for Defendants to make, especially considering their knowledge of and affinity for the "other" waiting period case out of Colorado—*Rocky Mountain Gun Owners v. Polis* (a case Defendants cite 17 times in their brief). The plaintiffs in *Rocky Mountain Gun Owners v. Polis* filed a motion for a pre-enforcement preliminary injunction of Colorado's three-day waiting period act. That motion was subsequently denied after the district court determined that the plaintiffs lacked standing to move to enjoin the waiting period act <u>before it was enforced</u>. *Rocky Mountain Gun Owners v. Polis*, No. 23-cv-01076-PAB-NRN, 2023 WL 5017257, at *5 (D. Colo. Aug. 7, 2023). Mindful of this recent decision in a neighboring state and wishing to avoid a quick dismissal based on lack of standing, Plaintiffs in the current case waited until the Waiting Period Act went into

effect on May 15th before bringing this action.

Plaintiffs have demonstrated that they have suffered an "injury in fact," that is "actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife,* 504 U.S. 555, 560 (1992). As outlined in Plaintiffs' declarations, on May 15, 2024, Plaintiff Ortega (a retired law enforcement officer) and Plaintiff Scott, both of whom are law-abiding adult residents of New Mexico, attempted to purchase firearms for their own self-defense and the defense of their families. Both cleared their federal instant background checks authorizing them to acquire these firearms, but when they attempted to take possession of the firearms so that they could transport them back to their residences, they were told that due to the Waiting Period Act, their firearms had to remain in the custody of the respective gun stores for the next seven days.

It is indisputable that the right to possess arms cannot be exercised unless individuals have the right to obtain them. *See Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (en banc) ("The core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms.") (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011). Any time that Plaintiffs or any other law-abiding resident of New Mexico attempts to purchase a firearm while the Waiting Period Act remains in effect, they will be denied possession of those firearms for a minimum of seven days, even if they have cleared a background check and rendered full payment. It is irrelevant to the discussion of harm that the denial of this basic Constitutional right is temporary or that the Plaintiffs in this case were ultimately able to take possession of the firearms they attempted to acquire on May 15th. As discussed in the Opening Brief, even a brief violation of constitutional rights constitutes irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373-74 (1976) (loss of constitutional freedom "for even minimal periods of time" unquestionably constitutes irreparable injury).

**B. The Balance of Harms and Public Interest Factors Support Entry of Injunctive Relief**

It is not only Plaintiffs' Second Amendment rights that have been violated by the Waiting Period Act, but also those of all law-abiding New Mexicans seeking to purchase a firearm. Because of that, the balance of equities in this case weighs in favor of granting a preliminary injunction. "[P]ublic interest concerns are implicated when a constitutional right has been violated, [and] all citizens have a stake in upholding the Constitution." *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023) (internal citation and quotation marks omitted; cleaned up). In *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010), the Tenth Circuit held that when applying these factors, courts must be mindful that even if a state is pursuing a legitimate goal (in that case, deterring illegal immigration), it has no interest in doing so by unconstitutional means, because a state "does not have an interest in enforcing a law that is likely constitutionally infirm." *Id*. "Moreover, the public interest will perforce be served by enjoining the enforcement of the invalid provisions of state law." *Id*. (internal quotation marks and citation omitted). *See also Utah Licensed Beverage Ass'n v. Leavitt*, 256 F.3d 1061, 1076 (10th Cir. 2001) (public interest favors preliminarily enjoining state statutes likely to be held unconstitutional).

In the present case, Defendants argue that because there is an important government interest advanced by the Waiting Period Act (namely, reducing impulsive gun suicides and homicides), the balance of harm tips in the Defendants' favor. But in making this argument, Defendants are asking the Court to employ the type of backdoor means-end test that has been rejected by *Bruen*. *See Bruen,* 597 U.S. at 24-25. "[T]he government may not simply posit that the regulation promotes an important interest [such as public safety]" *Id*. at 17.  Even if true, that potential outcome is irrelevant to the constitutionality of the Waiting Period Act.  And it is easy to see why the Supreme Court in *Bruen* explicitly forbade consideration of the proposed outcome of laws that implicate the Second Amendment. The state could just as easily enact a law that the delayed release

11

of news critical of the state would save lives and find an expert to opine on the result; or delaying the right to an attorney; or to peaceably assemble, and on, and on until the right itself was watered down to nonexistence.

### VIII.    CONCLUSION

The Waiting Period Act is an unconstitutional burden on the exercise of law-abiding New Mexicans' Second Amendment rights. Plaintiffs brought this case to prevent the infringement on the right of all New Mexicans to keep and bear arms. It would be troubling to let these violations continue to occur until final judgment can be entered in the case. For this reason, the Plaintiffs respectfully request that this Court issue a preliminary injunction.

DATED: June 18, 2024

Respectfully submitted,
*/s Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

Michael D. McCoy
Sean D. Nation
Robert Welsh
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, Colorado 80227
Phone: (303) 292-2021
mmccoy@mslegal.org

Joseph G.S. Greenlee
Erin M. Erhardt
**National Rifle Association of America**
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

***Attorneys for Plaintiff***