# Exhibit A

**Expert Report and Declaration**

**of Professor F. Lee Francis**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

SAMUEL ORTEGA and )
REBECCA SCOTT )
  )
   Plaintiffs, )     No. 1:24-cv-00471-JB-SCY
  )
   v. )
  )
MICHELLE LUJAN GRISHAM, in her )
Official capacity as Governor of the State )
Of New Mexico, and RAUL TORREZ, )
in his official capacity Attorney General )
of the State of New Mexico, )

   Defendants.

### EXPERT REPORT AND DECLARATION
### OF PROFESSOR F. LEE FRANCIS

I, F. Lee Francis, declare that the following is true and correct:

1. I have been asked to provide an expert opinion on the history of firearms waiting periods, their effectiveness, and to address the Declarations of Professors Robert Spitzer and Randolph Roth. My report below explores these issues in detail.

2. This declaration is based on my own knowledge and experience, and if I am called to testify as a witness, I could and would testify competently to the truth of the matters discussed in this declaration.

### BACKGROUND AND QUALIFICATIONS

3.      Beginning July 1, 2024, I will join the faculty of Widener University Commonwealth Law School as an Assistant Professor of Law. Most recently, I was an Assistant Professor of Law at Mississippi College School of Law in Jackson, Mississippi. I have a master's degree in English from the University of North Carolina at Greensboro, and a Juris Doctorate from the Maurice A. Deane School of Law at Hofstra University. At Widener University, my course load will include teaching courses in Constitutional Law, Criminal Procedure, and Evidence. Prior to my appointment as a professor, I served as a Special Assistant United States Attorney in the Eastern District of North Carolina where I prosecuted firearms related offenses. A copy of my complete curriculum vitae (CV) is attached to this declaration as Exhibit A.

4.      My scholarship on the Second Amendment and the history of firearms regulation has been cited by a federal court.[1] I have published multiple articles on this topic that have appeared in leading law reviews.[2]

5.      I have been invited to present lectures, papers at faculty workshops, and participated in conferences on the Second Amendment and the history of

---

[1] For a complete list of court citations, see my CV attached as Exhibit A to this report.
[2] Particularly relevant publications include F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms,* WEST VIRGINIA LAW REVIEW *(Forthcoming 2025)*; F. Lee Francis, *Defining Dangerousness: When Disarmament is Appropriate*, TEXAS TECH LAW REVIEW (Forthcoming 2024). A full list of relevant publications is also included in my CV.

firearms regulation at Duke University Law School, Southern Methodist University Dedman School of Law, and Mississippi College School of Law.

## RETENTION AND COMPENSATION

6.　　I have been retained to render expert opinions in this case. I am being compensated for services performed in the above-entitled case at an hourly rate of $400 for reviewing materials, participating in meetings, and preparing reports, $400 for depositions and court appearances, and compensation for travel expenses. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

## BASIS FOR OPINION AND MATERIALS CONSIDERED

7.　　Counsel for Plaintiffs provided me with the operative Complaint, Answer, Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, Defendants' Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, and Statement Respecting Plaintiffs' Request for Temporary Restraining Order. Otherwise, my report is based on my independent research.  In my report, I cite to a variety of scholarly articles, laws, cases, popular and learned constitutional commentaries, and various other related materials on which I based my opinions. The materials cited in this report are a subset of the relevant materials I have consulted to understand the contours of American constitutional history that are relevant to understanding the historical issues posed

by this case.

## I.    FIREARM WAITING PERIODS

8.    I agree with the proponents of the law when they confirm that waiting periods, as they are understood today, did not exist during the Founding Era. They are a wholly modern development and do not comport with the history and tradition standard established by the Supreme Court.

9.    During the colonial period, firearms were an essential part of daily life. They were primarily used for hunting and for defending one's home or community.[3]

10.    Spitzer emphasizes the large number of firearms dealers currently in the U.S. While I do not question the estimation, I am skeptical of the implication. For instance, in 1790, the U.S. population was just shy of 4 million people.[4] During the early colonial and early Republic periods, it would not be uncommon for individuals to make their own firearms.[5]

11.    The U.S. population today is more than 335 million people.[6] That is

---

[3] Joseph G.S. Greenlee, *The American Tradition of Self-Made Arms*, 54 ST. MARY'S L.J. 35 (2023) ("Since the earliest colonial days, Americans have been busily manufacturing and repairing arms. In the colonies, the ability to defend one's home and community, hunt, fight wars, and ultimately win American independence depended largely on the ability to produce arms. For the newly independent nation, arms production was critical to repel invasions and insurrections, and eventually, to western expansion. The skill was always valued and in demand, and many Americans made their own arms rather than depend on others.").

[4] US Census data, https://www.census.gov/history/www/through_the_decades/fast_facts/1790_fast_facts.html

[5] *See supra note* 3.

[6] US Commerce Dept., https://www.commerce.gov/news/blog/2024/01/census-bureau-projects-

more than 80 times the population of 1790. Thus, it is not surprising that there are so many firearms dealers today. Rather than assume that the absence of historical waiting periods is due to a lack of demand or availability, a more plausible explanation is that at the time many citizens possessed skill that did not always require them to seek out retailers. Many citizens would make their own clothing, hunt for their own meat, and raise their own cattle.

12.     While many did make their own firearms, this should not be understood to assert that firearms were not commonly available to the public. Historical sources including advertisement and state probate records clearly support the notion that firearms were generally available for purchase during the Founding period.

### A.     FIREARM AVAILABILITY DURING THE COLONIAL ERA

13.     Spitzer's declaration concedes the fact that waiting periods "did not exist early in the country's history." However, to justify the waiting period in this case, he contends that such was not necessary because there was no "Guns-R-Us" retailers during the Founding Era:

> First, in the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers, private sales, gun shows, and through internet sales. This modern sales system was key to the enactment of waiting periods. No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until

us-and-world-populations-new-years-day

the end of the nineteenth century, when mass production techniques,
improved technology and materials, and escalating marketing
campaigns all made guns relatively cheap, prolific, reliable, and easy
to get.

14.     This point is misleading and not a complete depiction of the history.

For example, probate records indicate that in more densely populated areas, firearm

ownership was considerably high:

> Guns are found in 50-73% of the male estates in each of the eight
> databases and in 6-38% of the female estates in each of the first four
> databases. Gun ownership is particularly high compared to other
> common items. For example, in 813 itemized male inventories from
> the 1774 Jones national database, guns are listed in 54% of estates,
> compared to only 30% of estates listing any cash, 14% listing swords
> or edged weapons, 25% listing Bibles, 62% listing any book, and 79%
> listing any clothes.[7]

15.     While it may be difficult to accurately ascertain the number of

gunsmiths and gun makers that existed during the Founding Era until the early

nineteenth century, there are a large number of historical newspaper advertisements

indicating that firearm sales were common and accessible.

16.     During a search of historical newspaper advertisements in the

*Pennsylvania Gazette* from 1728 through 1800, I found a great number of ads for

firearms. One such ad was that of a merchant named Peter Turner who, in 1741, was

liquidating his property before setting sail to London. Of the property he sought to

---

[7] James Lindgren and Justin L. Heather, *Counting Guns in Early America*, 43 WILLIAM
AND MARY L. REV. 1777, 1778 (2002).

relieve himself of items included "Rifle barrel Guns,… with several sorts of fowling Pieces [akin to a shotgun]…."[8]

17.     Indeed, even large quantities of firearms were available for purchase. For example, in 1745, a gentleman named Commissary Dart sold 300 muskets and bayonets out of his home.[9] Similarly, in 1748, "12 fine carriage guns, "12 swivels [akin to small cannons], a parcel [of] fine blunderbusses, muskets, [and] pistols" were auctioned during a sale in Pennsylvania.[10] Another ad in the 1748 newspaper offered for sale "a parcel of small arms, pistols, cutlasses, 16 fine cannon . . . swivel guns, grenadoes, and other warlike stores" and a notice of an upcoming auction where "10 carriage guns, and 6 swivel guns" would be sold.[11] A Connecticut newspaper featured an ad by a local store selling 26 Horsemen's Pistols [52 handguns].[12]

18.     The common thread central to each of these examples is that while firearms were generally accessible and available to the public both in small individual sales and in bulk quantities, neither required a waiting period. There are numerous other similar ads, as well as many ads offering muskets, pistols, and gunpowder for sale, as well as parts for making guns.[13]

---

[8] *Pennsylvania Gazette*, July 30, 1741.
[9] *South Carolina Gazette*, June 1, 1745, at 2.
[10] *Pennsylvania Gazette*, Sep. 15, 1748.
[11] *Pennsylvania Gazette*, Mar. 29, 1748.
[12] *Connecticut Courant*, Mar. 7, 1797.
[13] *JUST imported from London*, PENNSYLVANIA GAZETTE, November 1, 1744, 4; Id., September 26, 1745.

## B.    FIREARMS AND INTOXICATION LAWS

19.    Spitzer's report seemingly equates historical state laws regulating firearm use and intoxication laws with modern waiting period restrictions:

> An interesting, instructive, and analogous historical parallel to waiting periods is gun laws pertaining to alcohol use and intoxication. These measures mimicked waiting periods because, for the most part, they prevented gun acquisition or use only for the period of time of actual intoxication (leaving aside those individuals for which chronic intoxication was a more-or-less permanent condition). When a person became sober, the intoxication barrier disappeared.[14]

20.    I contend that this is not the most natural or apt comparison for the following reasons.

21.    A waiting period prevents someone from *obtaining* a firearm. None of the historical statutes from the Founding Era cited in Spitzer's report indicate a similar intrusion on the right to bear arms. To put it another way, merely being intoxicated during the Founding Era would not have prohibited an individual from obtaining a firearm. This is a separate consideration from those of *use* of a firearm while intoxicated. Of the few laws that did regulate drinking while shooting, the impact was de minimis at best:

> A trio of laws passed between 1761 and 1775 in New York and New Jersey restricted the discharge of firearms on certain occasions. These laws, however, did not prevent the carrying while intoxicated, nor was intoxication an element of the offense. What is more, the New York ordinance clearly permitted the use of a firearm while drinking, save for only two days out of the year. Therefore, there was a strong tradition

---

[14] Spitzer's Declaration p. 7.

of permitting drinking while shooting.[15]

22.    It is true that excessive alcohol consumption and drunkenness was pervasive during the colonial period.[16] In the seventeenth and eighteenth centuries, it was commonplace:

> During the seventeenth and eighteenth centuries, habitual drunkenness was commonplace.[17] It is not unreasonable to think that individuals drank due to some hardship or other difficulties of the time, rather people drank simply because they wanted to, not out of necessity.[18]

23.    Moreover, drinking did not occur silently in the privacy of one's home or during an occasional gathering at the local tavern. quite the contrary, people drank everywhere:

> [Alcohol] flowed freely at weddings, christenings and funerals, at the building of churches, the installation of pews and the ordination of

---

[15] F. Lee Francis, *Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After Bruen*, 107 Marq. L. Rev. 803 (2024).

[16] H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978) ("Seventeenth century and especially eighteenth century America was notable for the amount of alcoholic beverages consumed, the universality of their use and the high esteem they were accorded. Liquor was food, medicine and social lubricant, and even such a Puritan divine as Cotton Mather called it the "good creature of God.").

[17] H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978) ("Seventeenth century and especially eighteenth century America was notable for the amount of alcoholic beverages consumed, the universality of their use and the high esteem they were accorded. Liquor was food, medicine and social lubricant, and even such a Puritan divine as Cotton Mather called it the "good creature of God.").

[18] F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, West Virginia Law Review (Forthcoming 2025); *see also* H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978) ("Seventeenth century and especially eighteenth century America was notable for the amount of alcoholic beverages consumed, the universality of their use and the high esteem they were accorded. Liquor was food, medicine and social lubricant, and even such a Puritan divine as Cotton Mather called it the "good creature of God.").

ministers. For example, in 1678 at the funeral of a Boston minister's wife, mourners consumed 51 l/2 gallons of wine; at the ordination of Reverend Edwin Jackson of Woburn, Massachusetts, the guests drank 6 1/2 barrels of cider, along with 25 gallons of wine, 2 gallons of brandy and 4 gallons of rum. Heavy drinking was also part of special occasions like corn huskings, barn raisings, court and meeting days, and especially militia training days. Workers received a daily allotment of rum, and certain days were set aside for drunken bouts; in some cases, employers paid for the liquor.[19]

24.     In the nineteenth century, drinking to excess continued, and age was no discriminator:

White males were taught to drink as children, even as babies. As soon as a toddler was old enough to drink from a cup, he was coaxed to consume the sugary residue at the bottom of an adult's nearly empty glass of spirits. Adolescents perceived drinking at a public house to be a mark of manhood. Men encouraged this youthful drinking.[20]

25.     Thus, when people drank, it was to get drunk.[21]

26.     Our Founders were brilliant men. They knew the world and enjoyed many of its vices, including alcohol. Drunkenness was not foreign to them, nor did it elude them. When the Second Amendment was drafted and ratified, they simply did not consider alcohol or drunkenness to be a reason to deprive one of their rights to keep and bear arms.

27.     However, as Spitzer notes, such was not a basis for prohibiting an

---

[19] H.G. Levine, *The Discovery of Addiction Changing Conceptions of Habitual Drunkenness in America*, 39 Journal of Studies on Alcohol 143 (1978).

[20] W.J. RORABAUGH, THE ALCOHOLIC REPUBLIC: AN AMERICAN TRADITION (1979).

[21] *Id*. ("Americans drank wine, beer, cider and distilled spirits, especially rum. They drank at home, at work and while traveling; they drank morning, noon and night. And they got drunk.").

individual from obtaining a firearm until the late nineteenth century, more than 100 years after the Founding.[22]

28.    What is more, implicit in Spitzer's analysis of intoxicant laws is the fact that those laws did not prohibit an individual from simply carrying or possessing firearms.[23]

29.    Further still, many, if not all, of the laws regulating firearm use or possession while intoxicated fall outside the relevant time period as explained by the Supreme Court in *Bruen*.[24]

30.    What is more, many of the precedent surrounding these laws were decided before *Bruen* and many of those courts applied the now defunct two-step intermediate scrutiny approach rejected by the *Bruen* majority.[25]

31.    These pre-*Bruen* precedents are ripe for challenge, and under the history and tradition standard articulated by the High Court, these laws likely won't

---

[22] See Spitzer Declaration at 11. ("In 1878, 1880, and 1908, Mississippi enacted laws that made it illegal "to sell to any minor or person intoxicated" any pistol or other named weapon.").
[23] State v. Christen, 2021 WI 39 (2021) (R.G. Bradley, J., dissenting) ("From before the enactment of the Second Amendment through the late-18th and early-19th centuries, legislatures did not limit the individual right to bear arms while under the influence of an intoxicant. Indeed, few colonial-era laws even regulated the use of firearms while consuming alcohol, and none dealt with carrying while intoxicated."); *see also* F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (Forthcoming 2025).
[24] New York State Rifle & Pistol Association, Inc. v. Bruen, 597 U.S. ___ (2022) ("As we suggested in Heller, however, late-19th [and 20th] centur[ies] evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence.").
[25] *See* People v. Wilder, 861 N.W.2d 645 (Mich. Ct. App. 2014); *see also* State v. Christen, 2021 WI 39.

pass constitutional muster.[26]

32.    To test the point further, much like alcohol regulations, laws restricting drug use were not enacted until 1875.[27] Notably, this ordinance did not restrict an individual's right to keep and bear nor did it prevent individuals from obtaining firearms while under the influence. Such laws did not exist until the twentieth century.[28]

33.    The 1655 Virginia statute referenced in Spitzer's report fails to provide the necessary context to the law. The law had a practical purpose, to prevent the false alarm of an Indian attack:

> [P]rior to the formation of the Republic, British colonies, such as those in Pennsylvania, Virginia, and Massachusetts, appear to have been predominantly concerned with what they perceived as defending themselves against unjustified attacks by Indians. Virginia, for instance, passed a statute in 1655–56 that outlawed the 'shoot[ing] of any gunns at drinkeing (marriages and ffuneralls onely excepted) [sic].' The reason for the law was that 'gunshots were the common alarm of Indian attack,' 'of which no certainty

---

[26] See F. Lee Francis, *Armed and Under the Influence: The Second Amendment and the Intoxicant Rule After Bruen*, 107 Marq. L. Rev. 803 (2024) (arguing that laws restricting the right to keep and bear arms due to intoxication are unconstitutional.).

[27] *See Order No.* 1254, S.F. EXAMINER, Nov. 24, 1875, at 2; see also James Baumohl, *The Dope Fiend's Paradise' Revisited: Notes from Research in Progress on Drug Law Enforcement in San Francisco*, 1875-1915, 24 THE SURVEYOR 3 (1992) ("[To] keep or maintain, or become an inmate of, or visit, or … in any way contribute to the support of any place, house or room, where opium is smoked, or where persons assemble for the purpose of moking opium, or inhaling the fumes of opium[.]").

[28] F. Lee Francis, *The Addiction Restriction: Addiction and the Right to Bear Arms*, WEST VIRGINIA LAW REVIEW (Forthcoming 2025) ("However, it would take Congress until the early twentieth century to pass significant legislation regulating the use of drugs. True, these laws were keen on regulating the use and distribution of drugs, but nowhere was a restriction on an individual's right to bear arms contemplated. Indeed, a prohibition of this sort did not become law until 1993.").

can be had in respect of the frequent shooting of guns in drinking.'[29]

34.     On page 11 of Spitzer's declaration, he quotes the 1636 Rhode Island

statute:

> "In 1636 Rhode Island enacted a measure to punish any who would
> engage in 'shooting out any gun . . . drinking in any tavern alehouse . .
> . on the first day of the week more than necessity requireth.'"

35.     The full text of the statute reads as follows:

> And bee it further enacted by the authority aforesaid, That any person
> or persons shall presume to sport, game or play at any manner of
> game or games, *or shooting on the first day of the weeke* as aforesaid,
> or shall sit tippling and drinking in any tavern, ale-house, ordinary or
> victualling house on the first day of the weeke, more than necessity
> requireth [emphasis added].[30]

36.     This was likely a statute intending to preserve the Sabbath. In fact, it

forbade all varieties of sport as well as drinking on the Sabbath. It did not, however,

prohibit one from being armed while intoxicated.

37.     The statutes referenced in Spitzer's report enacted between 1623-1750

clearly did not prohibit an individual from obtaining a firearm while intoxicated. The

---

[29] Ann E. Tweedy, "*Hostile Indian Tribes . . . Outlaws, Wolves, . . . Bears . . . Grizzlies and Things Like That?" How the Second Amendment and Supreme Court Precedent Target Tribal Self-Defense*, 13 U. PA. J. CONST. L. 687, 698 (2011).
[30] 3 RECORDS OF THE COLONY OF RHODE ISLAND, AND PROVIDENCE PLANTATIONS, IN NEW ENGLAND 31 (1858).
https://books.google.com/books?id=ehxPAQAAMAAJ&newbks=1&newbks_redir=0&dq=%22 That%20any%20person%20or%20persons%20shall%20presume%20to%20sport%2C%20game %20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&pg=PA31#v= onepage&q=%22That%20any%20person%20or%20persons%20shall%20presume%20to%20spo rt,%20game%20or%20play%20at%20any%20manner%20of%20game%20or%20games%22&f= false.

earliest statute that is even remotely supportive of the proponent's view was not enacted until 1878 and falls outside of the relevant historical period under *Bruen*. Furthermore, restrictions on alcohol consumption are no justification for firearm waiting periods. Limiting where one may choose to imbibe is not tantamount to preventing one from obtaining a firearm.

## II.   THE PURPOSE OF WAITING PERIODS

38.     Spitzer explains in his report that the purpose of waiting periods:

"By its nature, a gun waiting period simply delays an otherwise lawful purchase for sound [sic] two reasons: to complete a proper background check to ensure that the individual is not among those not qualified to have a gun; and to provide a cooling off period for those who seek to obtain a gun impulsively for homicidal or suicidal reasons."

39.     Notwithstanding the national background check system currently in place, the New Mexico statute seemingly imposes a waiting period irrespective of whether the background check yields a clean result before the mandatory seven-day period: "The firearm shall remain in the custody of the seller or the federal firearms licensee performing the federal instant background check during the entirety of the waiting period."[31]

40.     If the purpose of the statute is to provide a "cooling off" period, then such is an unconstitutional end-means approach expressly rejected by *Bruen*:

In the years since, the Courts of Appeals have coalesced around a "two-

---

[31] § 30-7-7.3, Unlawful Sale of a Firearm Before Required Waiting Period Ends.

step" framework for analyzing Second Amendment challenges that combines history with means-end scrutiny. Today, we decline to adopt that two-part approach. In keeping with Heller, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."[32]

41.    The government's policy concerns may be reasonable, but without a plausible showing that this regulatory scheme is consistent with our Nation's history and tradition, the law should be struck down under the *Bruen* Framework.

## III.  ROTH'S HOMICIDE RATES

42.    Roth's homicide rates should not be confused with *murder* rates. Though, it seems the two are conflated in Spitzer's report:

> Third, as Randall Roth reports, homicide rates in the colonies and early Federal era were generally low, and when homicides occurred, guns were seldom used because of the time involved loading them, their unreliability, and (especially for pistols) their inaccuracy. More specifically, muzzle loading firearms were problematic as implements for murder: they did not lend themselves to impulsive use unless already loaded (and it was generally unwise to leave them loaded for extended periods because their firing reliability degraded over time). Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict.

---

[32] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022).

43.     Roth explains that he is focused on *homicide* rates that include "assaults that were legally justified or not meant to cause death." This catch-all category does not truly capture the data Spitzer implies.

44.     If we are to consider today's murder rates, the essential question to be addressed is whether law-abiding individuals, subject to the waiting periods, who legally purchase firearms are likely to commit such violence.

45.     Spitzer implies that a waiting period helps to reduce gun violence because it gives the individual time for "cooling off." However, the data suggests that law-abiding citizens subject to a waiting period are less likely to engage in intentional and unprovoked gun violence.

46.     In fact, leading research studies suggest that "different types of access to firearms may have divergent effects on rates of violent crime, suggesting that all gun availability may not have the same effect on crime rates."[33]

47.     Furthermore, scientists believe that legally acquired firearms are more likely to be used in a defensive situation, as in a justifiable homicide context, rather than used in a criminally offensive manner.[34] Most importantly, the data indicates that there is likely "no relationship to criminal violence" when firearms are obtained

---

[33] Daniel C. Semenza, et al., *Firearm Availability, Homicide, and the Context of Structural Disadvantage,* 27 Homicide Studies 2 (2021); see also Philip J. Cook, *The Effect of Gun Availability on Robbery and Robbery Murder: A Cross-Section Study of Fifty* Cities (1979).
[34] *Id.* ("More specifically, illegally obtained guns may be more likely to be used during the course of a violent crime, whereas legally obtained weapons may be more salient in a defensive context or have no relationship to criminal violence at all.").

through legal means.[35]

48.    Scientists agree, as the data show, "that the availability of illegal guns influences violent crime rates" more than guns obtained legally.[36] In a study examining how guns come into police possession, experts found that 79 percent of perpetrators apprehended by police were carrying stolen firearms:

> Most cases involve a single perpetrator. Traffic stop and street patrol accounted for 31% of method of recovery. Most perpetrators (79%) were carrying a gun that did not belong to them.[37]

49.    To be clear, this data is widely accepted across the political spectrum. Even progressive gun control groups such as Everytown for Gun Safety Support Fund agree that "the majority of homicides and assaults involve stolen or illegal guns."[38]

## IV.    SUICIDE RATES

50.    It is true that suicide has plagued our society since the Colonial Era. Still today, the subject continues to perplex and elude experts in our advanced

---

[35] *Id. See also* Lisa Stolzenberg and Stewart J. D'Alessio, *Gun Availability and Violent Crime: New Evidence from the National Incident-Based Reporting System*, SOCIAL FORCES, Volume 78, Issue 4, June 2000, Pages 1461–1482, https://doi.org/10.1093/sf/78.4.1461
[36] *Id.* See also
[37] Anthony Fabio, et al., *Gaps continue in firearm surveillance: Evidence from a large U.S. City Bureau of Police, Social Medicine*, Volume 10, Number 1, July 2016 ("Given that 79% of perpetrators are connected to firearms for which they are not the legal owner, it is highly likely that a significant amount of theft or trafficking is the source of perpetrators' firearms."), https://socialmedicine.info/index.php/socialmedicine/article/view/852/1649
[38] Jay Szkola, et al., "Gun Thefts from Cars: The Largest Source of Stolen Guns," Everytown Research and Policy, 5/9/2024, https://everytownresearch.org/report/gun-thefts-from-cars-the-largest-source-of-stolen-guns-2/

society. It is also true that firearms are one of the leading means of suicide today.

51.    However, the data surrounding firearm related suicides are not as plain and clear as the proponents and its experts contend.

52.    Like the data addressing homicide and murder statistics, the narrow question requiring redress in the context of firearm related suicide is whether those who lawfully obtain firearms are the primary victims of suicide. Upon further examination, the data seemingly indicates that the answer is no.

53.    A recent study found that "The association between firearm ownership and suicide was approximately 2 times stronger among adolescents relative to adults."[39] Many states as well as federal firearms licensees prohibit individuals under the age of 21 from purchasing handgun. A waiting period simply does not reach those with an increased risk for suicide. This proves that the typical law-abiding citizen seeking to purchase firearms are not in the class of individuals who would use a firearm for self-harm. If the purpose of waiting periods is to reduce suicide rates, then such an aim is clearly overbroad.

54.    The proponents of the waiting period system note on several occasions that the plan would provide a cooling off period which would limit "those who seek

---

[39] Kivisto AJ, Kivisto KL, Gurnell E, et al.. *Adolescent suicide, household firearm ownership, and the effects of child access prevention laws*. J AM ACAD CHILD ADOLESC PSYCHIATRY 2020 ("There were 37,652 suicides among adolescents aged 14 to 18 years during the study period (1991−2017), for an overall rate of 6.9 per 100,000. Slightly more than half of all adolescent suicides (51.5%, n = 19,402) were with a firearm, for a rate of 3.6 per 100,000. For comparison, 53.9% of adult suicides used a firearm during the same time period.").

to obtain a gun impulsively for homicidal or suicidal reasons."[40] They also claim that the "purpose of a modern gun purchase waiting period is to provide a 'cooling off' period for the prospective purchaser—very much like a "sobering up" period for someone who is intoxicated."[41]

55.     Again, the data does not support these claims. For example, more than 76 percent of suicide attempters "did not attempt impulsively."[42] This is also true within the adolescent population where "less than 10% of the adolescents who had attempted suicide in their sample had done so impulsively. Again, these findings are consistent with the idea that suicide attempts "on a whim" are quite rare."[43]

56.     Thus, because most individuals who intend to commit suicide plan well in advance of the act itself, a waiting period would likely not impede their decision. As such, its utility has significantly less value than the proponents of the law claim. Therefore, this general prohibition on the right to keep and bear arms is again overbroad.

## V.    HISTORICAL LICENSING LAWS

57.     Spitzer references several laws that he claims to be analogues to modern waiting period laws. This presumption is seriously flawed for two reasons.

---

[40] Spitzer Declaration at 6.
[41] Spitzer Declaration at 7.
[42] April R. Smith, et al., *Revisiting impulsivity in suicide: implications for civil liability of third parties*. 26 BEHAV SCI LAW 779 (2008),
https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2597102/.
[43] *Id*.

58.     First, nearly all of the statutes cited by Spitzer fall outside the relevant period determined by the *Bruen* majority.[44]

59.     True, in a concurring opinion Justice Barrett inquired as to whether laws enacted around 1868 would be relevant for understanding the scope of the right to keep and bear arms following the passage of the Fourteenth Amendment:

> Second and relatedly, the Court avoids another "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868" or when the Bill of Rights was ratified in 1791.[45]

60.     However, the statute at issue in *Bruen*, the New Mexico waiting period and the licensing laws referenced by Spitzer fail regardless of whether the proper period is the Founding Era or Reconstruction.

61.     The New York statute required an applicant to prove "proper cause exists" in order to carry a firearm in public. The Supreme Court struck down the 1913 statute finding that the law prevented an individual from exercising their constitutional right to keep and bear arms:

> Throughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms. But apart from a handful of late19th-century jurisdictions, the historical record compiled by respondents does not demonstrate a tradition of broadly prohibiting the public carry of commonly used

---

[44] *See Supra* note 24.
[45] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1 (2022) (Barrett, J., concurring).

firearms for self-defense. Nor is there any such historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense. We conclude that respondents have failed to meet their burden to identify an American tradition justifying New York's proper cause requirement. Under Heller's text-and-history standard, the proper-cause requirement is therefore unconstitutional.[46]

62.     The proponents rightly concede that there is no historical tradition of requiring individuals to wait before acquiring firearms. Like the statute at issue in *Bruen*, requiring an individual to wait a period of time is tantamount to prohibiting an individual from exercising their constitutional right. Thus, because there is no historical tradition of requiring an individual to wait prior to taking possession of a firearm, the New Mexico waiting period fails regardless of whether the relevant time period is 1791 or 1868.

63.     Second, of the Founding Era statutes Spitzer cites none of them actually require one to postpone taking possession of a firearm. Even when a permit or license is required to hunt, Spitzer has shown no evidence that the individual would be required to wait for any period of time before taking possession of his firearm regardless of whether he'd be permitted to hunt. There is simply no historical basis to support this statute.

---

[46] *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 29-30 (2022)

I declare under penalty of perjury under the laws of the State of New Mexico that the foregoing is true and correct.

Executed on June 17, 2024

_____

F. Lee Francis