IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

SAMUEL ORTEGA, and
REBECCA SCOTT,

    Plaintiffs,

vs.                                            No. 1:24-cv-00471-JB-SCY

MICHELLE LUJAN GRISHAM, in her
official capacity as Governor of the State of
New Mexico, and RAÚL TORREZ, in his
official capacity as Attorney General of the
State of New Mexico,

    Defendants.

**DEFENDANTS' JOINT SUPPLEMENTAL BRIEF**

    Governor Michelle Lujan Grisham and Attorney General Raúl Torrez (collectively, "Defendants"), by and through their respective counsel of record, hereby submit their supplemental brief pursuant to the Court's leave granted orally at the June 27, 2024, preliminary injunction hearing.

**INTRODUCTION**

    On June 21, 2024, the United States Supreme Court issued its opinion in *United States v. Rahimi*, 602 U.S. __, 2024 WL 3074728 (U.S. June 21, 2024), its first Second Amendment decision following *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022). At the outset, it is important to note what *Rahimi* did *not* do. Contrary to the Court's initial concerns expressed at last week's preliminary injunction hearing, *Rahimi* did not abandon *Bruen*'s first step in which courts must consider whether the regulated conduct is protected by Second Amendment's plain text. Nor did it abrogate *Heller*'s list of "presumptively lawful" measures, such as "laws imposing conditions

1

and qualifications on the commercial sale of arms." *D.C. v. Heller*, 554 U.S. 570, 626-27 &. n.26 (2008). Thus, this Court need not doubt its preliminary conclusion that Plaintiffs are unlikely to succeed because (1) the Second Amendment's plain text does not cover the right to immediately acquire a newly purchased firearm and (2) the challenged waiting period is a presumptively lawful commercial regulation.

While *Rahimi* did not shed much, if any, light on *Bruen*'s first step, it *did* provide much needed clarification to lower courts applying the second step of the *Bruen* test and addressing facial challenges to firearm regulations. Regarding *Bruen*'s second step, *Rahimi* clarified that (1) courts should apply *Bruen*'s "more nuanced" approach to identifying historical analogs even if a modern law is addressing general societal issues that existed at the time of the founding; (2) courts may rely on historical laws to justify a modern regulation even though those laws addressed different societal issues so long as the modern regulation is consistent with the principles underlying the historical laws; and (3) *Bruen* allows for modern regulations that address longstanding or evolving societal issues through different means. Applying these clarifications to the instant case, it is clear waiting periods are consistent with the principles underlying historical regulations like intoxication laws and licensing regimes because they only impose a brief delay on an individual's ability to use a firearm to help ensure the deadly weapon is not misused. And regarding facial challenges, *Rahimi* confirmed that individuals bringing such a challenge to a firearm regulation—as Plaintiffs do here—must "establish *that no set of circumstances* exists under which the [challenged law] would be valid." *Rahimi*, 2024 WL 3074728, at *6 (cleaned up) (emphasis added). Because Plaintiffs obviously fail to meet this demanding standard, this Court should flatly reject their request for a preliminary injunction.

At bottom, while Defendants are confident the challenged waiting period in this case would have been upheld prior to the Supreme Court's latest decision, *Rahimi* solidifies that conclusion.

## BACKGROUND

On May 15, 2024, Plaintiffs filed the instant action against challenging New Mexico's newly enacted waiting period law, NMSA 1978, § 30-7-7.3 (2024), on the basis that it allegedly violates the Second Amendment. [Doc. 1] In addition to seeking declaratory and permanent injunctive relief, Plaintiffs moved for a temporary restraining order and preliminary injunction. [Doc. 2] Defendants filed their response to Plaintiffs' motion on June 4, 2024. [Doc. 15] Plaintiffs filed their reply on June 18, 2024. [Doc. 21] Three days later, the Supreme Court issued *Rahimi*, 2024 WL 3074728, a 103-page opinion upholding the constitutionality of 18 U.S.C. § 922(g)(8) in which it addresses lower courts' "misunderst[anding of] the methodology of [the Court's] recent Second Amendment cases[.]" *Rahimi*, 2024 WL 3074728, at *6. Given the significance of *Rahimi* on this Court's analysis of Plaintiffs' Second Amendment challenge, the Governor requested leave to file a supplemental brief on the issue. [Doc. 25] The Court also permitted the parties to address other issues raised by the Court at the June 27, 2024, preliminary injunction hearing—including the Court's concerns that *Rahimi* may have transformed *Bruen*'s two-part test into a single history and tradition inquiry for all firearm regulations regardless of whether they regulate conduct unprotected by the Second Amendment's plain text or are presumptively lawful.

## DISCUSSION

**I.**   ***United States v. Rahimi***

In *Rahimi*, the Supreme Court addressed whether 18 U.S.C. § 922(g)(8), a federal law prohibiting persons subject to certain domestic violence restraining orders from possessing a firearm, violated the Second Amendment. The Court began its analysis by observing that "the right

secured by the Second Amendment is not unlimited" and "was never thought to sweep indiscriminately." 2024 WL 3074728, at *5 (cleaned up). Thus, the Court noted, "the bearing of arms was subject to regulations ranging from rules about firearm storage to restrictions on gun use by drunken New Year's Eve revelers" since the founding. *Id.*

The Court then went on to summarize its holding in *D.C. v. Heller*, 554 U.S. 570 (2008), and *Bruen*, 597 U.S. 1, and the historical inquiry it directed courts to undertake in Second Amendment challenges. *Rahimi*, 2024 WL 3074728, at *6. However, the Court noted, "some courts have misunderstood the methodology of our recent Second Amendment cases." *Id.* The Court clarified:

> *These precedents were not meant to suggest a law trapped in amber*. As we explained in *Heller*, for example, the reach of the Second Amendment is not limited only to those arms that were in existence at the founding. Rather, it extends, prima facie, to all instruments that constitute bearable arms, even those that were not yet in existence. *By that same logic, the Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers.*

*Rahimi*, 2024 WL 3074728, at *6 (cleaned up) (emphases added).

Therefore, the Court explained, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition[,]" and "[a] court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, applying faithfully the balance struck by the founding generation to modern circumstances." *Id.* (cleaned up) (emphasis added). The Court reaffirmed *Bruen*'s direction that "[w]hy and how the regulation burdens the right are central to this inquiry." *Rahimi*, 2024 WL 3074728, at *6. Significantly, though, the Court observed:

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. . .

4

> . And when a challenged regulation does not precisely match its historical precursors, it still may be analogous enough to pass constitutional muster. The law must comport with the *principles* underlying the Second Amendment, but it need not be a "dead ringer" or a "historical twin."

*Rahimi*, 2024 WL 3074728, at *6 (cleaned up) (emphasis added).[1]

With these clarified principles in mind, the Court turned to the challenged regulation, § 922(g)(8). The Court began by observing that "[f]rom the earliest days of the common law, firearm regulations have included provisions barring people from misusing weapons to harm or menace others." *Rahimi*, 2024 WL 3074728, at *7. The Court focused on "two distinct legal regimes" that had developed by the 1700s and early 1800s: surety laws and going armed laws. *Id.* at **7-9. The former category of laws was a form of preventative justice in which a magistrate could jail "individuals suspected of future misbehavior" unless they posted a bond, which they would forfeit should they later break the peace. *Id.* at *8. And the latter category of laws, derived from the common-law prohibition on "affrays," broadly proscribed "riding or going armed, with dangerous or unusual weapons, [to] terrify[ ] the good people of the land." *Id.* at *9 (quoting 4 Blackstone 149).

"Taken together," the Court concluded, "the surety and going armed laws confirm what common sense suggests: When an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed." *Id.* at *9. This was true even though § 922(g)(8) "is by no means identical to these founding era regimes." *Rahimi*, 2024 WL 3074728, at *9. The Court found that § 922(g)(8) was still "relevantly similar" to the surety and going armed laws because it

---

[1] The Court again recognized the "ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government)." *Id.* at *6 n.1 (quoting *Bruen*, 597 U.S., at 37). And the Court again declined to resolve this debate. *Id.*

5

"applies to individuals found to threaten the physical safety of another" and "restricts gun use to mitigate demonstrated threats of physical violence." *Rahimi*, 2024 WL 3074728, at *9. Section 922(g)(8) was also relevantly similar in the sense that its prohibition is of limited duration and its penalty (i.e., temporary disarmament) was less severe than the punishment provided for under the going armed laws (i.e., imprisonment). *Rahimi*, 2024 WL 3074728, at *10. Thus, the Court concluded the federal law was constitutional on its face and as-applied to the challenger. *Id.* at *11.

## II. *Rahimi* did not alter or abandon the first step of the *Bruen* test or *Heller*'s list of presumptively lawful measures

As an initial matter, it is important to note what *Rahami* did *not* do. This Court raised concerns at the beginning of last week's preliminary injunction hearing that *Rahimi* may have turned *Bruen*'s two-step test into a single inquiry in which the government must justify its regulations by showing they are consistent with history and tradition, even if they fall within one of *Heller*'s categories of presumptively lawful measures, because the Supreme Court did not perform any analysis of *Bruen*'s first step in determining the constitutionality of § 922(g)(8). However, as discussed at the hearing, the Supreme Court did not need to address *Bruen*'s first step because § 922(g)(8) indisputably imposed on the defendant's right to "keep" and "bear" firearms. *See Rahimi*, 2024 WL 3074728, at *35 (Thomas, J., dissenting) ("It is undisputed that § 922(g)(8) targets conduct encompassed by the Second Amendment's plain text."). And so there is no reason to believe that the Supreme Court transformed *Bruen*'s two-step inquiry into a single history and tradition test simply because it did not address an obvious proposition.

Rather than read *Rahimi* as implicitly discarding *Bruen*'s first step—which would be a major change in Second Amendment jurisprudence—based on what the Court did *not* say, this Court should rely on what the Supreme Court *has* clearly said:

> We reiterate that the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.

*Bruen*, 597 U.S. at 24; *see generally Shalala v. Ill. Council on Long Term Care, Inc.*, 529 U.S. 1, 18 (2000) ("This Court does not normally overturn, or so dramatically limit, earlier authority *sub silentio*."); *cf. Vincent v. Garland*, 80 F.4th 1197, 1200 (10th Cir. 2023) (stating that district courts and the Tenth Circuit are obligated to apply Tenth Circuit precedent unless the Supreme Court "indisputably and pellucidly" abrogated it).

For this same reason, this Court should not read *Rahimi* as abrogating *Heller*'s list of "presumptively lawful" measures, including "laws imposing conditions and qualifications on the commercial sale of arms." *D.C. v. Heller*, 554 U.S. 570, 626-27 &. n.26 (2008); *see also Rocky Mountain Gun Owners v. Polis*, 2023 WL 8446495, at *2 (D. Colo. Nov. 13, 2023) (noting that "three of the justices from the majority indicated that the decision was not disturbing what was stated in *Heller* regarding presumptively lawful regulatory measures"). The Court did not need to address this category of presumptively lawful laws because no one argued that § 922(g)(8) qualified as one. *See generally Rahimi*, 2024 WL 3074728. If anything, *Rahimi* reaffirmed the ongoing viability of these presumptively lawful measures by citing this discussion with apparent approval. *See id.* at *9 (stating that "the Court does not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse" (citing *Heller*, 554 U.S., at 626); *id*. at *10 ("But *Heller* never established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home. In fact, our opinion stated that many such prohibitions, like

7

those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" (quoting *Heller*, 554 U.S. at 626, 627, n.26)).

In sum, this Court need not be concerned that *Rahimi* drastically transformed *Bruen*'s two-step test and abolished *Heller*'s category of presumptively lawful measures. If the Court intended to enact such a sea change in Second Amendment law, it would have done so clearly—as it did in *Bruen*. *See Shalala*, 529 U.S. at 18. Concluding otherwise would be a dangerous mistake. And, as explained previously, the plain text of the Second Amendment does not protect the right to immediately acquire a newly purchased firearm, and Section 30-7-7.3 qualifies as a presumptively lawful regulation imposing conditions and qualifications on the commercial sale of arms. [Doc. 15 at 8-14] Therefore, the Court has no reason to doubt its preliminary conclusion that Plaintiffs are unlikely to succeed on the merits of their challenge.

**III.    Intoxication laws and licensing regimes are sufficient to justify Section 30-7-7.3 under *Bruen*'s second step, as clarified by *Rahimi***

Given the foregoing, this Court need not analyze whether Section 30-7-7.3 is consistent with history and tradition under *Bruen*'s second step. *See* 597 U.S. at 24. However, should the Court decide to proceed to this step, it should conclude that waiting periods like the one imposed by Section 30-7-7.3 are consistent with the principles embodied in intoxication laws and licensing regimes because it simply briefly delays a person's ability to use a firearm to help ensure they will not misuse it.

**A.    *Rahimi*'s impact on *Bruen*'s second step**

The Supreme Court's decision in *Rahimi* provides several key clarifications to the second step of the *Bruen* test in which the government must show that a firearm regulation is consistent with history and tradition. First, *Rahimi* makes clear that the government need not show "unprecedented societal concerns" or "dramatic technological changes" that were "unimaginable

8

at the founding" to gain the benefit of *Bruen*'s "more nuanced approach" to finding historical analogs—as some have argued. *Bruen*, 597 U.S. 1, 27-28; *see, e.g.*, *Rocky Mountain Gun Owners*, 2023 WL 8446495, at *13 (addressing argument that a challenge to Colorado's waiting period law "is a straightforward case like *Heller* and *Bruen* since the problem of impulsive gun violence dates from the invention of guns" and "the complete absence of similar Founding-era regulations addressing a problem that was familiar to the Founders means the Act is inconsistent with the Second Amendment" (cleaned up)); *cf. Rahimi*, 2024 WL 3074728, at *43 (Thomas J., dissenting) (arguing that "[s]urety laws demonstrate that this case should have been a 'straightforward' inquiry" because the risk of interpersonal violence persisted since the 18th century). If this were not the case, the federal government could not have relied on surety and going armed laws to justify a "by no means identical" law addressing an issue that existed at the time of the founding (i.e., domestic violence). *Rahimi*, 2024 WL 3074728, at *9; *see id.* at *36 (Thomas, J., dissenting) ("The Government's failure is unsurprising given that § 922(g)(8) addresses a societal problem— the risk of interpersonal violence—that has persisted since the 18th century, yet was addressed through the materially different means of surety laws." (cleaned up)).

Second, *Rahimi* clarifies that courts may rely on historical laws to justify a modern regulation even though those laws addressed different societal issues so long as the modern regulation is consistent with the *principles* underlying the historical laws. *See Rahimi*, 2024 WL 3074728, at *6; *see also id.* at * 12 (Sotomayor, J. concurring) ("The Court's opinion also clarifies an important methodological point that bears repeating: Rather than asking whether a present-day gun regulation has a precise historical analogue, courts applying *Bruen* should consider whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." (cleaned up)); *id.* at *30 (Barrett, J., concurring) (similar); *id.* at *31 (Jackson, J., concurring)

(similar). Accordingly, the federal government was able to rely on going armed laws to justify a law addressing domestic violence even though going armed laws were aimed at a different societal problem (i.e., threatening *public* peace) because they shared the same underlying principle of protecting against individuals who posed a threat to others. *Compare id.* at **8-11, *with id.* at *44 (Thomas J., dissenting).

Third, and relatedly, *Rahimi* reinforces that *Bruen*'s test is not a "regulatory straightjacket" and allows for modern regulations that address longstanding or evolving societal issues through different—or even stricter—ways. *See id.* at *6 ("These precedents were not meant to suggest a law trapped in amber. . . . [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791."). As Justice Barrett explains more fully in her concurrence:

> Courts have struggled with this use of history in the wake of *Bruen*. One difficulty is a level of generality problem: Must the government produce a founding-era relative of the challenged regulation—if not a twin, a cousin? Or do founding-era gun regulations yield concrete principles that mark the borders of the right?
>
> Many courts, including the Fifth Circuit, have understood *Bruen* to require the former, narrower approach. But *Bruen* emphasized that 'analogical reasoning' is not a 'regulatory straightjacket.' To be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart. Besides, imposing a test that demands overly specific analogues has serious problems. To name two: It forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.' And it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them.

*Rahimi*, 2024 WL 3074728, at *30 (Barrett, J., concurring) (cleaned up). And so, the federal government is permitted to prophylactically disarm those subject to certain domestic violence restraining orders (and punish those who disobey with imprisonment) even though the founding era laws that addressed this issue only required a surety bond. *Compare id*. at **7-9, *with id.* at

*40 (Thomas, J., dissenting) ("[T]he Founders responded to the societal problem of interpersonal violence through a less burdensome regime: surety laws.").

      **B.**      **Section 30-7-7.3 is consistent with the principles underlying intoxication laws and licensing regimes, as demonstrated by *Rahimi***

Applying the foregoing principles to the instant case, it is clear Section 30-7-7.3 does not violate the Second Amendment. First, this Court should have no trouble using *Bruen*'s more "nuanced approach" to identifying historical analogues to Section 30-7-7.3, such as intoxication laws and licensing regimes. Plaintiffs ask that this Court require Defendants produce a historical twin to Section 30-7-7.3 because "[t]he Founders knew and understood that firearms could be used for violent purposes, yet they imposed no waiting period to acquire a firearm." [Doc. 21 at 8] But the same could have been said of interpersonal violence during the founding. Yet the Supreme Court accepted surety laws and going armed laws as sufficient to justify § 922(g)(8), which was "by no means identical." *Rahimi*, 2024 WL 3074728, at *9; *see id.* at *36 (Thomas, J., dissenting). This Court should, therefore, apply *Bruen*'s more nuanced approach regardless of whether it finds that Section 30-7-7.3 addresses a general issue that existed at the time of the founding.

Second, the Court should accept intoxication laws and licensing regimes as relevantly similar historical analogs that justify Section 30-7-7.3 even though they may have addressed different societal issues because they stand for the principle that the government may impose temporary measures that briefly delay a person's ability to use a firearm to ensure that they do not misuse the deadly weapons. *Rahimi* makes clear that Section 30-7-7.3 is constitutional so long as it is consistent with the *principles* underlying historical laws like intoxication laws and licensing regimes. *See Rahimi*, 2024 WL 3074728, at *6; *id.* at * 12 (Sotomayor, J. concurring); *id.* at *30 (Barrett, J., concurring); *id.* at *31 (Jackson, J., concurring). These two categories of historical laws stand for the principle that the government may impose brief delays on someone's ability to

11

use a firearm to help ensure that they use it properly. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at **18-20 (explaining the purpose of intoxication laws and licensing regimes). And, like those laws, Section 30-7-7.3 only imposes a short, 7-day delay on an individual's ability to possess a newly purchased firearm in order to help ensure that they do not use it impulsively to hurt themselves or others.[2] [Doc. 15 at 3-4, 19-20; Doc. 20-1; Doc. 20-2]

Lastly, the Court should accept intoxication laws as sufficient to justify Section 30-7-7.3 even though they used different means to ensure people responsibly used their firearms. Plaintiffs argue that intoxication laws "are poor analogies" because they did not "assume that everyone is always intoxicated" and did not impose an additional delay on the ability to possess a firearm after the person sobered up. [Doc. 21 at 5-6][3] Yet these laws *did* assume that every intoxicated person with a firearm presented a potential danger (regardless of whether they actually did), similar to Section 30-7-7.3.[4] And the fact that Section 30-7-7.3 applies a bit more broadly in the sense that it

---

[2] Section 30-7-7.3 also helps ensure that individuals do not take possession of a firearm without first completing a background check. [Doc. 15 at 4] In this sense, it is not materially different than the shall-issue licensing regimes tacitly approved by the Supreme Court in *Bruen*. 597 U.S. at 39 n.9; *cf. McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024) (rejecting challenge to law providing for enhanced background checks for firearm purchasers under 21, which can create a waiting period of up to 10 days before delivering a firearm).

[3] Notably, Plaintiffs did not argue in their briefing that licensing regimes are not relevantly similar to Section 30-7-7.3; they merely argue that universal licensing regimes did not become popular until the early twentieth century, which Plaintiffs assert is "entirely too late to be an appropriate analogue." [Doc. 21 at 6] However, this ignores the fact that the Supreme Court in *Bruen* suggested that these were constitutional and "indicated that there is a sufficient historical basis for 'shall-issue' licensing regimes." *Rocky Mountain Gun Owners*, 2023 WL 8446495, at **10, 19 (citing *Bruen*, 597 U.S. 1, 39 n.9); *see also Antonyuk v. Chiumento*, 89 F.4th 271, 320 n.32 (2d Cir. 2023) (noting that twentieth century laws "are not weightless" and remain probative as to the existence of an American tradition of regulation" when they "reflect previously settled practices and assumptions").

[4] Plaintiffs fault 30-7-7.3 for making this "assumption." But what other way could the government realistically protect against impulsive firearm violence? Background checks alone are by no means perfect, and it is impossible to read a purchaser's mind and predict whether they plan to kill

applies to everyone who purchases a new firearm and imposes a few additional days of delay on a purchaser's ability to take possession of their firearm does not require this Court to reject it as a proper analogue. *See Rocky Mountain Gun Owners*, 2023 WL 8446495, at **18-19; *cf. Rahimi*, 2024 WL 3074728 (finding surety laws relevantly similar to § 922(g)(8) even though they only required an individual to post a small bond).

At bottom, Section 30-7-7.3 satisfies *Bruen*'s second step, as clarified by *Rahimi*, because it simply imposes a brief delay on an individual's ability to use a firearm to help ensure that they safely and responsibly use it.[5] A contrary conclusion would result in a "law trapped in amber." *Rahimi*, 2024 WL 3074728, at *6; *id.* at *30 (Barrett, J., concurring).

### IV. Plaintiffs fail to show that Section 30-7-7.3 is unconstitutional in all its applications, as required by *Rahimi*

In addition to clarifying the analysis under *Bruen*'s second step, *Rahimi* confirms Defendants' position that Plaintiffs must "establish *that no set of circumstances* exists under which the [challenged law] would be valid" and, conversely, "the Government need only demonstrate that [the challenged law] is constitutional in *some* of its applications." 2024 WL 3074728, at *6 (cleaned up) (emphases added); [Doc. 15 at 6-7]. Here, Plaintiffs requested that the Court issue "a preliminary injunction of the Waiting Period Act" (i.e., Section 30-7-7.3). To gain this sort of

---

themselves or others with a newly purchased firearm. *See, e.g.*, Reese Oxner, *Uvalde gunman legally bought AR rifles days before shooting, law enforcement says*, Texas Tribune (May 25, 2022), https://www.texastribune.org/2022/05/25/uvalde-shooter-bought-gun-legally/ (reporting that the Uvalde gunman legally purchased the assault rifles he used to massacre 19 children and two adults days before the tragedy).

[5] In their reply, Plaintiffs argue that the Court should issue a preliminary injunction if it finds the present historical record "indeterminate." [Doc. 21 at 8] This argument flies in the face of the Tenth Circuit's repeated admonitions that plaintiffs must show a "clear and unequivocal" right to the "extraordinary remedy" of a preliminary injunction. *Nova Health Sys. v. Edmondson*, 460 F.3d 1295, 1298 (10th Cir. 2006); *see, e.g.*, *We the Patriots, Inc. v. Lujan Grisham*, 2023 WL 6622042, at *9 (D.N.M. Oct. 11, 2023).

unqualified preliminary injunctive relief, Plaintiffs must show a likelihood of success on their facial challenge to Section 30-7-7.3. *See Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132, 1257, 75 (D.N.M. 2022) (Browning, J.) (concluding that the plaintiffs were not likely to succeed on their facial challenge and only granting a preliminary injunction prohibiting the defendants from prosecuting the plaintiffs on the basis of their as-applied challenge).

Notably, when the Governor pointed out that the requested preliminary injunction depended on the likelihood of Plaintiffs mounting a successful facial challenge, [Doc. 15 at 6-7] Plaintiffs did not deny it. [Doc. 21 at 3] Rather, Plaintiffs simply faulted the Governor for not offering any analysis as to how facial challenges apply in the context of preliminary injunctions and Second Amendment law. *See id.* But the caselaw already makes clear that a plaintiff seeking to preliminarily enjoin a law in all of its applications must meet this demanding standard. *See Moody v. NetChoice, LLC*, __ U.S. __, 2024 WL 3237685, at *7 (U.S. July 1, 2024) (holding that a party seeking a preliminary injunction barring enforcement of a law in its entirety must show they are likely to succeed on their facial challenge); *Harmon v. City of Norman, Oklahoma*, 981 F.3d 1141, 1150 (10th Cir. 2020); *Antonyuk*, 89 F.4th at 313; *Voter Reference Found.*, 616 F. Supp. 3d at 1257. And now the Supreme Court has confirmed this demanding standard applies to Second Amendment challenges. *See Rahimi*, 2024 WL 3074728, at *6. Thus, the Court must find that Section 30-7-7.3 is likely unconstitutional in *all* of its applications before it grants Plaintiffs' request to universally enjoin the law.[6]

---

[6] It is unclear if Plaintiffs now claim they only seek a preliminary injunction based on an as-applied challenge to Section 30-7-7.3. [Doc. 21 at 3] If so, it bears emphasizing that this is not the relief requested in Plaintiffs' motion, and therefore, the Court should not analyze an as-applied challenge's likelihood of success. *See Genesee Cnty. Employees' Ret. Sys. v. Thornburg Mortg. Sec. Tr. 2006-3*, 825 F. Supp. 2d 1082, 1225 n.39 (D.N.M. 2011) (Browning, J.). Plus, as discussed at the preliminary injunction hearing, there is no need to issue an injunction protecting Plaintiffs because they have no definitive plans to purchase additional firearms in the immediate future. *See*

Plaintiffs fail to meet this demanding burden. For example, while it is true Section 30-7-7.3 imposes a 7-day waiting period regardless of whether the firearm purchaser has received notification that they have passed the required federal background check, it is indisputably constitutional to the extent it applies to individuals who do *not* receive such a notification. *See McRorey*, 99 F.4th 831; [Doc. 21 at 4 ("Plaintiffs do not challenge the time it takes for a Federal Firearms Licensee to conduct a background check to ensure a purchaser is not a prohibited possessor.")]. And while most federal firearm background checks come back within minutes, a non-insignificant amount take longer than three days—which can lead to firearms being transferred to prohibited persons.[7] Section 30-7-7.3, therefore, "is constitutional in *some* of its applications," *Rahimi*, 2024 WL 3074728, at *6 (cleaned up), and Plaintiffs cannot obtain their requested preliminary injunction to enjoin it in all of its applications.[8]

---

*Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) ("To constitute irreparable harm, an injury must be certain, great, actual and not theoretical. . . . The party seeking injunctive relief must show that the injury complained of is of such imminence that there is a clear and present need for equitable relief to prevent irreparable harm." (cleaned up)).

[7] *See, e.g.*, *The Effects of Waiting Periods*, RAND (Jan. 10, 2023), https://www.rand.org/research/gun-policy/analysis/waiting-periods.html ("In 2021, for instance, 5,203 firearms were confirmed to be transferred from federally licensed firearm dealers to prohibited persons because of delays in NICS background checks that exceeded three business days."); *see generally* 18 U.S.C. 922(t)(1)(B)(ii) (allowing a licensee to transfer a firearm to a purchaser if "3 business days . . . have elapsed since the licensee contacted the system, and the system has not notified the licensee that the receipt of a firearm by such other person would violate subsection (g) or (n) of this section, or State, local, or Tribal law").

[8] Even if Plaintiffs *could* show a likelihood of success on a facial or as-applied challenge, the Court should only issue a preliminary injunction protecting the parties themselves. *See Labrador v. Poe by & through Poe*, 144 S. Ct. 921, 927-28 (2024) (Gorsuch, J., concurring, joined by Thomas and Alito, JJ.) (advising lower courts to "take heed" and retire universal injunctions that protect nonparties); *id.* at 928-29 (J. Kavanaugh, concurring, joined by Barrett, J.) (stating that the state's application seeking "a stay primarily because of the scope of the injunction" "is itself certworthy" and "has a likelihood of success"); *see generally* Hon. Trevor N. McFadden and Vetan Kapoor, *The Precedential Effects of the Supreme Court's Emergency Stays*, 44 HARV. J. L. & PUB. POL'Y 827, 832-35, 882 (2021) ("When the full Supreme Court grants a stay application, lower

## **CONCLUSION**

For the foregoing reasons, the Court should deny Plaintiffs' request for a preliminary injunction.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel to Governor Michelle Lujan Grisham*
**KYLE P. DUFFY**
*Deputy General Counsel to Governor Michelle Lujan Grisham*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.Agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

*/s/ Mark W. Allen*
Mark W. Allen
*Assistant Attorney General*
Billy J. Jimenez
*Assistant Attorney General*
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
505.490.4825
mallen@nmdoj.gov
bjimenez@nmdoj.gov

*Attorneys for Raúl Torrez*

---

courts should accord that decision great weight, unless there is compelling reason not to do so."); *Legacy Church, Inc. v. Kunkel*, 472 F. Supp. 3d 926, 1046 (D.N.M. 2020) (Browning, J.) (deferring to concurring opinion in Supreme Court denial of a stay).

## CERTIFICATE OF SERVICE

I hereby certify that on July 3, 2024, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Holly Agajanian*
Holly Agajanian