# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT,<br><br>　　　　　　　Plaintiffs,<br><br>　v.<br><br>MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico,<br><br>　　　　　　　Defendants. | No. 24-CV-0471 |

## PLAINTIFFS' SUPPLEMENTAL BRIEF

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ........................................................................................ ii

I.    The Second Amendment's plain text covers the right to obtain possession of firearms ......... 1

   A.   The Second Amendment's plain text protects Plaintiffs' right to possess arms ................. 2

   B.   The waiting period law burdens Plaintiffs' right to possess arms ...................................... 2

   C.   The right to possess arms includes the right to acquire arms. ........................................... 3

   D.   The right to acquire arms is a necessary concomitant of the right to keep and bear arms. .............................................................................................................................. 4

II.   All firearms regulations must be justified by historical tradition, including the regulations that *Heller* deemed "presumptively lawful." .................................................. 8

III.  The waiting period law is neither longstanding nor a commercial regulation ................. 12

IV.  *Rahimi* makes clear that narrow laws, such as intoxication laws, cannot be analogs for laws that broadly restrict arms use by the public generally, such as the waiting period law ............................................................................................................ 15

CONCLUSION ............................................................................................................ 16

i

# TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*,
   50 Tenn. 165 (1871)...............................................................................................6

*Antonyuk v. Chiumento*,
   89 F.4th 271 (2d. Cir. 2023).............................................................................19

*Atkinson v. Garland*,
   70 F.4th 1018 (7th Cir. 2023)...........................................................................15

*Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
   No. 1:22-CV-80, 2023 WL 8361745 (N.D.W. Va. Dec. 1, 2023) ...........................7, 8

*District of Columbia v. Heller*,
   554 U.S. 570 (2008)...........................................................1-4, 6, 10, 12, 16, 18

*Drummond v. Robinson Twp.*,
   9 F.4th 217 (3d Cir. 2021) ..................................................................................7

*Illinois Ass'n of Firearms Retailers v. City of Chicago*,
   961 F. Supp. 2d 928 (N.D. Ill. 2014) ...............................................................9, 18

*Jackson v. City & Cnty. of San Francisco*,
   746 F.3d 953 (9th Cir. 2014) ...............................................................................6

*Kole v. Vill. of Norridge*,
   No. 11-cv-3871, 2017 WL 5128989 (N.D. Ill. Nov. 6, 2017)..................................9

*Luis v. United States*,
   578 U.S. 5 (2016)..................................................................................................6

*McConnell v. Federal Election Com'n*,
   540 U.S. 93 (2003).............................................................................................10

*McCulloch v. Maryland*,
   17 U.S. 316 (1819)........................................................................................5, 19

*McDonald v. City of Chicago*,
   561 U.S. 742 (2010)...........................................................................................10

*Miller v. Bonta*,
   No. 19-CV-01537, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023)...........................8

*Minneapolis Star and Tribune Co. v. Minn. Comm'r of Revenue*,
   460 U.S. 575 (1983).......................................................................................9, 10

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
   597 U.S. 1 (2022)...............................................................1-4, 11-12, 14-17, 19-20

*New York State Rifle & Pistol Ass'n, Inc. v. City of New York*,
   140 S. Ct. 1525 (2020)......................................................................................5, 6

*Oakland Tactical Supply, LLC v. Howell Twp., Michigan*,
    103 F.4th 1186 (6th Cir. 2024) ...................................................................................6-7, 9-10

*Range v. Att'y Gen. United States of Am.*,
    69 F.4th 96 (3d Cir. 2023) (en banc) ................................................................................ 13

*Renna v. Bonta*,
    667 F. Supp. 3d 1048 (S.D. Cal. 2023) ......................................................................... 8, 17

*Richmond Newspapers v. Virginia*,
    448 U.S. 555 (1980) ............................................................................................................ 5

*Teixeira v. Cnty. of Alameda*,
    873 F.3d 670 (9th Cir. 2017) (en banc) ............................................................................. 7

*United States v. Alston*,
    No. 5:23-CR-021-FL-1, 2023 WL 7003235 (E.D.N.C. Oct. 24, 2023) .............................. 8

*United States v. Bena*,
    664 F.3d 1180 (8th Cir. 2011) ......................................................................................... 14

*United States v. Duarte*,
    101 F.4th 657 (9th Cir. 2024) ................................................................................12-13, 15

*United States v. Marzzarella*,
    614 F.3d 85 (3d Cir. 2010) ........................................................................................... 6, 19

*United States v. McNulty*,
    684 F. Supp. 3d 14 (D. Mass. 2023) ............................................................................. 7-8

*United States v. Perez-Garcia*,
    96 F.4th 1166 (9th Cir. 2024) ......................................................................................... 15

*United States v. Quiroz*,
    629 F. Supp. 3d 511 (W.D. Tex. 2022) ......................................................................... 4-6

*United States v. Rahimi*,
    No. 22-915, 602 U.S. __, 2024 WL 3074728 (June 21, 2024) ........................ 2-3, 14-15, 20-21

*Vigil v. City of Espanola*,
    No. CIV 08–0980 JB/RLP, 2009 WL 1300746 (D. N.M. Feb. 18, 2009) .............................. 18

## Constitutional Provisions

U.S. Const. amend. I ................................................................................................................. 1, 9

U.S. Const. amend. II .................................................................................................................... 1

## Statutes and Regulations

18 U.S.C. § 922(g)(3) ................................................................................................................... 8

18 U.S.C. § 922(g)(8) .............................................................................................................. 14, 20

1923 Cal. Stat. 701 .................................................................................... 16-17

N.M. Stats. § 30-7-7.3(D) ........................................................................... 19

**Other Authorities**

Johnson, Samuel, DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1 (4th ed. 1773) ...................... 4

MERRIAM-WEBSTER'S Collegiate Dictionary (10th ed. 1996) ................................................ 4

THE AMERICAN HERITAGE COLLEGE DICTIONARY (3d ed. 1993) .................................................. 4

Webster, Noah, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE, vol. 1 (1828) .................... 4

## PLAINTIFFS' SUPPLEMENTAL BRIEF

The Court held a hearing on Plaintiffs' Motion for a Temporary Restraining Order and Preliminary Injunction on June 27, 2024. [ECF 28]. The Court invited the parties to file simultaneous supplemental briefing by July 3, 2024, with response briefs due by July 8, 2024. [*Id.* at 4]. Plaintiffs hereby submit initial supplemental briefing on the topics of: (1) whether a waiting period law that prevents Americans from possessing their firearms implicates the Second Amendment's plain text; (2) whether "presumptively lawful" firearms regulations must be justified by historical tradition; (3) whether the waiting period law is either longstanding or a commercial regulation; and (4) whether the Supreme Court's decision in *United States v. Rahimi* alters the historical analysis required by *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*.

**I.     The Second Amendment's plain text covers the right to obtain possession of firearms.**

In a Second Amendment challenge, the initial inquiry is whether "the Second Amendment's plain text covers" the plaintiffs' desired conduct.[1] *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). Here, "Plaintiffs desire to obtain possession of firearms that they have purchased for lawful purposes." Compl. ¶ 13.

The Supreme Court conducted the plain text analysis in *District of Columbia v. Heller*, 554 U.S. 570, 576–600 (2008). The Court's analysis makes clear that the plain text covers Plaintiffs' possession of their purchased firearms. And even if the waiting period law is characterized as a restriction on acquisition rather than possession, Supreme Court precedent makes clear that the right to acquire arms is inherent to the right to keep and bear arms.

---

[1] The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

**A.      The Second Amendment's plain text protects Plaintiffs' right to possess arms.**

The *Heller* Court's plain text analysis makes clear that the Second Amendment's plain text covers Plaintiffs' possession of their purchased firearms.

The *Heller* Court held that the Second Amendment's "textual elements": (1) "guarantee the individual right to *possess* and carry weapons," *id.* at 592 (emphasis added); (2) protect the rights of "all Americans," *id.* at 580; and (3) "extend[] prima facie, to all instruments that constitute bearable arms," *id.* at 582. Plaintiffs in this case are "Americans" who desire to "possess" their "bearable arms." Under *Heller*, therefore, their conduct is covered by the plain text.

Notably, in *United States v. Rahimi*, No. 22-915, 602 U.S. __, 2024 WL 3074728 (June 21, 2024), the Court did not address the plain text analysis. There was no need. The Court's precedents clearly established that the possession of a firearm by an American is covered by the Second Amendment's plain text. *Heller*, 554 U.S. at 592; *Bruen*, 597 U.S. at 32. *Rahimi* did not eliminate the plain text inquiry, but instead demonstrated that the plain text inquiry was never intended to be a significant obstacle for challengers to overcome. Rather, the inquiry simply indicates when the government's burden to justify a regulation with historical tradition is triggered.

Here, as in *Rahimi*, it is clear that Plaintiffs' possession of firearms is covered by the plain text.[2]

**B.      The waiting period law burdens Plaintiffs' right to possess arms.**

New Mexico's waiting period law directly burdens Plaintiffs' right to possess arms: but for the law, Plaintiffs could possess their firearms during the week after purchasing them.

---

[2] *Rahimi*, in fact, referred broadly to conduct that relates to "arms-bearing." *See* No. 22-915, 2024 WL 3074728, at *6 ("[W]hen the Government regulates arms-bearing conduct, as when the Government regulates other constitutional rights, it bears the burden to 'justify its regulation.'" (quoting *Bruen*, 597 U.S. at 24)).

Because "the Second Amendment's plain text covers" Plaintiffs' possession of their purchased firearms, the Court should require the government to "justify its regulation" that deprives Plaintiffs of their right to possess their firearms for one week "by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

### C.    The right to possess arms includes the right to acquire arms.

Characterizing the waiting period law as a restriction on firearms acquisition rather than possession does not alter the plain text analysis. The right to acquire arms is inherent to the right to possess arms.

The *Heller* Court consulted Samuel Johnson's and Noah Webster's dictionaries in its plain text analysis to conclude that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" 554 U.S. at 582. To "have" something—both historically and today—has always included its acquisition. Johnson's dictionary defined "have" as "5. To obtain" and "6. To take; to receive." 1 Samuel Johnson, DICTIONARY OF THE ENGLISH LANGUAGE (4th ed. 1773) (unpaginated).[3] Webster's defined "have" as "9. To gain; to procure; to receive; to obtain; to purchase." 1 Noah Webster, AMERICAN DICTIONARY OF THE ENGLISH LANGUAGE (1828) (unpaginated).[4] Today, *Merriam Webster's* defines "have" as "4 a: to acquire or get possession of: OBTAIN" and to "b: RECEIVE." MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY 533 (10th ed. 1996). *American Heritage* defines "have" as "6.a. To come into possession of; acquire. b. To receive; get. c. To accept; take." THE AMERICAN HERITAGE COLLEGE DICTIONARY 622 (3d ed. 1993).

---

[3] *Heller* relied on Johnson to define "arms," 554 U.S. at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "well-regulated," *id.* at 597.

[4] *Heller* relied on Webster to define "arms," *id.* at 581, "keep," *id.* at 582, "bear," *id.* at 584, and "militia," *id.* at 595.

Because "the plain meaning of the verbs 'have' or 'possess' include the act of receipt," "'to have weapons'" must encompass the "receipt" and "possession of those weapons." *United States v. Quiroz*, 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022).

> **D.      The right to acquire arms is a necessary concomitant of the right to keep and bear arms.**

At a minimum, the right to acquire arms is a necessary concomitant of the right to possess arms.

"A constitution. . . . requires, that only its great outlines should be marked, its important objects designated, and the minor ingredients which compose those objects, be deduced from the nature of the objects themselves." *McCulloch v. Maryland*, 17 U.S. 316, 407 (1819). Thus, "the [Supreme] Court has acknowledged that certain unarticulated rights are implicit in enumerated guarantees." *Richmond Newspapers v. Virginia*, 448 U.S. 555, 579 (1980). And "fundamental rights, even though not expressly guaranteed, have been recognized by the Court as indispensable to the enjoyment of rights explicitly defined." *Id.* at 580.

In the Second Amendment context, four Supreme Court Justices determined—and none disagreed—that "a necessary concomitant" of "the right to keep a handgun in the home for self-defense" is the right "to take a gun to a range in order to gain and maintain the skill necessary to use it responsibly." *New York State Rifle & Pistol Ass'n, Inc. v. City of New York*, 140 S. Ct. 1525, 1541 (2020) (Alito, J., joined by Gorsuch and Thomas, J.J., dissenting); *id.* at 1527 (Kavanaugh, J., concurring) (expressing "agree[ment] with Justice Alito's general analysis of *Heller*"); *see also Oakland Tactical Supply, LLC v. Howell Twp., Michigan*, 103 F.4th 1186, 1192 (6th Cir. 2024) ("at least some [firearms] training is protected . . . because it is a necessary corollary to the right defined in *Heller*. Four Justices seemingly endorsed this view"). Another "necessary concomitant" of the right to keep and bear arms is the right to acquire arms:

> Constitutional rights thus implicitly protect those closely related acts necessary to their exercise. . . . The right to keep and bear arms, for example, "implies a corresponding right to obtain the bullets necessary to use them," *Jackson* v. *City and County of San Francisco*, 746 F. 3d 953, 967 (CA9 2014) (internal quotation marks omitted). . . . Without protection for th[is] closely related right[], the Second Amendment would be toothless.

*Luis v. United States*, 578 U.S. 5, 26–27 (2016) (Thomas, J., concurring).

In a case *Heller* cited thrice approvingly, 554 U.S. at 608, 614, 629, the Tennessee Supreme Court held that "[t]he right to keep arms, necessarily involves the right to purchase them," *Andrews v. State*, 50 Tenn. 165, 178 (1871). More recently, the Third Circuit held that the Second Amendment protects the right to purchase firearms, *Drummond v. Robinson Twp.*, 9 F.4th 217, 226–29 (3d Cir. 2021), and the Ninth Circuit reasoned that "[c]ommerce in firearms is a necessary prerequisite to keeping and possessing arms for self-defense," *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 682 (9th Cir. 2017) (en banc). The Seventh Circuit has likewise held that "[t]he right to possess firearms for protection implies a corresponding right to acquire and maintain proficiency in their use," *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (Sykes, J.), and the Eleventh Circuit, noting that all its "sister circuits have found that the right to keep and bear arms includes the right to acquire them," assumed the truth of that proposition without formally deciding it, *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1325 (11th Cir. 2023). The Fourth Circuit has gone so far as to declare that a waiting-period law, specifically, violates the plain text of the Second Amendment — meaning that even if the defense's overly constrained view that the right implicated here is the timely/fast acquisition of a firearm, that right is covered by the amendment's plain text. *See Maryland Shall Issue, Inc. v. Moore*, 86 F.4th 1038, 1044-45 (4th Cir. 2023) ("[T]he law's waiting period could well be the critical time in which the applicant expects to face danger. So the temporary deprivation that Plaintiffs allege is a facially plausible Second Amendment

violation.  Accordingly, Maryland's law regulates conduct that falls within the Second Amendment's plain text.").

Numerous district courts have also recognized the right to acquire arms. *See, e.g.*, *Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 1:22-CV-80, 2023 WL 8361745, at *10 (N.D.W. Va. Dec. 1, 2023) ("the act of purchasing a handgun is within the bounds of the Second Amendment"); *Miller v. Bonta*, No. 19-CV-01537, 2023 WL 6929336, at *6 (S.D. Cal. Oct. 19, 2023) (recognizing "a citizen's constitutional right to acquire these firearms for self-defense"); *United States v. McNulty*, 684 F. Supp. 3d 14, 20 (D. Mass. 2023) ("The text of the Second Amendment itself also suggests that the right to 'keep' firearms necessarily includes an ability to purchase" firearms); *United States v. Alston*, No. 5:23-CR-021-FL-1, 2023 WL 7003235, at *4 (E.D.N.C. Oct. 24, 2023) ("The court has little difficulty concluding that [18 U.S.C.] § 922(g)(3), which prohibits the receipt of firearms, burdens conduct within the ambit of the Second Amendment.") (quotation marks omitted); *Renna v. Bonta*, 667 F. Supp. 3d 1048, 1065 (S.D. Cal. 2023) ("Plaintiffs' desire to purchase the arms in question on the retail market falls within the plain text of the Second Amendment"); *United States v. Hicks*, 649 F. Supp. 3d 357, 359 (W.D. Tex. 2023) ("[E]xcluding 'receipt' from 'keep and bear' lacks foundation in plain language because the verbs 'have' or 'possess' include the act of receipt.  For example, 'to have' means 'to be in possession of . . . something received.'  Therefore, 'to have weapons' would encompass the past receipt and the current possession of those weapons."  (footnotes omitted)); *Kole v. Vill. of Norridge*, No. 11-cv-3871, 2017 WL 5128989, at *9 (N.D. Ill. Nov. 6, 2017) ("the Second Amendment right . . . to acquire a firearm . . . is implicated by . . . laws directly or functionally banning firearm sales"); *Illinois Ass'n of Firearms Retailers v. City of Chicago*, 961 F. Supp. 2d 928, 930 (N.D. Ill. 2014) ("the right to keep and bear arms for self-defense. . . . must also include

6

the right to *acquire* a firearm"). Some of these decisions have been appealed, but they nevertheless represent the widespread consensus that the Second Amendment protects the right to acquire arms.

Similarly, "[t]he First Amendment guarantee of a free press . . . implies a right to buy the inks and paper necessary for printing newspapers." *Oakland Tactical Supply, LLC*, 103 F.4th at 1201 (Kethledge, J., dissenting) (citing *Minneapolis Star and Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 582–83 (1983)). And "the First Amendment 'right to speak would be largely ineffective if it did not include the right to engage in financial transactions that are the incidents of its exercise.'" *Id.* (quoting *McConnell v. Federal Election Comm'n*, 540 U.S. 93, 252 (2003) (Scalia, J., concurring in part)). The Second Amendment—which is not a "second-class right" to be "singled out for special—and specially unfavorable—treatment," *McDonald v. City of Chicago*, 561 U.S. 742, 778–79, 780 (2010)—contains implicit rights just like the First Amendment. Indeed, "self-defense" is not among the 27 words of the Second Amendment's text, yet *Heller* identified it as a "core protection" of the Second Amendment. 554 U.S. at 634.

Indeed, if a one-week waiting period does not implicate the plain text, no waiting period does. The plain text analysis considers only whether the conduct is covered; limitations on covered conduct are considered in the historical analysis. At the plain text stage, the question is the same for a one-week and one-year waiting period—*i.e.*, is the right to obtain possession of purchased firearms protected? The government bears the burden of justifying the wait it imposes at the historical stage of the analysis.

Because the right to acquire arms is inherent to the right to possess arms—or at least a necessary concomitant of that right—even if the waiting period law is characterized as an acquisition restriction, "the Constitution presumptively protects" Plaintiffs' conduct, and the State

7

must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

## II. All firearms regulations must be justified by historical tradition, including the regulations that *Heller* deemed "presumptively lawful."

The Supreme Court set forth "*the standard* for applying the Second Amendment" in *Bruen*:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation. *Only then* may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

597 U.S. at 24 (emphasis added). The Court reiterated twice that the "*only*" way the government can justify a firearms regulation is with historical tradition. *Id.* at 17 ("*Only if* a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's unqualified command.") (quotation marks omitted and emphasis added); *Id.* at 34 ("*Only if* respondents carry that burden can they show that the pre-existing right codified in the Second Amendment . . . does not protect petitioners' proposed course of conduct.") (emphasis added).

The *Bruen* Court made it unmistakably clear that this historical test applies to the "presumptively lawful" regulations it identified in *Heller*. *Heller* deemed three categories of "longstanding" laws "presumptively lawful": "prohibitions on the possession of firearms by felons and the mentally ill"; "laws imposing conditions and qualifications on the commercial sale of arms"; and "laws forbidding the carrying of firearms in sensitive places." *Id.* at 626–27 & n.26. In *Bruen*, the government "attempt[ed] to characterize New York's proper-cause requirement as a 'sensitive-place' law." 597 U.S. at 30. The Court consulted the historical record to conclude that "there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police

Department." *Id.* at 30–31. *Bruen* thus held the alleged "sensitive place" restriction to the same historical standard—"*the standard* for applying the Second Amendment," 597 U.S. at 24 (emphasis added)—that applies to all firearms regulations. "Had the Court in *Bruen* endorsed simply deferring to *Heller*'s 'presumptively lawful' footnote, the outcome of that case would have been much different." *United States v. Duarte*, 101 F.4th 657, 669 (9th Cir. 2024). Instead, "[a]s with any other firearm regulation challenged under the Second Amendment, *Bruen* clarified, courts must now analyze 'sensitive place' laws by analogizing them to a sufficiently comparable historical counterpart." *Id.* Thus, "[i]t would be fundamentally inconsistent with *Bruen*'s analytical framework to treat" commercial regulations "any differently, as nothing in the majority opinion implies that we can jettison *Bruen*'s test for one 'presumptively lawful' category of firearm regulations but not others (e.g., sensitive place regulations)." *Id.* (quotation marks omitted).

*Bruen*'s treatment of the "presumptively lawful" sensitive-place regulation is consistent with *Heller*, which conveyed that those regulations must be historically justified. The *Heller* Court acknowledged that it did "not provid[e] extensive historical justification for those regulations" but asserted that "there will be time enough to expound upon *the historical justifications* for" the regulations in a later case. 554 U.S. at 635 (emphasis added). Thus, any restriction on the commercial sale of arms must have "historical justifications," just like any other firearms regulation.

Both *Heller* and *Bruen* make clear that *Heller*'s "presumptively lawful" language has no doctrinal significance. Consequently, the Ninth Circuit recently held that "[s]imply repeating *Heller*'s language about the 'presumptive lawfulness' of felon firearm bans will no longer do after *Bruen*." *Duarte*, 101 F.4th at 668 (cleaned up). And the en banc Third Circuit declined to rely on *Heller*'s "presumptively lawful" language when holding the federal firearms ban for felons

9

unconstitutional as applied to a nonviolent felon and instead applied the historical analysis. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96 (3d Cir. 2023) (en banc), *cert. granted*, *judgment vacated sub nom. Garland, Atty Gen. v. Range, Bryan D.*, No. 23-374, 2024 WL 3259661 (U.S. July 2, 2024);[5] *see also Nguyen v. Bonta*, 2024 WL 1057241, at *6 (S.D. Cal. Mar. 11, 2024) (publication in F. Supp. 3d forthcoming) ("*Bruen* suggests that the proper question in evaluating whether a regulation falls within the commercial sales category is not the extent of interference with the Second Amendment right, but instead whether the regulation historically would have been tolerated.  In the wake of *Bruen*, several Courts of Appeals have conducted the full text-and-history analysis when confronted with a regulation that falls within one of *Heller*'s enumerated categories."  (citations omitted)).

In *Rahimi*, the Supreme Court confirmed that *all* laws must be historically justified, emphasizing that:

> the appropriate [Second Amendment] analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition. [*Bruen*,] 597 U.S., at 26–31, 142 S.Ct. 2111. A court must ascertain whether the new law is "relevantly similar" to laws that our tradition is understood to permit, "apply[ing] faithfully the balance struck by the founding generation to modern circumstances." *Id.*, at 29, and n. 7, 142 S.Ct. 2111.

No. 22-915, 2024 WL 3074728, at *6; *see also id.* ("In *Bruen*, we directed courts to examine our 'historical tradition of firearm regulation' to help delineate the contours of the right." (quoting *Bruen*, 597 U.S. at 17)).

Prior to *Bruen*, some courts upheld the law at issue in *Rahimi*, 18 U.S.C. § 922(g)(8), by reasoning that it is analogous to the "presumptively lawful" prohibitions for felons and the

---

[5] The Supreme Court granted, vacated, and remanded *Range* for further consideration in light of its decision in *Rahimi*, but it is not apparent that anything in *Rahimi* would alter the en banc court's decision.

mentally ill. *See, e.g.*, *United States v. Bena*, 664 F.3d 1180, 1184 (8th Cir. 2011) ("this statute—like prohibitions on the possession of firearms by violent felons and the mentally ill—is focused on a threat presented by a specific category of presumptively dangerous individuals."). The *Rahimi* Court, significantly, did not take that approach. Instead, the Court analyzed Section 922(g)(8) the same way it analyzed the handgun ban in *Heller*, the carry restriction in *Bruen*, and the sensitive place argument in *Bruen*—by "considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." No. 22-915, 2024 WL 3074728, at *6.

The Supreme Court has clearly and repeatedly defined its Second Amendment test. *See Bruen*, 597 U.S. at 17, 24; *Rahimi*, No. 22-915, 2024 WL 3074728, at *6. Never once has the Court articulated an exception for the regulations it deemed "presumptively lawful" in *Heller*. Rather, the Court has expressly stated that "a court [may] conclude that the individual's conduct falls outside the Second Amendment's" scope "*[o]nly if* a firearm regulation is consistent with this Nation's historical tradition." *Bruen*, 597 U.S. at 17 (emphasis added).

As the Ninth Circuit explained in holding that the "presumptively lawful" language has no doctrinal significance, "*Bruen* expressly 'requires courts to assess whether' . . . '*any* regulation infringing on Second Amendment rights, is consistent with this nation's historical tradition of firearm regulation.'" *Duarte*, 101 F.4th at 668 (quoting *United States v. Perez-Garcia*, 96 F.4th 1166, 1175 (9th Cir. 2024)) (brackets omitted). "It would pay lip service to this mandate if we continued to defer . . . to *Heller*'s ['presumptively lawful'] footnote." *Id.* "Nothing allows us to sidestep *Bruen* in this way." *Id.* at 669 (quoting *Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023)) (brackets omitted).

**III.      The waiting period law is neither longstanding nor a commercial regulation.**

Because *Heller*'s "presumptively lawful" language does not alter *Bruen*'s analysis, neither does the "longstanding" qualifier that describes the "presumptively lawful" regulations. *See* 554 U.S. at 627 n.26.

In any event, the only allegedly longstanding waiting period law produced in this case is California's 1923 law prohibiting the transfer of a handgun from a licensed dealer to a purchaser on the same day as the purchase. 1923 Cal. Stat. 701, ch. 339 §§ 10, 11.[6] California's law cannot qualify New Mexico's seven-day waiting period law as "longstanding" for several reasons.

First, the law held unconstitutional in *Bruen* was enacted in 1911. 597 U.S. at 11. And the Court acknowledged that New York had started requiring a license to carry in 1905. *Id.* The *Bruen* Court did not consider that 1911 law "longstanding," so California's 1923 law cannot be "longstanding" either.

Second, California's law forbade only the transfer of a handgun on the same business day that the purchase was made, meaning that the transfer could occur in less than 24 hours—for example, if the purchase was made in the evening, the purchaser could acquire the handgun the following morning. 1923 Cal. Stat. 701, ch. 339 § 10. Because New Mexico's waiting period is more than seven times longer than California's, the burden is more than seven times as severe.

---

[6] Notably, California's 1923 waiting period law—the first in the United States—was not produced in this case by Defendants; rather, it was produced by Plaintiffs. *See* Compl. ¶ 19. Defendants offered only intoxication laws and licensing laws as proposed historical analogs, *see* Response Br., ECF No. 15, at 16–17, suggesting that Defendants recognize that all waiting period laws in the United States come too late in time to pass muster under *Bruen*'s historical tradition standard.

Third, California's law applied only to handguns. *Id.* New Mexico's applies to all firearms. California's law, therefore, still allowed long guns to be immediately possessed, while New Mexico's entirely deprives citizens of their Second Amendment rights for one week.

Fourth, California's law applied only to sales by licensed dealers. *Id.* A seller who was not licensed could transfer a firearm to anyone "personally known to the vendor" without any wait. *Id.* New Mexico's law applies to sales by licensed *and* non-licensed sellers. Thus, under California's law—unlike New Mexico's—handguns could still be possessed immediately through private sales.

Fifth, *Bruen* makes clear that a restriction that appears for the first time in the 20th century cannot establish a tradition. The *Bruen* Court first discounted "late-19th-century evidence" due to its "temporal distance from the founding," 597 U.S. at 66, and accordingly refused to "stake our interpretation on a handful of temporary territorial laws that were enacted nearly a century after the Second Amendment's adoption," *id.* at 67–68. The Court then dismissed 20th-century evidence entirely: "[a]s with their late-19th-century evidence, the 20th-century evidence presented by respondents and their *amici* does not provide insight into the meaning of the Second Amendment when it contradicts earlier evidence." *Id.* at 66 n.28.

With respect to Defendants' argument that the law is a commercial regulation, this Court should avoid opening that Pandora's box. A law that directly burdens an individual right to self-defense by strategically regulating a business is not a true commercial regulation. Otherwise, by Defendants' logic, an indefinite ban on firearms purchases is merely a commercial regulation; and a complete prohibition on the ordinary sale of ammunition is merely a commercial regulation. *Renna*, 667 F. Supp. 3d at 1065 ("If the commercial sales limitation identified in *Heller* were interpreted as broadly as the State suggests, the exception would swallow the Second Amendment."). It is implausible that the Supreme Court, when it decided *Bruen*, meant that such

laws would be presumptively constitutional, and that it would be a plaintiff's burden—*contra Bruen*—to establish that these laws are unconstitutional. *See Vigil v. City of Espanola*, No. CIV 08–0980 JB/RLP, 2009 WL 1300746, *9 (D. N.M. Feb. 18, 2009) (Browning, J.) (rejecting "elevat[ing] form over substance"); *Illinois Ass'n of Firearms Retailers*, 961 F. Supp. 2d at 930–31 (rejecting Chicago's argument that a ban on firearms sales and transfers within city limits was a commercial regulation).

What is more, New Mexico's waiting period applies to *all* sales—including both ordinary business and *private* sales between non-commercial entities. So even if Defendants could viably assert that every law that limits or imposes conditions on a commercial purchase is presumptively constitutional, this law is not merely a restriction on "commercial sale[s]," and thus far exceeds the scope of the regulations that *Heller* referred to. 554 U.S. at 627. Had *Heller* intended to carve out literally all sales from the protection of the Second Amendment, it would not have used the word "commercial."

The New Mexico law's purpose also has nothing to do with commercial sales: the law is designed exclusively to prevent certain impulsive uses of the firearm *by the buyer*, versus being a law that "primarily impact[s] manufacturers, sellers, or transferers". *United States v. James*, 677 F. Supp. 3d 329, 343 (D.V.I. 2023). The New Mexico law even imposes criminal penalties *on the buyer*, further underscoring this point. *See* NMSA 1978, § 30-7-7.3(D) ("Each party to an unlawful sale of a firearm before the required waiting period ends is in violation of this section and may be separately charged for the same sale.").

Finally, even commercial regulations are unconstitutional if they are "abusive." And a law that constitutes a pretextual smokescreen for a burden on the right to keep and bear arms is abusive. *Cf. Antonyuk v. Chiumento*, 89 F.4th 271, 316 (2d. Cir. 2023), *cert. granted, judgment vacated sub*

14

*nom. Antonyuk, Ivan, et al. v. James, Steven G., et al.*, No. 23-910, 2024 WL 3259671 (U.S. July 2, 2024) ("[A] licensing decision that uses 'good moral character' as a smokescreen to deny licenses for impermissible reasons untethered to dangerousness, such as the applicant's lifestyle or political preferences, would violate the Constitution by relying on a ground for disarmament for which there is no historical basis."); *United States v. Marzzarella*, 614 F.3d 85, 92 n.8 (3d Cir. 2010), *abrogated on other grounds by Bruen*, 597 U.S. at 19 ("In order to uphold the constitutionality of a law imposing a condition on the commercial sale of firearms, a court necessarily must examine the nature and extent of the imposed condition. If there were somehow a categorical exception for these restrictions, it would follow that there would be no constitutional defect in prohibiting the commercial sale of firearms. Such a result would be untenable under *Heller*."). Here, New Mexico's law imposes just as much liability on a purchaser as it does the seller. *See* N.M. Stats. § 30-7-7.3(D). Such a provision clearly evidences whom the law targets—individuals who want to keep and bear arms.

**IV.    *Rahimi* makes clear that narrow laws, such as intoxication laws, cannot be analogs for laws that broadly restrict arms use by the public generally, such as the waiting period law.**

It is clear under *Bruen* that the waiting period law contradicts our nation's tradition of firearm regulation. *Rahimi* confirms it.

*Bruen* emphasizes that the historical "inquiry will be fairly straightforward" in cases where "a challenged regulation addresses a general societal problem that has persisted since the 18th century" and there is a "lack of a distinctly similar historical regulation addressing that problem." 597 U.S. at 26. That is precisely the case here. Impulsive firearms use has persisted since the colonial era—indeed, since the invention of firearms centuries prior—yet no waiting period regulation was enacted during the 17th, 18th, or 19th centuries. Prelim. Inj. Hr'g Tr. 190:13-18,

193:5-9. *Bruen*'s test can be straightforwardly applied, therefore, to invalidate the waiting period law.

*Rahimi* provides additional support for invalidating the waiting period law. *Rahimi* made clear that "narrow" laws, such as the intoxication laws that the State offers as analogs, are distinctly dissimilar from laws that "broadly restrict arms use by the public generally," such as the waiting period law. No. 22-915, 2024 WL 3074728, at *9. That is because "our Nation's tradition of firearm regulation distinguishes citizens who have been found to pose a credible threat to the physical safety of others from those who have not." *Id.* at *10. So while surety laws were "an appropriate analogue" for Section 922(g)(8)'s "narrow" restriction that applies to particular individuals, they were "not a historical analogue for a broad prohibitory regime like New York's" licensing regime at issue in *Bruen* that applied to the public generally. *Id.* at *10. For the same reason, intoxication laws—which were narrow and applied only to intoxicated individuals—cannot justify the waiting period law—which "broadly restrict[s] arms use by the public generally." *Id.* at *9.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a temporary restraining order and a preliminary injunction of the Waiting Period Act.

Dated: July 3, 2024

Respectfully submitted,

*/s/ Carter B. Harrison IV*
Carter B. Harrison IV
Attorney and Partner
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

Michael D. McCoy
Sean D. Nation
**Mountain States Legal Foundation**

16

2596 South Lewis Way
Lakewood, Colorado 80227
(303) 292-2021
mmccoy@mslegal.org

Joseph G.S. Greenlee
Erin M. Erhardt
**National Rifle Association of America**
11250 Waples Mill Road
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org
eerhardt@nrahq.org
***Attorneys for Plaintiffs***