IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SAMUEL ORTEGA and REBECCA SCOTT,

      Plaintiffs,

vs.                                    No. CIV 24-0471 JB/SCY

MICHELLE LUJAN GRISHAM, in her official
capacity as Governor of the State of New
Mexico, and RAÚL TORREZ, in his official
capacity as Attorney General of the State of
New Mexico,

      Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Motion for Temporary Restraining Order

and Preliminary Injunction, filed May 15, 2024 (Doc. 2)("Motion"). The Court held an evidentiary

hearing on June 27, 2024. See Clerk's Minutes, filed June 27, 2024 (Doc. 28). The primary issue

is whether the Court should enter a temporary restraining order ("TRO") or a preliminary

injunction ("PI") enjoining Defendants Governor Michelle Lujan Grisham and Attorney General

Raúl Torrez ("Defendants") from enforcing N.M.S.A. § 30-7-7.3 ("Waiting Period Act"), because

the Waiting Period Act violates the Second Amendment to the Constitution of the United States

by burdening the citizens of the State of New Mexico's right to keep and bear arms. The Court

concludes that the Plaintiffs have not shown that they are entitled to a TRO or PI enjoining the

Waiting Period Act. Accordingly, the Court denies the Motion.

## FINDINGS OF FACT

The Court must make findings of fact to enter a TRO or a PI. See Herrera v. Santa Fe Pub.

Sch., 792 F. Supp. 2d 1174, 1179 (D.N.M. 2011)(Browning, J.)("A temporary restraining order

requires the Court to make predictions about the plaintiff's likelihood of success."); Fort Defiance Indian Hosp. Bd., Inc. v. Becerra, 604 F. Supp. 3d 1187, 1192 (D.N.M. 2022)(Browning, J.)("The Court must make findings of fact to order a PI.").  Rule 52 of the Federal Rules of Civil Procedure states: "In granting or refusing an interlocutory injunction, the court must . . . state the findings and conclusions that support its action." Fed. R. Civ. P. 52(a)(2).  "'[T]he findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits.'"  Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d at 1179 (quoting Attorney Gen. of Okla. v. Tyson Foods, Inc., 565 F.3d 769, 776 (10th Cir. 2009))(alteration in Herrera v. Santa Fe Public Schools).  See Univ. of Tex. v. Camenisch, 451 U.S. 390, 395 (1981)("[A] preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits.").  Moreover, "[t]he Federal Rules of Evidence do not apply to preliminary injunction hearings."  Heideman v. S. Salt Lake City, 348 F.3d 1182, 1188 (10th Cir. 2003).  Accordingly, while the Court does the best it can to make accurate findings from the record before it, these findings of fact are relevant only for the purpose of determining whether to issue a TRO or a PI, and do not bind the Court or the parties at trial.  See Kottke Cattle, LLC v. Zia Agric. Consulting, LLC, No. CIV 21-1004, 2021 WL 4894197, at *1 (D.N.M. October 20, 2021)(Browning, J.).  The Court finds as follows:

       1.      **The Waiting Period Act**.

       1.      On March 4, 2024, Lujan Grisham, the Governor of the State of New Mexico, signed into law House Bill 129, 56th Leg., 2nd Sess. (N.M. 2024)("HB 129").  See 7-Day Waiting Period, New Mexico Department of Safety ("Waiting Period Information"), www.dps.nm.gov/7-day-waiting-period (last visited July 18, 2024).

       2.      On May 15, 2024, the Waiting Period Act came into effect.  See Waiting Period

Information.

3.      HB 129 enacts the Waiting Period Act, which creates a new criminal offense entitled "Unlawful Sale of a Firearm Before Required Waiting Period Ends."  HB 129 § 1.

4.      The Waiting Period Act states: "A waiting period of seven calendar days shall be required for the sale of a firearm and the transfer of the firearm to the buyer."  HB 129 § 1(A).

5.      The seven-day waiting period "include[s] the period required to conduct a federal instant background check."  HB 129 § 1(A).

6.      "If the seven-calendar-day waiting period has expired without the completion of a required federal instant background check," however, the Waiting Period Act requires that "the seller shall not transfer the firearm to the buyer until the federal instant background check is completed."  HB 129 § 1(A).

7.      The Waiting Period Act further provides: "The firearm shall remain in the custody of the seller or the federal firearms licensee performing the federal instant background check during the entirety of the waiting period."  HB 129 § 1(B).

8.      The Waiting Period Act defines the offense of "[u]nlawful sale of a firearm before the required waiting period ends" as "the transfer of ownership, possession or physical control of the firearm from the seller to the buyer before the end of the required seven-calendar-day waiting period . . . ."  HB 129 § 1(C).

9.      Unlawful sale of a firearm before the required waiting period ends "does not include," however, "temporary possession or control of a firearm provided to a customer by the proprietor of a licensed business in the conduct of that business."  HB 129 § 1(C).

10.     The Waiting Period Act states that a violation of "the provisions of this section" constitutes a "misdemeanor."  HB 129 § 1(G).

11.     The act establishes that "[e]ach party to an unlawful sale of a firearm before the required waiting period ends is in violation of this section and may be separately charged for the same sale," and that "[e]ach firearm sold contrary to the provisions of this section constitutes a separate offense . . . ."  HB 129 § 1(D)-(E).

12.     Likewise, "[t]wo or more offenses may be charged in the same complaint, information or indictment and shall be punished as separate offenses."  HB 129 § 1(F).

13.     The Waiting Period Act carves out five exceptions to the offense; namely, a violation is not committed where a firearm is sold: (i) "to a buyer who holds a valid federal firearms license"; (ii) "to a buyer who holds a valid New Mexico concealed handgun license pursuant to the Concealed Handgun Carry Act," N.M.S.A. § 29-19-1; (iii) "to a law enforcement agency"; (iv) "between two law enforcement officers authorized to carry a firearm and certified pursuant to federal law or the Law Enforcement Training Act," N.M.S.A. § 30-7-2; and (v) "between immediate family members," HB 129 § 1(H)(1)-(5).

14.     The Waiting Period Act defines firearm as "any weapon that will or is designed to or may readily be converted to expel a projectile by the action of an explosion; the frame or receiver of any such weapon; and includes any handgun, rifle or shotgun," but excludes from the definition "an antique firearm as defined in 18 U.S.C. Section 921(16), a powder-actuated tool or other device designed to be used for construction purposes, an emergency flare or a firearm in permanently inoperable condition . . . ."  HB 129 § 1(I)(1).

15.     An immediate family member for the Waiting Period Act's purposes is "a spouse, a parent, a child, a sibling, a grandparent, a grandchild, a great-grandchild, a niece, a nephew, a first cousin, an aunt or an uncle."  HB 129 § 1(I)(2).

- 4 -

2.      **The Plaintiffs.**

16.      Plaintiffs Paul Samuel Ortega and Rebecca Scott are adult New Mexico residents. See Complaint ¶¶ 1-2, at 2-3, filed May 15, 2024 (Doc. 1)("Complaint").

17.      Ortega owns six firearms.  See Transcript of Hearing at 76:2 (taken June 27, 2024), filed July 15, 2024 (Doc. 37)("Tr.")(Ortega).

18.      On May 15, 2024, Ortega sought to purchase a Glock 21 Gen4 .45 handgun from Calibers Shooting Sports Center in Albuquerque, New Mexico.  See Complaint ¶ 1, at 1.

19.      Ortega's primary motivation for purchasing the handgun was that he "wanted a new gun" and [a]lso for protection and [to] take camping."  See Tr. at 79:5-8 (McCoy, Ortega).

20.      After supplying the required information for a federal background check and passing the background check, Ortega paid for the firearm.  See Complaint ¶ 1, at 1.

21.      When "Ortega requested to take possession of the firearm that he had purchased so that he could remove it from the store and transport it to his residence," the employee who had been helping him with his transaction, "responded that due to the Waiting Period Act, the firearm had to remain in the custody of Calibers Shooting Sports Center for the next seven days." Complaint ¶ 1, at 1.  See Declaration of Robert Pohl ¶¶ 5-9, at 3 (executed May 15, 2024), filed May 15, 2024 (Doc. 2-4)("Pohl Decl."); Tr. at 79:23-80:6 (McCoy, Ortega).

22.       The Calibers Center employee informed Ortega that the sole reason that they were unable to let Ortega take the firearm into his possession and remove it from the store is the Waiting Period Act.  See Complaint ¶ 1, at 1.

23.      Ortega paid for the firearm before the Calibers Center employee informed him that his purchase was subject to the Waiting Period Act.  See Complaint ¶ 1, at 1; Declaration of Paul Samuel Ortega ¶ 7, at 3 (executed May 15, 2024), filed May 15, 2024 (Doc. 2-2)("Ortega

Decl.")("After paying the purchase price, including the sales tax, for the firearm . . . [t]he employee responded that . . . the firearm had to remain in the custody of Calibers for the next seven days.").

24.     Ortega returned to Calibers Center and took the purchased firearm into his "possession" on May 23, 2024.  Tr. at 83:18-84:8 (McCoy, Ortega).

25.     Ortega plans to purchase more firearms in the future.  See Complaint ¶ 1, at 2.

26.     On May 15, 2024, Scott visited the Big R Store in Farmington, New Mexico, to buy a Smith & Wesson M&P EZ Shield 380 handgun.  See Complaint ¶ 2, at 3.

27.     Scott's primary motivation for purchasing the firearm was self-defense.  See Tr. at 59:25-60:5 (McCoy, Scott).

28.     After supplying the required information for a federal background check and passing the background check, Scott "attempted to pay the purchase price for her firearm so she could transport it back to her residence."  Complaint ¶ 2, at 3.

29.     At this point, however, the Big R Store employee who was helping Scott with her transaction informed Scott that "the firearm had to remain in the custody of the Big R Store for the next seven days."  Complaint ¶ 2, at 3.  See Tr. 61:1-20 (McCoy, Scott).

30.     The Big R Store employee informed Scott that the sole reason they were unable to let Scott take the firearm into her possession and remove it from the store is the Waiting Period Act.  See Complaint ¶ 2, at 3.

31.     Scott did not pay for the firearm before the Big R Store employee informed her that her purchase was subject to the Waiting Period Act.  See Complaint ¶ 2, at 3; Declaration of Rebecca Scott ¶ 7, at 3 (executed May 15, 2024), filed May 15, 2024 (Doc. 2-3)("Scott Decl.")("I was informed by the Big R store employee who had been helping me with the transaction that I

could not pay for the firearm at that time or take possession of it until seven days had passed.").

32.     Scott returned to the Big R Store on May 22, 2024, at which point she paid for the firearm and was allowed to take it into her possession.  See Tr. 62:22-63:16 (McCoy, Scott).

33.     Scott plans to purchase more firearms in the future.  See Complaint ¶ 2, at 3.

**3.     <u>Gun Violence and the Waiting Period Act's Purpose</u>.**

34.     Firearm-related deaths in the United States have risen significantly in recent years.  <u>See</u> <u>CDC Provisional Data: Gun Suicides Reach All-time High in 2022, Gun Homicides Down Slightly from 2021</u>, Ctr. for Disease Control (July 27, 2023)("Newly released provisional data from the Centers for Disease Control and Prevention shows that gun death rates in 2022 remained near highs not seen since the mid-90s . . . ."), https://publichealth.jhu.edu/center-for-gun-violence-solutions/2023/cdc-provisional-data-gun-suicides-reach-all-time-high-in-2022-gun-homicides-down-slightly-from-2021 (last visited July 19, 2024); John Gramlich, <u>What the Data Says About Gun Deaths in the U.S.</u>, Pew Rsch. Ctr. (April 26, 2023)("More Americans died of gun-related injuries in 2021 than in any other year on record . . . ."), www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s (last visited July 19, 2024); <u>Firearm Deaths Grow, Disparities Widen</u>, Ctr. for Disease Control (June 6, 2022)("Firearm deaths continue to be a significant and growing public health problem in the United States."), www.cdc.gov/vitalsigns/firearm-deaths/index.html (last visited July 19, 2024).

35.     The increase in gun deaths is even sharper in New Mexico.  <u>See</u> <u>Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico</u> at 2, N.M. Dept. Health (September 29, 2023)("Gun Death Report"), www.nmhealth.org/publication/view/report/8463 (last visited July 19, 2024).

36.     New Mexico's age-adjusted firearm death rate increased by eighty-seven percent

- 7 -

between 2010 and 2021.  See Gun Death Report at 2, 5 fig.5.

37.     A seventy percent increase in the homicide rate between 2018 and 2021 is "driving the overall increase in firearm fatalities."  Gun Death Report at 2.  See Gun Death Report at 5 fig.5.

38.     New Mexico has the third-highest gun-death rate among all States.  See Firearm Mortality by State, Nat'l Ctr. for Health Stat. (2022), https://www.cdc.gov/nchs/pressroom/sosmap/firearm_mortality/firearm.htm (last visited July 19, 2024).

39.     The Waiting Period Act's primary purpose is to lower the number of gun deaths in New Mexico, by preventing impulsive suicides and homicides committed with legally purchased firearms.  See Response at 3; Fiscal Impact Report for HB 129 at 3-4, Leg. Fin. Comm. (February 13, 2024), www.nmlegis.gov/Sessions/24%20Regular/firs/HB0129.pdf (last visited July 19, 2024).

40.     The Waiting Period Act also seeks to "close[] or narrow[] the 'Charleston loophole' in which firearm purchasers can receive a firearm without completing a federal background check should the background check results not come back within three business days."  Response at 3-4 (citing House Consumer Affairs, at 2:52 p.m., N.M. Legislature, https://bit.ly/4dJKUsC (statements of House Bill 129 sponsor, Representative Andrea Romero)).

41.     Waiting period laws that delay the purchase of firearms reduce gun deaths.  See Expert Report and Declaration of Professor Christopher Poliquin ¶¶ 8-20, at 4-8 (executed March 11, 2024)(originally filed in Richards v. Bonta, No. CIV 23-0793 (S.D. Cal)), filed July 12, 2024 (Doc. 20-2)("Poliquin Report").

42.     Specifically, waiting periods reduce gun homicides by roughly seventeen percent, see Poliquin Report ¶¶ 11-15, at 5-6; Michael Luca, Deepak Malhotra & Christopher Poliquin,

Handgun Waiting Periods Reduce Gun Deaths, 114 Proc. Nat'l Acad. Sci. 12162, 12162 (2017), and waiting periods have been shown to decrease suicides, see Poliquin Report ¶¶ 16-20, at 6-8; Zachary Dunton, et al., The Association Between Repealing the 48-Hour Mandatory Waiting Period on Handgun Purchases and Suicide Rates in Wisconsin, 26 Archives Suicide Res. 1327, 1327 (2021)(concluding that the repeal of a forty-eight-hour waiting period on handgun purchases in 2015 is correlated with the increase of firearm-related suicides among Wisconsin residents of color and Wisconsinites residing in urban counties).

43.     In 2022, 218 homicides were committed with firearms.  See Underlying Cause of Death, 2018-2022, New Mexico, CDC Wonder, https://wonder.cdc.gov (last visited July 19, 2024).

44.     The Waiting Period Act is likely to save approximately thirty-seven lives per year. See FOF ¶¶ 42-43, at 8-9.

**4.     The United States' Historical Tradition of Commercial Firearm Regulations.**

45.     At the founding, including the period leading up to and following the Second Amendment's ratification in 1791, the colonies and later the States regulated the sale of firearms. See Declaration of Robert Spitzer ¶¶ 86-88, 91-99, at 32-38 (executed May 31, 2024), filed June 4, 2024 (Doc. 15-1)("Spitzer Report"); Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 L. & Hist. Rev. 567, 585 (1998); 1723 Conn. Acts 292 (prohibiting the sale of firearms to Native Americans); 1763 Pa. Laws 319, § 1 (prohibiting sale to "any Indian or Indians . . . any guns . . . or other warlike stores without license"); Robert J. Cottrol Raymond T. Diamond, The Second Amendment: Toward an Afro-Americanist Reconsideration, 80 Geo. L. J. 309, 336 n.129 (1991)("Sale or other delivery of firearms to slaves was forbidden by several states."); Robert J. Spitzer, Gun Law History in the

United States and Second Amendment Rights, 80 L. & Contemp. Probs. 55, 72 (2017)(identifying laws prohibiting the sale of firearms to those who expressed seditious sentiments).

46. This regulatory history included prohibitions on the sale of firearms to certain subsets of the populace, see, e.g., 1723 Conn. Acts 292, as well as less-onerous licensing restrictions for those who wished to sell firearms to certain subsets of the populace, see, e.g., 1763 Pa. Laws 319.

47. The principle underpinning the founding-era tradition of commercial sale restrictions was a concern that certain individuals among the groups that the laws targeted would use purchased firearms to do harm in society. See Bellesiles, supra, at 576 (explaining how colonial lawmakers, "fearing the consequences of unregulated access to firearms and munitions," "sought to regulate the . . . sale . . . of firearms and munitions"); Robert J. Spitzer, Guns Across America 52 (2015)("Gun laws aimed at barring [those] deemed dangerous to society from possessing firearms focused early in the country's history on Native Americans . . . ."); Bellesiles, supra, at 576 ("[S]lave uprisings -- real and imagined -- persuaded colonial legislatures that blacks as a group, slave or free, should not be allowed to own firearms."); Spitzer 2017, supra, at 57 (explaining that founding-era laws prohibiting individuals who expressed seditious opinions from buying firearms out of a concern that such individuals would take up arms against the Nation).

48. Our Nation's historical tradition of firearm regulations includes commercial regulations dating from the mid-eighteenth century to the mid-nineteenth century that restricted and prohibited the sale of arms to large groups of the population out of a concern that certain individuals within the population that the regulations targeted would use firearms they purchased to do harm in society. See FOF ¶¶ 40-42, at 9-10.

## PROCEDURAL BACKGROUND

The Plaintiffs filed the Complaint and the Motion on May 15, 2024.  See Complaint at 1;
Motion at 1.  On June 4, 2024, the Defendants responded to the Motion.  See Governor Lujan
Grisham's Response to Plaintiffs' Motion for Temporary Restraining Order and Preliminary
Injunction, filed June 4, 2024 (Doc. 15)("Response"); Attorney General Raúl Torrez' Notice of
Joiner to Governor Lujan Grisham's Response to Plaintiffs' Motion for Temporary Restraining
Order and Preliminary Injunction, filed June 5, 2024 (Doc. 18)("Notice of Joinder").  The
Plaintiffs replied to the Response on June 18, 2024.  See Reply in Support of Motion for Temporary
Restraining Order and Preliminary Injunction, filed June 18, 2024 (Doc. 21)("Reply").  The Court
held an evidentiary hearing on June 27, 2024.  See Clerk's Minutes, filed June 27, 2024 (Doc. 28).
Following the hearing, the parties submitted supplemental briefing.

1.    **The Complaint.**

In the Complaint, the Plaintiffs argue that "the Waiting Period Act burdens the right to
keep and bear arms, and because the government could never meet its burden to establish a
historical analogue to justify its regulation, it is unconstitutional under the Second
Amendment . . . ."  Complaint at 2.  The Complaint identifies one claim for relief for violation of
the Second Amendment's right to keep and bear arms, noting specifically that the Waiting Period
Act provides for "significant criminal sanctions," "arbitrarily delay[s] the right of law-abiding
citizens to obtain arms," and "contains no exceptions . . . ."  Complaint ¶¶ 21-27, at 7-8.  The
Plaintiffs seek: (i) "a declaratory judgment pursuant to 28 U.S.C. § 2201 that the Waiting Period
Act is unconstitutional on its and face and as applied"; (ii) "a Temporary Restraining Order and
preliminary and permanent injunctive relief" enjoining the Waiting Period Act's enforcement; and
(iii) "remedies available under 42 U.S.C. § 1983" in addition to "reasonable attorney fees, costs,

and expenses under 42 U.S.C. § 1988, or any other applicable law . . . ."  Complaint ¶¶ 28-30, at 8.

        **2.**        **<u>The Plaintiffs' Motion for a TRO and PI</u>**.

In the Motion, filed on the same day as the Complaint, the Plaintiffs argue that they are entitled to a TRO and PI enjoining the Waiting Period Act's enforcement.  <u>See</u> Motion ¶ 31, at 17. First, the Plaintiffs argue that they are likely to succeed on the merits of their claim, because the Waiting Period Act is unconstitutional under the Second Amendment.  <u>See</u> Motion ¶¶ 8-26, at 8-26.  At the outset, the Plaintiffs contend that, as "law abiding American citizens" who passed federal background checks, they "are part of 'the people' that the Second Amendment protects." Motion ¶ 7, at 7 (no citation given for quotation, but presumably U.S. Const. Amend. II).  The Plaintiffs next explain that, in "resolving Second Amendment challenges," courts apply the two-part framework established by the Supreme Court of the United States in <u>New York State Rifle & Pistol Ass'n, Inc. v. Bruen</u>, 597 U.S. 1 (2022)("<u>Bruen</u>").  <u>See</u> Motion ¶ 6, at 7.  <u>Bruen</u>'s two-part test, the Plaintiffs supply, requires courts to assess, first, whether "'the Second Amendment's plain text covers an individual's conduct,'" in which case "'the Constitution presumptively protects that conduct,'" and, second, whether the government has justified "'its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.'"  Motion ¶ 6, at 7 (quoting <u>Bruen</u>, 597 U.S. at 24).

Pursuant to <u>Bruen</u>, the Plaintiffs first contend that the Second Amendment's plain text covers their "desire to obtain possession of firearms that they have purchased for lawful purposes." Motion ¶ 8, at 8.  "The right to 'keep' arms," the Plaintiffs assert, "necessarily implies the right to obtain arms."  Motion ¶ 8, at 8 (citing <u>District of Columbia. v. Heller</u>, 554 U.S. 570, 582 (2008)("<u>Heller</u>")).  Anticipating counterarguments, the Plaintiffs attempt to refute the argument

"that while the plain text of the Second Amendment may protect the keeping of a firearm, it does not extend to obtaining one in the first place . . . ."  Motion ¶ 9, at 8.  According to the Plaintiffs, "this argument is incorrect," because the Waiting Period Act allows an individual to obtain a firearm by paying for the weapon and passing the required background check, but then prevents them from "subsequently 'carry[ing]'" the firearm.  Motion ¶ 9, at 8 (no citation given for quotation)(alteration the Court's).  Furthermore, the Plaintiffs argue that, because "constitutional rights necessarily include those rights attendant to exercising them . . . [t]he right to keep and bear arms obviously implies the right to obtain them."  Motion ¶ 10, at 9 (citing Teixeira v. Cnty. of Alameda, 873 F.3d 670, 677 (9th Cir. 2017)).  The Plaintiffs also aver that the Waiting Period Act's exceptions do "not save it from being presumptively violative of the Second Amendment," because the vast majority of New Mexicans remain affected by the Waiting Period Act, and "[t]he Supreme Court has never held that a gun control law needs to impact all or even most people's Second Amendment rights to implicate the text."  Motion ¶ 11, at 9.

Under Bruen's second step, the Plaintiffs argue that the Waiting Period Act is not consistent with the Nation's history of firearms regulation.  See Motion ¶ 14, at 10.  When Second Amendment's plain text covers conduct, the Plaintiffs explain, "the State may attempt to rebut the presumption of unconstitutionality only by demonstrating that the Act is consistent with the Nation's historical tradition of firearms regulation."  Motion ¶ 14, at 10.  Here, the Plaintiffs contend that the Defendants cannot meet this burden, "because there is no historical tradition of firearms being regulated in this manner, either at the time of our founding and the ratification of the Second Amendment, or during the Reconstruction era and the ratification of the Fourteenth Amendment."  Motion ¶ 14, at 10.  According to the Plaintiffs, the first waiting period law "was not enacted until 1923," which is "far too late to offer a historical analogue . . . ."  Motion ¶ 15, at

10-11 (citing Professor David B. Kopel's Written Testimony on Colorado House Bill 23-1219, To Delay the Acquisition of Firearms, https://davekopel.org/Testimony/HB23-1219%20Kopel%20testimony%20on%20forced%20delays%20in%20gun%20acquisition-Mar6.pdf).

The Plaintiffs contend that, "'when a challenged regulation addresses a general societal problem that has persisted since the 18th century," the failure to identify "'a distinctly similar historical regulation addressing that problem is relevant evidence that the challenged regulation is inconsistent with the Second Amendment.'"  Motion ¶ 16, at 11 (quoting Bruen, 597 U.S. at 26). "[I]mpulsive gun violence," the Plaintiffs represent, is the issue the Waiting Period Act seeks to address.  Motion ¶ 17, at 11.  The Plaintiffs argue that "the problem of impulsive gun violence dates from the invention of guns, and the Founders themselves could have adopted regulations to confront this problem," Motion ¶ 18, at 12, which provides strong evidence that the Waiting Period Act is unconstitutional, Motion ¶¶ 19-20, at 12.

In addition, the Plaintiffs clarify that "interest balancing" -- for example, justifying the Waiting Period Act's burden on firearm purchasers' interest in acquiring a firearm without delay by pointing to the societal interest in "public safety" -- "is simply irrelevant to the resolution of Plaintiffs' Second Amendment challenge" under Bruen.  Motion ¶ 22, at 12-13 (citing Bruen, 597 U.S. at 22-23).  Furthermore, the Plaintiffs aver that the Waiting Period Act is not a "commercial regulation," because "the very purpose of the law is to limit the ability of a purchaser to obtain a firearm . . . ."  Motion ¶ 23, at 13.  Under the Waiting Period Act, the Plaintiffs explain, "the seller can accept[] money for the firearm . . . but ownership and control of the firearm cannot be transferred to the purchaser . . . ."  Motion ¶ 23, at 13.  Moreover, the Plaintiffs provide, that the Waiting Period Act contains exceptions for certain firearm purchasers further demonstrates that

the Waiting Period Act is not "a true commercial regulation." Motion ¶ 24, at 13. Finally, the Plaintiffs highlight that the Waiting Period Act burdens only the rights of law-abiding citizens -- those who have passed a background check -- and is thus "particularly suspect." Motion ¶ 25, at 13-14. Because they have shown that the Waiting Period Act is presumptively unconstitutional under the Second Amendment, and because the Defendants cannot rebut this unconstitutionality by identifying a historical tradition of like regulations, the Plaintiffs conclude that they likely are to succeed on their claim's merits. See Motion ¶ 26, at 14.

Next, the Plaintiffs contend that they have suffered irreparable harm. See Motion ¶ 27, at 14. First, the Plaintiffs provide that the "[v]iolation of constitutional rights," and, in particular, a violation of an individual's Second Amendment rights, "per se constitutes irreparable injury." Motion ¶ 27, at 14-15 (citing Baird v. Bonta, 81 F.4th 1036, 1042 (9th Cir. 2023)). Second, the Plaintiffs quote caselaw for the proposition that "'irreparable harm is often suffered when the injury can[not] be adequately atoned for in money, or when the district court cannot remedy [the injury] following a final determination on the merits.'" Motion ¶ 27, at 15 (quoting Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001))(alterations in Prairie Band of Potawatomi Indians v. Pierce).

Finally, the Plaintiffs argue that "the balance of harms and public interest factors," which the Plaintiffs note "merge when the government is the opposing party favor injunctive relief," "favor injunctive relief." Motion ¶ 28, at 15. As with the irreparable harm factor, the Plaintiffs contend that their "likelihood of success on the merits of a Second Amendment claim tips the merged third and fourth factors decisively in their favor," because "'public interest concerns are implicated when a constitutional right has been violated'" and because a State "has no interest in . . . pursuing a legitimate goal" if it does "so by unconstitutional means."

Motion ¶ 28, at 15 (quoting <u>Baird v. Bonta</u>, 81 F.4th at 1042).  Moreover, the Plaintiffs aver, <u>Bruen</u> precludes the Court from considering any "important governmental interest" under the third and fourth TRO factors, because such balancing "would effectively amount to a backdoor means-end test of the type rejected by <u>Bruen</u>."  TRO ¶ 29, at 16.  According to the Plaintiffs, "<u>Bruen</u>'s rejection of means-end scrutiny would be nullified if courts were to eschew such scrutiny while examining the merits of a Second Amendment claim, only to bring such scrutiny right back in when determining whether to grant a remedy for a constitutional violation."  Motion ¶ 28, at 16.

        **3.**        <u>**The Defendants' Response.**</u>

On June 4, 2024, Defendant Lujan Grisham responded to the Motion, <u>see</u> Response at 1, and the following day, Defendant Torrez joined Defendant Lujan Grisham's Response, <u>see</u> Notice of Joinder at 1.  In the Response, the Defendants request that the Court "soundly reject Plaintiffs' dangerous request to preliminarily enjoin the waiting period and disrupt the status quo during the pendency of this suit."  Response at 2.  The Defendants argue at the outset that the "Plaintiffs seek a disfavored preliminary injunction," "because it would require the Court alter the status quo and grant Plaintiffs substantially all the relief that they could recover at the conclusion of a full trial."  Motion at 7.  For this reason, the Plaintiffs request that the Court "closely scrutinize Plaintiffs' request for preliminary injunctive relief . . . ."  Response at 8.

Turning to the <u>Winter</u> factors, <u>see</u> <u>Winter v. Nat. Res. Def. Council, Inc.</u>, 555 U.S. 7, 20 (2008)("<u>Winter</u>")("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."), the Defendants first aver that the "Plaintiff[s] cannot demonstrate a strong likelihood of success on the merits."  Response at 8.  Under the first <u>Bruen</u> prong, the Plaintiffs represent, "it is Plaintiffs'

burden to establish that the Second Amendment's plain text, as understood to ordinary citizens in the founding generation, protects a right to immediately acquire firearms."  Response at 9.  At this step, the Defendants contend, the Waiting Period Act "does not implicate the plain text of the Second Amendment," and, therefore, "the Court need not proceed further in its analysis." Response at 9-12.  The Defendants reject the Plaintiffs' "implied rights" argument that the words "keep and bear" in the Second Amendment encompass additional conduct necessary to the possession and carrying of firearms as "contrary to <u>Bruen</u> and <u>Heller</u>," and provide that the argument "disregard[s] the actual text of the Second Amendment and its scope as revealed by historical understandings."  Response at 11-12.  In addition, the Defendants note that the Supreme Court in <u>Bruen</u> acknowledges the presumptive Constitutionality of regulations like the Waiting Period Act which delay the purchase of firearms when it acknowledges "that 'nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes . . . which often require applicants to undergo a background check or pass a firearms safety course' -- things which necessarily delay an individual's ability to acquire a firearm."  Response at 10 (quoting <u>Bruen</u>, 597 U.S. at 38).

"Even if Plaintiffs could meet their initial burden" under <u>Bruen</u>'s first step, the Defendants argue, the Waiting Period Act, "which . . . applies only to firearm 'sellers' and 'buyers,'" "is a presumptively lawful condition and qualification on the sale of arms."  Response at 12-13 (citing <u>Heller</u>, 554 U.S. at 626-27).  The Defendants aver that <u>Bruen</u> reaffirms that the presumptively lawful categories of regulations which the Supreme Court identifies in <u>Heller</u> remain presumptively lawful, and note that "the Fifth Circuit recently upheld a background check law that imposes an expanded waiting period as a presumptively lawful regulation."  Response at 14 (citing <u>McRorey v. Garland</u>, 99 F.4th 831, 835 (5th Cir. 2024)("<u>McRorey</u>")).   The Defendants

acknowledge that a condition or qualification on the commercial sale of firearms could be "put to abusive ends" if it imposed too lengthy of a delay on the purchase of firearms, but provide that the Waiting Period Act is not such a regulation.  Response at 14 (citing McRorey, 99 F.4th at 840).

Turning to Bruen's second step, which the Defendants maintain the Court need not reach, because the Second Amendment's plain text does not cover the conduct of purchasing a firearm, the Defendants argue that "a seven-day waiting period is consistent with this Nation's history and tradition of firearm regulation."  Response at 14.  First, the Defendants maintain that the problems which the Waiting Period Act seeks to address -- namely, "impulsively purchasing a firearm to commit a homicide or suicide" -- "involve both 'unprecedented societal concerns' and 'dramatic technological changes' because 'firearms were not as readily available for purchase and . . . impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed.'"  Response at 15 (quoting Rocky Mountain Gun Owners v. Polis, No. CIV 23-2563, 2023 WL 8446495, at *16 (D. Colo. November 13, 2023)(Kane, J.)).  According to the Defendants, that the Waiting Period Act addresses concerns not present to the same degree at the founding means that the Court may reason by analogy to identify the comparable historical regulations Bruen requires.  See Response at 15-16.

The Defendants identify "two types of historical analogues [that] stand out here given their 'how' (i.e., temporarily delaying the transfer of a firearm) and 'why' (i.e., to avoid impulsive gun violence): laws involving intoxicated persons and licensing regimes."  Response at 16 (no citation given for quotation but presumably Bruen, 597 U.S. at 29).  First, the Defendants point to a recent case from the United States District Court for the District of Colorado in which the Honorable John L. Kane, United States District Judge for the District of Colorado, identified "laws from multiple states ranging from 1623 to 1893 that prevented the sale of arms to intoxicated individuals

and the possession of firearm by intoxicated individuals" as "proper analogues because they 'both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm.'" Response at 16-17 (quoting <u>Rocky Mountain Gun Owners v. Polis</u>, 2023 WL 8446495, at *17-18). Second, the Defendants briefly aver that "licensing regimes [a]re a proper analogue 'because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm to ensure those receiving a firearm are law-abiding, responsible citizens.'" Response at 17 (quoting <u>Rocky Mountain Gun Owners v. Polis</u>, 2023 WL 8446495, at *19). This argument finds support, the Defendants argue, in the Supreme Court's pronouncement in <u>Bruen</u> that modern shall-issue licensing regimes are Constitutionally permissible. <u>See</u> Response at 17 (citing <u>Bruen</u>, 597 U.S. at 38 n.9). For these reasons, the Defendants provide, the Plaintiffs are unlikely to succeed on their claim's merits. The Defendants conclude that the Plaintiffs cannot establish the remaining <u>Winter</u> factors, because they delayed in bringing their lawsuit, <u>see</u> Response at 17-19, and the Waiting Period Act's benefits are substantial, <u>see</u> Response at 19-20.

      **4.**     **<u>The Plaintiffs' Reply</u>.**

      The Plaintiffs reply to the Defendants' Response. <u>See</u> Reply at 1. In the Reply, the Plaintiffs begin by arguing that "an injunction based on a constitutional challenge to a law, sought on the effective date of the law, does not truly disrupt the status quo." Reply at 6. Turning to the likelihood of their success on the merits, the Plaintiffs contend that, because "there is no historical analogue to the New Mexico Waiting Period Act either at the Founding or for 150 years after the Founding," they "are likely to prevail on the merits." Reply at 5. The Plaintiffs refute as irrelevant the Defendants' "argument that a waiting period law will save some number of lives," because, under <u>Bruen</u>, "no amount of policy debate on the supposed wisdom of the Waiting Period Act can change the constitutional analysis." Reply at 5.

The Plaintiffs next aver that, under <u>Bruen</u>'s first step, "[t]he right to 'keep' arms necessarily implies the right to obtain arms," because, "[b]y the Waiting Period Act's very terms, it prevents individuals from taking 'possession' of their firearms." Reply at 7 (no citation given for quotation). Moreover, the Plaintiffs provide, the Defendants "mis-frame" the conduct implicated as the "'immediate' access to firearms," which the Plaintiffs argue "would never withstand scrutiny in the context of any other fundamental right," because "a mandatory 7-day delay on offering a political stump speech" clearly would implicate the First Amendment. Reply at 8. The Plaintiffs contend that the Waiting Period Act is not a presumptively lawful commercial regulation, because the Waiting Period Act "imposes a clear burden on the buyer's right of armed self-defense" and imposes "penalties on the buyer." Reply at 8-9.

Next, the Plaintiffs argue that the Defendants have not met their burden under <u>Bruen</u>'s second step, because the Defendants' proffered historical analogues are "ill-fitting." Reply at 9. First, the Plaintiffs explain that historical regulations prohibiting firearm usage by intoxicated persons are not properly analogous, "because they did not, as the Waiting Period Act does, assume that everyone is always intoxicated, and require them to wait seven days after passing a background check to sober up." Reply at 9-10. Second, the Plaintiffs maintain that the licensing regimes which the Defendants identify cannot serve as historical analogues under <u>Bruen</u>, because they were not "universal licensing regimes," and were "most often rooted in racism and bias regarding disfavored racial groups." Reply at 10. Instead, the Plaintiffs represent, the first universal and non-discriminatory waiting period law, was not enacted until 1911, which is too recent to serve as an appropriate analogue, and, moreover, this regime did not "'postpone taking possession of a firearm.'" Reply at 10 (quoting Expert Report and Declaration of Professor F. Lee Francis ¶ 63, at 22 (executed on June 17, 2024), filed June 18, 2024 (Doc. 21-1)("Francis Report"). In addition,

the Plaintiffs contend that "firearms were freely available for purchase at shops" during the founding era, and, given the concern over "armed rebellions" and "confrontations with Native Americans," "[t]he Founders knew and understood that firearms could be used for violent purposes, yet they imposed no waiting period to acquire a firearm."  Reply at 11-12.  The Plaintiffs conclude their argument that they are likely to succeed on the merits by representing that, as a legal matter, where the history which the Defendants provide is "indeterminate," the Plaintiffs' Constitutional challenge must succeed.  Reply at 12-13.

The Plaintiffs turn next to the remaining Winter factors.  See Reply at 13-16.  The Plaintiffs argue that they are suffering irreparable harm, because "[i]t is indisputable that the right to possess arms cannot be exercised unless individuals have the right to obtain them," and "even a brief violation of constitutional rights constitutes irreparable injury."  Reply at 14.  The Plaintiffs disagree with the Defendants that their delay in challenging the Waiting Period Act until it went into effect should weigh against a finding of irreparable harm, because, the Defendants explain, they waited to file the lawsuit in light of the ruling of the Honorable Philip A. Brimmer, Chief United States District Judge for the United States District Court for the District of Colorado, who ruled in Rocky Mountain Gun Owners v. Polis, No. 23-CV-1076, 2023 WL 5017257 (D. Colo. August 7, 2023), that the plaintiffs lacked standing to challenge Colorado's waiting period law, which had yet to go into effect.  See Reply at 9-10.  Finally, the Plaintiffs argue that the requested PI will serve the public interest, because it will enjoin an unconstitutional law, and restate their argument that the Court cannot weigh the government interest at this step of the Winter analysis, because "the Supreme Court in Bruen explicitly forbade consideration of the proposed outcome of laws that implicate the Second Amendment."  Reply at 15.

5.      __The Hearing__.

The Court held an evidentiary hearing on June 27, 2024.  <u>See</u> Clerk's Minutes, filed June

27, 2024 (Doc. 28).  The Plaintiffs began by arguing in support of their Motion.  <u>See</u> Tr. at 10:1-

27:12 (Harrison).  Specifically, the Plaintiffs argue that the Defendants frame the conduct that the

Waiting Period Act covers too narrowly, <u>see</u> Tr. at 16:17-25 (Harrison), and that the Supreme

Court's recent decision in <u>United States v. Rahimi</u>, 144 S. Ct. 1889 (2024)("<u>Rahimi</u>"), provides an

example of appropriate historical analogues that demonstrate that the Waiting Period Act lacks

proper historical analogues, <u>see</u> Tr. at 20:3-25:21 (Harrison); Tr. at 240:14-25 (averring that the

Defendant's proffered historical analogues are "not even distant relatives").  The Plaintiffs rejected

the argument that only a substantial infringement on the ability to acquire a firearm would

implicate the Second Amendment, because this would be akin to saying "[y]ou can speak, but you

can't speak for three days," in the First Amendment context.  <u>See</u> Tr. at 224:3-13 (McCoy).  The

Plaintiffs conceded that the Second Amendment does not cover background checks or,

"currently[,] felon in possession."  <u>See</u> Tr. at 228:5-10 (Court, McCoy).   In addition, the Plaintiffs

argued that <u>Heller</u>'s presumptively lawful categories of regulations are "examples of the types of

laws that will often be upheld" under the <u>Bruen</u> test, but that they do not provide for an

"independent analysis."  Tr. at 28:14-20 (Harrison).  <u>See</u> Tr. at 221:2-6 (Court, McCoy)(arguing

that <u>Rahimi</u> implicitly overrules language in <u>Heller</u>).   <u>But see</u> Tr. at 229:9-11 (Court,

McCoy)(declining to "say <u>Rahimi</u> has now eliminated the first step of <u>Bruen</u>").  The Plaintiffs

conclude that the remaining <u>Winter</u> factors "collapse in a constitutional case like this one," where

the movants demonstrate a likelihood of success on the merits of their Constitutional claim, Tr. at

26:9-27:12 (Harrison), and explain that the Court must disregard any "potential benefits" the

Waiting Period Act may have, Tr. at 243:11-16 (McCoy).

The Defendants responded that <u>Rahimi</u> does not upset the analytical framework established by <u>Heller</u> and <u>Bruen</u>, including <u>Heller</u>'s presumptively lawful categories of regulations.  <u>See</u> Tr. at 38:11-18 (Duffy); <u>id.</u> at 248:23-249:3 (Duffy)(explaining that <u>Rahimi</u> didn't discuss <u>Bruen</u>'s first step, because such discussion was unnecessary).  The Defendants provided that, to the contrary, <u>Rahimi</u> affirms that <u>Heller</u>'s presumptively lawful categories remain intact.  <u>See</u> Tr. at 250:2-251:1 (Duffy).  In addition, the Defendants argued that the Waiting Period Act does not "meaningfully infringe[] upon the right to keep a firearm."  <u>See</u> Tr. at 255:18-256:13 (Duffy).  The Defendants contended that the Waiting Period Act does not "infringe on the right to keep arms because [the Second Amendment's] plain meaning implies that the person already has those arms," Tr. at 44:17-19 (Duffy), and urged the Court, if it reaches the historical tradition analysis, to not seek a historical twin, <u>see</u> Tr. at 47:13-50:6 (Duffy).  <u>See</u> Tr. at 257:15-261:20 (Court, Duffy)(explaining that <u>Rahimi</u> provides for a more nuanced process for identifying historical analogues).  The Defendants reiterated that a preliminary injunction is an "extraordinary remedy," Tr. at 40:15-20 (Duffy), and explained that, because the Plaintiffs bring a facial challenge, and the Plaintiffs' challenge fails, because they concede "that they don't challenge the constitutionality of this law to the extent a background check doesn't come back instantly," Tr. at 42:8-43:10 (Duffy).  The Defendants concluded that the Plaintiffs have not "alleged a meaningful infringement upon their right of self-defense," nor demonstrated that the "public interest and the balancing of the equities" support the entry of a TRO or PI.  Tr. at 52:4-54:15 (Duffy).

   6.   **The Parties' Supplemental Briefing.**

Following the Supreme Court's ruling in <u>Rahimi</u>, the Defendants filed an unopposed motion for supplemental briefing to address <u>Rahimi</u>'s potential impact on the case.  <u>See</u> Governor Lujan Grisham's Unopposed Motion for Supplemental Briefing, filed June 25, 2024 (Doc.

25)("Motion for Supp. Briefing").  The Court granted the Motion for Supp. Briefing.  See Order

Granting Governor Lujan Grisham's Unopposed Motion for Supplemental Briefing, filed July 3,

2024 (Doc. 30).  On July 3, 2024, the parties filed supplemental briefs.  See Defendants' Joint

Supplemental Brief, filed July 3, 2024 (Doc. 31)("Defendants' Supp. Brief"); Plaintiffs'

Supplemental Brief, filed July 3, 2024 (Doc. 32)("Plaintiffs' Supp. Brief").  On July 8, 2024, the

parties filed responses to the supplemental briefing.  See Defendants' Joint Response to Plaintiffs'

Supplemental Brief, filed July 8, 2024 (Doc. 35)("Defendants' Supp. Response"); Plaintiffs'

Response to Defendants [sic] Supplemental Brief, filed July 8, 2024 (Doc. 36)("Plaintiffs' Supp.

Response").

> ### a.    The Plaintiffs' Supp. Brief.

In the Plaintiffs' Supp. Brief, the Plaintiffs begin by arguing that the Second Amendment's

plain text covers the right to obtain possession of firearms.  See Plaintiffs' Supp. Brief at 6-13.

First, the Plaintiffs aver that Heller's "plain text analysis makes clear that the Second

Amendment's plain text covers Plaintiffs' possession of their purchased firearms," because Heller

held that the Second Amendment "guarantee[s] the individual right to possess and carry weapons,"

and the Plaintiffs "desire to 'possess' their 'bearable arms.'"  Plaintiffs' Supp. Brief at 7 (quoting

Heller, 554 U.S. at 582, 592).  Second, the Plaintiffs contend that Waiting Period Act "directly

burdens Plaintiffs' right to possess arms," because it prohibits them from "possess[ing] their

firearms during the week after purchasing them."  Plaintiffs' Supp. Brief at 7-8.  Third, the

Plaintiffs argue that "[t]he right to acquire arms is inherent to the right to possess arms."  Plaintiffs'

Supp. Brief at 8.  In support of this proposition, the Plaintiffs provide that Heller states that "'the

most natural reading of keep Arms in the Second Amendment is to have weapons,'" Plaintiffs'

Supp. Brief at 8 (quoting Heller, 554 U.S. at 582), and "[t]o 'have' something -- both historically

and today -- has always included its acquisition," Plaintiffs' Supp. Brief at 8 (citing 1 Samuel Johnson, Dictionary of the English Language (4th ed. 1773)(listing "obtain" as a definition of "have"). According to the Plaintiffs, "[b]ecause 'the plain meaning of the verbs have or "possess include the act of receipt,' 'to have weapons' must encompass the 'receipt' and 'possession of those weapons.'" Plaintiffs' Supp. Brief at 8 (quoting United States v. Quiroz, 629 F. Supp. 3d 511, 516 (W.D. Tex. 2022)(Counts, J.))).

Fourth, the Plaintiffs explain that, "[a]t a minimum, the right to acquire arms is a necessary concomitant of the right to possess arms." Plaintiffs' Supp. Brief at 9. The Plaintiffs express that "four Supreme Court Justices" have "determined . . . that 'a necessary concomitant' of 'the right to keep a handgun in the home for self-defense' is the right 'to take a gun to a range in order to gain and maintain the skill necessary to use it responsibly,'" Plaintiffs' Supp. Brief at 9 (quoting New York State Rifle & Pistol Ass'n, Inc. v. City of New York, 140 S. Ct. 1525, 1541 (2020)(Alito, J., joined by Gorsuch, J., and Thomas, J., dissenting)), identify that Justice Thomas, in a concurring opinion, has indicated that the Second Amendment contains an implied right to obtain bullets, see Plaintiffs' Supp. Brief at 9 (citing Luis v. United States, 578 U.S. 5, 26-27 (2016)(Thomas, J., concurring), and cite to numerous Courts of Appeals and district court decisions that the Plaintiffs aver hold that the acquisition of a firearm is a commitment right to the right to keep and bear arms, see Plaintiffs' Supp. Brief at 10-11. The Plaintiffs analogize to the First Amendment, where, the Plaintiffs argue, there also exists implicit rights necessary for the exercise of core rights, and reason that "'self-defense' is not among the 27 words of the Second Amendment's text, yet Heller identified it as a 'core protection' of the Second Amendment." Plaintiffs' Supp. Brief at 12 (quoting Heller, 554 U.S. at 634). The Plaintiffs provide that Rahimi "demonstrated that the plain text inquiry was never intended to be a significant obstacle for

challengers to overcome."  Plaintiffs' Supp. Brief at 9.

The Plaintiffs next argue that "[a]ll firearms regulations must be justified by historical tradition, including the regulations that Heller deemed 'presumptively lawful.'"  Plaintiffs' Supp. Brief at 13.  The Plaintiffs supply that Bruen "made it unmistakably clear that this historical test applies to the 'presumptively lawful' regulations it identified in Heller" by "reiterat[ing] twice that the 'only' way the government can justify a firearms regulation is with historical tradition." Plaintiffs' Supp. Brief at 13 (quoting Bruen, 597 U.S. at 17, 34).  Notably, the Plaintiffs explain, the Supreme Court in Bruen applied the historical analysis to sensitive places, one of Heller's categories of presumptively lawful regulations.  Plaintiffs' Supp. Brief at 13-14 (citing United States v. Duarte, 101 F.4th 657, 686 (9th Cir. 2024), reh'g en banc granted, opinion vacated, No. 22-50048, 2024 WL 3443151 (9th Cir. July 17, 2024)).  This conclusion is consistent, the Plaintiffs contend, with Heller, which "conveyed that [its presumptively Constitutional] regulations must be historically justified."  Plaintiffs' Supp. Brief at 14.

Rahimi, the Plaintiffs contend, confirms that Heller's category of presumptively Constitutional regulations must satisfy Bruen's historical tradition test.  For example, the Plaintiffs provide that Rahimi "emphasizes" that "'the appropriate [Second Amendment] analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition,'" Plaintiffs' Supp. Brief at 15 (quoting Rahimi, 144 S. Ct. at 1898)(alterations in Plaintiffs' Supp. Brief, but not in Rahimi), and Rahimi opts to analyze 18 U.S.C. § 922(g)(8) through Bruen's step-two analysis and "not by analog[izing] to the 'presumptively lawful' prohibitions for felons and the mentally ill," as had several courts before Rahimi, Plaintiffs' Supp. Brief at 15-16.  The Plaintiffs explain that "[n]ever once has the Court articulated an exception for the regulations it deemed 'presumptively lawful' in Heller," and maintain that the Supreme Court

"has expressly stated that 'a court [may] conclude that the individual's conduct falls outside the Second Amendment's" scope "[o]nly if a firearm regulation is consistent with this Nation's historical tradition." Plaintiffs' Supp. Brief at 16 (quoting Bruen, 597 U.S. at 17)(alterations and emphasis in Plaintiffs' Supp. Brief, but not in Bruen).

Regardless, the Plaintiffs posit, the Waiting Period Act "is neither longstanding nor a commercial regulation." Plaintiffs' Supp. Brief at 17. According to the Plaintiffs, the Waiting Period Act is not longstanding, because "the only allegedly longstanding waiting period law produced in this case is California's 1923 law," and Bruen struck down a law that "was enacted in 1911." Plaintiffs' Supp. Brief at 17. The Plaintiffs reiterate that "Bruen makes clear that a restriction that appears for the first time in the 20th century cannot establish a tradition." Plaintiffs' Supp. Brief at 18. In addition, the Plaintiffs argue that the Waiting Period Act cannot be longstanding, because it differs from California's 1923 law in that California's law imposed a shorter waiting period, and "applied only to handguns" and "to sales by licensed dealers." Plaintiffs' Supp. Brief at 17-18.

"With respect to Defendants' argument that the law is a commercial regulation," the Plaintiffs urge the Court not to "open[] that Pandora's box," because "[a] law that directly burdens an individual right to self-defense by strategically regulating a business is not a true commercial regulation." Plaintiffs' Supp. Brief at 18. "Otherwise," the Plaintiffs reason, "an indefinite ban on firearms purchases is merely a commercial regulation." Plaintiffs' Supp. Brief at 18. Furthermore, the Plaintiffs contend, the Waiting Period Act applies to all firearm sales, including "private sales between non-commercial entities," and the Waiting Period Act's "purpose . . . has nothing to do with commercial sales." Plaintiffs' Supp. Brief at 19 (emphasis in original). Rather, it "is designed exclusively to prevent certain impulsive uses of the firearm by the buyer, versus

- 27 -

being a law that 'primarily impact[s] manufacturers, sellers, or transferers.'"  Plaintiffs' Supp. Brief at 19 (quoting United States v. James, 677 F. Supp. 3d 329, 343 (D.V.I. 2023)(Smith, J.))(emphasis in Plaintiffs' Supp. Brief, but not in United States v. James).  Regardless, the Plaintiffs emphasize, "even commercial regulations are unconstitutional if they are 'abusive.'  And a law that constitutes a pretextual smokescreen for a burden on the right to keep and bear arms is abusive."  Plaintiffs' Supp. Brief at 19-20 (no citation given for quotation).

The Plaintiffs conclude that Rahimi confirms that the Waiting Period Act is inconsistent with our Nation's historical tradition of firearm regulation.  That "[i]mpulsive firearms use has persisted since the colonial era . . . yet no waiting period regulation was enacted during the 17th, 18th, or 19th centuries," confirms, the Plaintiffs provide, that the historical inquiry here should be "'fairly straightforward.'"  Plaintiffs' Supp. Brief at 20 (quoting Bruen, 597 U.S. at 26).  Finally, the Plaintiffs contend that "Rahimi made clear that 'narrow' laws, such as the intoxication laws that the State offers as analogs, are distinctly dissimilar from laws that 'broadly restrict arms use by the public generally,' such as the waiting period law."  Plaintiffs' Supp. Brief at 21 (quoting Rahimi, 144 S. Ct. at 1901).

### b.    The Defendants' Supp. Brief.

The Defendants begin by explaining that Rahimi "did not abandon Bruen's first step in which courts must consider whether the regulated conduct is protected by Second Amendment's plain text," and it did not "abrogate Heller's list of 'presumptively lawful' measures, such as 'laws imposing conditions and qualifications on the commercial sale of arms.'"  Defendants' Supp. Brief at 1-2 (quoting Heller, 554 U.S. at 626-27, 627 n.26).  The Defendants argue that nothing in Rahimi casts doubt upon the vitality of Bruen's clear pronouncement that courts must assess whether "the Second Amendment's plain text covers an individual's conduct," Defendants' Supp. Brief at 6-7

- 28 -

(quoting <u>Bruen</u>, 597 U.S. at 24), and <u>Heller</u>'s list of presumptively lawful measures, which the Defendants contend <u>Rahimi</u> reaffirmed "by citing [<u>Heller</u>'s] discussion with apparent approval," Defendants' Supp. Brief at 7-8 (quoting <u>Rahimi</u>, 144 S. Ct. at 1901).

The Defendants provide: "While <u>Rahimi</u> did not shed much, if any, light on <u>Bruen</u>'s first step," however, "it <u>did</u> provide much needed clarification to lower courts applying the second step of the <u>Bruen</u> test and addressing facial challenges to firearm regulations." Defendants' Supp. Brief at 2 (emphasis in original). The Defendants contend that <u>Rahimi</u> clarifies three things about <u>Bruen</u>'s second step. <u>See</u> Defendants' Supp. Brief at 2. First, according to the Defendants, <u>Rahimi</u> clarifies that courts "should apply <u>Bruen</u>'s 'more nuanced' approach to identifying historical analogs even if a modern law is addressing general societal issues that existed at the time of the founding." Defendants' Supp. Brief at 2 (no citation given for quotation but presumably <u>Bruen</u>, 597 U.S. at 27). The Defendants explain that, if the Supreme Court meant to allow historical analysis via analogy only for modern regulations addressing problems that did not exist at the founding, the United States in <u>Rahimi</u> "could not have relied on surety and going armed laws to justify a 'by no means identical' law addressing an issue that existed at the time of the founding (i.e., domestic violence)." Defendants' Supp. Brief at 9 (quoting <u>Rahimi</u>, 144 S. Ct. at 1901). Second, the Defendants reason that <u>Rahimi</u> informs courts that they "may rely on historical laws to justify a modern regulation even though those laws addressed different societal issues so long as the modern regulation is consistent with the principles underlying the historical laws," Defendants' Supp. Brief at 2, because the United States in <u>Rahimi</u> "was able to rely on going armed laws to justify a law addressing domestic violence even though going armed laws were aimed at a different societal problem (i.e., threatening public peace) because they shared the same underlying principle of protecting against individuals who posed a threat to other," Defendants'

Supp. Brief at 9-10 (citing <u>Rahimi</u>, 144 S. Ct. at 1898).  Third, the Defendants emphasize that <u>Rahimi</u> "reinforces that <u>Bruen</u>'s test is not a 'regulatory straightjacket' and allows for modern regulations that address longstanding or evolving societal issues through different -- or even stricter -- ways," Defendants' Supp. Brief at 10 (citing <u>Rahimi</u>, 144 S. Ct. at 1898), because the United States, under <u>Rahimi</u>, "is permitted to prophylactically disarm those subject to certain domestic violence restraining orders (and punish those who disobey with imprisonment) even though the founding era laws that addressed this issue only required a surety bond," Defendants' Supp. Brief at 10-11.

Applying these principles, the Defendants argue, the Waiting Period Act survives <u>Bruen</u>'s second step.  First, the Defendants aver that the Court should "apply <u>Bruen</u>'s more nuanced approach regardless of whether it finds that [the Waiting Period Act] addresses a general issue that existed at the time of the founding."  Defendants' Supp. Brief at 11.  "Second, the Court should accept intoxication laws and licensing regimes as relevantly similar historical analogs," because, while these laws are not identical to the Waiting Period Act, they share a similar underlying principle to the Waiting Period Act, namely, "that the government may impose temporary measures that briefly delay a person's ability to use a firearm to ensure that they do not misuse the deadly weapons."  Defendants' Supp. Brief at 11.  Third, the Defendants contend that the Court should accept founding-era intoxication laws despite that the Waiting Period Act "applies a bit more broadly in the sense that it applies to everyone who purchases a new firearm."  Defendants' Supp. Brief at 12-13.

Regarding facial challenges, the Defendants state: "<u>Rahimi</u> confirmed that individuals bringing such a challenge to a firearm regulation -- as Plaintiffs do here -- must 'establish <u>that no set of circumstances</u> exists under which the [challenged law] would be valid.'"  Defendants' Supp.

Brief at 2 (quoting <u>Rahimi</u>, 144 S. Ct. at 1898)(emphasis in Defendants' Supp. Brief, but not <u>Rahimi</u>).   According to the Defendants, this quotation means that, to obtain the requested "unqualified preliminary injunctive relief, Plaintiffs must show a likelihood of success on their facial challenge to Section 30-7-7.3."   Defendants' Supp. Brief at 13-14.   The Plaintiffs cannot demonstrate a likelihood of success on their facial challenge, the Defendant's argue, because the Waiting Period Act "is indisputably constitutional to the extent it applies to individuals" who seek to purchase a firearm but do not "pass[] the required federal background check."   Defendants' Supp. Brief at 15.   The Defendants conclude that, "while Defendants are confident the challenged waiting period in this case would have been upheld prior to the Supreme Court's latest decision, <u>Rahimi</u> solidifies that conclusion."   Defendants' Supp. Brief at 3.

        **c.**        <u>**The Plaintiffs' Supp. Response.**</u>

The Plaintiffs respond to the Defendants' Supp. Brief.   <u>See</u> Plaintiffs' Supp. Response at 1.   The Plaintiffs begin by averring that the "Defendants concede that the waiting period law burdens the right to possess arms," and thus "[n]othing more is required at the plain text stage." Plaintiffs' Supp. Response at 4 (explaining that Defendants "admit that the law 'imposes' a '7-day delay on an individual's ability to possess a newly purchased firearm'" (quoting Defendants' Supp. Brief at 12)).   The Plaintiffs contend that the Defendants improperly narrow the right at issue by "argu[ing] that the plain text 'does not cover the right to immediately acquire a newly purchased firearm.'"   Plaintiffs' Supp. Response at 4 (quoting Defendants' Supp. Brief at 2).   The Plaintiffs explain that the conclusion that the Waiting Period Act implicates the Second Amendment's plain text is supported by the dissent in <u>New York State Rifle & Pistol Ass'n, Inc. v. City of New York</u>, 140 S. Ct. 1525 (2020), in which the Honorable Samuel Alito, Associate Justice of the Supreme Court, reasoned that "range training was protected by the plain text."   Plaintiffs' Supp. Response

at 5-6.  More broadly, the Plaintiffs posit, the Supreme Court's Second Amendment case law demonstrates that <u>Bruen</u>'s first step asks "whether the conduct [is] covered" and leaves any consideration regarding "the limitation on that conduct" for <u>Bruen</u>'s second step.  Plaintiffs' Supp. Response at 6.

The Plaintiffs reiterate their argument that the Waiting Period Act is not a presumptively Constitutional commercial regulation, because it serves no commercial purpose.  <u>See</u> Plaintiffs' Supp. Response at 6-7 (citing <u>Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives</u>, 5 F.4th 407, 416 (4th Cir. 2021), <u>vacated as moot</u>, 14 F.4th 322 (4th Cir. 2021)); <u>id.</u> at 7 ("The Act merely targets the 'transfer' of a firearm to a customer after a purchase, not the underlying sale of that firearm.").  Even if the Waiting Period Act constituted a commercial regulation, the Plaintiffs aver, the presumption of Constitutionality it is afforded is rebutted by the fact that the Defendants cannot "establish that the law is consistent with this Nation's historical tradition."  Plaintiffs' Supp. Response at 8.  Specifically, the Plaintiffs provide that, "[d]espite Defendants' best efforts to fit the square peg of intoxication laws and licensing regimes into the round hole of the waiting period law, the simple fact is that they are not analogous in any way."  Plaintiffs' Supp. Response at 8. The Plaintiffs reason that the intoxication laws tha the Defendants identify are distinguishable from the Waiting Period Act, because they only applied once an individual was identified as drunk and ceased to apply once the individual sobered up.  <u>See</u> Plaintiffs' Supp. Response at 9.  Moreover, the Plaintiffs' supply, that the Waiting Period Act imposes a delay longer than the intoxication laws is "equally disqualifying," because the degree of the burden imposed by the regulations is central to the <u>Bruen</u> step-two analysis.  Plaintiffs' Supp. Response at 10 (citing <u>Bruen</u>, 597 U.S. at 29).

The Plaintiffs explain that they "challenge the waiting period law both on its face and as

applied."  Plaintiffs' Supp. Response at 10 (citing Complaint ¶ 28, at 8).  The Plaintiffs disagree with the Defendants that the Waiting Period Act is Constitutional as applied to "individuals who do not receive notification that they have passed their background check within 7 days of attempting to purchase their firearms."  Plaintiffs' Supp. Response at 11.  "As a facial matter," the Plaintiffs contend,

> the 7-day waiting period imposed by the law is completely untethered to the length of time that a background check process takes. A delay associated with a background check experienced by relatively few individuals exists independently of the arbitrary 7-day delay imposed on all purchasers by the waiting period law. Those purchasers who do not receive notification of their background check in a "timely manner" would be delayed in acquiring their firearms, regardless of whether the waiting period law existed or not.

Plaintiffs' Supp. Response at 11 (no citation given for quotation).

### d.    The Defendants' Supp. Response.

The Defendants respond to the Plaintiffs' Supp. Brief.  See Defendants' Supp. Response at 1.  The Defendants argue first that the Waiting Period Act does not implicate the Second Amendment's plain text, because it "does not prevent anyone from 'keeping' or 'bearing' their arms that they already possess.  Nor does it prohibit anyone from purchasing any firearm.  Rather, it merely imposes a brief delay on the transfer of a newly purchased firearm to a buyer."  Defendants' Supp. Response at 2.  See Defendants' Supp. Response at 3 ("[T]he right to 'keep Arms' is a right to continue to keep in one's possession something already possessed.").  Citing B & L Prods., Inc. v. Newsom, 104 F.4th 108 (9th Cir. 2024)("B & L Prods., Inc."), however, the Defendants concede that "a regulation impacting someone's ability to acquire a new firearm may infringe on conduct protected by the Second Amendment's plain text if it 'meaningfully constrains' their right to keep firearms for self-defense." Defendants' Supp. Response at 4-5. (quoting B & L Prods., Inc., 104 F.4th at 118).  According to the Defendants, "it is safe to say a

- 33 -

seven-day delay does not meaningfully constrain anyone's right to bear arms for self-defense." Defendants' Supp. Response at 5 (citing Bruen, 597 U.S. at 39 n.9 for the proposition that the Supreme Court has approved of temporary delays on an individuals right to obtain firearms).

The Defendants proceed that, contrary to the Plaintiffs' "newly-raised argument," "[p]resumptively lawful commercial regulations are not subject to Bruen's second step." Defendants' Supp. Response at 7. The Defendants urge the Court to follow the Fifth Circuit's conclusion in McRorey, "that Heller described 'conditions and qualifications on the commercial sale of arms as presumptively lawful,' and 'Bruen did nothing to disturb that part of Heller.'" Defendants' Supp. Response at 8 (quoting McRorey, 99 F.4th at 836). The Defendants further explain that the "two divided appellate cases" the Defendants cite for the proposition that Heller's presumptively constitutional regulations have been subsumed into Bruen's step-two test

> are on shaky grounds following Rahimi, which went out of its way to note that the Supreme Court did "not suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse," and repeated Heller's observation that "many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'"

Defendants' Supp. Response at 9-10 (quoting Rahimi, 144 S. Ct. at 1901).

The Defendants argue that laws imposing conditions and qualifications on the commercial sale of arms need not be longstanding to be presumptively Constitutional, because the word longstanding in Heller qualifies only the first category of presumptively Constitutional regulations -- i.e., prohibitions on the possession of firearms by felons and the mentally ill -- and, alternatively, longstanding "is simply an adjective that describes (rather than conditions) these categories of presumptively lawful regulations." Defendants' Supp. Response at 12. Regardless, the Defendants explain, waiting period acts are sufficiently longstanding, because they date to the

early twentieth century.  Defendants' Supp. Response at 12.  The Defendants conclude that "Rahimi supports finding intoxication laws and licensing regimes as proper analogues to waiting periods," because Rahimi confirmed that an "identical" historical analogue is no longer required under Bruen's second step.  Defendants' Supp. Response at 15-16.  The Defendants distinguish the Waiting Period Act from the "burdensome" licensing regime struck down in Bruen and reiterate that the historical analogues that they proffer are consistent with the principles underlying the Waiting Period Act.

## LAW REGARDING PRELIMINARY INJUNCTIONS

"A preliminary injunction is an extraordinary remedy constituting drastic relief."  Pryor v. Sch. Dist. No. 1, 99 F.4th 1243, 1249-50 (10th Cir. 2024).  Accordingly, "a preliminary injunction should be granted only in cases where the necessity for it is clearly established."  U.S. ex rel. Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc., 883 F.2d 886, 888-89 (10th Cir. 1989).  See SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1098 (10th Cir. 1991)(advising that a PI "should not be issued unless the movant's right to relief is clear and unequivocal").  Before a district court may issue a PI, the movant must make four showings: (i) that "the movant will suffer irreparable injury if the court denies the injunction"; (ii) that "the movant's harm without the injunction outweighs the other party's harm with the injunction"; (iii) that "the injunction, if issued, would not be adverse to the public interest"; and (iv) that "the injunction is not adverse to the public interest."  Pryor v. Sch. Dist. No. 1, 99 F.4th at 1250.  See Winter v. NRDC, Inc., 555 U.S. 7, 19 (2008)("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  (citing Munaf v. Geren, 553 U.S. 674, 688-89 (2008))).

The movant bears the burden of demonstrating all four prongs' satisfaction.  See Automated Mktg. Sys., Inc. v. Martin, 467 F.2d 1181, 1183 (10th Cir. 1972).  The likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis.  Nken v. Holder, 556 U.S. 418, 434 (2009).  "A plaintiff suffers irreparable harm 'when the court would be unable to grant an effective remedy after a full trial because such damages would be inadequate and difficult to ascertain.'"  Plant Oil Powered Diesel Fuel Sys., Inc. v. ExxonMobil Corp., 778 F. Supp. 2d 1180, 1190 (D.N.M. 2011)(Browning, J.)(quoting Dominion Video Satellite, Inc. v. EchoStar Satellite Corp., 269 F.3d 1149, 1156 (10th Cir. 2001)).  In addition, the third and fourth Winter factors, which "assess[] the harm to the opposing party and weigh[] the public interest," "merge when the Government is the opposing party."  Nken v. Holder, 556 U.S. at 435.

The Tenth Circuit has clarified that it is insufficient for a moving party to demonstrate that there is only a "possibility" either of success on the merits or of irreparable harm.  Diné Citizens Against Ruining Our Env't v. Jewell, 839 F.3d 1276, 1282 (10th Cir. 2016)("Diné Citizens").  In Diné Citizens, the United States Court of Appeals for the Tenth Circuit holds that a relaxed test for preliminary relief is "inconsistent with the Supreme Court's recent decision in Winter v. Natural Resources Defense Council," which "overruled the Ninth Circuit's application of a modified preliminary injunction test under which plaintiffs . . . could receive a preliminary injunction based only on a possibility, rather than a likelihood, of irreparable harm."  Diné Citizens, 839 F.3d at 1282 (citing Winter, 555 U.S. at 22).  The Tenth Circuit concluded that, although the standard which the Supreme Court found incorrect in Winter dealt with the irreparable-harm factor, "Winter's rationale seems to apply with equal force" to the likelihood-of-success factor.  Diné Citizens, 839 F.3d at 1282.  Accordingly, the Tenth Circuit holds that "any modified test

which relaxes one of the prongs for preliminary relief and thus deviates from the standard test is impermissible."  Diné Citizens, 839 F.3d at 1282.

"[T]he limited purpose of a preliminary injunction 'is merely to preserve the relative positions of the parties until a trial on the merits can be held . . . .'"  Schrier v. Univ. of Colo., 427 F.3d at 1258 (quoting Univ. of Tex. v. Camenisch, 451 U.S. at 395).  In that vein, "courts 'disfavor' some preliminary injunctions and so require more of the parties who request them."  Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d 792, 797 (10th Cir. 2019).  "[A] disfavored injunction may exhibit any of three characteristics: (1) it mandates action (rather than prohibiting it), (2) it changes the status quo, or (3) it grants all the relief that the moving party could expect from a trial win."  Free the Nipple-Fort Collins v. City of Fort Collins, 916 F.3d at 797.  See Schrier v. Univ. of Colo., 427 F.3d at 1258.  Regarding the category of disfavored mandatory PIs, the Court has explained:

> The Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief 'affirmatively require[s] the nonmovant to act in a particular way, and as a result . . . place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction.'"  Schrier v. Univ. of Colorado, 427 F.3d at 1261 (all alterations but first in Schrier v. Univ. of Colo.)(quoting O Centro [II] . . . , 389 F.3d at 979).  The Tenth Circuit has thus disclaimed -- or at least augmented -- the simpler and more intuitive way of defining these terms, i.e., that a prohibitory injunction is one in which the court orders the enjoined party not to do something, and a mandatory injunction is one in which the court orders the enjoined party to do something.

Salazar v. San Juan Cnty. Det. Ctr., 2016 WL 335447, at *40.  When evaluating whether the issuance of a requested injunction would alter the status quo between the parties, courts should look at "the reality of the existing status and relationships between the parties, regardless of whether the existing status and relationships may ultimately be found to be in accord or not in accord with the parties' legal rights."  SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, 1100

(10th Cir. 1991), overruled on other grounds by Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal, 546 U.S. 418 (2006).  With respect to PIs that will change the status quo, the "movant has an 'even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued.'"  Kikumura v. Hurley, 242 F.3d 950, 955 (10th Cir. 2001)(quoting SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d at 1098-99).

"[I]n an action for money damages, the district court does not have the power to issue a preliminary injunction . . . ."  United States ex rel. Rahman v. Oncology Assocs., 198 F.3d 489, 495-96 (4th Cir. 1999)(citing Grupo Mexicano de Desarrollo, S.A. v. Alliance Bond Fund, Inc., 527 U.S. 308, 324-25 (1999)).  See Gelco Corp. v. Coniston Partners, 811 F.2d 414, 418-20 (8th Cir. 1987)(concluding that a PI should not issue where a remedy of money damages was available).  Federal courts have the inherent equitable power to issue a PI only when it is necessary to protect a movant's entitlement to a final equitable remedy.  See, e.g., De Beers Consol. Mines v. United States, 325 U.S. 212, 219-23 (1945); Reebok Int'l, Ltd. v. Marnatech Enters., Inc., 970 F.2d 552, 559-60 (9th Cir. 1992).

## LAW REGARDING TEMPORARY RESTRAINING ORDERS

The requirements for a TRO's issuance are essentially the same as those for a PI.  See People's Trust Fed. Credit Union v. Nat'l Credit Union Admin. Bd., 350 F. Supp. 3d 1129, 1138 (D.N.M. 2018)(Browning, J.); 13 Moore's Federal Practice ¶ 65.36(1), at 65-83 (3d ed. 2004).  The primary differences between a TRO and a preliminary injunction are that a TRO may issue without notice to the opposing party and that TROs are limited in duration to fourteen days.  See Fed. R. Civ. P. 65(b)(1)-(2).  In both cases, however, injunctive relief is an "extraordinary remedy," and the movant must demonstrate a "clear and unequivocal right" to have a request granted.

- 38 -

Greater Yellowstone Coalition v. Flowers, 321 F.3d 1250, 1256 (10th Cir. 2003)).  See Herrera v.

Santa Fe Pub. Sch., 792 F. Supp. 2d at 1181.  To establish its right to a TRO under rule 65(b), the

moving party must "establish that he is likely to succeed on the merits, that he is likely to suffer

irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest."  Winter v. Nat. Res. Def. Council, Inc., 555 U.S.

7, 20 (2008)("Winter")(citing Munaf v. Geren, 553 U.S. 674, 689-90 (2008)); Amoco Prod. Co.

v. Gambell, 480 U.S. 531, 542 (1987); Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-12

(1982)).  A moving party must demonstrate that "immediate and irreparable injury, loss, or damage

will result" unless a court issues the order.  Fed. R. Civ. P. 65(b).  "[I]rreparable injury" is "harm

that cannot be undone, such as by an award of compensatory damages or otherwise."  Salt Lake

Tribune Pub. Co., LLC v. AT & T Corp., 320 F.3d 1081, 1105 (10th Cir. 2003)(citing Tri-State

Generation & Transmission Ass'n v. Shoshone River Power, Inc., 805 F.2d at 355).  As with a PI,

the likelihood-of-success and irreparable-harm factors are "the most critical" in the analysis, Nken

v. Holder, 556 U.S. at 434, and it is insufficient for a moving party demonstrate that there is only

a "possibility" either of success on the merits or of irreparable harm.  Diné Citizens, 839 F.3d at

1282.

Under rule 65(c), the court may issue a TRO "only if the movant gives security in an

amount that the court considers proper to pay the costs and damages sustained by any party found

to have been wrongfully enjoined or restrained."  Fed. R. Civ. P. 65(c).  The United States, and its

officers and agencies, are exempt from this requirement.  See Fed. R. Civ. P. 65(c).  The court

must consider whether a bond is necessary.  See Coquina Oil Corp. v. Transwestern Pipeline Co.,

825 F.2d 1461, 1462 (10th Cir. 1987)(concluding that, where a trial court does not "contemplate

the imposition of the bond, its order granting a preliminary injunction is unsupportable").  See also

- 39 -

Flood v. ClearOne Comm'ns, 618 F.3 1100, 1126 n.4 (10th Cir. 2010).  Courts in the Tenth Circuit

"have 'wide discretion under Rule 65(c) in determining whether to require security'" and may,

therefore, impose no bond requirement.  RoDa Drilling Co. v. Siegal, 552 F.3d 1203, at 1215 (10th

Cir. 2009)(quoting Winnebago Tribe of Neb. v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003)).[1]

## LAW REGARDING THE SECOND AMENDMENT

The Second Amendment reads: "A well regulated Militia, being necessary to the security

of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const.

amend. II.  Although the Second Amendment is a now a well-known Constitutional guarantee --

and the subject of contentious legal and political debate -- for most of its history, it was a relatively

seldom-interpreted provision.    See Vincent v. Garland, 80 F.4th 1197, 1199 (10th Cir.

2023)("Vincent")("For over two centuries, the nature of this right was uncertain."), cert. granted,

---

[1]The Court has written numerous times on the topic of TROs and PIs.  See, e.g., O Centro
Espirita Beneficiente Uniao Do Vegetal v. Duke, 286 F. Supp. 3d 1239, 1269-70 (D.N.M.
2017)(Browning, J.)(issuing a PI requiring the United States Citizen and Immigration Services
("USCIS") to reconsider a religious minister's I-129 nonimmigrant R-1 petition, in part because it
was substantially likely that the USCIS' first denial of the minister's R-1 petition violated the
Religious Freedom Restoration Act, 42 U.S.C.A. § 2000bb); Herrera v. Santa Fe Pub. Schs., 792
F. Supp. 2d at 1200 (granting a TRO prohibiting the Santa Fe Public Schools from suspicionless
pat-down searches of its students before prom and graduation); Salazar v. San Juan County
Detention Center, No. CIV 15-041, 2016 WL 335447 (D.N.M. January 15, 2016)(Browning,
J.)(denying a request for injunctive relief after concluding that, although the plaintiffs face
irreparable harm, the balance of equities favor them, an injunction is not adverse to the public
interest, and the plaintiffs were unlikely to succeed on the merits); New Mexico Cattle Growers'
Ass'n v. United States Forest Serv., No. CIV 23-0150, 2023 WL 2185698 (D.N.M. February 22,
2023)(Browning, J.)(declining to issue a TRO, because the plaintiffs did not demonstrate
substantial likelihood of success on the merits nor make a showing that they are likely to suffer
irreparable harm in relation to the United States Forest Service's plan to shoot 150 cattle in New
Mexico's Gila Wilderness); Vigil v. Fed. Emergency Mgmt. Agency, No. CIV 23-0941, 2024 WL
2404487 (D.N.M. May 23, 2024)(Browning, J.)(denying the plaintiffs' request for injunctive
relief, as the plaintiffs did not demonstrate a substantial likelihood of success on the merits,
because they could not identify a viable cause of action to maintain their claims).

judgment vacated, No. 23-683, 2024 WL 3259668 (U.S. July 2, 2024).  In the antebellum period, there was little judicial interpretation of the Second Amendment, as it was not thought that the Fourteenth Amendment incorporated the Second Amendment to apply to the States, and, until 1934, there was no significant federal gun control legislation.  See William Baude & Robert Leider, The General Right to Bear Arms, 99 Notre Dame L. Rev (forthcoming 2024)(manuscript at 7-8); Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 58 Law & Contemp. Probs. 55, 58 (discussing the Nation Firearms Act of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934)("National Firearms Act")); James O. Browning, 'Right to Bear Arms' Born of Natural Law, Albuquerque J., Dec. 9, 1991, at A1.

Following the National Firearms Acts of 1934, Pub. L. No. 73-474, 48 Stat. 1236 (1934) -- through which Congress sought to regulate "certain firearms and machine guns" -- the Supreme Court decided its first major Second Amendment case, United States v. Miller, 307 U.S. 174 (1939)("Miller").  In Miller, the Supreme Court reviewed -- via direct appeal -- a ruling in which the Honorable Heartsill Ragon, United States District Judge for the Western District of Arkansas, dismissed an indictment brought under the National Firearms Acts because, Judge Ragon ruled, the relevant provision of the National Firearms Acts "is invalid in that it violates the Second Amendment to the Constitution of the United States."  United States v. Miller, 26 F. Supp. 1002, 1003 (W.D. Ark. 1939)(Ragon, J.).  The Supreme Court reversed, holding: "In the absence of any evidence tending to show that possession or use of a 'shotgun having a barrel of less than eighteen inches in length' at this time has some reasonable relationship to the preservation or efficiency of a well regulated militia, we cannot say that the Second Amendment guarantees the right to keep and bear such an instrument."  Miller, 307 U.S. at 178.  The Supreme Court thus reversed and remanded the case for further proceedings.  See 307 U.S. at 183.

Following Miller, "the Second Amendment underwent a period of dormancy" until 2008, when the Supreme Court "overturned that dormancy in District of Columbia v. Heller." Baude & Leider, supra, at 14.  In District of Columbia. v. Heller, 554 U.S. 570 (2008)("Heller"), the Supreme Court -- for the first time -- holds that a law regulating firearms is unconstitutional under the Second Amendment, and clarifies that the provision does not protect solely the right to have firearms for militia service, because "the conception of the militia at the time of the Second Amendment's ratification was the body of all citizens capable of military service, who would bring the sorts of lawful weapons that they possessed at home to militia duty."  554 U.S. at 627.  See id. at 580-81 ("Reading the Second Amendment as protecting only the right to 'keep and bear Arms' in an organized militia therefore fits poorly with the operative clause's description of the holder of that right as 'the people.'" (quoting U.S. Const. amend. II)).  In an opinion that the Honorable Antonin Scalia, Associate Justice of the Supreme Court, authored, the Supreme Court subjects the Second Amendment to a close textual analysis -- involving individual interpretation of the operative and prefatory clauses, see 554 U.S. at 576-600 -- and ultimately concludes that the District of Columbia's ordinance prohibiting, among other things, the possession of handguns in the home, is unconstitutional, see 554 U.S. at 635.  The Supreme Court concludes the Heller opinion by stating:

> We are aware of the problem of handgun violence in this country, and we take seriously the concerns raised by the many amici who believe that prohibition of handgun ownership is a solution.  The Constitution leaves the District of Columbia a variety of tools for combating that problem, including some measures regulating handguns, see supra, [128 S.Ct. 2783,] 2816-2817, and n. 26.  But the enshrinement of constitutional rights necessarily takes certain policy choices off the table.  These include the absolute prohibition of handguns held and used for self-defense in the home.  Undoubtedly some think that the Second Amendment is outmoded in a society where our standing army is the pride of our Nation, where well-trained police forces provide personal security, and where gun violence is a serious problem.  That is perhaps debatable, but what is not debatable is that it is

not the role of this Court to pronounce the Second Amendment extinct.
Heller, 554 U.S. at 636.   See McDonald v. City of Chicago, Ill., 561 U.S. 742, 750
(2010)("McDonald")("[W]e hold that the Second Amendment right is fully applicable to the
States.").

In Heller's wake, lower courts struggled with how to apply Constitutional scrutiny in
alleged violations of the Second Amendment's Constitutional guarantee.   See, e.g., United States
v. Reese, 627 F.3d 792, 801 (10th Cir. 2010)("The Supreme Court did not specify in Heller
precisely what level of scrutiny a reviewing court must apply to a challenged law.").   Some Courts
of Appeals, like the United States Court of Appeals for the Third Circuit, concluded that, akin to
the First Amendment to the Constitution of the United States, "the Second Amendment can trigger
more than one particular standard of scrutiny" depending on the nature of the challenged
government regulation.   United States v. Marzzarella, 614 F.3d 85, 97 (3d Cir. 2010).   Following
from this notion, many Courts of Appeals eventually coalesced around a "two step approach," in
which a reviewing court first inquires whether (i) "the challenged law affects conduct that is
protected by the Second Amendment," and, if so, (ii) the court determines the appropriate level of
constitutional scrutiny:

> If a regulation "amounts to a destruction of the Second Amendment right," it is
> unconstitutional under any level of scrutiny; a law that "implicates the core of the
> Second Amendment right and severely burdens that right" receives strict scrutiny;
> and in other cases in which Second Amendment rights are affected in some lesser
> way, we apply intermediate scrutiny.

Young v. Hawaii, 992 F.3d 765, 784 (9th Cir. 2021)(quoting Silvester v. Harris, 843 F.3d 816, 821
(9th Cir. 2016), cert. granted, judgment vacated, 142 S. Ct. 2895 (2022), and abrogated by New
York State Rifle & Pistol Ass'n, Inc. v. Bruen, 597 U.S. 1 (2022)("Bruen")).

In <u>Bruen</u>, the Supreme Court clarifies the approach to be taken when assessing a Constitutional challenge to firearm regulations under the Second Amendment, and expressly rejects the two-step approach and any balancing of government's interest in Second Amendment Constitutional analysis.  See <u>Bruen</u>, 597 U.S. at 17-24.  As the Honorable Clarence Thomas, Associate Justice of the Supreme Court, writes for the majority:

> Despite the popularity of this two-step approach, it is one step too many. Step one of the predominant framework is broadly consistent with <u>Heller</u>, which demands a test rooted in the Second Amendment's text, as informed by history. But <u>Heller</u> and <u>McDonald</u> do not support applying means-end scrutiny in the Second Amendment context.  Instead, the government must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms.

<u>Bruen</u>, 597 U.S. at 19.  As Justice Thomas explains, interest balancing is inapplicable in the Second Amendment context, because "[t]he Second Amendment 'is the very <u>product</u> of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." 597 U.S. at 26 (quoting <u>Heller</u>, 554 U.S. at 635)(emphasis in <u>Bruen</u> and <u>Heller</u>).[2]  In place of the pre-<u>Bruen</u> two-step approach, the Supreme Court in <u>Bruen</u> clarifies the correct approach -- also, alas, involving a two-step inquiry:

---

[2]As the Court explained in <u>United States v. Teston</u>, 2024 WL 1621512, at *19 n.11, the Court has concern about the role that "self-defense" -- and "quintessential self-defense weapon[s]," <u>Heller</u>, 554 U.S. at 629 -- play in contemporary Second Amendment jurisprudence. The Supreme Court has given the concept of self-defense, and its purported centrality to the Second Amendment, significant emphasis in recent times.  See, e.g., <u>Bruen</u>, 597 U.S. at 29 ("As we stated in <u>Heller</u> and repeated in <u>McDonald</u>, 'individual self-defense is 'the <u>central component</u>' of the Second Amendment right." (quoting <u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. at 767)(emphasis in <u>Bruen</u>).  Although the Supreme Court in <u>Heller</u> purports to anchor this weapons-used-for-self-defense in the pre-ratification history of the Amendment -- the codification of a "<u>pre-existing</u> right," <u>Heller</u>, 554 U.S. at 592 -- the Supreme Court's analysis is most persuasive on the idea that the Second Amendment codifies a right that "enable[s] individuals to defend themselves," <u>Heller</u>, 554 U.S. at 592, but not necessarily that individual self-defense was central to the right.  This difference is important and has -- arguably -- led to the over-emphasis on individual self-defense in Second Amendment Constitutional law.  See Baude & Leider, <u>The General Right to Bear Arms</u>

at 27 (noting that, "[h]istorically, constitutionally protected 'arms' were those arms particularly appropriate for defense of the community" and that "[w]eapons of purely private conflict . . . were not protected," and that judicial confusion on this question is because of "[b]ad analogizing . . . perhaps exacerbated by some inaccurate dicta in <u>Heller</u>"); William G. Merkel, <u>Uncoupling the Constitutional Right to Self-Defense from the Second Amendment: Insights From the Law of War</u>, 45 Conn. L. Rev. 1809, 1820-21 (2013)("The original public meaning methodology by the Court in <u>Heller</u> and <u>McDonald</u> does not correlate well with the nonmilitia-linked right to armed private self-defense voted into life by a one justice majority in each case."). While the Supreme Court's limitation of the Second Amendment to individual self-defense may be more politically correct to an active Supreme Court on this issue, this limitation is not based on sound historical analysis or sound originalist reasoning.    The Supreme Court's current interpretation simultaneously overprotects and underprotects what the drafters meant to protect. This is owing, in part, to the awkward manner in which incorporation affects the Second Amendment guarantee.  To understand why incorporation distorts the Second Amendment, the Court explains the nature of the individual right that the Second Amendment protects.

The right to bear arms was not born solely -- or even significantly -- out of a concern in protecting individual "self-defense," but as part of a natural pre-existing right, which English law recognized, to resist against oppressive or ineffectual government.  <u>See</u> Browning, <u>'Right to Bear Arms' Born of Natural Law</u>, Albuquerque J., Dec. 9, 1991, at A1; Amar, <u>The Bill of Rights: Creation and Reconstruction</u> at 46 (noting that the Second and Third Amendments, like "rights of the people to petition and assemble in conventions," are "intimately bound up with the people's transcendent right to alter or abolish their government").  As Blackstone states, the "right of having arms" is rooted in "the natural right of resistance and self-preservation, when the sanctions of society and laws are found insufficient to restrain the violence of oppression."   1 William Blackstone, Commentaries at *139-40.  As Professor Amar notes, at the time of the Founding, the Second Amendment's words had resonance with the violent political struggles of then-recent history, federalism concerns, and populism.  <u>See</u> Amar, <u>The Bill of Rights: Creation and Reconstruction</u> at 46-59.  Indeed, many Anti-Federalists at the time of ratification saw the right that the Second Amendment protects as part of a broader check on the ominous specter of an abusive and self-interested central government:

> An aristocratic central government, lacking sympathy with and confidence from ordinary constituents, might dare to resist -- especially if that government were propped up by a standing army of mercenaries, vagrants, convicts, aliens, and the like.  Only an armed populace could deter such an awful spectacle.  Hence the need to bar Congress from disarming freemen.  Thus the Second Amendment was closely linked to the textually adjoining First Amendment's guarantees of assembly and petition.  One textual tip-off is the use of the magisterial Preamble phrase "the people" in both contexts, thereby conjuring up the Constitution's grand principle of popular sovereignty and its concomitant popular right to alter or abolish the national government.  More obvious is the preamble to the Second Amendment itself, and its structural concern with democratic self-government in a "free State."

. . . .

_____

     History also connected the right to keep and bear arms with the idea of popular sovereignty.  In Locke's influential <u>Second Treatise of Government</u>, the people's right to alter or abolish tyrannous government invariably required a popular appeal to arms.[]  To Americans in 1789, this was not merely speculative theory.  It was the lived experience of their age.  Beginning with the shot heard round the world, when British soldiers met armed Massachusetts minutemen at Lexington and Concord, Americans had seen the Lockean words of the Declaration of Independence -- affirming "the Right of the People to alter or abolish" oppressive government -- made flesh (and blood) in a Revolution wrought by arms.  Thus when Pendleton trumpeted the right of the people to assemble in convention as the answer to any federal misbehavior, Patrick Henry rose up to offer a more bleak assessment: "O sir, we should have fine times, indeed, if, to punish tyrants, it were only sufficient to assemble the people!  Your arm, wherewith you could defend yourselves, are gone . . . ."[]

. . . .

     But to see the un-Reconstructed amendment as primarily concerned with an individual right to protect one's home is like viewing the heart of the speech and assemble clauses as the right of persons to meet to play bridge or have sex.

Amar, <u>The Bill of Rights: Creation and Reconstruction</u> at 47-49.  The Second Amendment, while it protects individual rights, also is addressing a collective of people -- militia -- with arms.  When one reads the Second Amendment's plain text, the idea of self-defense does not leap off the page as much as the idea that arms might be used for collective defense, and, if necessary, rebellion against tyranny.

     While in practice, American courts, and especially the federal judiciary, which is part of a structure of a federal government based on a document that all judges and justices have sworn to uphold, do not like to talk about the right to rebel, the reality is that -- like jury nullification -- it is part of the constitutional DNA of our Nation.  <u>See</u> <u>United States v. Courtney</u>, 960 F. Supp. 2d 1152, 1164 (D.N.M. 2013)(Browning, J.)(discussing the Founding Era-origins of jury nullification).  In any case, while it is illegal to rebel, just because the right to rebel is not available and cannot co-exist with an ordered government, the status of the Constitutional right to bear arms still should be understood and defined based on whether an arm would be "particularly appropriate for defense of the community" and useful to a right to rebel -- not using the more narrow individual right that the Supreme Court has invented and is using without historical, textual, and originalist mooring.  Baude & Leider, <u>The General Right to Bear Arms</u> at 27.  The Court, writing on a blank slate, would stay away from Second Amendment understandings of "Arms" that rely on whether a weapon is useful for self-defense.  U.S. Const. amend. II.

     While the Court agrees with the result in <u>Heller</u> and the Supreme Court's finding of an individual right, <u>see</u> <u>Heller</u>, 554 U.S. at 595, the Court still thinks -- as it did over three decades ago -- that the Second Amendment should not be incorporated on the States through the Fourteenth Amendment, <u>see</u> Browning, '<u>Right to Bear Arms' Born of Natural Law</u>, Albuquerque J., Dec. 9,

1991, at A6 ("States and municipalities, however, would not be limited by the Second Amendment from imposing any limitations that its citizens desire on the right to bear arms."). Incorporation has distorted the Second Amendment's original meaning, because the Founders did not think that the Second Amendment applies to the States and localities, and it does not apply easily. See Amar, The Bill of Rights: Creation and Reconstruction at 215-18. It is best to leave the States and localities alone, and not preempt local gun regulations, even as misguided and ineffective as many of these local regulations are. There is no historical, textualist, or originalist evidence that supports that "the people" in Pennsylvania and Virginia were concerned that their State governments were going to take away their guns, and that they needed the new national government's protection to keep their guns from the States; the people's concern was that the new national government would take away their arms. In sum, the Supreme Court should let the States and localities regulate guns if they choose, but broaden the definition of "Arms" that Congress cannot regulate. Such a definition would be more consistent with federalism, history, and original meaning than the two wrong interpretations that the Supreme Court has made in this area.

Any time the Supreme Court incorporates a right and applies that right to the States, it is in tension with federalism and moves issues from the political process to the courts. Sometimes, that step is necessary, as was the case with the Civil War amendments, because States in the South had failed to protect a group of people on the basis of their race. Other times, taking an area of law and Constitutionalizing it should be done with great caution, because it can have enormous consequences. See Roe v. Wade, 410 U.S. 113 (1973)(Constitutionalizing State abortion law at the very time States were liberalizing State abortion law, and spawning a profound realignment in American politics and religion that is still ongoing, and then having a subsequent Supreme Court decades later say, "never mind," leave it to the States after all); Robin West, From Choice to Reproductive Justice: De-Constitutionalizing Abortion Rights, 118 Yale L.J. 1394 (2009); Ruth Bader Ginsburg, Some Thoughts on Autonomy and Equality in Relation to Roe v. Wade, 63 N.C. L. Rev. 375, 381-82 (1985)(criticizing Roe, stating that "[t]he sweep and detail of the opinion stimulated the mobilization of a right-to-life movement and an attendant reaction in Congress and state legislatures," and that, "[i]n place of the trend 'toward liberalization of abortion statutes' noted in Roe,[] legislatures adopted measures aimed at minimizing the impact of the 1973 rulings, including notification and consent requirements,[] prescriptions for the protection of fetal life,[] and bans on public expenditures for poor women's abortions").

It often goes unrecognized that incorporation of the Second Amendment through the Fourteenth Amendment contravenes two of the Framers' mandates. First, the Second Amendment was not intended to apply to the States, but instead was added for the protection of State militia and State laws that required men to have guns. Second, the Second Amendment intends to leave the power to affect arms, which is denied to Congress, to the State political process. The Second Amendment -- indeed, the Bill of Rights -- does not stake out the furthermost limits of the national government's power, for the Constitution expressly delegates to Congress certain powers, and specifically reserves all other powers to the States and to the people. As a description of the division of the political and legislative power in the Constitution, that principle is beyond dispute. The point of the Second Amendment's second mandate is not that the Second Amendment carves out a small or large exception from Congress' power, but that it carves out only that much from the political process.

_____

The Court thus proposes three basic premises of Second Amendment analysis. The first is that the Second Amendment protects against federal legislation; the second is that the Second Amendment protects arms that can be used for a rebellion or collective self-defense; and the third is that the Second Amendment provides an individual right to these protected arms. These principles do not prevent States and localities from regulating arms in a manner that Congress cannot. This plausible interpretation of the Second Amendment is not the only legitimate source of justification for the suggested principles, however, for there are pragmatic and institutional concerns which compel its acceptance.

Incorporation of the Second Amendment, then, implies that it is no longer of Second Amendment concern where that residual majoritarian power lies. The Framers' division of powers between the States and the federal government is now irrelevant to Second Amendment analysis and its limitations now apply to all government action equally.

The issue now is simply what are those limitations. The Supreme Court should be slow to move the limitations placed on Congress to the States, because the limits on the national government are for a different purpose. The Supreme Court has told the nation, however, that who is acting is irrelevant. The universal limitation is now on the majoritarian will in every State, and that limitation on Congress was intended to be great. Hence, incorporation decreases majoritarian powers in States when the Second Amendment was designed to protect what was happening in the States from the new national government. Moreover, to make the check on all governments more palatable, the Supreme Court now limits the check to just weapons that are for self-defense, rather than arms needed to express the right to rebel or protect collectively against the national government. With this new limitation on the Second Amendment, Congress is no longer constrained by a broad reading of the Second Amendment permitted when the division between the States and Congress is maintained. The flaw in the Supreme Court's Second Amendment analysis is that it ignores that the Framers intended the political power to regulate firearms to lay somewhere and not disappear, but did not intend it to rest with the national government. The Supreme Court does not acknowledge that incorporation means that the majority of the democratic process no longer makes the decision and, by making State and local regulations a Constitutional issue, the Supreme Court appropriates that decision making to itself. Even if, however, the Court agrees with the Supreme Court -- as the Court as an inferior Court must -- that the Second Amendment equally limits Congress and the States, structural analysis still can be helpful in determining the extent of those limitations.

Finally, the Court wants to make a sympathetic rebuttal to the best policy reason for applying the Second Amendment to the States. Justice Thomas, in his partial concurrence in McDonald v. City of Chicago, Ill., 561 U.S. at 805-58 (Thomas, J., concurring in part), makes an impassioned argument that, in the early nineteenth century through Reconstruction, many southern States restricted both enslaved and free African Americans from possessing firearms, leaving African Americans at the mercy of whites who had guns, see 561 U.S. at 843-47 (Thomas, J., concurring in part). He is indisputably correct, and it is also the case that the modern federal gun legislation was prompted in part by Americans, and especially anxious white Americans, seeing armed Black militants on their television screens during the late 1960s and 1970s. See Nicholas J. Johnson, Firearms Policy and the Black Community: An Assessment of the Modern Orthodoxy, 45 Conn. L. Rev. 1491, 1566-67 (2013)("With cities burning and black radicals preaching violent revolution, politicians and editorialists called for stricter gun legislation as a way to disarm the

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command."

Bruen, 597 U.S. at 24 (quoting Konigsberg v. State Bar of Cal., 366 U.S. 36, 50 n.10 (1961)).

Bruen's first step calls for a "'textual analysis'" that "focuse[s] on the 'normal and ordinary' meaning of the Second Amendment's language," Bruen, 597 U.S. at 20 (quoting Heller, 554 U.S. at 576-78), and is "guided by" a consideration of how "ordinary citizens in the founding generation" would have understood the "[n]ormal meaning" of the Second Amendment's textual elements, Heller, 554 U.S. at 576-78 (quoting United States v. Sprague, 282 U.S. 716, 731 (1931)). See Rahimi, 144 S. Ct. at 1911-12 (Kavanaugh, J., concurring)("The first and most important rule in constitutional interpretation is to heed the text -- that is, the actual words of the Constitution -- and to interpret that text according to its ordinary meaning as originally understood.").  Where a challenged regulation impacts conduct that the Second Amendment's plain text does not cover, the Second Amendment challenge fails, and the reviewing court need not precede to Bruen's second step.  See B & L Prods., Inc., 104 F.4th at 117 ("As the plain text of the Second Amendment

---

ghettos.").  Nevertheless, the Second Amendment is not -- and should not be -- the primary vehicle by which to combat State-level discriminatory disarming practices.  The Second Amendment is a mighty check on Congress' power, and the modern Equal Protection Clause should keep States from disarming only one group on the basis of race.  The nation does not need the Second Amendment to protect African Americans from being systematically discriminated against.  The Civil Rights laws, and other Constitutional protections, are better suited to combat the issues that arise from discriminatory disarming.  While the Court has tremendous respect for Justice Thomas as an originalist and as a creative thinker, and shares his disgust for the lack of protection for African-Americans in the South against White brutality after the Civil War, there is not much evidence that a Second Amendment applied to the States would have prevented what occurred during that time period.  A collective lack of national will to maintain African-Americans within the political system at the State level was the overall culprit, and there were plenty of laws -- such as laws against murder -- that the nation chose not to enforce during that time.

does not cover B&L's proposed conduct -- namely, contracting for the sale of firearms and ammunition on state property[] -- B&L's argument necessarily fails."); Rahimi, 144 S. Ct. at 1912 (Kavanaugh, J., concurring)("The historical approach applies when the text is vague. But the text of the Constitution always controls.").

If the Second Amendment's plain text covers the conduct that the regulation burdens, the challenged regulation may nevertheless survive the Second Amendment challenge if the government can demonstrate that the regulation is consistent with the nation's historical tradition of firearm regulation.[3] See Bruen, 597 U.S. at 24. At this step, "the appropriate analysis involves

---

[3]Conservatives have been critical of liberal judges for acting as super-legislatures, picking and choosing which laws survive Constitutional scrutiny and which do not. See Bruen, 597 U.S. at 77 (Alito, J., concurring)(criticizing the pre-Bruen means-end analysis as placing "no firm limits on the ability of judges to sustain any law restricting the possession or use of a gun"). Conservatives have been advocates of bright-line rules that provide clear guidance to lower courts, lawmakers, and the public. The Supreme Court has failed in providing such guidance in the Second Amendment context. While history is important in determining the original intent of the Second Amendment, it should serve as only one factor in the overall analysis.

Rather than require lower courts to engage in a scavenger hunt for historical analogues, the Supreme Court should require three things. First, the Supreme Court should identify a plausible theory of the values that the Second Amendment seeks to promote. Second, the Supreme Court should extract principles from those values. Third, the Supreme Court should elucidate some of the pragmatic and institutional concerns that compel acceptance of a limited interpretation of the Second Amendment's scope. The Supreme Court then should apply these principles in specific areas of gun regulation to develop rules for governing the challenges that continue to arise. There are good reasons that the interpretation that the Supreme Court should adopt should be more limited than the one that the Supreme Court uses today. To derive a more limited principle, the Supreme Court should look not only to the Constitutional text and history, but also to the structure of the government.

The following analysis has as its premise that the only legitimate sources of Constitutional principles are the Constitution's text, the reasonable inferences that may be drawn from the document's text and history, and from the structure of a democratic government that it proscribes. See Lillian R. BeVier, The First Amendment and Political Speech: An Inquiry into the Substance and Limits of Principle, 30 Stan. L. Rev. 299, 299-31 (1978). See also Robert Bork, Neutral Principles and Some First Amendment Problems, 47 Ind. L. J. 1, 20-35 (1971); Thomas H. Jackson & John Calvin Jeffries, Jr., Commercial Speech: Economic Due Process and the First Amendment, 65 V. L. Rev. 1, 6-11 (1979); Herbert Wechsler, Toward Neutral Principles of Constitutional Law, 73 Harv. L. Rev. 1, 14-20 (1959). These fundamental premises have two justifications. First, the

considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." Rahimi, 144 S. Ct. at 1898 (citing Bruen, 597 U.S. at 26-31). See Rahimi, 144 S. Ct. at 1898 ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" (quoting Bruen, 597 U.S. at 30)). The Supreme Court instructs that this task often involves "reasoning by analogy," which the Supreme Court notes is "a commonplace task for any lawyer or judge." Bruen, 597 U.S. at 28. This instruction flows from a general recognition that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868."[4] Bruen, 597 U.S. at 27. "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" Rahimi, 144 S. Ct. at 1898

---

need for legitimacy in its rulemaking necessarily restricts a court's search for legal principles that limit the majority's power to govern to the Constitution's text, history, and structure. See generally, Bork, supra, at 20-35; John Ely, The Wages of Crying Wolf: A Comment on Roe v. Wade, 82 Yale L. J. 920 (1973); Hans A. Lindet, Judges, Critics, and the Realist Tradition, 82 Yale L. J. 227 (1972). What this premise does is demand that all Constitutional principles be consistent with the text and history -- a minimum requirement that is necessary, but not sufficient, to establish legitimacy. In a word, the Supreme Court's results must conform to permissible textual meaning and must not be contradicted flatly by the Constitution's history.

[4]The Supreme Court has thus far declined to weigh in on "the 'ongoing scholarly debate on whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope (as well as the scope of the right against the Federal Government).'" Rahimi, 144 S. Ct. at 1898 n.1 (quoting Bruen, 597 U.S. at 37). See Heller, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century."). While the Supreme Court advises that "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represents a "critical tool of constitutional interpretation," Heller, 554 U.S. at 605, the Court has reasoned that the most "relevant historical time-period on which to base" Bruen's historical tradition analysis is 1791, see United States v. Teston, 2024 WL 1621512, at *8 n.8.

(quoting <u>Bruen</u>, 597 U.S. at 29, 29 n.7).  "Why and how the regulation burdens the right are central to this inquiry."  <u>Rahimi</u>, 144 S. Ct. at 1898.

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.

<u>Rahimi</u>, 144 S. Ct. at 1898.

## <u>ANALYSIS</u>

The Court denies the Plaintiffs' request for a TRO and PI.  The Court's analysis proceeds in three parts.  First, the Court concludes that the Plaintiffs have not demonstrated a likelihood of success on the merits, because: (i) the Second Amendment's plain text does not cover the conduct of purchasing a firearm, which the Waiting Period Act implicates; (ii) the Waiting Period Act is presumptively Constitutional, because it is a condition or qualification on the commercial sale of firearms; and (iii) the Waiting Period Act is consistent with the Nation's historical tradition of commercial firearms regulations, which licensed and prohibited the sale of firearms to sections of the populace out of a concern that a purchaser might use the firearm to harm the public.  Second, the Court concludes that Plaintiffs have not shown that they are likely to suffer irreparable injury if the Court does not temporarily enjoin the Waiting Period Act, because the Plaintiffs do not have a likelihood of success on the merits and the harm that they stand to suffer should they seek to purchase another firearm is slight.  Third, the Court concludes that the Plaintiffs have not established that the balance of the equities weighs in their favor nor that an injunction is in the public interest, because the Plaintiffs' interest in purchasing a firearm without delay is minimal compared to the public's interest in keeping the Waiting Period Act in effect.  Accordingly, the

Court denies the Motion.

I.      **THE PLAINTIFFS DO NOT HAVE A STRONG LIKELIHOOD OF SUCCESS ON THE MERITS.**

To obtain preliminary injunctive relief, the moving party must demonstrate that it is substantially likely to succeed on the merits.  See Mrs. Fields Franchising, LLC v. MFGPC, 941 F.3d 1221, 1232 (10th Cir. 2019).  See Diné Citizens, 839 F.3d at 1282 (noting that it is insufficient that a moving party demonstrate that there is only a "possibility" of success on the merits).  "The first Winter factor is centrally important in cases where a plaintiff brings a constitutional claim." Baird v. Bonta, 81 F.4th 1036, 1042 (9th Cir. 2023).  The Plaintiffs argue that they are likely to succeed on their claim's merits, because the Waiting Period Act is unconstitutional under the Second Amendment.  See Motion ¶¶ 6-26, at 7-14.  First, the Plaintiffs contend that the Waiting Period Act is presumptively unconstitutional, because the Second Amendment's plain text covers the conduct that they allege the Waiting Period Act burdens, namely, "obtain[ing] possession of firearms . . . ."  Motion ¶ 8, at 8.  Second, the Plaintiffs maintain that the Defendants cannot rebut the presumption that the Waiting Period Act is unconstitutional, because the Waiting Period Act is not "consistent with the Nation's historical tradition of firearms regulation."  Motion ¶ 14, at 10. The Plaintiffs respond that the conduct which the Waiting Period Act burdens is "'categorically unprotected,'" because the Second Amendment's plain text, as "ordinary citizens in the founding generation" understood it, does not cover "immediately acquir[ing] firearms."  Response at 8-12 (quoting Bruen, 597 U.S. at 18).  Moreover, even if the Second Amendment's plain text covers the conduct here, the Defendants aver, the Waiting Period Act "is a valid condition and qualification on the sale of arms," Response at 12-14, and "is consistent with history and tradition," Response at 14-17.

The Court evaluates these competing contentions against the analytical framework that the Supreme Court provides.  In <u>Bruen</u>, the Supreme Court devised a two-part analytical approach for assessing Constitutional challenges to firearm regulations under the Second Amendment.  597 U.S. at 17-24.  At the test's first step, a court must determine whether "the Second Amendment's plain text covers an individual's conduct."  <u>Bruen</u>, 597 U.S. at 24.  If the text applies to the conduct at issue, "the Constitution presumptively protects that conduct," and the court must proceed to <u>Bruen</u>'s second step.  <u>Bruen</u>, 597 U.S. at 24.  If the Second Amendment's plain text does not cover the conduct, or the challenged regulation falls into one of the "presumptively lawful" categories of regulations the Supreme Court identified in <u>Heller</u>, <u>see</u> <u>Heller</u>, 554 U.S. at 626-27, 627 n.26, the challenged regulation is considered presumptively Constitutional, and the court need not engage in <u>Bruen</u>'s step-two analysis, <u>see, e.g.</u>, <u>B & L Prods., Inc.</u>, 104 F.4th at 117.

A court reaching <u>Bruen</u>'s second step must determine whether the challenged regulation "is consistent with the Nation's historical tradition of firearm regulation."  <u>Bruen</u>, 597 U.S. at 24. <u>See</u> <u>Rahimi</u>, 144 S. Ct. at 1897-98 (clarifying <u>Bruen</u>'s historical tradition inquiry).   If the challenged regulation is consistent with the Nation's historical tradition of firearm regulation, the presumption made at <u>Bruen</u>'s first step is overcome, and the regulation can stand.  <u>See</u> <u>Bruen</u>, 597 U.S. at 24.  Although, in <u>Bruen</u>, the Supreme Court expressly rejects the "means-end scrutiny" approach involving an assessment of the government's interest in regulating firearms that many Courts of Appeals embraced following its decision in <u>Heller</u>, 554 U.S. at 635, the Supreme Court maintains that the two-part test it announces in <u>Bruen</u> remains grounded in its <u>Heller</u> decision. <u>Bruen</u>, 597 U.S. at 17-20, 26 ("The test that we set forth in <u>Heller</u> and apply today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding.").  <u>See</u> <u>Bruen</u>, 597 U.S. at 31 ("Having made the constitutional

- 54 -

standard endorsed in <u>Heller</u> more explicit, we now apply that standard . . . .").

Against this legal backdrop, the Court analyzes the merits of the Plaintiffs' Second Amendment claim in three parts.  First, the Court concludes that the Second Amendment's plain text does not cover the conduct that the Waiting Period Act restrains: purchasing a firearm.  <u>See</u> <u>Bruen</u>, 597 U.S. at 24.  Moreover, and relatedly, the Waiting Period Act does not so broadly constrain the conduct of obtaining a firearm that it meaningfully constrains the right to keep and bear arms.  Second, the Court concludes that the Waiting Period Act is a "presumptively lawful" "law imposing conditions and qualifications on the commercial sale of arms," <u>Heller</u>, 554 U.S. 626-27, 627 n.26, because the Waiting Period Act: (i) regulates the commercial sale of firearms; (ii) is sufficiently longstanding; and (iii) the Plaintiffs cannot rebut the Waiting Period Act's presumptive lawfulness.  Third, in the alternative, even if the Waiting Period Act implicated the Second Amendment's plain text and was not a presumptively lawful commercial regulation, the Court concludes that the Waiting Period Act is consistent with the Nation's historical tradition of firearm regulation, because it comports with the principles underlying founding-era commercial regulations restricting the sale of firearms to sections of the population out of a concern that certain among those groups might use the purchased guns to do harm in society.  <u>See</u> <u>Bruen</u>, 597 U.S. at 24.  Accordingly, the Court concludes that the Plaintiffs are not likely to succeed on the merits of their Second Amendment claim.

### A. THE WAITING PERIOD ACT IS PRESUMPTIVELY CONSTITUTIONAL, BECAUSE THE SECOND AMENDMENT'S PLAIN TEXT DOES NOT COVER THE PURCHASE AND ACQUISITION OF FIREARMS.

At the first step of <u>Bruen</u>'s Second Amendment analysis, the Court must determine whether the regulated conduct falls within the scope of the Second Amendment's plain text.  <u>Bruen</u>, 597 U.S. at 24.  This "'textual analysis' focuse[s] on the 'normal and ordinary' meaning of the Second

Amendment's language," Bruen, 597 U.S. at 20 (quoting Heller, 554 U.S. at 576-78), and is "guided by" a consideration of how "ordinary citizens in the founding generation" would have understood the "[n]ormal meaning" of the Second Amendment's textual elements, Heller, 554 U.S. at 576-78 (quoting United States v. Sprague, 282 U.S. at 731).  The Second Amendment reads in full: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  "[T]he 'textual elements' of the Second Amendment's operative clause -- 'the right of the people to keep and bear Arms, shall not be infringed' -- 'guarantee the individual right to possess and carry weapons in case of confrontation.'"  Bruen, 597 U.S. at 32 (quoting Heller, 554 U.S. at 592).  Upon this foundation, the central question the Court must address here is whether the "right . . . to keep and bear Arms" encompasses the right to obtain firearms.  U.S. Const. amend. II.

There is a divergence of opinion among United States District Courts regarding whether the Second Amendment's plain text encompasses the right to obtain and purchase firearms.[5]  Two

---

[5]Compare Rocky Mountain Gun Owners v. Polis, No. CIV 23-2563, 2023 WL 8446495, at *8 (D. Colo. November 13, 2023)(Kane, J.)("From this reading of the plain text, it is clear the relevant conduct impacted by the waiting period -- the receipt of a paid-for firearm without delay -- is not covered."); Vermont Fed'n of Sportsmen's Clubs v. Birmingham, No. CIV 23-0720, at *70 (D. Vt. July 18, 2024)(Sessions III, J.)("The Court finds that the relevant conduct -- acquiring a firearm through a commercial transaction on-demand -- is not covered by the plain text of the Second Amendment."); United States v. King, 646 F. Supp. 3d 603, 607 (E.D. Pa. 2022)(Leeson, J.)(reasoning that the Second Amendment does not encompass a right to buy and sell firearms, and explaining that "whether the Act violates the Second Amendment, the Court looks at the Second Amendment's plain text; it does not consider 'implicit' rights that may be lurking beneath the surface of the plain text"); United States v. Tilotta, No. CR 19-4768, 2022 WL 3924282, at *6 (S.D. Cal. August 30, 2022)(Curiel, J.)("[T]he natural reading of 'keep and bear arms' does not include the ability to sell or transfer firearms unrestricted."); Knight v. City of New York, No. CIV 22-3215, 2024 WL 1126309, at *6 (S.D.N.Y. January 17, 2024)(Figueredo, M.J.)("The question thus becomes whether a waiting period before the purchase of a second handgun is conduct covered by the text of the Second Amendment.  It is not."), report and recommendation adopted in part, No. CIV 22-3215, 2024 WL 1096991 (S.D.N.Y. March 13, 2024)(Caproni, J.), with Fraser v. Bureau of Alcohol, Tobacco, Firearms & Explosives, 672 F. Supp. 3d 118, 128 (E.D. Va.

United States Courts of Appeals, however, have recently identified an approach for addressing the Second Amendment's plain text as it pertains to the conduct of obtaining firearms.  See McRorey, 99 F.4th at 836-40; B & L Prods., Inc., 104 F.4th at 117-20.  In McRorey, addressing a Second Amendment challenge to expanded pre-sale background checks for eighteen- to twenty-one-year-olds, the United States Court of Appeals for the Fifth Circuit states: "on its face[,] 'keep and bear' does not include purchase . . . ."  99 F.4th at 838.  The Fifth Circuit further notes that, in keeping with Heller, "Bruen continued to distinguish the treatment of prohibitions on 'keep[ing] and bear[ing]' -- such as the law at issue in Bruen -- and other ancillary firearm regulations such as background checks preceding sale . . . ."  McRorey, 99 F.4th at 836-37 (citing Bruen, 597 U.S. at 38 n.9).  In B & L Productions, Inc., the Ninth Circuit, considering a challenge to a California regulation banning firearm sales on State property, reasons similarly that, "[o]n its face," the Second Amendment "says nothing about commerce."  104 F.4th at 117.  Accord Nat'l Rifle Ass'n v. Bondi, 61 F.4th 1317, 1324-25 (11th Cir. 2023)("[T]he Second Amendment's plain text includes only a right 'to keep and bear arms,' not a right to buy them."), reh'g en banc granted, opinion vacated, 72 F.4th 1346 (11th Cir. 2023).  Thus, the Fifth and Ninth Circuits begin with the conclusion that the Second Amendment's plain text, which speaks only to a right "to keep and bear arms," does not cover the conduct of purchasing a firearm.  U.S. Const. amend. II.

Nonetheless, the Fifth and Ninth Circuits acknowledge and account for the proposition that "unless the right to acquire firearms receives some Second Amendment protection, the right to

---

2023)(Payne, J.)("[G]iven its ordinary, commonsense, and logical meaning the right to 'keep arms' . . . of necessity includes the right, inter alia, to purchase arms."); Rocky Mountain Gun Owners v. Polis, 685 F. Supp. 3d 1033, 1053 (D. Colo. 2023)(Brimmer, C.J.)("The Court agrees with the Individual Plaintiffs that the Second Amendment includes the right to acquire firearms . . . .").

keep and bear firearms would be meaningless . . . ."  B & L Prods., Inc., 104 F.4th at 118.  The
Ninth Circuit therefore recognizes "that the Second Amendment also 'protects ancillary rights
necessary to the realization of the core right to possess a firearm for self-defense.'"  B & L Prods.,
Inc., 104 F.4th at 117-18 (quoting Teixeira v. Cnty. of Alameda, 873 F.3d 670, 677 (9th Cir.
2017)(en banc)).  Likewise, the Fifth Circuit accepts that "[t]he right to 'keep and bear' can
implicate the right to purchase," but emphasizes that "such an implication is not the same thing as
being covered by the plain text of the amendment."  McRorey, 99 F.4th at 838.  Rather, the Ninth
and Fifth Circuits hold "that the plain text of the Second Amendment only prohibits meaningful
constraints on the right to acquire firearms."  B & L Prods., Inc., 104 F.4th at 118.  McRorey, 99
F.4th at 838 (recognizing that the Supreme Court "prohibits shoehorning restrictions on purchase
into functional prohibitions on keeping").  Accordingly, having first concluded that the Second
Amendment's plain text does not cover the purchase of firearms, the Ninth and Fifth Circuit next
assess "whether plaintiffs have shown that these presumptively lawful regulations have been 'put
toward[s] abusive ends' or have otherwise rebutted that presumption."  McRorey, 99 F.4th at 839
(quoting Bruen, 597 U.S. at 38 n.9).  See B & L Prods., Inc., 104 F.4th at 118-19 (holding that
"whether a challenged regulation meaningfully impairs an individual's ability to access firearms"
is the appropriate analysis for assessing challenges to regulations that implicate "ancillary rights,"
like "the right to acquire firearms"); Bruen, 597 U.S. at 38 n.9 ("[W]e do not rule out constitutional
challenges to shall-issue regimes where, for example, lengthy wait times in processing license
applications or exorbitant fees deny ordinary citizens their right to public carry.").  For the reasons
that follow, the Court agrees that the approach outlined in B & L Prods., Inc. and McRorey is the
most faithful to the Second Amendment's plain text as well as the Supreme Court's textual
assessment in Heller.  Applying this approach, the Court concludes that the Plaintiffs' Second

Amendment Claim fails at <u>Bruen</u>'s first step, because the Second Amendment's plain text does not cover the conduct of purchasing a firearm.

Writing for the Supreme Court in <u>Heller</u>, Justice Scalia engages in a detailed textual analysis to determine the "[n]ormal meaning," 554 U.S. at 576-77, of the words "keep" and "bear" in the Second Amendment, 554 U.S. at 581-92.  He explains that "the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons.'" <u>Heller</u>, 554 U.S. at 582 (citing 1 <u>Dictionary of the English Language</u> 106 (4th ed.)(reprinted 1978)(defining "keep" as "[t]o retain; not to lose," and "[t]o have in custody"), and N. Webster, <u>American Dictionary of the English Language</u> (1828)(defining "keep" as "[t]o hold; to retain in one's power or possession")). Proceeding to the word "bear," Justice Scalia states: "At the time of the founding, as now, to 'bear' meant to 'carry.'" <u>Heller</u>, 554 U.S. at 584 (citing Johnson 161, Webster, T. Sheridan, <u>A Complete Dictionary of the English Language</u> (1796)).  "When used with 'arms,'" Justice Scalia advises, "the term has a meaning that refers to carrying for a particular purpose -- confrontation." <u>Heller</u>, 554 U.S. at 584.  The Supreme Court in <u>Bruen</u> and <u>Rahimi</u> does not address specifically the meaning of the words "keep" and "bear," although it reiterates that the analysis whether the Second Amendment's plain text covers a given course of conduct should track closely <u>Heller</u>'s textual analysis into the normal and ordinary meaning of the Second Amendment's textual elements.  <u>See Bruen</u>, 597 U.S. at 20.

Having considered the "'normal and ordinary' meaning of the Second Amendment's language," the Court agrees with the Defendants that "the Second Amendment's plain text" does not cover purchasing firearms.  <u>Bruen</u>, 597 U.S. 17.  The Supreme Court has repeatedly instructed that the "most important rule in constitutional interpretation is to heed the text -- that is, the actual words of the Constitution -- and to interpret that text according to its ordinary meaning as originally

understood." Rahimi, 144 S. Ct. at 1911 (Kavanaugh, J., concurring).  Today and in 1791, the normal and ordinary meaning of "keep" is to possess and the normal and ordinary meaning of "bear" is to carry.  See Heller, 554 U.S. at 582-84; B & L Prods., Inc., 104 F.4th at 117 ("The plain text of the Second Amendment directly protects one thing -- the right to 'keep and bear' firearms."); Darrell A. H. Miller, Analogies and Institutions in the First and Second Amendments: A Response to Professor Magarian, 91 Tex. L. Rev. 137, 142 (2013)("[I]f you consult a dictionary, whether printed in 1791 or 2013, 'keep' means 'have,' 'bear' means 'carry' . . . ."); Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 16 (2012)("In their full context, words mean what they conveyed to reasonable people at the time they were written . . . ."). Simply put, to possess or carry does not mean to obtain or acquire.  See McRorey, 99 F.4th at 838 ("[O]n its face 'keep and bear' does not include purchase . . . ."); Joseph E. Sitzmann, High-Value, Low-Value, and No-Value Guns: Applying Free Speech Law to the Second Amendment, 86 U. Chi. L. Rev. 1981, 2015 (2019)("[N]otably absent in [Bruen and Heller] is an interpretation that 'keep and bear' means 'acquire.'").  In concrete terms, the Waiting Period Act does not limit an individual's ability to keep firearms in their home nor carry those firearms with them in public for self-defense.  See Knight v. City of New York, 2024 WL 1126309, at *6.

What is more, while Bruen provides that the inquiry into our Nation's historical tradition of firearm regulation is properly conducted only when the Second Amendment's text covers the conduct the challenged regulation implicates, the Supreme Court advises in Heller that historical understanding may also play a role in construing the Second Amendment's plain text.  See Heller 554 U.S. at 595, 598 (conducting a textual analysis of the Second Amendment in light of "the history that the founding generation knew").  The history underpinning the Second Amendment confirms that the primary concern that motivated the founding generation in drafting the Second

Amendment was "the fear that the Federal Government would disarm the people . . . ." Heller 554 U.S. at 598.  For example, as the Supreme Court identified in McDonald, "King George III's attempt to disarm the colonists in the 1760's and 1770's 'provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms.'"  561 U.S. at 768 (quoting Heller, 554 U.S. at 594)).  Most recently, the Supreme Court explained that "[t]he spark that ignited the American Revolution was struck at Lexington and Concord, when the British governor dispatched soldiers to seize the local farmers' arms and powder stores," and highlighted language from "a leading and early proponent of emancipation," who expressed: "'Disarm a community and you rob them of the means of defending life.  Take away their weapons of defense and you take away the inalienable right of defending liberty.'"  Rahimi, 144 S. Ct. at 1897 (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)).  This history demonstrates why the Second Amendment's "keep and bear" language focuses on retention rather than acquisition of arms.  U.S. Const. amend. II.  While the Court is mindful that "collateral aids" such as the founding generation's historical understanding "cannot be indulged in to narrow or enlarge the text," McPherson v. Blacker, 146 U.S. 1, 27 (1892), this historical understanding provides further confirmation that the Second Amendment was not drafted to protect the right to purchase arms.

The Plaintiffs provide several ultimately unpersuasive arguments why the Court should conclude that the Second Amendment's plain text covers the conduct of purchasing a firearm.  One such argument is semantic: In their supplemental brief, the Plaintiffs argue that Heller states that "'the most natural reading of keep Arms in the Second Amendment is to have weapons,'" Plaintiffs' Supp. Brief at 8 (quoting Heller, 554 U.S. at 582), and "[t]o 'have' something -- both historically and today -- has always included its acquisition," Plaintiffs' Supp. Brief at 8 (citing 1 Samuel Johnson, Dictionary of the English Language (4th ed. 1773)).  It is beyond dispute that, in

the English language, words generally do not have a single immutable definition. Accordingly, the Plaintiffs are correct that, if the Court proceeds down the list of permissible definitions for the word "have" in dictionaries today and at the founding, the Court eventually reaches the definition that the Plaintiffs urge the Court to accept: to obtain or acquire, as in the phrase "may I have." See Plaintiffs' Supp. Brief at 8-9 (citing the fifth, ninth, fourth, and sixth listed dictionary definitions for the word "have"). The very first listed dictionary definition listed for "have," however, is almost always the definition that Heller identified as helpful in understanding the word "keep" in the Second Amendment: "to hold or maintain as a possession." Have, Merriam-Webster (2024), available at www.merriam-webster.com/dictionary/have (last visited July 20, 2024). See Heller, 554 U.S. at 582 (defining "'keep' as '[t]o have in custody' (quoting 1 Dictionary of the English Language 106 (4th ed.)(reprinted 1978)).

More broadly, however, this argument places undue emphasis on a word that does not appear in the Second Amendment. It is the Court's duty, in interpreting the Second Amendment's plain text, is to interpret the word "keep," which appears in the Second Amendment, U.S. Const. amend. II., and not the word "have," Heller, 554 U.S. at 582, which does not appear in the Second Amendment. As the Honorable Neil Gorsuch, Associate Justice of the Supreme Court, advises in his concurrence in Rahimi, "what we say in our opinions must 'be taken in connection with the case in which those expressions are used,' and may not be 'stretch[ed] . . . beyond their context.'" Rahimi, 144 S. Ct. at 1910 (Gorsuch, J., concurring)(quoting Cohens v. Virginia, 6 Wheat. 264, 399 (1821), and then Brown v. Davenport, 596 U.S. 118, 141 (2022))(alterations in Rahimi, but not in Brown v. Davenport). See Reiter v. Sonotone Corp., 442 U.S. 330, 341 (1979)("[T]he language of an opinion is not always to be parsed as though we were dealing with [the] language of a statute."). To rely on an alternative dictionary definition of "have" to define the Second

Amendment's scope would be to stretch Justice Scalia's language beyond its context, and rely on an attenuated form of Constitutional interpretation which the Supreme Court rejects. Heller is clear that, today and at the founding, the "normal and ordinary" meaning of keep means to "'retain'" not obtain. Heller, 554 U.S. at 576, 582 (quoting 1 Dictionary of the English Language 106 (4th ed.)(reprinted 1978)).

Next, the Plaintiffs argue that the Court should conclude that the Second Amendment's plain text "implies the right to obtain" arms. Motion at 9. See Plaintiffs' Supp. Brief at 9 ("[T]he right to acquire arms is a necessary concomitant of the right to possess arms.").[6] When interpreting Constitutional language, however, the Supreme Court has advised, in a case that Justice Scalia cites as the starting point for his analysis of the Second Amendment's plain text in Heller, that "where the [Constitution's] intention i[s] clear there is no room for construction and no excuse for interpolation or addition." United States v. Sprague, 282 U.S. at 731. See Caminetti v. United States, 242 U.S. 470, 485 (1917)("Where the language is plain and admits of no more than one meaning, the duty of interpretation does not arise . . . ."). The normal and ordinary meaning of "the right . . . to keep and bear arms," U.S. Const. amend. II., which the Supreme Court holds in Heller is "the right to possess and carry weapons in case of confrontation," Heller, 554 U.S. at 582-84, "i[s] clear," and, therefore, the Court declines to "interpolat[e] or add[]" to the text's plain meaning an implied right to obtain arms, United States v. Sprague, 282 U.S. at 731. See United States v. King, 646 F. Supp. 3d at 607 ("[I]n determining whether the Act violates the Second

---

[6] While the Court acknowledges below that the ancillary right to acquire firearms may "implicate[] the Second Amendment in limited circumstances," B & L Prods., Inc., 104 F.4th at 118, this acknowledgement "is not the same thing as being covered by the plain text of the amendment," McRorey, 99 F.4th at 838, which is the argument that the Plaintiffs make here.

Amendment, the Court looks at the Second Amendment's plain text; it does not consider 'implicit'

rights that may be lurking beneath the surface of the plain text.").  As Justice Kavanaugh notes in

his concurring opinion in <u>Rahimi</u>, "the text of the Constitution always controls."  <u>Rahimi</u>, 144 S.

Ct. at 1912 (Kavanaugh, J., concurring).[7]  For these reasons, the Court concludes that the Second

Amendment's plain text does not cover the conduct that the Waiting Period Act implicates, and,

therefore, the Waiting Period Act is not presumptively unconstitutional.  <u>See</u> <u>Bruen</u>, 597 U.S. at

17.

Nevertheless, the Court agrees with the Plaintiffs that, "unless the right to <u>acquire</u> firearms

receives some Second Amendment protection, the right to keep and bear firearms would be

meaningless."  <u>B & L Prods., Inc.</u>, 104 F.4th at 118 (emphasis in original).  Logic dictates that,

were the United States or New Mexico to ban entirely all purchases of firearms, an individual's

---

[7]The Plaintiffs also argue that the conduct that the Waiting Period Act implicates is the possession of a gun, which is conduct that the Second Amendment's plain text covers, rather than the purchase of a gun, <u>see</u> Plaintiffs' Supp. Brief at 7 ("[B]ut for the law, Plaintiffs could possess their firearms during the week after purchasing them."), because the Waiting Period Act prevents the Plaintiffs from "obtain[ing] possession of firearms that they have purchased," Motion ¶ 8, at 8 ("By the Waiting Period Act's very terms, it prevents individuals from taking 'possession' of their firearms." (no citation given for quotation)).  By its express terms, however, the Waiting Period Act affects "the sale of a firearm and the transfer of the firearm to the buyer," HB 129 § 1(A), not the possession of the purchased firearm, which, necessarily, may only occur after the firearm has been transferred, <u>see</u> <u>Rocky Mountain Gun Owners v. Polis</u>, 2023 WL 8446495, at *8 ("To 'keep,' under the definitions provided in Heller, meant to retain an object one already possessed.  It did not mean to receive a newly paid-for item . . . .").  Moreover, it is of no moment that one of the Plaintiffs, Ortega, paid for his firearm before the salesperson informed him that the Waiting Period Act prevented him from taking the gun into his possession.  <u>See</u> FOF ¶ 19, at 5.  Even if the Court agreed with the Plaintiffs that possession of a gun is complete upon purchase, the process implemented by the Calibers Center employee on this occasion -- <u>i.e.</u>, choosing to accept payment for a firearm before initiating the waiting period and declining to transfer the purchased firearm -- "is not a requirement of the challenged law."  <u>McRorey</u>, 99 F.4th at 839.  "That dealers choose to [implement the waiting period after accepting payment] is a result of their own policy," and "'a third party's legitimate discretion breaks the chain of constitutional causation.'"  <u>McRorey</u>, 99 F.4th at 839 (quoting <u>Turaani v. Wray</u>, 988 F.3d 313, 317 (6th Cir. 2021)).

Second Amendment right to possess firearms could be undermined and made meaningless.  In such a scenario, only current gun owners would enjoy the Second Amendment's protections.  See McRorey, 99 F.4th at 839 n.18 ("There is no question that regulations on purchase so burdensome that they act as de facto prohibitions on acquisition would be subject to constitutional challenge under Bruen's rigorous historical requirement.").  Thus, while the Second Amendment's plain text does not cover the act of purchasing a firearm, and therefore does not render any restriction on firearm purchases presumptively unconstitutional, it does "prohibit[] shoehorning restrictions on purchase into functional prohibitions on keeping."  McRorey, 99 F.4th at 838.  As the Ninth Circuit puts it, "the plain text of the Second Amendment only prohibits meaningful constraints on the right to acquire firearms."  B & L Prods., Inc., 104 F.4th at 118.  This approach is consistent with Bruen, in which the Supreme Court affirmed the remaining vitality of "laws imposing conditions and qualifications on the commercial sale of arms," Heller, 665 U.S. at 626, discussed in greater depth infra, Section I.B, but declined to "rule out constitutional challenges" to such regulations where, for instance, "lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry," Bruen, 597 U.S. at 38 n.9.  See Eugene Volokh, Implementing the Right to Keep and Bear Arms After Bruen, 98 N.Y.U. L. Rev. 1950, 1956 (2023)("Volokh 2023")("Bruen leaves room for upholding restrictions that only modestly burden the right to bear arms.").

Here, the Waiting Period Act does not so substantially impinge the ability to acquire firearms that it functions as a de facto prohibition on the right to keep and bear arms.  The seven-day waiting period that the Waiting Period Act imposes is minimally burdensome on the Plaintiffs' ancillary right to acquire firearms.  See McRorey, 99 F.4th at 839 ("[T]here is some point at which a background check becomes so lengthy that it is 'put towards abusive ends' or subject to Bruen's

- 65 -

historical framework as a de facto prohibition on possession.  But a period of 10 days does not

qualify."); Silvester v. Harris, 843 F.3d 816, 827 (9th Cir. 2016)(concluding that "[t]he burden of

the 10-day waiting period here, requiring an applicant to wait ten days before taking possession of

the firearm" does not "place[] a substantial burden on a Second Amendment right").  Cf. Rahimi,

144 S. Ct. at 1902 (identifying the "limited duration" and "temporary" nature of "Section

922(g)(8)'s restriction" on Rahimi's Second Amendment right).  The Waiting Period Act "simply

requires [the Plaintiffs] to wait the incremental portion of the waiting period that extends beyond

completion of the background check."  Silvester v. Harris, 843 F.3d at 827.  Moreover, the time

New Mexicans must wait before purchasing a firearm under the Waiting Period Act is substantially

less than delays in other States that have thus far survived Second Amendment challenges.  See

Knight v. City of New York, 2024 WL 1126309, at *6 ("[B]ecause the requirement does not

prevent a person from keeping or bearing arms, the 90-day waiting period does not infringe on

core conduct protected by the Second Amendment."); People v. Gunn, No. CIV 22-1032, 2023

WL 6280229, at *5 (Ill. App. Ct. 1st Dist. September 27, 2023)("We cannot say that 90 days

constitutes a 'lengthy' wait time . . . ." (quoting Bruen, 597 U.S. at 38 n.9)).  Accordingly, seven

days is not a period of time that is "so lengthy" so as to functionally prohibit the right to keep and

bear arms.  Bruen, 597 U.S. at 38 n.9.  See Volokh 2023, supra, at 1961 ("[W]hatever one might

say of a waiting period of a few days, a waiting period of nearly three years . . . is surely a serious

burden.").  Because the Second Amendment's plain text does not cover the conduct that the

Waiting Period Act implicates -- purchasing a firearm -- and because the Waiting Period Act's

burden on acquiring a firearm is not so onerous as to implicate rights the Second Amendment's

plain text does cover -- i.e., possessing and carrying firearms -- the Waiting Period Act is not

presumptively unconstitutional at Bruen's first step.

**B.  THE WAITING PERIOD ACT IS PRESUMPTIVELY CONSTITUTIONAL, BECAUSE IT IS A CONDITION OR QUALIFICATION ON THE COMMERCIAL SALE OF ARMS.**

In Heller, the Supreme Court states that, "[l]ike most rights, the right secured by the Second Amendment is not unlimited."  554 U.S. at 626.  The Second Amendment is "not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Heller, 554 U.S. at 626.  Accordingly, "laws imposing conditions and qualifications on the commercial sale of arms," Heller, 554 U.S. at 626-27, are "presumptively constitutional," Heller, 554 U.S. at 627 n.26.  "Bruen did nothing to disturb that part of Heller."  McRorey, 99 F.4th at 836.  See United States v. McNulty, 684 F. Supp. 3d 14, 20 (D. Mass. 2023)(Young, J.)("[I]t is incorrect to posit that Bruen has upended the presumptive constitutionality of measures seeking to regulate firearms commerce."); United States v. Roberts, No. CR 23-0057, 2024 WL 50889, at *5 (D. Alaska January 4, 2024)(Burgess, J.)("[T]he Bruen court did not repudiate -- and indeed preserved -- Heller's list of presumptively lawful firearm regulations.").  Indeed, the Supreme Court in Bruen, in both the majority and concurring opinions, emphasizes the continued vitality of Heller's non-exhaustive list of categories of presumptively Constitutional regulations.  See Bruen, 597 U.S. at 38 n.9 ("To be clear, nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue'[8] licensing regimes."); id. at 72 (Alito, J.,

---

[8]Shall-issue licensing regimes for carrying handguns generally "require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements." Bruen, 597 U.S. at 80 (Kavanaugh, J., concurring).  Unlike the "may-issue" licensing regime struck down in Bruen, shall-issue regimes "are constitutionally permissible," because they do not require regulating officials to use their subjective judgment to determine whether an applicant has sufficient need to carry a handgun in public.  Bruen, 597 U.S. at 80 (Kavanaugh, J., concurring). See Bruen, 597 U.S. at 38 n.9.

concurring)("Our holding decides nothing about . . . the requirements that must be met to buy a gun. . . . Nor have we disturbed anything that we said in Heller or McDonald . . . about restrictions that may be imposed on the possession or carrying of guns."); id. at 80 (Kavanaugh, J., concurring)("Properly interpreted, the Second Amendment allows a 'variety' of gun regulations." (quoting Heller, 554 U.S. at 636)).

"[C]ommercial restrictions presumptively do not implicate the plain text of the Second Amendment at the first step of the Bruen test." B & L Prods., Inc., 104 F.4th at 119 ("For any law to be 'presumptively lawful,' it necessarily must not implicate the plain text of the Second Amendment."). See United States v. Marzzarella, 614 F.3d 85, 91 (3d Cir. 2010)("[T]he identified restrictions are presumptively lawful because they regulate conduct outside the scope of the Second Amendment."). The conclusion that the analysis whether a law is presumptively Constitutional under Heller must be undertaken at Bruen's first step is logical, because a law cannot be simultaneously presumptively Constitutional and presumptively unconstitutional. As the Ninth Circuit explains in B & L Productions, Inc., "[f]or any law to be 'presumptively lawful,' it necessarily must not implicate the plain text of the Second Amendment. Otherwise, Bruen makes clear that the Constitution would 'presumptively protect[] that conduct,' and the government would bear the burden of identifying a historical tradition of similar regulation." 104 F.4th at 119 (quoting Bruen, 597 U.S. at 17)(alterations in B & L Prods., Inc.). Accordingly, if a firearm regulation falls into one of the presumptively Constitutional categories that Heller outlines, the regulation does not implicate the Second Amendment's plain text, and, thus, a court need not proceed to Bruen's second prong. See Rocky Mountain Gun Owners v. Polis, 2023 WL 8446495, at *10 (concluding that "the presumption" that the regulations governing the commercial sale of firearms is "warranted because the conduct is not covered by the plain text of the Second

Amendment"); <u>United States v. McNulty</u>, 684 F. Supp. 3d at 20 ("[T]his presumptive constitutionality means that such regulations, in their effort to govern firearm commerce . . . do not implicate the Second Amendment."). <u>But see</u> <u>Rocky Mountain Gun Owners v. Polis</u>, 685 F. Supp. 3d at 1054-55 ("[T]he Court disagrees with the Governor's reading of <u>Heller</u> as exempting certain types of regulations at the first step of the <u>Bruen</u> test.").

The Court's analysis whether the Waiting Period Act is presumptively Constitutional under <u>Heller</u> proceeds in three parts. First, the Court concludes that the Waiting Period Act qualifies as a law "imposing conditions and qualifications on the commercial sale of arms." <u>Heller</u>, 554 U.S. at 626-27. Second, reasoning that the regulations that <u>Heller</u> identifies must be "longstanding" to be "presumptively constitutional," the Court concludes that the laws imposing waiting periods on the purchase of firearms are sufficiently longstanding. <u>Heller</u>, 554 U.S. at 626-27, 627 n.26. Here, the Court considers but rejects the Plaintiffs' argument that <u>Bruen</u> has wholly subsumed <u>Heller</u>'s presumptively lawful carveouts. Third, acknowledging that a presumption may be rebutted, the Court concludes that the Plaintiff's cannot rebut the Waiting Period Act's presumptive Constitutionality by demonstrating that the regulation is overly burdensome or requires firearm sellers to exercise their discretion regarding who may exercise their Second Amendment right. Accordingly, the Court concludes that the Waiting Period Act is a presumptively Constitutional commercial firearm regulation.

### 1.   **The Waiting Period Act Regulates the Commercial Sale of Arms.**

Courts have yet to agree upon the characteristics that render a firearm regulation a presumptively Constitutional "law[] imposing conditions and qualifications on the commercial sale of arms," <u>Heller</u>, 554 U.S. at 626-27; <u>see</u> <u>Pena v. Lindley</u>, 898 F.3d 969, 976 (9th Cir. 2018)("The Court, however, did not define the contours of these 'presumptively lawful'

categories.").[9]   In a subsequently vacated opinion, the United States Court of Appeals for the

Fourth Circuit defined "[a] condition or qualification on the sale of arms" as "a hoop someone

must jump through to <u>sell</u> a gun, such as obtaining a license, establishing a lawful premise, or

maintaining transfer records." <u>Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives</u>,

5 F.4th 407, 416 (4th Cir.)("<u>Hirschfeld</u>")(emphasis in original), <u>as amended</u> (July 15, 2021),

<u>vacated as moot on other grounds</u>, 14 F.4th 322 (4th Cir. 2021).   Concurring in part in <u>Pena v.

Lindley</u>, 898 F.3d 969, the Honorable Jay S. Bybee, United States Circuit Judge for the Ninth

Circuit, explained that he understood conditions and qualifications on commercial sales to refer

primarily to "rules of general applicability," such as "[f]ire codes, sales taxes, and commercial

licenses are ordinary conditions on commercial sales generally," but acknowledged that "arms-

sales-specific restrictions," like "time, place, and manner restrictions" in the context of the First

Amendment, were also likely to be Constitutionally permissible.   <u>See</u> <u>Pena v. Lindley</u>, 898 F.3d at

1008-09 (Bybee, J., concurring in part); <u>id.</u> at 1009 (listing "restrictions [that] go to where and

when such commercial sales can take place" as likely to be Constitutionally permissible).[10]   More

---

[9]Before <u>Bruen</u> rejected the means-end scrutiny test that most Courts of Appeals followed
post-<u>Heller</u>, many Courts of Appeals purposefully avoided the question altogether by declining to
decide whether a given regulation was presumptively Constitutional and proceeding directly to the
interest balancing step.   <u>See</u> <u>Pena v. Lindley</u>, 898 F.3d at 976 ("In these cases, the court avoided
having to define the contours of the commercial sales category because it assumed the Second
Amendment applied and upheld the restriction under the appropriate level of constitutional
scrutiny."); <u>Woollard v. Gallagher</u>, 712 F.3d 865, 876 (4th Cir. 2013).

[10]Interestingly, Judge Bybee posited that "[o]ther point-of-sale restrictions such as
background checks and waiting periods are better characterized as regulations in support of who
may lawfully possess (much less purchase) firearms."   <u>Pena v. Lindley</u>, 898 F.3d at 1009 n.19
(Bybee, J., concurring in part).   Judge Bybee emphasized that regulations imposing waiting periods
at the point of sale were "more easily defended as restrictions on 'the possession of firearms by
felons and the mentally ill.'"   <u>Pena v. Lindley</u>, 898 F.3d at 1009 n.19 (Bybee, J., concurring in
part)(quoting <u>Heller</u>, 554 U.S. at 626).   <u>But see</u> Eugene Volokh, <u>Implementing the Right to Keep
and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda</u>, 56 UCLA

recently, however, the Ninth Circuit has taken a more lenient approach to determining what constitutes a condition or qualification on the commercial sale of arms, assuming without discussion in <u>B & L Productions, Inc.</u> that the law at issue -- a ban on firearm sales in certain locations -- regulated the commercial sale of arms.  See <u>B & L Prods., Inc.</u>, 104 F.4th at 114; <u>Silvester v. Harris</u>, 843 F.3d at 829 (Thomas, C.J., concurring)(assuming that California's ten-day waiting period for firearm sales regulated the commercial sale of arms).  As these opinions indicate, a condition or qualification on the commercial sale of firearms generally must: (i) affect the sale of firearms -- <u>i.e.</u>, it must apply at the point of sale and must not "fall[] asymmetrically on buyers rather than sellers," <u>Hirschfeld</u>, 5 F.4th at 417; and (ii) qualify or condition the sale of arms, which is to say it must be a "hoop" to be jumped through rather than "a total ban on buying a gun," <u>Hirschfeld</u>, 5 F.4th at 417 (emphasis omitted).

Applying these principles, the Court concludes that the Waiting Period Act is a condition or qualification on the commercial sale of firearms.  First, the Waiting Period Act covers the sale of firearms.  <u>United States v. Hosford</u>, 843 F.3d 161 (4th Cir. 2016).  See <u>Rocky Mountain Gun Owners v. Polis</u>, 2023 WL 8446495, at *11 ("Colorado's Waiting-Period Act regulates only the sale, and specifically sellers, of firearms."); <u>Silvester v. Harris</u>, 843 F.3d at 830 (Thomas, C.J., concurring)("California's waiting period law is a condition or qualification on the sale of guns . . . .").  Sale is "[t]he transfer of property or title for a price," <u>Sale</u>, Black's Law Dictionary (12th ed. 2024), and commercial is defined as "[o]f, relating to, or involving the selling of goods or services for profit," <u>Commercial</u>, Black's Law Dictionary (12th ed. 2024).  The Waiting Period Act defines the regulated conduct as "the transfer of ownership, possession or physical control of

---

L. Rev. 1443, 1444 (2009)(characterizing laws imposing waiting periods as "'when' restrictions" as opposed to "'who' restrictions").

the firearm from the seller to the buyer . . . ."  HB 129 § 1(C).  Like "time, place, and manner restrictions" in the context of the First Amendment, the Waiting Period Act merely affects the time that an individual may purchase a gun.  See Pena v. Lindley, 898 F.3d at 1008-09 (Bybee, J., concurring in part).

The Court acknowledges that, while the Waiting Period Act prohibits sellers from "transfer[ring the] ownership, possession or physical control of the firearm . . . to the buyer before the end of the required seven-calendar-day waiting period," it affects firearms purchasers as well. HB 129 § 1(C).  Unlike Colorado's ten-day waiting period act, at issue in Rocky Mountain Gun Owners v. Polis, 2023 WL 8446495, the Waiting Period Act imposes criminal penalties on both the seller and the buyer of a firearm before the waiting period ends.  See HB 129 § 1(D) ("Each party to an unlawful sale of a firearm before the required waiting period ends is in violation of this section and may be separately charged for the same sale.").  That a regulation on the sale of firearms impacts firearms buyers, however, does not necessarily mean that the regulation cannot be a presumptively Constitutional "law[] imposing conditions or qualifications on the commercial sale of arms."  Heller, 554 U.S. at 626.  As the Fourth Circuit has explained, regulations that "place[] burdens on sellers with an indirect effect on buyers" may still be presumptively Constitutional, so long as they do not "fall[] asymmetrically on buyers rather than sellers," thus operating as a "functional ban."  Hirschfeld, 5 F.4th at 417.  Moreover, background checks and licensing schemes for firearms purchases, which courts have categorized as presumptively Constitutional qualifications on the commercial sale of firearms, see Bruen, 597 U.S. at 38 n.9 (explaining that "'shall-issue' licensing regimes . . . which often require applicants to undergo a background check," remain presumptively Constitutional post-Bruen); McRorey, 99 F.4th at 836-37 (observing that "ancillary firearm regulations such as background checks preceding sale" are

"'conditions and qualifications on the commercial sale of arms'" (quoting <u>Heller</u>, 554 U.S. at 626-27)), target directly the buyer in the firearm sale.  For these reasons, the Court concludes that the Waiting Period Act covers only the commercial sale of firearms.

Second, the Waiting Period Act "imposes a mere condition or qualification," <u>United States v. Hosford</u>, 843 F.3d at 166, and does not act as a "functional prohibition on buyers," <u>Hirschfeld</u>, 5 F.4th at 417.  Eugene Volokh, <u>Implementing the Right to Keep and Bear Arms for Self-Defense: An Analytical Framework and A Research Agenda</u>, 56 UCLA L. Rev. 1443, 1545 (2009)("Restrictions on the sales transactions that enable the exercise of these constitutional rights should be evaluated based on whether they impose a substantial burden on the exercise of the protected right.").  As discussed, the Waiting Period Act "imposes a brief delay -- to permit compliance with background check requirements and provide a 'cooling off' period -- as a prerequisite to acquiring a gun."  <u>Silvester v. Harris</u>, 843 F.3d at 830 (no citation given for quotation)(Thomas, C.J., concurring).  The Waiting Period Act does not "categorically ban[] an entire group of law-abiding citizens from purchasing firearms based on age," <u>Rocky Mountain Gun Owners v. Polis</u>, 685 F. Supp. 3d at 1055, nor "ban . . . all sales of a certain type of gun or ammunition in a region," <u>B & L Prods., Inc.</u>, 104 F.4th at 119.  See <u>Hirschfeld</u>, 5 F.4th at 416-17 (recognizing that "a Chicago ordinance that allowed firearm transfers only outside city limits" constituted a "functional ban[]").  As <u>Bruen</u> indicated, a restriction on commercial firearm sales could become Constitutionally problematic if it grew too "lengthy," but seven days is not long enough to raise this concern.  <u>Bruen</u>, 597 U.S. at 38 n.9.  See <u>McRorey</u>, 99 F.4th at 839 ("[T]here is some point at which a background check becomes so lengthy that it is 'put towards abusive ends' or subject to <u>Bruen</u>'s historical framework as a de facto prohibition on possession.  But a period of 10 days does not qualify.").

2.    __The Waiting Period Act Is Sufficiently Longstanding__.

There is debate "whether the Supreme Court called presumptively lawful all 'laws imposing conditions and qualifications on the commercial sale of arms,' or only 'longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms.'" United States v. Hosford, 843 F.3d at 166 (quoting Heller, 554 U.S. at 626-27).   The Court concludes that, for conditions and qualifications on the commercial sale of arms to be presumptively constitutional, they must be longstanding.   See Teixeira v. Cnty. of Alameda, 873 F.3d 670, 699 (9th Cir. 2017)(Bea, J., dissenting)("Longstanding' . . . tells us which 'laws imposing conditions and qualifications on the commercial sale of arms' are 'presumptively lawful . . . .'" ); Silvester v. Harris, 843 F.3d at 831 (Thomas, C.J., concurring)("Heller also suggested that presumptively lawful regulations should be longstanding.").   The Ninth and Fourth Circuits have adopted this approach, see Teixeira v. Cnty. of Alameda, 822 F.3d at 1057 ("[T]he type of law in question must be both longstanding and closely match a listed prohibition."); United States v. Hosford, 843 F.3d at 166, and -- more importantly -- the Supreme Court has suggested that the presumptively Constitutional regulations it identified in Heller must be sufficiently longstanding.   In McDonald, the Supreme Court "repeat[ed]" its "assurances" that Heller "did not cast doubt on such longstanding regulatory measures as 'prohibitions on the possession of firearms by felons and the mentally ill,' 'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms.'"   561 U.S. at 786 (quoting Heller, 554 U.S. at 626-27).  The addition of the word "such" as well as the Supreme Court's omission of Heller's use of the word "or" between the first and second category of presumptively Constitutional regulations suggests that the Supreme Court intends "longstanding" to modify each category of regulation it identifies.   See

- 74 -

Corey A. Ciocchetti, <u>The Business of Guns: The Second Amendment & Firearms Commerce</u>, 46 Pepp. L. Rev. 1, 42 (2018)("The Supreme Court appeared to clarify in <u>McDonald</u> that only 'longstanding . . . laws imposing conditions and qualifications on the commercial sale of arms' are presumptively lawful." (quoting <u>McDonald,</u> 561 U.S. at 786)).  Finally, in <u>Bruen</u>, the Supreme Court expresses that "'longstanding'" modifies "'laws forbidding the carrying of firearms in sensitive places such as schools and government buildings,'" indicating that "longstanding" modifies not only "prohibitions on the possession of firearms by felons and the mentally ill," but each category of presumptively Constitutional regulations, including "laws imposing conditions and qualifications on the commercial sale of arms."  597 U.S. at 30 (quoting <u>Heller</u>, 554 U.S. at 626-27).  <u>See</u> <u>Nat'l Rifle Ass'n v. Bondi</u>, 61 F.4th at 1320 ("[T]he Supreme Court has already identified 'laws imposing conditions and qualifications on the commercial sale of firearms' as 'longstanding' and therefore 'presumptively lawful' firearm regulations."   (quoting <u>Heller</u>, 554 U.S. at 626-27, 627 n.26)).

Having concluded that a "law[] imposing conditions and qualifications on the commercial sale of arms" must be "longstanding" to be "presumptively constitutional," the Court turns next to the question of how longstanding a regulation must be to fit into this category.  <u>Heller</u>, 554 U.S. at 626-27.  "The majority view" in the Courts of Appeals is "that 'a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue.'" Corey A. Ciocchetti, <u>The Business of Guns: The Second Amendment & Firearms Commerce</u>, 46 Pepp. L. Rev. 1, 42 (2018)(quoting <u>Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives</u>, 700 F.3d 185, 196 (5th Cir. 2012)).  <u>See</u> <u>United States v. Skoien</u>, 614 F.3d 638, 641 (7th Cir. 2010)("[W]e do take from <u>Heller</u> the message that exclusions need not mirror limits that were on the books in 1791.").  As the Fifth Circuit notes, "<u>Heller</u> demonstrates that a regulation

can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue . . . .  After all, Heller considered firearm possession bans on felons and the mentally ill to be longstanding, yet the current versions of these bans are of mid-20th century vintage."  Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d at 196.  See United States v. McCane, 573 F.3d 1037, 1048 (10th Cir. 2009)(Tymkovich, J., concurring)("[T]he weight of historical evidence suggests felon dispossession laws are creatures of the twentieth -- rather than the eighteenth -- century.").[11]  Accordingly, the conclusion that, to be longstanding, a regulation need only have a reasonably lengthy historical tradition of enforcement, extending back to some point in the twentieth century, is sound.  See Drake v. Filko, 724 F.3d 426, 432 (3d Cir. 2013)(concluding that New Jersey's permit requirement for possessing handguns is "longstanding" where New Jersey established its permit requirement in 1966 and first required permits for only concealable handguns in 1924); Heller v. D.C., 670 F.3d 1244, 1253 (D.C. Cir. 2011)(concluding that laws dating to the early twentieth century are sufficiently longstanding);

---

[11]The academic literature is largely in agreement that at the felon-in-possession exception that Heller outlines does not have specific founding-era analogues.  See Joseph G.S. Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 257 (2020)("[T]here is no historical basis for denying nonviolent felons the right to keep and bear arms."); Carlton F.W. Larson, Four Exceptions in Search of A Theory: District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1374 (2009)("[S]o far as I can determine, no colonial or state law in eighteenth-century America formally restricted the ability of felons to own firearms."); C. Kevin Marshall, Why Can't Martha Stewart Have A Gun?, 32 Harv. J.L. & Pub. Pol'y 695, 698 (2009)("The federal 'felon' disability -- barring any person convicted of a crime punishable by more than a year in prison from possessing any firearm -- is less than fifty years old."); Adam Winkler, Heller's Catch-22, 56 UCLA L. Rev. 1551, 1563 (2009)("Bans on ex-felons possessing firearms were first adopted in the 1920s and 1930s, almost a century and a half after the Founding."); Larson, supra, at 1376 ("One searches in vain through eighteenth-century records to find any laws specifically excluding the mentally ill from firearms ownership. Such laws seem to have originated in the twentieth century."); Winkler, supra, at 1563 ("The Founding generation had no laws limiting gun possession by the mentally ill . . . .").

Silvester v. Harris, 843 F.3d at 831 (Thomas, C.J., concurring)("[W]aiting periods -- which first appeared on the books in California in 1923 -- constitute a sufficiently longstanding condition or qualification on the commercial sale of arms to be considered presumptively lawful.").

The Plaintiffs urge the Court to disregard the Courts of Appeals' consensus that "a regulation can be deemed 'longstanding' even if it cannot boast a precise founding-era analogue," Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d at 196, because, they argue, the Heller exceptions have been subsumed into Bruen's test such that to conclude that a regulation is longstanding is no different than saying a regulation is consistent with our nation's historical tradition of firearm regulation, see Plaintiffs' Supp. Brief at 13-16. The Court concludes, however, that conflating Heller's "categories of traditional exceptions" with Bruen's direction that courts assess whether a modern regulation has a founding-era analogue when the modern regulation implicates the Second Amendment's plain text is inappropriate. Rahimi, 144 S. Ct. at 1923 (Kavanaugh, J., concurring).

In rejecting the argument that Heller "established a categorical rule that the Constitution prohibits regulations that forbid firearm possession in the home," the Supreme Court in Rahimi reaffirmed "that many such prohibitions, like those on the possession of firearms by 'felons and the mentally ill,' are 'presumptively lawful.'" Rahimi, 144 S. Ct. at 1902. This suggestion from the Supreme Court that Heller's presumptively lawful categories remain intact accord with the majority of Courts of Appeals that have concluded that Heller's exception for modern felon disarmament laws retains its vitality. See United States v. Gay, 98 F.4th 843, 846 (7th Cir. 2024)(recognizing that the Supreme Court continues to maintain that "'longstanding prohibitions on the possession of firearms by felons' are valid" (quoting Heller, 554 U.S. at 626)); United States v. Cunningham, 70 F.4th 502, 506 (8th Cir. 2023)("The longstanding prohibition on possession of

firearms by felons is constitutional . . . ."); <u>United States v. Dubois</u>, 94 F.4th 1284, 1293 (11th Cir. 2024)("Because the Supreme Court 'made it clear in <u>Heller</u> that [its] holding did not cast doubt' on felon-in-possession prohibitions, and because the Court made it clear in <u>Bruen</u> that its holding was '[i]n keeping with <u>Heller</u>,' <u>Bruen</u> could not have clearly abrogated our precedent upholding section 922(g)(1)." (quoting <u>McDonald</u>, 561 U.S. at 786, and then <u>Bruen</u>, 597 U.S. at 17)).

Furthermore, in a now-vacated opinion, the Tenth Circuit reaffirmed that the presumptively Constitutional categories that <u>Heller</u> identifies survive <u>Bruen</u> and do not require a separate <u>Bruen</u> step-two analysis.  Before <u>Bruen</u>, in <u>United States v. McCane</u>, 573 F.3d 1037, the Tenth Circuit rejected a Second Amendment challenge to 18 U.S.C. § 922(g), the federal felon firearm possession ban, because "[t]he Supreme Court . . . explicitly stated in <u>Heller</u> that 'nothing in our opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons.'"   573 F.3d at 1047 (quoting <u>Heller</u>, 554 U.S. at 626).   After <u>Bruen</u>, in <u>Vincent v. Garland</u>, 80 F.4th 1197, the Tenth Circuit addressed a renewed challenge to § 992(g) and considered whether <u>Bruen</u> altered its conclusion in <u>United States v. McCane</u>.  80 F.4th at 1199-1202.  The Tenth Circuit declined to revisit its holding in <u>United States v. McCane</u>, and concluded that, "[t]hough <u>Bruen</u> created a new test for determining the scope of the Second Amendment, the Court didn't appear to question the constitutionality of longstanding prohibitions on possession of firearms by convicted felons."  <u>Vincent v. Garland</u>, 80 F.4th at 1201.  <u>See Rocky Mountain Gun Owners v. Polis</u>, 2023 WL 8446495, at *11 ("The Tenth Circuit's recent opinion in <u>Vincent v. Garland</u>, 80 F.4th 1197 (10th Cir. 2023), also lends support for the conclusion that <u>Heller</u>'s presumptively lawful measures withstood <u>Bruen</u>.").

As with <u>Heller</u>'s exception for prohibitions on the possession of firearms by felons, the Court sees no sound reason to conclude that <u>Bruen</u> abrogated <u>Heller</u>'s exception for laws imposing

conditions and qualifications on the commercial sale of arms.  Even as it has refined the test that courts must apply when assessing Second Amendment challenges, the Supreme Court never has wavered in its emphasis that <u>Heller</u>'s categorical exceptions remain intact.  Most recently, the Honorable Brett Kavanaugh, Associate Justice for the Supreme Court, concurring in <u>Rahimi</u>, reaffirms that "'laws imposing conditions and qualifications on the commercial sale of arms'" remain a "categor[y] of traditional exceptions to the right" to keep and bear arms.  <u>Rahimi</u>, 144 S. Ct. at 1923 (Kavanaugh, J., concurring).  Moreover, in <u>Bruen</u>, the Honorable Samuel Alito, Associate Justice for the Supreme Court, explains that the Supreme Court's clarification of the history and tradition test "decides nothing about . . . the requirements that must be met to buy a gun."  <u>Bruen</u>, 597 U.S. at 72 (Alito, J., concurring).

Furthermore, <u>Bruen</u>'s recognition that objective shall-issue licensing regimes, "which often require applicants to undergo a background check or pass a firearms safety course" to obtain a concealed-carry permit, but do not require licensing officials to exercise discretion whether an applicant has a special need for self-defense, are Constitutionally permissible lends further support for the conclusion that <u>Heller</u>'s exceptions remain intact.  <u>Bruen</u>, 597 U.S. at 38 n.9.  <u>Bruen</u> does not reason that shall-issue licensing regimes, the first of which appeared in "New Hampshire in 1923," comport with the nation's historical tradition of firearm regulation.  Brief of Arizona et al. as Amicus Curiae at 7, <u>Bruen</u>, 597 U.S. 1 (2022).  Indeed, the Supreme Court took great care to describe how New York's may-issue licensing regime -- which <u>Bruen</u> advises can be differentiated only from the permissible shall-issue regimes because "it grants open-ended discretion to licensing officials and authorizes licenses only for those applicants who can show some special need apart from self-defense" -- could not satisfy <u>Bruen</u>'s step-two requirement.  <u>Bruen</u>, 597 U.S. at 80 (Kavanaugh, J., concurring).  Thus, the most faithful reading of the Supreme Court's analysis that

shall-issue licensing regimes are permissible, despite that similar may-issue licensing regimes boast no founding-era analogue, is that shall-issue licensing regimes, and their requirements that "a license applicant . . . undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements," fall within one of <u>Heller</u>'s presumptively Constitutional categories. <u>Bruen</u>, 597 U.S. at 80 (Kavanaugh, J., concurring).  Because the Supreme Court "made it clear in <u>Heller</u> that [its] holding did not cast doubt" on commercial firearm regulations, <u>McDonald</u>, 561 U.S. at 786, and because the Court made it clear in <u>Bruen</u> and again in <u>Rahimi</u> that its holdings are "[i]n keeping with <u>Heller</u>," <u>Bruen</u>, 597 U.S. at 17, <u>Bruen</u> cannot fairly be understood to abrogate <u>Heller</u>'s clear command that laws imposing conditions and qualifications on the commercial sale of arms are a presumptively Constitutional "categor[y] of traditional exceptions to the" Second Amendment's right to keep and bear arms.  <u>See</u> <u>Nat'l Rifle Ass'n v. Bondi</u>, 61 F.4th at 1320 ("[T]he Supreme Court has already identified 'laws imposing conditions and qualifications on the commercial sale of firearms' as 'longstanding' and therefore 'presumptively lawful' firearm regulations." (quoting <u>Heller</u>, 554 U.S. at 626-27, 627 n.26)).

Here, the Waiting Period Act is sufficiently longstanding.  Like the other longstanding modern regulations that the Supreme Court has identified as presumptively lawful -- namely, laws banning the possession of firearms by felons and shall-issue licensing regimes -- laws imposing a waiting period on the sale of firearms have a longstanding tradition of enforcement in the United States dating to the early twentieth century. <u>See</u> <u>Silvester v. Harris</u>, 843 F.3d at 831 (Thomas, C.J., concurring)("[W]aiting periods . . . constitute a sufficiently longstanding condition or qualification on the commercial sale of arms to be considered presumptively lawful.").  As the Plaintiffs provide, the first waiting-period law dates to 1923.  <u>See</u> Motion ¶ 15, at 10.  Accordingly,

because the Waiting Period Act bears on the commercial sale of firearms, is not so burdensome

that it impinges on the right to keep and bear arms, and is longstanding, it is presumptively

Constitutional.  See United States v. McNulty, 684 F. Supp. 3d at 20 (recognizing the "presumptive

constitutionality" of regulations that "govern firearm commerce"); United States v. King, 646 F.

Supp. 3d at 607 (reasoning that Heller "confirm[s] that the government may regulate the

commercial sale of firearms").

### 3.   The Plaintiffs Cannot Rebut the Waiting Period Act's Presumptive Constitutionality.

Of course, a presumption can be rebutted.  One way to rebut a regulation's presumptively

Constitutionality is "by showing that the regulation at issue has 'more than a de minimis effect

upon his right.'"  Peterson v. Martinez, 707 F.3d 1197, 1218 n.1 (10th Cir. 2013)(quoting Heller

v. D.C., 670 F.3d at 1253).  See Tyler v. Hillsdale Cty. Sheriff's Dep't, 837 F.3d 678, 686 (6th

Cir. 2016)(en banc)("Heller only established a presumption that such bans were lawful; it did not

invite courts onto an analytical off-ramp to avoid constitutional analysis."); Joseph G.S. Greenlee,

The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L.

Rev. 249, 254 (2020)("Even ignoring the Court's express language, it would be unreasonable to

read Heller's 'presumptively lawful' as 'conclusively lawful.'" (no citation given for quotation)).

The Court has already concluded that the Waiting Period Act is not overly burdensome such that

it implicates the right to keep and bear arms.  See Section I.A., supra, at 65-67; McRorey, 99 F.4th

at 840 ("[T]here is some point at which a background check becomes so lengthy that it is "put

towards abusive ends" or subject to Bruen's historical framework as a de facto prohibition on

possession.  But a period of 10 days does not qualify.").  Cf. Tyler v. Hillsdale Cnty. Sheriff's

Dep't, 837 F.3d at 687 (recognizing that a "permanent ban on the possession of guns by anyone

who has been committed to a mental institution" was sufficiently burdensome to overcome <u>Heller</u>'s presumption that laws barring the possession of firearms by the mentally ill were Constitutional).

In addition, however, <u>Bruen</u> acknowledges a second way by which a party might refute the presumption that a law imposing a qualification or condition on the commercial sale of firearms is presumptively Constitutional: by showing that the regulation provides a licensing official an impermissible amount of discretion in deciding whether to allow an individual to exercise his or her Second Amendment right. In <u>Bruen</u>, the Supreme Court presumed the Constitutionality of "'shall-issue' licensing regimes," and distinguished them from New York's licensing regime, which the Court adjudged unconstitutional. <u>Bruen</u>, 597 U.S. at 38 n.9. Unlike New York's "proper-cause" permitting scheme, which "require[s] applicants to show an atypical need for armed self-defense" and requires licensing officials to exercise their discretion whether a person's need to carry a firearm in public is sufficient, shall-issue licensing schemes "contain only 'narrow, objective, and definite standards' guiding licensing officials . . . ." <u>Bruen</u>, 597 U.S. at 38 n.9 (quoting <u>Shuttlesworth v. Birmingham</u>, 394 U.S. 147, 151 (1969)). While it remains unclear how the Supreme Court's concern regarding the degree of discretion officials carrying out a firearm regulation exercise fits into the history and tradition inquiry that must guide consideration of all challenges to firearm regulation, the Waiting Period Act's characteristics place it comfortably alongside the shall-issue licensing schemes the Supreme Court identifies as Constitutional. First, the Waiting Period Act does not impose an obligation on firearm sellers to "'apprais[e] facts, . . . exercise . . . judgment," or "form[] an opinion . . . ." <u>Bruen</u>, 597 U.S. at 38 n.9 (quoting <u>Cantwell v. Connecticut</u>, 310 U.S. 296, 305 (1940)). Instead, the Waiting Period Act applies equally to all individuals seeking to purchase a firearm and does not require firearms sellers to

appraise a buyer's need, and thus contains "only 'narrow, objective, and definite standards' guiding licensing officials . . . ." <u>Bruen</u>, 597 U.S. at 38 n.9 (quoting <u>Shuttlesworth v. Birmingham</u>, 394 U.S. at 151).  Second, the Waiting Period Act, unlike New York's proper-cause licensing regime, does not "effectively presume[] that no citizen ha[s a Second Amendment] right, absent a special need." <u>Rahimi</u>, 144 S. Ct. at 1902.  Rather, the Waiting Period Act presupposes that all individuals may exercise their Second Amendment right to possess and carry firearms.

In sum, the Waiting Period Act is presumptively Constitutional, because it does not implicate conduct covered by the Second Amendment's plain text and is a longstanding condition or qualification on the commercial sale of arms.  The Plaintiffs have not refuted this presumption of Constitutionality.  This conclusion suggests strongly that the Plaintiffs do not have a strong likelihood of success on the merits of their Second Amendment claim. As one commentator has acknowledged, the Second Amendment "authorizes modest delays before a person may exercise the right to carry guns," and the Waiting Period Act does just that.  Volokh 2023, <u>supra</u>, at 1974.

### C.     THE WAITING PERIOD ACT IS CONSISTENT WITH OUR NATION'S HISTORICAL TRADITION OF FIREARM REGULATION.

Even if the Waiting Period Act implicated the Second Amendment's plain text, the Court concludes that the Defendants carry their burden to "justify [the Waiting Period Act] by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." <u>Bruen</u>, 597 U.S. at 24.  As the Court notes above, under <u>Bruen</u>'s second step, courts must "examine our 'historical tradition of firearm regulation.'" <u>Rahimi</u>, 144 S. Ct. at 1897 (quoting <u>Bruen</u>, 597 U.S. at 17).  "[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." <u>Rahimi</u>, 144 S. Ct. at 1898 (citing <u>Bruen</u>, 597 U.S. at 26-31).  <u>See Rahimi</u>, 144 S. Ct. at 1898 ("The law must comport with

the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" (quoting Bruen, 597 U.S. at 30).  "A court must ascertain whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" Rahimi, 144 S. Ct. at 1898 (quoting Bruen, 597 U.S. at 29 & n.7).  "Why and how the regulation burdens the right are central to this inquiry." Rahimi, 144 S. Ct. at 1898.

> For example, if laws at the founding regulated firearm use to address particular problems, that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations. Even when a law regulates arms-bearing for a permissible reason, though, it may not be compatible with the right if it does so to an extent beyond what was done at the founding.

Rahimi, 144 S. Ct. at 1898.  Here, the Defendants seek to justify the Waiting Period Act by arguing that it is sufficiently analogous to historical "laws involving intoxicated persons and licensing regimes."  Response at 16-17.  The Plaintiffs respond that the Defendants' proffered historical regulations are "ill-fitting analogies," because "intoxication laws from the Founding era" did not "assume that everyone is always intoxicated, and require them to wait seven days after passing a background check to sober up," and because founding-era licensing regimes were not "universal," they were "rooted in racism and bias regarding disfavored racial groups."  Reply at 9-10.  The Court concludes that the Waiting Period Act is consistent with the principles underpinning our Nation's historical tradition of prohibiting and restricting the sale of firearms to large swaths of the population out of a fear that some among these groups would use the purchased firearms to do harm.  See FOF ¶ 48, at 10.  Accordingly, even if the Plaintiffs could demonstrate that the Waiting Period Act burdened conduct protected by the Second Amendment's plain text, the Defendants

would carry their burden to justify the Waiting Period Act by demonstrating its consistency with our Nation's historical tradition of firearm regulation.

"[C]olonial governments substantially controlled the firearms trade." Teixeira v. Cnty. of Alameda, 873 F.3d at 685. See FOF ¶ 45, at 9-10; United States v. Trujillo, 670 F. Supp. 3d 1235, 1242 (D.N.M. 2023)(Johnson, C.J.)(identifying "a variety of firearms regulations enacted during the colonial period before and after the Revolutionary War that . . . regulated the sale . . . of firearms"), appeal dismissed, No. 23-2080, 2023 WL 5093358 (10th Cir. August 9, 2023); United States v. Holton, 639 F. Supp. 3d 704, 711 (N.D. Tex. 2022)(Boyle, J.)("Several states restricted where and to whom individuals could sell guns."). Indeed, one of the very first laws adopted by colonists living in the region that would become the United States was a regulation on the sale of guns. In 1619, the "fir[s]t legislative body that ever met in America" was established in the Virginia Colony. See H.R. McIlwaine & John P. Kennedy, eds., Journals of the House of Burgesses of Virginia, 1619-1776 at xxvi (1905), https://hdl.handle.net/2027/uc2.ark:/13960/t4th8sj3p (last visited July 18, 2024). On August 4, 1619, the legislature pronounced "[t]hat no man do sell or give any Indians any piece, shot, or powder, or any other arms offensive or defensive, upon paine of being held a traitor to the colony and of being hanged." McIlwaine & Kennedy, supra, at 13. Not all commercial regulations on the sale of firearms to Native Americans were complete bans, however. See Spitzer Report ¶¶ 95-96, at 35 (highlighting found-era laws "licensing the sale of weapons to Indigenous people"); United States v. Duarte, 101 F.4th at 686 (highlighting laws establishing "licensing requirements" that "implied that those with proper credentials could still trade arms with Indians"). In 1784, for example, Georgia outlawed selling arms to Native Americans, but only at any "place . . . [other] than at stores or houses licensed for that purpose." Act of Feb. 1784, Digest of Laws of the State

of Georgia 288-89 (Watkins ed. 1800).  See 1763 Pa. Laws 319, § 1 (prohibiting sale to "any Indian or Indians . . . any guns . . . or other warlike stores without license").   In 1669, the Connecticut assembly "allowed each town to appoint one person who could sell firearms to the Indians but under the strictest regulation."  Michael A. Bellesiles, Gun Laws in Early America: The Regulation of Firearms Ownership, 1607-1794, 16 Law & Hist. Rev. 567, 585 (1998). Connecticut returned to a complete ban in 1708, however, when it passed a restriction, "forbidding selling, lending, or giving 'to any of our friend Indian or Indians, any gun, for any time.'" Bellesiles, supra, at 585-86 (quoting J. H. Turnbull et al., eds., The Public Records of the Colony of Connecticut (1850-90)).  See 1639 N.J. Laws 18 (prohibiting the sale of firearms to Indians); 1645 N.Y. Laws 47 (same); 1723 Conn. Acts 292 (same).  Such prohibitions on the sale of firearms to Native Americans "'prevailed up to the period immediately before and after the framing of the Constitution.'"  Bruen, 597 U.S. at 35 (quoting Sprint Communications Co. v. APCC Services, Inc., 554 U.S. 269, 311 (2008)(Roberts, C.J., dissenting)).  See 1763 Pa. Laws 319; An Act Concerning the Kaskaskia Indians, in Nathaniel Pope, Laws of the Territory of Illinois (1815); 1853 Or. Rev. Stat. 257.

While "[b]ans on selling arms to Indians were a matter of course in the early American colonies," United States v. Duarte, 101 F.4th at 679, laws restricting firearm commerce were not limited to preventing the sale of arms to Native Americans.  For example, at least one colony enacted a law preventing those who expressed or seditious opinions from purchasing firearms.  See Robert J. Spitzer, Gun Law History in the United States and Second Amendment Rights, 80 Law & Contemp. Probs. 55, 72 (2017)("The Massachusetts colony enacted a law in 1637 that required named individuals who expressed 'opinions & revelations that 'seduced & led into dangerous errors many of the people' of New England to turn in all 'guns, pistols, swords, powder, shot, &

match,' and it further barred them from 'buy[ing] or borrow[ing]' any of the same until such time as the local court said otherwise." (quoting <u>Records of the Governor and Company of the Massachusetts Bay in New England</u> 211-12 (Nathaniel B. Shurtleff ed., 1853))).  Notably, this regulation implemented only a temporary bar on the purchase of firearms, because "[i]f those disarmed admitted to their 'seditious libel,' they could have their weapons restored."  Spitzer, <u>supra</u>, at 72 (quoting Records of the Governor at 212).  Closer to the founding, Pennsylvania enacted a similar law stripping those who "'refuse[d] or neglect[ed] to take the oath or affirmation' of allegiance to the state" and preventing the individual from "borrow[ing] or even us[ing] another person's firearms."  Saul Cornell & Nathan DeDino, <u>A Well Regulated Right: The Early American Origins of Gun Control</u>, 73 Fordham L. Rev. 487, 506-07 (2004).  <u>See also</u> <u>Teixeira v. Cnty. of Alameda</u>, 873 F.3d at 685 ("Connecticut banned the sale of firearms by its residents outside the colony." (citing 1 Trumbull, <u>Public Records of the Colony of Connecticut</u>, 138-39, 145-46)).

Finally, numerous post-ratification commercial firearm regulations restricted the sale of arms to slaves, despite that slaves were often authorized "to possess firearms for some limited purpose."  <u>United States v. Duarte</u>, 101 F.4th at 687.  <u>See</u> Robert J. Cottrol Raymond T. Diamond, <u>The Second Amendment: Toward an Afro-Americanist Reconsideration</u>, 80 Geo. L.J. 309, 336 n.129 (1991)("Sale or other delivery of firearms to slaves was forbidden by several states.").  For example, an 1836 Tennessee law[12] provided: "Any free person who, without the consent of the

---

[12]As Justice Kavanaugh clarifies in his concurring opinion in <u>Rahimi</u>, post-ratification regulations serve an important function in "determining exceptions to individual constitutional rights," because such "laws and practices have often reflected and reinforced common understandings of the Constitution's authorizations and limitations."  144 S. Ct. at 1916 (Kavanaugh, J., concurring).  As Justice Scalia explains in <u>Heller</u>, "how the Second Amendment was interpreted from immediately after its ratification through the end of the 19th century" represents a "critical tool of constitutional interpretation."  554 U.S. at 605.  <u>See</u> <u>Heller</u>, 554 U.S. at 605 ("We now address how the Second Amendment was interpreted from immediately after its

owner, shall sell, loan or give to any slave, any gun, pistol, sword, or dirk, shall be guilty of a misdemeanor . . . ."  1835-36 Tenn. Pub. Acts 168.  A nearly identical provision in New Mexico prohibited the sale "to any slave any . . . gun, pistol or other fire arms, or any other kind of deadly weapon of offence, or any ammunition of any kind suitable for fire arms."  1858 N.M. Laws 68. See also Spitzer Report ¶¶ 97, at 35-36 (listing licensing regimes aimed at restricting "enslaved persons or free persons of color" access to firearms); Cornel & DeDino, supra, at 516 ("Virginia passed a law in 1806 that required every 'free negro or mulatto' to first obtain a license before carrying or keeping 'any fire-lock of any kind, any military weapon, or any powder or lead.'" (quoting Act of Feb. 4, 1806, 1805-1806 Va. Acts ch. XCIV, at 51)).

Taken together, these regulations demonstrate a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might use those firearms to do harm in society.  See FOF ¶ 47, at 10.  During the colonial era, "fearing the consequences of unregulated access to firearms and munitions,"

---

ratification through the end of the 19th century.").  Nonetheless, courts "must also guard against giving postenactment history more weight than it can rightly bear."  Bruen, 597 U.S. at 35.  Thus, post-enactment history is unhelpful where it "contradicts" the Second Amendment's text, Bruen, 597 U.S. at 35.  See Rahimi, 144 S. Ct. at 1916 (Kavanaugh, J., concurring)(expressing that "[p]ost-ratification interpretations and applications" of the Second Amendment are helpful "when reasonably consistent"); Bruen, 597 U.S. at 66 ("[L]ate-19th-century evidence cannot provide much insight into the meaning of the Second Amendment when it contradicts earlier evidence, or is inconsistent with practices at the founding.").

Here, the post-enactment regulations affecting the sale of guns that the Court relies on fall comfortably within the period "immediately after [the Second Amendment's] ratification through the end of the 19th century" that Justice Scalia identifies as most illuminating.  See Heller, 554 U.S. at 605.  Moreover, these regulations are not contrary to the Second Amendment's text, which says nothing about firearm sales, nor are they "inconsistent with practices at the founding."  Bruen, 597 U.S. at 66.  Rather, these laws are consistent with, for example, laws passed earlier in the founding-era which sought to restrict slaves' ability to access firearms. See Bellesiles, supra, at 576; 1750 N.J Laws 444 (barring "any negro or mulatto slave" from "carrying a gun on the Lord's Day).

"American governments sought to regulate the . . . sale . . . of firearms and munitions." Bellesiles, supra, at 576. Typically, these restrictions were motivated by a desire to keep firearms out of the hands of "blacks, slave and free; Indians; propertyless whites; non-Protestants or potentially unruly Protestants." Bellesiles, supra at 576. For example, early commercial firearm regulations restricting the sale of arms to Native Americans sought "to limit Indian access to firearms" as "the Indians resisted the conquest of their lands," Bellesiles, supra, at 574, 581, by engaging in attacks on white settlers using firearms which they had previously purchased or for which they traded, see Teixeira v. Cnty. of Alameda, 873 F.3d at 685 (describing how, "[i]n response to the threat posed by Indian tribes," colonies made "it a crime to sell, give, or otherwise deliver firearms or ammunition to Indians"); Robert J. Spitzer, Guns Across America 52 (2015)("Gun laws aimed at barring [those] deemed dangerous to society from possessing firearms focused early in the country's history on Native Americans . . . ."); David J. Silverman, Thundersticks: Firearms and the Violent Transformation of Native America 13-15 (2016). Similar fears justified laws restricting the sale of firearms to slaves. Following South Carolina's 1740 Stono Rebellion, a slave revolt in which armed slaves killed over two dozen colonists, "slave uprisings -- real and imagined -- persuaded colonial legislatures that blacks as a group, slave or free, should not be allowed to own firearms." Bellesiles, supra, at 576. See Adam Winkler, Gunfight 115-16 (2011)(explaining that certain racial groups were disarmed "out of fear that these groups would use guns to revolt against slave masters," even if they "were completely law-abiding"); McDonald, 561 U.S. at 845 (Thomas, J., concurring in part)("The fear generated by these and other rebellions led Southern legislatures to take particularly vicious aim at the rights of free blacks and slaves to speak or to keep and bear arms for their defense."). Finally, founding-era laws prohibiting individuals who expressed seditious opinions, see Spitzer, supra, at 72, or refused to swear an oath of allegiance to

their State, see Cornell & DeDino, supra, at 506, from buying or even borrowing firearms, were passed because it was feared that these individuals "posed a potential danger," Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d at 200.  See United States v. Duarte, 101 F.4th at 681 (explaining that non-associators' access to firearms were restricted because it was feared they would "take up arms against America").  By limiting the commercial sale of firearms in an effort to keep firearms out of the hands of individuals who may commit impulsive acts of violence against the populace, the Waiting Period Act fits within this regulatory tradition.

The Waiting Period Act "is by no means identical to these founding era regimes, but it does not need to be." Rahimi, 144 S. Ct. at 1901.  Rather, the Waiting Period Act "is 'relevantly similar' to" founding-era restrictions on gun sales "in both why and how it burdens the Second Amendment right." Rahimi, 144 S. Ct. at 1901 (quoting Bruen, 597 U.S. at 29).  First, were the Waiting Period Act to burden the Second Amendment right, it would burden the right for the same reason as founding-era firearm sale restrictions: to decrease the chance that gun purchasers will use purchased firearms to commit acts of violence against others in society.  Compare Fiscal Impact Report, Firearm Sale Waiting Period Changes (February 13, 2024)("[T]here is moderate evidence waiting periods decrease firearm suicides and decrease overall homicides . . . ."); NM Sentencing Commission, Agency Bill Analysis at 3 (January 18, 2024)("Research has shown that waiting periods for firearms purchases can reduce gun mortality."), with Winkler, Gunfight, supra at 115 (explaining that certain racial groups were disarmed "out of fear that these groups would use guns to revolt"); Bellesiles, supra at 576 (describing how founding-era governments, "fearing the consequences of unregulated access to firearms and munitions," "sought to regulate the . . . sale . . . of firearms and munitions").  Founding-era restrictions on arms sales were passed

to address the "particular problem" that the arms sold would be used against the public; the Waiting

Period Act imposes restrictions for "similar reasons," which is "a strong indicator that" the Waiting

Period Act "fall[s] within a permissible category of regulations." Rahimi, 144 S. Ct. at 1898.  As

the Nation's history and tradition of firearm regulation demonstrates, commercial restrictions have

long been employed to keep firearms out of the hands of individuals who may do harm with those

firearms, see Teixeira v. Cnty. of Alameda, 873 F.3d at 685 ("Notably, colonial government

regulation included some restrictions on the commercial sale of firearms."), and thus the Waiting

Period Act, which shares this same purpose, is "consistent with the principles that underpin our

regulatory tradition." Rahimi, 144 S. Ct. at 1898.  See United States v. Holton, 639 F. Supp. 3d at

711 (concluding that laws "aimed at preventing the sale of firearms to Indian tribes" were

sufficiently analogous to 18 U.S.C. § 922(k) to pass constitutional muster under Bruen); United

States v. Trujillo, 670 F. Supp. 3d at 1242 (same).

Second, regarding "how" the Waiting Period Act affects the Second Amendment right, it

does not "regulate[] . . . to an extent beyond what was done at the founding." Rahimi, 144 S. Ct.

at 1898.  Specifically, like Section 922(g)(8) in Rahimi, the Waiting Period Act is relevantly

similar to founding-era commercial regulations in its "burden," which the Supreme Court advises

in Rahimi includes an assessment of the regulation's "duration" and the "penalty" that it imposes.

Rahimi, 144 S. Ct. at 1901-02.  See Bruen, 597 U.S. at 29 ("[W]hether modern and historical

regulations impose a comparable burden on the right of armed self-defense and whether that

burden is comparably justified are 'central' considerations when engaging in an analogical

inquiry." (quoting McDonald, 561 U.S. at 767)).  First, even if the Waiting Period Act burdened

the Plaintiffs' Second Amendment right, it would not burden the right "beyond what was done at

the founding," because founding-era commercial regulations allowed for a complete ban on

firearms sales to broad swaths of the population, whereas the Waiting Period Act provides only for a brief delay before the firearm may be purchased.  Rahimi, 144 S. Ct. at 1898.  Second, the Waiting Period Act's restriction is temporary, and, accordingly, the Waiting Period Act's duration does not extend beyond the limits of founding-era prohibitions on firearm sales, which often were complete prohibitions with no temporal limit.  See Rahimi, 144 S. Ct. at 1902 ("[L]ike surety bonds of limited duration, Section 922(g)(8)'s restriction was temporary . . . .").  Third, the Waiting Act's "penalty -- another relevant aspect of the burden -- also fits within the regulatory tradition."  Rahimi, 144 S. Ct. at 1902.  Unlike founding era commercial restrictions, which imposed penalties ranging from imprisonment to whipping on those buying or selling firearms in violation of a commercial restriction, see 1858 N.M. Laws 681763 (punishing the sale "to any slave any . . . gun, pistol or other fire arms, or any other kind of deadly weapon of offence, or any ammunition of any kind suitable for fire arms" with "imprisonment not less than three months nor more than three years"); 1763 Pa. Laws 319 ("If any person or persons whatsoever shall . . . sell barter or exchange with any Indian or Indians whatsoever any guns, gunpowder, shot, bullets, lead . . . every such person or persons so offending, being thereof legally convicted . . . shall be whipped with thirty-nine lashes on his bare back, well laid on . . . ."), the Waiting Period Act imposes only a misdemeanor offense on those found to have violated its restrictions, see Rahimi, 144 S. Ct. at 1902 ("[I]f imprisonment was permissible to respond to the use of guns to threaten the physical safety of others, then the lesser restriction of temporary disarmament that Section 922(g)(8) imposes is also permissible.").

The Plaintiffs argue that the Waiting Period Act is inapposite to founding-era commercial regimes in how they regulate, because historical regimes were largely "narrow" and applied only to subsets of the population, whereas the Waiting Period Act "'broadly restrict[s] arms use by the

public generally.'"  Plaintiffs' Supp. Brief at 21 (quoting <u>Rahimi</u>, 144 S. Ct. at 1901).  <u>See</u> Reply at 10 ("[T]he 'licensing' laws Professor Spitzer collected were not universal licensing regimes . . . .").  The Plaintiffs are correct that the Waiting Period Act, which aims to delay the transmission of firearms to individuals who might use them for unlawful purposes, also will apply to individuals who seek to purchase a firearm for lawful use.  This strategy, however, is consistent with our Nation's history and tradition of firearm regulation.  While founding-era laws placing restrictions on the sale of firearms to Native Americans, for example, may have prevented firearms from passing to some Native Americans who sought to use those firearms against the public, they simultaneously affected more Native Americans who sought to purchase a firearm to hunt or for self-defense.  Likewise, the Waiting Period Act affects a large section of the populace -- <u>i.e.</u>, all firearms purchasers who are not law enforcement agencies or do not have a New Mexico concealed handgun license or federal firearms license -- in an effort to lessen the risk that some among this overinclusive group might use a purchased firearm to harm the public.  Moreover, the Waiting Period Act remains consistent with founding-era regulations targeting the sale of firearms to Native Americans despite that it affects the sale of guns to those who otherwise enjoy the right to carry arms.  <u>See</u> <u>United States v. Duarte</u>, 101 F.4th at 680 ("Many colonial-era firearm regulations targeting Indians did not even disarm this group but instead banned the <u>sale</u> of arms <u>to them</u>." (emphasis in original)).

At bottom, by urging the Court to reject founding-era analogues on the grounds that they applied to a narrower swath of the population than does the Waiting Period Act, the Plaintiffs ask the Court to make the same methodological mistake the Supreme Court identifies in <u>Rahimi</u>.  <u>See</u> <u>Rahimi</u>, 144 S. Ct. at 1897 ("[S]ome courts have misunderstood the methodology of our recent Second Amendment cases.  These precedents were not meant to suggest a law trapped in amber.").

"[T]he appropriate analysis involves considering whether the challenged regulation is consistent with the principles that underpin our regulatory tradition," as is the Waiting Period Act here. Rahimi, 144 S. Ct. at 1898.  See Rahimi, 144 S. Ct. at 1898 ("The law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" (quoting Bruen, 597 U.S. at 30)); id. at 1925 (Barrett, J., concurring)("To be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart.").  Rahimi's conclusion that 18 U.S.C. § 922(g)(8) is consistent with founding-era "surety" and "going armed" laws illustrates that a modern regulation -- even one that is dissimilar from founding-era analogues in significant ways -- is still Constitutionally permissible if it is consistent with the "principles that underpin" the founding-era regulations.  Rahimi, 144 S. Ct. at 1898.  To illustrate this principle, the Court briefly discusses the Supreme Court's historical analogy analysis in Rahimi.

Section 922(g)(8), the statute subject to Second Amendment scrutiny in Rahimi, prohibits an individual subject to a domestic violence restraining order from possessing a firearm if that order includes a finding that he "represents a credible threat to the physical safety of [an] intimate partner," or a child of the partner or individual.  18 U.S.C. § 922(g)(8).  By contrast, founding-era surety laws -- one of Section 922(g)(8)'s historical analogues -- "authorized magistrates to require individuals suspected of future misbehavior to post a bond."  Rahimi, 144 S. Ct. at 1900.  Unlike § 922(g)(8), surety laws did not prohibit suspected wrongdoers from owning firearms nor implicate the possession of guns by those whom the laws targeted in any way.  See Rahimi, 144 S. Ct. at 1939 (Thomas, J., dissenting)("[A] surety demand did not alter an individual's right to keep and bear arms.").  Rather, an individual subject to a surety law who "broke the peace," merely "forfeit" the bond he or she had posted.  Rahimi, 144 S. Ct. at 1900.  See Bruen, 597 U.S. at 59

("[S]urety statutes did not directly restrict public carry . . . .").  <u>Rahimi</u> also analogized to "going armed" or "affray" laws, which the Supreme Court explains "prohibited 'riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land,'" and punished violators "with 'forfeiture of the arms . . . and imprisonment.'"  <u>Rahimi</u>, 144 S. Ct. at 1900-01. Again, unlike § 922(g)(8), which "prevents a covered person from carrying any firearm or ammunition, in any manner, in any place, at any time, and for any reason," the "going armed laws did not prohibit carrying firearms at home or even public carry generally," but rather "prohibited only carrying certain weapons . . . in a particular manner . . . and in particular places."  <u>Rahimi</u>, 144 S. Ct. at 1942-43 (Thomas, J., dissenting).  <u>See</u> <u>Rahimi</u>, 144 S. Ct. at 1943 (Thomas, J., dissenting)("Affray laws were criminal statutes that penalized past behavior, whereas § 922(g)(8) is triggered by a civil restraining order that seeks to prevent future behavior.")  In light of these fundamental differences in purpose, scope, and means, the Supreme Court acknowledged that "Section 922(g)(8) is by no means identical to these founding era regimes," but reasoned "it does not need to be."  <u>Rahimi</u>, 144 S. Ct. at 1901.  Rather, the Supreme Court concluded, § 922(g)(8) was "consistent with the principles that underpin our regulatory tradition," because, "[l]ike the surety and going armed laws, Section 922(g)(8)(C)(i) applies to individuals found to threaten the physical safety of another," and "restricts gun use to mitigate demonstrated threats of physical violence . . . ."  <u>Rahimi</u>, 144 S. Ct. at 1898, 1901.  Here, accordingly, the Court is mindful to focus its inquiry on the principles underpinning the regulations in question, "[r]ather than asking whether [the Waiting Period Act] has a precise historical analogue."  <u>Rahimi</u>, 144 S. Ct. at 1904 (Sotomayor, J., concurring).  <u>See</u> <u>Rahimi</u>, 144 S. Ct. at 1904 (Barrett, J., concurring)("'Analogical reasoning' under <u>Bruen</u> demands a wider lens: Historical regulations reveal a principle, not a mold." (no citation given for quotation)); <u>Bruen</u>, 597 U.S., at 28-29 (explaining that the Second

Amendment does not apply only to firearms in existence in the eighteenth century, but rather to all weapons satisfying the "general definition" of "bearable arms" (emphasis added)).

The Plaintiffs' argument that founding-era firearms regulations cannot serve as proper historical analogues because they were "rooted in racism and bias" is similarly unpersuasive. Reply at 10. While the fact that a regulation was passed solely on the basis of bias against a particular group may be pertinent for considering why the law was passed, the Supreme Court has not suggested that courts may analogize only to those regulations that would not be viewed as discriminatory or unconstitutional today. Indeed, adopting the Plaintiffs' position would result in an inversion of the Bruen test: rather than assessing whether a modern regulation is consistent with founding-era Constitutional understanding, the Court would be required to judge founding-era regulations against modern Constitutional interpretations. See Koons v. Platkin, 673 F. Supp. 3d 515, 575 (D.N.J. 2023)(Bumb, C.J.)("While these racist laws certainly violate the Constitution's demand for equal protection and substantive due process, for the purposes of this inquiry, they suggest that a requirement to establish good character to carry firearms is not a novel one."); United States v. Levasseur, No. CR 22-0155, 2023 WL 6623165, at *7 (D. Me. October 11, 2023)(Walker, J.)(listing as part of our Nation's history and tradition of firearm regulation "the colonial discriminatory practice of disarming Native Americans and African Americans[, which] stemmed from a concern that they would revolt or threaten public safety"). Many founding-era gun regulations, including the historical analogues discussed by the Court, undoubtably are repugnant. See Winkler, supra, at 537 ("For a significant portion of American history, gun laws bore the ugly taint of racism."). Nevertheless, the Court must grapple with the principles underpinning this troubling regulatory tradition if it is to adhere faithfully to the Supreme Court's instruction to

assess the Constitutionality of modern firearm regulations against those laws in existence in the eighteenth and early nineteenth century.  See Bruen, 597 U.S. at 35.

For these reasons, the Waiting Period Act "is consistent with the principles that underpin our regulatory tradition" of restricting firearm sales to sections of the population out of a fear that some among those groups would harm the public with the purchased weapons.  Rahimi, 144 S. Ct. at 1898.  While founding-era commercial regulations differ by a degree in whom they target, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."  Rahimi, 144 S. Ct. at 1898-99.  In sum, the Plaintiffs have not demonstrated a likelihood of success on the merits of their Second Amendment claim, because: (i) the Second Amendment's plain text does not cover the conduct that the Waiting Period Act implicates; (ii) the Waiting Period Act is presumptively lawful, because it is a law that imposes a condition or qualifications on the commercial sale of arms,; and (iii) the Waiting Period Act is consistent with our Nation's historical tradition of commercial firearm restrictions.

## II.     THE PLAINTIFFS ARE UNLIKELY TO EXPERIENCE IRREPARABLE HARM ABSENT A TRO OR PI.

To obtain a TRO or PI, a plaintiff must make "a clear and unequivocal showing it will likely suffer irreparable harm absent preliminary relief."  State v. U.S. Env't Prot. Agency, 989 F.3d 874, 886 (10th Cir. 2021).  See Winter, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief.").  Along with the likelihood of success on the merits prong, a demonstration of irreparable injury is the most important consideration in the TRO and PI analysis.  See Nken v. Holder, 556 U.S. at 434.  "Although irreparable harm 'does not readily lend

itself to definition,' 'a plaintiff must demonstrate a significant risk that he or she will experience harm that cannot be compensated after the fact by money damages.'" New Mexico Dep't of Game & Fish v. U.S. Dep't of the Interior, 854 F.3d 1236, 1250 (10th Cir. 2017)(quoting Fish v. Kobach, 840 F.3d 710, 751-52 (10th Cir. 2016)). The harm a plaintiff must demonstrate "must be both certain and great," and not "merely serious or substantial." Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001). "[C]ourts should interpret the 'irreparable harm' factor in conjunction with whether the movant is likely to succeed on the merits." Legacy Church, Inc. v. Kunkel, 455 F. Supp. 3d 1100, 1163 (D.N.M. 2020)(Browning, J.), aff'd Legacy Church, Inc. v. Collins, 853 F. App'x 316 (10th Cir. 2021).

The Plaintiffs' primary argument that they have suffered irreparable harm is that they have suffered a Constitutional injury, and a "[v]iolation of constitutional rights per se constitutes irreparable injury." Motion ¶ 27, at 14. This argument lacks a sound basis, because -- as the Court describes above -- the Plaintiffs do not have a likelihood of success on their Second Amendment claim. See Logan v. Pub. Emps. Ret. Ass'n, 163 F. Supp. 3d 1007, 1030-31 (D.N.M. 2016)(Browning, J.)("The Plaintiffs have failed to show a substantial likelihood of success on their constitutional claims, so the Court cannot allow them a presumption of irreparable injury."); Fyock v. City of Sunnyvale, 25 F. Supp. 3d 1267, 1282 (N.D. Cal. 2014)(Whyte, J.)("As Plaintiffs base their entire irreparable harm argument on irreparable harm being presumed if they are likely to succeed on the merits, Plaintiffs fail to demonstrate that enforcement of the Sunnyvale law will cause them irreparable harm."), aff'd sub nom. Fyock v. Sunnyvale, 779 F.3d 991 (9th Cir. 2015).

Apart from their alleged Constitutional harm, the Plaintiffs assert that the Waiting Period Act forces them to wait an additional week to purchase firearms. See FOF ¶¶ 24, 32, at 6-7. This harm is insufficient to qualify as irreparable harm, which the Tenth Circuit advises "must be both

certain and great," and not "merely serious or substantial." <u>Prairie Band of Potawatomi Indians v.</u>
<u>Pierce</u>, 253 F.3d at 1250.  As the Defendants highlight, the Plaintiffs both already own multiple
firearms, a fact that "supports the inference that" the Plaintiffs' ability to defend themselves "with
a firearm would not be hampered by the waiting period." <u>Rocky Mountain Gun Owners v. Polis</u>,
2023 WL 8446495, at *20.  <u>See id.</u> ("Ms. Garcia's possession of numerous other firearms (ten to
twenty by her account) supports the inference that her ability to defend herself with a firearm
would not be hampered by the waiting period."); <u>Oregon Firearms Fed'n, Inc. v. Brown</u>, 644 F.
Supp. 3d 782, 812 (D. Or. 2022)(Immergut, J.)("Nothing in the permit-to-purchase scheme would
make it impossible for Plaintiffs to use their pre-existing firearms for self-defense . . . ."), <u>appeal</u>
<u>dismissed</u>, No. 22-36011, 2022 WL 18956023 (9th Cir. Dec. 12, 2022).  Moreover, the Plaintiffs
were able to take possession of their firearms after a brief delay.  <u>See</u> FOF ¶¶ 24, 32, at 6-7.
Accordingly, the Plaintiffs have not carried their burden to demonstrate that they are likely to
suffer irreparable harm absent the requested relief.

## III.   THE BALANCE OF THE EQUITIES WEIGHS IN THE DEFENDANTS' FAVOR AND AN INJUNCTION IS NOT IN THE PUBLIC INTEREST.

The third and fourth <u>Winter</u> factors "assess[] the harm to the opposing party and weigh[]
the public interest." <u>Nken v. Holder</u>, 556 U.S. at 435.  To determine whether the "balance of
equities tips in [the movant's] favor," <u>Winter</u>, 555 U.S. at 20, the court must assess whether the
"threatened injury outweighs any injury to [non-movants] caused by granting the injunction,"
<u>Awad v. Ziriax</u>, 670 F.3d 1111, 1131 (10th Cir. 2012).  Whether the preliminary injunction is in
the public's interest, "is another way of inquiring whether there are policy considerations that bear
on whether the order should issue."  11A C. Wright & A. Miller, Fed. Prac. & Proc. Civ. § 2948.4.

These final two <u>Winter</u> factors "merge when the Government is the opposing party." <u>Nken v. Holder</u>, 556 U.S. at 435.

At the outset, the Plaintiffs argue that the Court should decline to apply the third and fourth <u>Winter</u> factors, because balancing the harms and weighing the public's interest involves the same type of interest-balancing prohibited by <u>Bruen</u>. <u>See</u> Motion at 16 ("[E]ven if the Act did further an important policy goal, that fact would be irrelevant under <u>Bruen</u>."). To be sure, the Supreme Court in <u>Bruen</u> expressly prevents the Court from considering, for example, the increasing number of murders and suicides committed with firearms in New Mexico and throughout the United States in assessing whether a firearm restriction is unconstitutional under the Second Amendment. <u>See</u> <u>Bruen</u>, 597 U.S. at 22-23. The consideration "[w]hether a preliminary injunction should be entered relating to the time period before a final determination on constitutionality is made, however, is a different question for which the public interest must expressly be considered." <u>Md. Shall Issue, Inc. v. Montgomery Cnty.</u>, 680 F. Supp. 3d 567, 594 (D. Md. 2023)(Chuang, J.)(citing <u>Winter</u>, 555 U.S. at 20, 26). <u>See</u> <u>Kipke v. Moore</u>, 695 F. Supp. 3d 638, 663 (D. Md. 2023)(Russell, J.)("<u>Bruen</u> did not consider whether a preliminary injunction should be granted, and thus it did not apply the test established in <u>Winter</u>, . . . which requires this Court to consider the public interest in determining whether to temporarily enjoin enforcement of a law."). The Honorable Lawrence VanDyke, United States Circuit Judge for the Ninth Circuit, recently confirmed the assessment that <u>Bruen</u>'s admonition that interest balancing is inappropriate when assessing whether the Second Amendment right has been infringed in no way alters a court's duty to balance the equities and consider the public interest under <u>Winter</u>. <u>See</u> <u>Baird v. Bonta</u>, 81 F.4th at 1044. While Judge VanDyke recognized that "<u>Bruen</u> obviously affects the first <u>Winter</u> factor," he also advised that "under <u>Winter</u>'s well-settled standards -- which apply to Second Amendment claims like any other

constitutional claim -- courts consider all of the <u>Winter</u> factors and assess irreparable harm and the

public interest . . . ."  <u>Baird v. Bonta</u>, 81 F.4th at 1044.  The Court agrees with Judge VanDyke

that "<u>Bruen</u> did not change [<u>Winter</u>'s] multifactor preliminary injunction test," and that ignoring

the public's interest and the harm that may result should a firearm regulation be enjoined would

ignore the Supreme Court's demand that courts consider these factors in assessing a request for a

TRO and PI.  <u>Baird v. Bonta</u>, 81 F.4th at 1042.

      Having concluded that proceeding to assess the third and fourth <u>Winter</u> factors is proper,

the Court "'must balance the competing claims of injury and consider the effect of granting or

withholding the requested relief,'" paying "'particular regard for the public consequences in

employing the extraordinary remedy of injunction.'"  <u>Winter</u>, 555 U.S. at 24 (quoting <u>Amoco Prod.</u>

<u>Co. v. Vill. of Gambell</u>, 480 U.S. 531, 542 (1987), and then <u>Weinberger v. Romero-Barcelo</u>, 456

U.S. 305, 312 (1982)).  Accordingly, the Court balances the burden that the seven-day delay

imposes on the Plaintiffs should they chose to purchase another firearm against the harm to the

public that may result should the Waiting Period Act be enjoined.  As with their irreparable harm

inquiry, the Plaintiffs' primary argument is that the final two <u>Winter</u> factors tilt "decisively in their

favor, because 'public interest concerns are implicated when a constitutional right has been

violated, [and] all citizens have a stake in upholding the Constitution.'"  Motion at 15 (quoting

<u>Baird v. Bonta</u>, 81 F.4th at 1042).  Again, there being no likelihood of success on the merits, this

argument is wanting.  <u>See</u> <u>Rocky Mountain Gun Owners v. Polis</u>, 2023 WL 8446495, *21.

      The "threatened injury" the Plaintiffs must therefore rely on is the temporary delay in the

purchase of firearms.  <u>Awad v. Ziriax</u>, 670 F.3d at 1131.  On the other hand, the Defendants have

a substantial interest in enforcing validly enacted statutes.  <u>Maryland v. King</u>, 567 U.S. 1301, 1303

(2012).  More to the point, the Defendants have a concrete interest in protecting the people of New

Mexico from gun violence. Dahl v. HEM Pharms. Corp., 7 F.3d 1399, 1404 (9th Cir. 1993)("Public safety should be considered by a court when granting equitable relief."); Fyock v. City of Sunnyvale, 25 F. Supp. 3d at 1283 ("[B]ecause gun violence threatens the public at large, the court balances the public's interest in preserving its constitutional rights against the public's interest in preventing gun violence."). As the Plaintiffs provide, firearm-related homicides and suicides in the United States have risen to unprecedented levels in recent years. See Response at 2 ("In 2022, the most recent year for which complete data is available from the Centers for Disease Control and Prevention, 48,204 people died from gun-related injuries in the United States -- more gun-related deaths than in any other year on record aside from the previous year."); FOF ¶ 34, at 7. In New Mexico, the "situation is worse," with gun deaths climbing significantly in the last few years, "with the age-adjusted gun death rate increasing by 87% between 2010 and 2021." Response at 3. See FOF ¶¶ 35-36, at 7-8; Response at 3 ("[T]here was a 70% increase in homicides with a firearm from 2018 to 2021.").

The Defendants adduce significant evidence that waiting period laws may help reduce this tidal wave of gun violence. See Response at 19 n.17 (listing studies); FOF ¶¶ 41-42, at 8-9. For example, the Defendants identify a peer-reviewed study which concluded that "waiting periods reduce gun homicides by roughly 17%." Michael Luca, Deepak Malhotra & Christopher Poliquin, Handgun Waiting Periods Reduce Gun Deaths, 114 Proc. Nat'l Acad. Sci. 12162, 12162 (2017). Given that 218 homicides were committed with firearms in New Mexico in 2022, the Waiting Period Act stands to save the lives of approximately thirty-seven New Mexicans per year, not including those who may be prevented by the Waiting Period Act from committing suicide with a firearm. See FOF ¶¶ 43-44, at 9. On balance, therefore, the harm that the Defendants stand to suffer if the Court were to enjoin the Waiting Period Act -- e.g., the loss of New Mexican lives --

significantly outweighs the Plaintiffs threatened injury -- i.e., a temporary delay in the process of purchasing any additional firearms they seek to buy.  See Awad v. Ziriax, 670 F.3d at 1131. Moreover, the public's interest in the preservation of dozens New Mexican lives cannot be understated.  See Rocky Mountain Gun Owners v. Polis, 2023 WL 8446495, at *22 ("[S]aving approximately one hundred people in Colorado this year outweighs the aggregate harm of minimal expenditures of time and sacrificed business opportunities.").  Accordingly, the Plaintiffs have "not shown that the threatened injury outweighs the harms that the preliminary injunction will cause the government or that the injunction, if issued, will not adversely affect the public interest." Aposhian v. Barr, 958 F.3d at 990.  In conclusion, the Court denies the Plaintiffs request for a TRO and PI, because: (i) the Plaintiffs have not demonstrated a likelihood of success on the merits; (ii) the Plaintiffs have not shown that they are likely to experience irreparable harm absent a TRO or PI; and (iii) the balance of the equities and the public interest weigh against granting the Plaintiffs' request for a TRO and PI.

**IT IS ORDERED** that the Plaintiffs' Motion for Temporary Restraining Order and Preliminary Injunction, filed May 15, 2024 (Doc. 2), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Joseph Greenlee
Erin M. Erhardt
National Rifle Association of America
McCall, Idaho

-- and --

Carter B. Harrison, IV
Harrison & Hart, LLC
Albuquerque, New Mexico

-- and --

Donald S. Nation
Michael McCoy
Robert A. Welsh
Mountain States Legal Foundation
Lakewood, Colorado

  *Attorneys for the Plaintiffs*

Holly Agajanian
 Chief General Counsel to Governor Michelle Lujan Grisham
Kyle P. Duffy
 Associate General Counsel to Governor Michelle Lujan Grisham
Office of the Governor
Santa Fe, New Mexico

  *Attorneys for Defendant Michelle Lujan Grisham*

Raúl Torrez
 Attorney General for the State of New Mexico
Billy J. Jimenez
Mark W. Allen
 Assistant Attorneys General
New Mexico Department of Justice
Santa Fe, New Mexico

  *Attorneys for Defendant Raúl Torrez*