**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

      **Plaintiffs,**

**vs.**                                                                          **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her**
**official capacity as Governor of the State of**
**New Mexico, and RAÚL TORREZ, in his**
**official capacity as Attorney General of the**
**State of New Mexico,**

      **Defendants.**

**<u>DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT</u>**

Governor Michelle Lujan Grisham and Attorney General Raúl Torrez (collectively, "Defendants"), by and through their respective counsel of record, hereby submit their motion for summary judgment. As grounds for this motion, Defendants state as follows:

**INTRODUCTION**

Faced with historic levels of gun violence, New Mexico enacted a commercial regulation requiring firearm purchasers who have not availed themselves of the State's shall-issue licensing regime to wait seven days before acquiring newly purchased firearms. Such waiting periods are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, 'law abiding, responsible citizens,'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 38 n.9 (2022), as demonstrated by studies showing a significant reduction in impulsive gun suicides and homicides following their enactment. This Court should reject Plaintiffs' effort to nullify New Mexico's common-sense, life-saving regulation.

Plaintiffs' Second Amendment challenge stumbles out of the gate under *Bruen* step one. Courts nationwide (including this Court) have recognized the Second Amendment protects the right to "keep" and "bear" arms—not the right to obtain new firearms instantaneously—and a short delay on a commercial transfer does not meaningfully constrain conduct protected by the Second Amendment's plain text. Relatedly, New Mexico's waiting period is a presumptively lawful condition or qualification on the commercial sale of arms under *Heller* and binding Tenth Circuit precedent because it "regulates . . . selling and purchasing firearms." *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 120 (10th Cir. 2024) (*RMGO*). Nor can Plaintiffs overcome the law's presumptive constitutionality since it: (1) sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers; (2) it is aimed at ensuring guns are held by law-abiding, responsible persons; and (3) a significant number of jurisdictions have adopted similar laws.

Although a divided panel of the Tenth Circuit has rejected these arguments, its preliminary ruling does not control here. Its analysis runs headlong into *RMGO*, which held that a Colorado law requiring virtually all 18- to 20-year-olds to wait years to purchase a firearm was a presumptively lawful commercial regulation and did not employ abusive ends. 121 F.4th 96. With all due respect to the panel here, there is no principled way to reconcile its decision with *RMGO*. This Court is not bound to perpetuate this clear error; it should apply earlier, settled precedent to reaffirm its initial decision finding the waiting period likely constitutional.

Even if analysis proceeded to *Bruen* step two, the waiting period fits comfortably within the principles that define our historical tradition. Legislatures have long imposed temporary, preventive measures—through intoxication laws, licensing regimes, group-based restrictions, and surety laws—to mitigate foreseeable risks before they materialize. And while the divided panel

here (erroneously) rejected some of these historical analogues, the Tenth Circuit has since relied on similar laws disarming Catholics and loyalists to "reveal [a] key principle underpinning our Nation's history of firearm regulation: legislatures may disarm those believed to pose a risk of future danger," *United States v. Harrison*, 153 F.4th 998, 1021-32 (10th Cir. 2025)—a conclusion consistent with this Court's initial one. Nor was the panel here presented with all the historical laws now before the Court. Accordingly, this Court may reaffirm its preliminary decision finding the waiting period consistent with history and tradition.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### I.    Gun violence in the United States and New Mexico

1.    The rate of firearm-related deaths in our nation has been rising and reached a near three-decade high in 2021. *See Firearm Violence: A Public Health Crisis in America* 6, Off. of the U.S. Surgeon General (2024).

2.    In 2022, 48,204 people died from gun-related injuries in the United States—the second highest total ever recorded. *Id.* at 3. This represents over 8,000 more deaths than in 2019 and over 16,000 more deaths than in 2010. *Id.*

---

[1] Defendants do not discuss the historical analogues in this section, as they are legal authorities rather than factual matters subject to dispute. *See Baird v. Bonta*, 709 F. Supp. 3d 1091, 1100 (E.D. Cal. 2023) (taking judicial notice of historical analogues), *aff'd in part, rev'd in part and remanded*, 163 F.4th 723 (9th Cir. 2026); *cf. United States v. Mitchell*, 160 F.4th 169, 189 (5th Cir. 2025) (stating that the government may raise new historical analogues on appeal because they "provide additional legal support").

3.      The level of gun violence has remained elevated since. For example, 46,728 people died from gun-related injuries in the United States in 2023,[2] and 44,447 people died from gun-related injuries in the United States in 2024.[3]

4.      Approximately half of these individuals died from firearm suicides. *See Firearm Violence*, *supra*, at 6; Kim, *supra* note 3, at 2; Johns Hopkins, *supra* note 4.

5.      Most suicides committed with firearms are impulsive acts that are contemplated for less than 24 hours prior.[4]

6.      Since 2020, firearm-related injury has been the leading cause of death for U.S. children and adolescents. *Firearm Violence*, *supra* note 1 at 3; Johns Hopkins, *supra* note 4.

7.      Over the past two decades, New Mexico's gun death rates rose from seventh highest nationwide in 1999 to *third highest* in 2022, with the age-adjusted gun death rate increasing by 87% between 2010 and 2021.[5] Much of this increase has happened within the past few years. For example, there was a 70% increase in homicides with a firearm from 2018 to 2021, and the number of patients in New Mexico's trauma centers with gun injuries has increased by 39% between 2019 and 2022. *See id.* at 4-5, 7.

---

[2] Rose Kim et al., *Gun Violence in the United States 2023: Examining the Gun Suicide Epidemic* 2, Johns Hopkins Bloomberg School of Public Health (2025), https://publichealth.jhu.edu/sites/default/files/2025-06/2023-cgvs-gun-violence-in-the-united-states.pdf.

[3] *Firearm Violence in the United States*, Johns Hopkins Bloomberg School of Public Health (2025), https://publichealth.jhu.edu/center-for-gun-violence-solutions/issues/gun-violence-in-the-united-states (last visited Apr. 2, 2026).

[4] *Duration of Suicidal Crises*, Harvard Sch. of Pub. Health, https://hsph.harvard.edu/research/means-matter/means-matter-basics/duration-of-suicidal-crises/ (last visited Apr. 2, 2025).

[5] *Comprehensive Report on Gunshot Victims Presenting at Hospitals in New Mexico* 5, N.M. Dep't of Health (2023), https://www.nmhealth.org/publication/view/report/8463/.

8.      Although New Mexico's gun violence rates have decreased slightly in the past couple years, they remain significantly high compared to the rest of the country. In 2023, New Mexico had the fourth highest overall gun death rate in 2023, with 530 New Mexicans dying from gun-related injuries.[6]

## II.    New Mexico's enactment of the waiting period

9.      In early 2024, the New Mexico Legislature introduced House Bill 129, which sought to impose a waiting period on the sale of firearms. *See* H.B. 129, 56th Leg., 2nd Sess. (N.M. 2024).

10.     House Bill 129 addressed two primary issues: (1) preventing impulsive firearm homicides and suicides and (2) closing or narrowing the "Charleston loophole" in which firearm purchasers can receive a firearm without completing a federal background check should the background check results not come back within three business days.[7]

11.     After undergoing a series of changes during the legislative session, the Legislature passed House Bill 129 on February 12, 2024.[8]

12.     Subject to certain exceptions, the final version of House Bill 129 makes it unlawful for any seller to "transfer of ownership, possession or physical control of the firearm from the

---

[6] *Firearm Violence in the United States*, Johns Hopkins Bloomberg School of Public Health (2025), https://publichealth.jhu.edu/center-for-gun-violence-solutions/data/state-gun-violence-data/new-mexico (last visited Apr. 2, 2026).

[7] *House Consumer Affairs*, at 2:52 p.m., N.M. Leg., https://bit.ly/4dJKUsC (statements of House Bill 129 sponsor, Representative Andrea Romero); *Fiscal Impact Report*, at 3-4, Leg. Fin. Comm. (Feb. 13, 2024), https://www.nmlegis.gov/Sessions/24%20Regular/firs/HB0129.PDF. The Court may consider House Bill 129's Fiscal Impact Report in determining legislative intent. *See Butkus v. Pub. Employees Ret. Ass'n*, 2024-NMCA-041, ¶ 14, 547 P.3d 758.

[8] *2024 Regular Session - HB 129*, N.M. Leg., https://www.nmlegis.gov/Legislation/ Legislation?Chamber=H&LegType=B&LegNo=129&year=24 (last visited May 16, 2024).

seller to the buyer before the end of the required seven-calendar day waiting period." H.B. 129 § 1(C).

13.     The waiting period may be extended up to a maximum of twenty calendar days if the seven calendar-day waiting period has expired without the completion of a required federal instant background check. *Id.* § 1(A).

14.     The Governor signed House Bill 129 on March 4, 2024, which was subsequently codified as NMSA 1978, Section 30-7-7.3 (2024), and became effective May 15, 2024. *See* N.M. Legislature, *supra* note 4; N.M. Const. art IV, § 23.

15.     In passing House Bill 129, New Mexico joined at least a dozen other states that require waiting periods for commercial firearms sales. *See* Cal. Penal Code § 26815(a); Colo. Rev. Stat. § 18-12-115; D.C. Code § 22-4508; Fla. Stat. § 790.0655(1)(a); Haw. Rev. Stat. § 134-2(a), (e); 720 Ill. Comp. Stat. 5/24-3(A)(g); Md. Code Ann., Pub. Safety, § 5-123(a); Minn. Stat. § 624.7132; N.J. Stat. Ann. § 2c:58-2(a)(5)(a); R.I. Gen. Laws § 11-47-35(a)(1), -35.2(a); Vt. Stat. Ann. tit. 13, § 4019a; Wash. Rev. Code § 9.41.092(2).

## III.    Effectiveness of waiting periods

16.     There is substantial evidence that waiting period laws cause large and statistically significant reductions in homicides. *See* [Doc. 20-2 at 5-6].[9]

---

[9] Although this declaration was originally filed in a lawsuit challenging California's waiting period, this Court may still rely upon it. *See Hernandez v. Lujan Grisham*, 494 F. Supp. 3d 1044, 1067 n.2 (D.N.M. 2020) (Browning, J.) (finding declarations filed in another court "persuasive"); *accord* Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 Proc. Nat'l Acad. Sci. 12162, 12162 (Nov. 2017), https://www.pnas.org/doi/epdf/10.1073/pnas.1619896114; *see also*, Darryl W. Roberts, *Intimate Partner Homicide: Relationships to Alcohol and Firearms*, 25 J. Contemp. Crim. Just. 67 (2009) (finding that states with a 2- to 7-day waiting period experience a 52.9% reduction in intimate partner homicide compared to states with no waiting period); Christoph Koenig and David Schindler, *Impulse Purchases, Gun Ownership, and Homicides: Evidence from a Firearm Demand Shock*, The Review of Economics and Statistics (2023)

17.    Notably, one peer-reviewed study concluded that "waiting periods reduce gun homicides by roughly 17%." *See* [Doc. 20-2 at 5]; Luca, *supra* note 9 at 12162. According to this study, states with waiting periods collectively avoid around 750 gun homicides a year. *See id.* This would amount to dozens of New Mexicans being saved every year. *See Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1096 (D.N.M. 2024), *rev'd and remanded*, 148 F.4th 1134 (10th Cir. 2025). This study also found that the reduction in gun homicides was not offset by non-gun homicides. *See* [Doc. 20-2 at 6]; Luca, *supra* note 9 at 12164.

18.    There is substantial evidence that waiting period laws also cause large and statistically significant reductions in suicides. *See* [Doc. 20-2 at 6-8].[10]

19.    According to RAND's meta-analysis of waiting period studies: "Nine studies assessed the relationship between waiting-period laws and suicides. Of the five methodologically stronger studies, all found reductions in suicides or firearm suicides, and these reductions were statistically significant in two studies."[11]

20.    According to one peer-reviewed study, "[w]aiting periods also lead to a 7-11% reduction in gun suicides." Luca, *supra* note 9 at 12163; *accord* [Doc. 20-2 at 6]. This is the equivalent of 22-35 fewer suicides per year for the average state." *Id.*

---

(concluding that waiting period laws "can substantially reduce homicides by preventing impulsive purchases").

[10] *See, e.g.*, Michael Anestis et al., *Handgun Legislation and Changes in Statewide Overall Suicide Rates*, 107 Am. J. of Pub. Health 579, 579-81 (2017); Bradley Kawano, et al., *Restrictive Firearm Laws and Firearm-Related Suicide*, 236 J. Am. College of Surgeons 37 (2023); Zachary Dunton, et al., *The Association Between Repealing the 48-Hour Mandatory Waiting Period on Handgun Purchases and Suicide Rates in Wisconsin*, 26 Archives Suicide Res. 1327 (2021).

[11] *The Effects of Waiting Periods*, RAND (Jan. 29, 2026), https://www.rand.org/research/gun-policy/analysis/waiting-periods.html.

## V.    Unprecedented societal concerns and dramatic technological changes

21.    In the modern era, gun and ammunition purchases can be made easily and rapidly from tens of thousands of licensed gun dealers, private sales, gun shows, and through internet sales. *See* [Doc. 15-1 at 6].

22.    No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. *Id.* In the eighteenth century, the vast majority of firearms available in America were European imports. *Id.*

23.    Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. *Id.*

24.    The rise of handgun mail order purchasing through such companies as Montgomery Ward and Sears in the 1870s and 1880s brought cheap handguns to buyers' doors. *Id.* When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry and other restrictions in the late 1800s and early 1900s. *Id.*

25.    No organized system of gun waiting periods and background checking could feasibly exist until the modern era. *Id.*

26.    Homicide rates were low "from the Glorious Revolution of 1688-1689 through the French and Indian War of 1754-1763, thanks to political stability, a surge in patriotic fellow feeling within the British empire, and greater trust in government." [Doc. 15-7 at 10].

27.    Although household ownership of firearms was common, "the impact of firearms on the homicide rate was modest[.]" *Id.* at 11.

28.     When homicides occurred, guns were seldom used because of the time involved loading them and their unreliability. *Id.* at 12. "[M]uzzle-loading firearms, such as muskets and fowling pieces, had significant limitations as murder weapons in the colonial era" because they were liable to misfire, could not fire multiple shots without reloading, and time consuming to load, requiring "at least half a minute (and plenty of elbow room) to load a muzzle-loader if the weapon was clean and if powder, wadding, and shot or ball were at hand." *Id.*

29.     Nearly all firearms at the time were single shot weapons, meaning that reloading time rendered them all but useless if a second shot was needed in an interpersonal conflict. *Id.* at 12, 23.

30.     Family and household homicides were committed "almost exclusively with hands and feet or weapons that were close to hand: whips, sticks, hoes, shovels, axes, or knives." *Id.* at 12. "Guns were not the weapons of choice in homicides that grew out of the tensions of daily life." *Id.*

31.     Overall, only 10-15% of homicides were committed with a firearm around the time of the founding. *See id.* at 11.

32.     At the time of the nation's founding, suicides—and especially gun suicides—were rare. *See id.* at 45.

33.     A historical analysis of suicide in Vermont and New Hampshire from 1783-1824, reveals that the suicide rate was "remarkabl[y] low by today's standards" and that only 6 percent of suicides were committed with firearms, despite 50 to 60 percent of households owning a firearm. *Id.* Most suicides involved hanging, drowning, or cutting. *See id.*

34.     Muzzle-loading firearms were not the preferred means for committing impulsive suicides or homicides. *Id.* at 45-46.

35.     At the Founding, suicide was viewed as "an immoral act against God" and criminalized by the American colonies. *See* [Doc. 20-1 at 7-9]; *Hernandez*, 494 F. Supp. 3d at 1067 n.2.

36.     Founding era governments did not view reducing access to suicidal means to be a primary part of suicide prevention. *See* [Doc. 20-1 at 10].

37.     At the Founding era, the law's treatment of suicide was focused on after-the-fact criminal punishment. *See id.* at 5, 8-9.

38.     Today, suicide is understood as a manifestation of medical and psychological anguish. *See id.* at 17; Eric Ruben, *Scientific Context, Suicide Prevention, and the Second Amendment After* Bruen, 108 Minn. L. Rev. 3121, 3138 (2024).

39.     Beginning in the twentieth century, studies have shown that limiting access to suicidal means brings down suicide rates. *See* [Doc. 20-1 at 17-22].

40.     As Professor Ruben wrote, public health researchers Deborah Azrael and Matthew Miller explain that the understanding that:

> [R]estricting access to a highly lethal method can save lives rests on three well-established observations. . . . First, many suicidal crises are fleeting. . . . Second, the method people use in suicidal acts depends, to a vital extent, on the method's ready availability, over and above—and perhaps even independent of—the attempter's assessment of a method's intrinsic lethality. . . . Third, the prognosis if one survives a suicide attempt is excellent. . . . [F]ewer than 10% of people who attempt suicide and live later go on to die by suicide.

*Id.* at 20-21.

41.     Today, firearms are the most used suicide method in United States suicides, despite being used in a relatively small proportion of suicide attempts. *See id.* at 20-21.[12]

---

[12] *See also Suicide Data and Statistics*, Ctrs. for Disease Ctr. & Prevention, https://www.cdc.gov/suicide/facts/data.html (last visited Apr. 3, 2026) (stating that firearms are the most common method of suicide).

VII.    **Plaintiffs**

42.    Plaintiffs Samuel Ortega and Rebecca Scott are both law-abiding, adult residents of New Mexico. [Doc. 2-2 at ¶¶ 1-2; Doc. 2-3 at ¶¶ 1-2]

43.    Neither Plaintiff is a federal firearms licensee, holds a New Mexico concealed handgun license, or is a law-enforcement officer, and therefore, neither Plaintiff qualifies for any of the statutory exemptions to Section 30-7-7.3. [Doc. 2-2 at ¶ 3; Doc. 2-3 at ¶ 3]

44.    Both Plaintiffs maintain personal collections of firearms, including weapons they identify as used for self-defense. [Doc. 2-2 at ¶ 4; Doc. 2-3 at ¶ 4; Doc. 37 at 56-57, 59-60, 75-76, 79]

45.    On May 15, 2024, both Plaintiffs went to licensed firearms dealers in New Mexico for the purpose of purchasing specific handguns. [Doc. 2-2 at ¶ 5; Doc. 2-3 at ¶ 5]

46.    Both Plaintiffs successfully completed and passed federal National Instant Criminal Background Check System background checks authorizing them to proceed with their respective firearm purchases. [Doc. 2-2 at ¶ 6; Doc. 2-3 at ¶ 6]

47.    Although both Plaintiffs had to wait to acquire their then-newly purchased firearms, both have since taken possession of their firearms. [Doc. 2-2 at ¶¶ 7-8; Doc. 2-3 at ¶¶ 7-8; Doc. 37 at 65, 83-84]

48.    While Plaintiffs generally intend to expand their firearm collections, they do not have any specific plans to purchase additional firearms at this time. [Doc. 37 at 67, 87; *see generally* Doc. 2-2; Doc. 2-3]

## PROCEDURAL BACKGROUND

On May 15, 2024, Plaintiffs—two individuals who own multiple guns—filed the instant action against the Governor and Attorney General, claiming Section 30-7-7.3's seven-day waiting

period violates the Second Amendment. [Doc. 1] In addition to seeking declaratory and permanent injunctive relief, Plaintiffs filed a request for temporary restraining order and preliminary injunction. [Doc. 2] The Court denied Plaintiffs' motion for preliminary injunctive relief after receiving briefing and holding a hearing, finding that Section 30-7-7.3 likely does not violate the Second Amendment because: (1) the Second Amendment's plain text does not cover the purchase and acquisition of firearms, and a seven-day waiting period did not arise to the level of a functional prohibition on the right to "keep" and "bear" arms; (2) Section 30-7-7.3 is a presumptively constitutional condition or qualification on the commercial sale of firearms, and Plaintiffs have failed to rebut that presumption; and (3) Section 30-7-7.3 is consistent with our nation's historical tradition of firearm regulations. *See Ortega*, 741 F. Supp. 3d 1027.

Plaintiffs appealed, and a divided panel reversed and remanded to this Court to enter a preliminary injunction. *See Ortega v. Lujan Grisham*, 148 F.4th 1134 (10th Cir. 2025). Given numerous issues with the decision, including an irreconcilable conflict with *RMGO*, 121 F.4th 96, Defendants sought en banc review. However, a majority of the active judges denied the request for unspecified reasons. *See Ortega v. Lujan Grisham*, 162 F.4th 1056 (10th Cir. 2025). Judges Federico and Moritz filed a written dissent from the denial of rehearing en banc, explaining:

> Today's decision to deny en banc review is wrong for three reasons. First, it discards the exceptionally important public safety issues that surround New Mexico's firearms regulation . . . . Second, it ignores the tension between this case and our prior decision in [*RMGO*]. Third, it relies too heavily on the possibility that the Supreme Court will grant review in a pending petition for certiorari, and therefore overlooks several discretionary factors that militate in favor of our own en banc review.

*Id.* at 1057. This Court subsequently entered a preliminary injunction enjoining Defendants "from implementing and/or enforcing against Plaintiff Samuel Ortega and Plaintiff Rebecca Scott the provisions of N.M. Stat. § 30-7-7.3 . . . , which the United States Court of Appeals for the Tenth

Circuit has determined to be unconstitutional as it pertains to individuals who have passed a background check." [Doc. 97] Shortly after, the parties agreed to forego more discovery and proceed to filing cross motions for summary judgment, using the evidence submitted at the preliminary injunction stage. [Docs. 102, 106]

## DISCUSSION

### I.   Standard of review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if, under the governing law, it could have an effect on the outcome of the lawsuit." *Smothers v. Solvay Chems., Inc.*, 740 F.3d 530, 538 (10th Cir. 2014) (cleaned up). "A dispute over a material fact is genuine if a rational jury could find in favor of the nonmoving party on the evidence presented." *Id.* (cleaned up).

### III.   Section 30-7-7.3 does not violate the Second Amendment

#### A.   *Bruen* step one

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *Bruen*, the United States Supreme Court adopted a new two-part test for Second Amendment claims in which the challenger must first demonstrate that "the Second Amendment's plain text covers an individuals' conduct." 597 U.S. at 2129-30. If "the challenged law regulates activity falling outside the scope of the right as originally understood . . . the analysis can stop there; the regulated activity is categorically unprotected." *Bruen*, 597 U.S. at 18. But if the plain text does apply to the proposed course of conduct, "the burden then shifts to the government to justify its regulation by demonstrating that it is 'consistent with the *principles* that

13

underpin our' Nation's historical tradition of firearm regulation." *RMGO*, 121 F.4th at 113 (quoting *Rahimi*, 144 S. Ct. at 1898).

Of course, the right protected by the Second Amendment is "not unlimited." *Heller*, 554 U.S. at 595. "[I]ndividual self-defense is 'the central component' of the Second Amendment right." *McDonald v. City of Chicago*, 561 U.S. 742, 767 (2010) (quoting *Heller*, 554 U.S. at 599) (emphasis omitted). Accordingly, the *Heller* Court stated that its decision should not be read to "cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27; *accord McDonald*, 561 U.S. at 786 (repeating *Heller*'s assurances). Such laws are "presumptively lawful regulatory measures." *See Heller*, 554 U.S. at 627 n.26. As such, they "do not implicate the plain text of the Second Amendment." *RMGO*, 121 F.4th at 120.

> **1.** **Section 30-7-7.3 does not infringe on conduct protected by the Second Amendment's plain text**

"At step one, the plaintiff is tasked with establishing that the Second Amendment's explicit text, 'as informed by history,' encompasses the conduct they seek to engage in." *RMGO*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 17). In making this determination, courts must give the text its "[n]ormal meaning . . . [as] known to ordinary citizens in the founding generation." *Id.* (quoting *Heller*, 554 U.S. at 576-77). "To aid in interpreting the plain text, the challenger may consult 18th century dictionaries and treatises, utilize corpus linguistics, put forth historical sources such as the Federalist and Anti-Federalist Papers, ratification debates, and writings of the framers, examine early American court cases, and refer to English common law." *Id.* Additionally, precedent providing insight on the plain text, even if not from early American history, "may be authoritative[.]" *Id.*

Plaintiffs do not, and cannot, demonstrate that the waiting period regulates conduct protected by the plain text of the Second Amendment. As this Court has noted, the waiting period by its express terms only applies to the "sale" and "transfer" of firearms. *Ortega*, 741 F. Supp. 3d at 1075 n.7. Unlike the laws at issue in *Heller*, *McDonald*, *Bruen*, and *Rahimi*, the waiting period does not make possession of any weapon illegal, does not deprive anyone of their firearms, and places no limits on the firearms that are kept by anyone. That Plaintiffs may not possess the firearms they are purchasing for a few days as a result of the law does not, *ipso facto*, mean it infringes upon the Second Amendment's plain text protection of "keeping" and "bearing" arms. Otherwise, any law regulating commerce generally would be subject to *Bruen*'s historical review if it creates any delay on a person's ability to possess or use a firearm, including shall-issue licensing regimes. *See Beckwith v. Frey*, --- F. 4th ---, 2026 WL 914624, at *6 (1st Cir. Apr. 3, 2026) (rejecting identical argument in challenge to Maine's waiting period); *B & L Prods.*, 104 F.4th at 118 n.19; *see also Bruen*, 597 U.S. at 39 n.9 (recognizing that shall-issue licensing regimes "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right to public carry" (quoting *Heller*, 554 U.S. at 635)).

Instead, waiting period laws merely impose a brief delay on the transfer of a commercially sold firearm to the purchaser. In other words, the conduct regulated by New Mexico's waiting period is the acquisition of commercially sold firearms. More specifically, the conduct regulated is the acquisition of commercially sold firearms *without delay*. Thus, the question is: does the plain text of the Second Amendment cover acquiring or purchasing firearms, and if so, does it cover the *immediate* acquisition of commercially sold firearms? The answer is no.

As the Supreme Court in *Heller* noted, the 1773 edition of Samuel Johnson's dictionary defined "keep" as, "most relevantly, '[t]o retain; not to lose,' and '[t]o have in custody.'" 554 U.S.

15

at 581 (quoting 1 Dictionary of the English Language 1095 (4th ed.) (reprinted 1978)), and the 1828 edition of Webster's American Dictionary of the English Language defined "keep" as "[t]o hold; to retain in one's power or possession," *id.* (quoting N. Webster, American Dictionary of the English Language (1828) (reprinted 1989)). Other dictionaries at the time are in accord. *See, e.g.*, Thomas Sheridan, A Complete Dictionary of the English Language (6th ed.1796) (defining "to keep" as "[t]o retain; to have in custody"). Thus, the most natural reading of the phrase "keep arms," as known to ordinary citizens in the founding generation, is to retain arms. And the phrase "bear arms" "has a meaning that refers to carrying for a particular purpose – confrontation." *Heller*, 554 U.S. at 584.

Given the foregoing, it is no surprise that courts across the country (including this Court) have concluded that the Second Amendment's plain text does not encompass the purchase or acquisition of new firearms. *See McRorey v. Garland*, 99 F.4th 831, 838 (5th Cir. 2024) ("[O]n its face 'keep and bear' does not include purchase[.]"); *B & L Prods.*, 104 F.4th at 117 ("On its face, that language says nothing about commerce[.]"); *Nat'l Rifle Ass'n v. Bondi*, 61 F.4th 1317, 1324-25 (11th Cir. 2023) ("[T]he Second Amendment's plain text includes only a right 'to keep and bear arms,' not a right to buy them."), *reh'g en banc granted, opinion vacated*, 72 F.4th 1346 (11th Cir. 2023); *RMGO*, 701 F. Supp. 3d at 1133; *accord Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211, 222 (4th Cir. 2024) (en banc) (holding "that non-discretionary 'shall-issue' licensing laws are presumptively constitutional and generally do not 'infringe' the Second Amendment right to keep and bear arms under step one of the *Bruen* framework"); *Mills v. N.Y.C.*, 2024 WL 4979387, at *9 (S.D.N.Y. Dec. 4, 2024) ("[N]othing in the text of the Second Amendment suggests that plaintiffs have a right to immediately obtain firearms 'on demand' as opposed to having to wait a short period of time."). Indeed, the First Circuit just recently agreed with this principle in preliminarily

16

upholding Maine's waiting period. *See Beckwith*, 2026 WL 914624, at *6 ("We agree . . . that laws regulating the purchase or acquisition of firearms do not target conduct covered by the Second Amendment's 'plain text.'").

History confirms this to be the case. The Supreme Court recognized in *McDonald* that "King George III's attempt to *disarm* the colonists in the 1760's and 1770's 'provoked polemical reactions by Americans invoking their rights as Englishmen to keep arms.'" 561 U.S. at 768 (quoting *Heller*, 554 U.S. at 594)) (emphasis added). And the Court explained in *Rahimi* that "[t]he spark that ignited the American Revolution was struck at Lexington and Concord, when the British governor dispatched soldiers to *seize* the local farmers' arms and powder stores," and highlighted language from "a leading and early proponent of emancipation," who expressed: "*Disarm* a community and you rob them of the means of defending life. *Take away* their weapons of defense and you take away the inalienable right of defending liberty." 144 S. Ct. at 1897 (quoting Cong. Globe, 40th Cong., 2d Sess., 1967 (1868) (statement of Rep. Stevens)) (emphases added). As this Court put it, "This history demonstrates why the Second Amendment's 'keep and bear' language focuses on retention rather than acquisition of arms." *Ortega*, 741 F. Supp. 3d at 1073 (quoting U.S. Const. amend. II.).

Of course, this does not mean that governments can evade the Second Amendment by simply prohibiting all citizens from purchasing or acquiring firearms indefinitely. As recognized by this Court, "unless the right to acquire firearms receives some Second Amendment protection, the right to keep and bear firearms would be meaningless." *Ortega*, 741 F. Supp. 3d at 1075 (quoting *B & L Prods.*, 104 F.4th at 118). Thus, courts should still inquire as to whether a restriction or condition on purchasing or acquiring firearms is so burdensome as to amount to "a de facto prohibition" or a "meaningful constrain[t]" on the right to keep and bear arms. *Id.* (quoting

17

*McRorey*, 99 F.4th at 839 n.18, and *B & L Prods.*, 104 F.4th at 119). This approach is entirely consistent with Supreme Court precedent, which recognizes that "laws imposing conditions and qualifications on the commercial sale of arms" are "presumptively lawful regulatory measures." *Heller*, 554 U.S. at 626-27 & n.26; *see also Bruen*, 597 U.S. at 81 (Kavanaugh, J., concurring). After all, any law that is "'presumptively lawful' . . . necessarily must not implicate the plain text of the Second Amendment. Otherwise, *Bruen* makes clear that the Constitution would "presumptively *protect*[] that conduct[.]" *B & L Productions*, 104 F.4th at 119 (quoting *Bruen*, 597 U.S. at 17); *see RMGO*, 121 F.4th at 120 (agreeing with this logic). The same law cannot be both presumptively constitutional and presumptively unconstitutional. And until the Supreme Court provides guidance on how to overcome this presumption of lawfulness, "requiring that a regulation meaningfully constrain the right to keep and bear arms for the purpose of self-defense faithfully tracks the Second Amendment's plain text." *B & L Prods.*, 104 F.4th at 119 (cleaned up).

As courts across the country (including this Court) have held: a short, objectively applied waiting period like the seven-day period imposed by New Mexico does not rise to the level of a functional prohibition or meaningful constraint on the right to keep and bear arms. *See Ortega*, 741 F. Supp. 3d at 1075-76; *see also McRorey*, 99 F.4th at 839 ("[T]here is some point at which a background check becomes so lengthy that it is 'put towards abusive ends' or subject to *Bruen*'s historical framework as a de facto prohibition on possession. But a period of 10 days does not qualify."); *Silvester v. Harris*, 843 F.3d 816, 827 (9th Cir. 2016) (concluding that "[t]he burden of the 10-day waiting period here, requiring an applicant to wait ten days before taking possession of

18

the firearm" does not "place[ ] a substantial burden on a Second Amendment right");[13] *Vermont Fed'n of Sportsmen's Clubs v. Birmingham*, 741 F. Supp. 3d 172, 209 (D. Vt. 2024) ("The objective nature of Vermont's law, combined with its relatively short period of delay, reveals that it does not unduly burden the protected right[.]").

Indeed, New Mexico's waiting period is significantly less burdensome than the shall-issue licensing regimes that the Supreme Court tacitly approved. *See Bruen*, 597 U.S. at 38 n.9 (stating that "nothing in our analysis should be interpreted to suggest the unconstitutionality of the 43 States' 'shall-issue' licensing regimes, . . . . which often require applicants to undergo a background check or pass a firearms safety course" (cleaned up)); *id.* at 80 (Kavanaugh, J., concurring) (stating that "shall-issue regimes may require a license applicant to undergo fingerprinting, a background check, a mental health records check, and training in firearms handling and in laws regarding the use of force, among other possible requirements"); *see also Maryland Shall Issue, Inc.*, 116 F.4th at 227 n.15 (rejecting argument that a potential two-week delay in taking possession of a handgun as a result of licensing regime was "so lengthy as to deny individuals their Second Amendment rights"). If the State can lawfully prohibit individuals from *ever* purchasing or carrying a firearm unless they pay a fee, pass a background check, mental health screening, and take a firearm safety course, certainly it can allow individuals to bypass most of these measures in return for waiting a few days to help "ensure only that those bearing arms in the jurisdiction are, in fact, 'law-abiding, responsible citizens.'" *Bruen*, 597 U.S. at 38 n.9 (quoting *Heller*, 554 U.S. at 635); *Beckwith*, 2026 WL 914624, at *7  (observing that Maine's waiting period "resembles 'shall-issue' licensing

---

[13] While *Silvester* was decided pre-*Bruen*, it is still good law to the extent its analysis focused on history and tradition. *See Bruen*, 597 U.S. at 19 (stating that the first step of the pre-*Bruen* framework "is broadly consistent with *Heller*, which demands a test rooted in the Second Amendment's text, as informed by history").

laws"); *see generally Coastal States Energy Co. v. Hodel*, 816 F.2d 502, 506 n.6 (10th Cir. 1987) ("The power to do the greater includes the power to do the lesser."). Given the minimal burden New Mexico's waiting period imposes, Plaintiffs cannot meet their burden under *Bruen* step one.

But even if the plain text *did* protect the purchase or acquisition of firearms as a general matter, it certainly does not protect the *immediate* acquisition of new firearms. *See Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 209; *Rocky Mountain Gun Owners v. Polis*, 701 F. Supp. 3d 1121, 1132 (D. Colo. 2023); *see generally United States v. Manney*, 114 F.4th 1048, 1052 (9th Cir. 2024) (rejecting effort to define conduct "at such a high level of generality"), *cert. denied*, 145 S. Ct. 1151 (2025). Plaintiffs present no historical evidence that the plain text of the Second Amendment was originally understood to guarantee the right to *immediately* acquire purchased firearms. To the contrary, Defendants have presented substantial evidence demonstrating that many states and localities enacted licensing requirements for owning or discharging firearms in the 18th and 19th centuries. *See* [Doc. 15-1 at 17-29]. And, as Professor Spitzer observed, "licensing by its nature thwarts any ability to acquire or use firearms on demand." *Id.* at 18. The Ninth Circuit has similarly explained:

> There is . . . nothing new in having to wait for the delivery of a weapon. Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time. Our 18th and 19th century forebears knew nothing about electronic transmissions. Delays of a week or more were not the product of governmental regulations, but such delays had to be routinely accepted as part of doing business.

*Silvester*, 843 F.3d at 827; *see also Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 213 ("There is substantial evidence in the record highlighting that instant availability of a wide variety of guns would not have been anticipated at the founding."); *RMGO*, 701 F. Supp. 3d at 1133 (concluding that "the Founders would not have expected instant, widespread availability of the

firearm of their choice"). Thus, it is clear "the Second Amendment's explicit text, 'as informed by history,' [does not] encompass[] the conduct [Plaintiffs] seek to engage in." *RMGO*, 121 F.4th at 113 (quoting *Bruen*, 597 U.S. at 17).

Given the above, the Court should reject Plaintiffs' Second Amendment challenge to Section 30-7-7.3 and grant summary judgment in Defendants' favor.

**2.      Section 30-7-7.3 is a presumptively constitutional commercial regulation, and Plaintiffs cannot overcome this presumption**

Putting aside any plain text argument, Plaintiffs' Second Amendment claim also fails at *Bruen*'s first step because New Mexico's waiting period is a lawful condition and qualification on the sale of arms. The Supreme Court has repeatedly emphasized that the right protected by the Second Amendment is "not unlimited." *Rahimi*, 144 S. Ct. at 1897 (quoting *Heller*, 554 U.S. at 626). Accordingly, the *Heller* Court stated that it should not be read to "cast doubt on . . . laws imposing conditions and qualifications on the commercial sales of arms." *Heller*, 554 U.S. at 626-27.[14] Such laws, the Court stated, are "presumptively lawful regulatory measures." *Id.* at 627 n.26. This "'presumptively lawful regulatory measures' language, first stated in *Heller* . . . remains good law." *RMGO*, 121 F.4th at 119.

New Mexico's waiting period is a presumptively constitutional law imposing conditions and qualifications on the commercial sales of arms. In *RMGO*, the Tenth Circuit held that a Colorado law setting 21 as the minimum age to purchase a firearm constitutes a presumptively lawful "age-based condition or qualification" on the commercial sales of arms because it "regulates . . . selling and purchasing firearms." 121 F.4th at 120; *see also United States v. Morgan*, 150 F.4th

---

[14] The Supreme Court use of the term "longstanding" in mentioning these laws has led to confusion as to whether only "longstanding" commercial regulations are presumptively constitutional. *See RMGO*, 121 F.4th at 121. However, the majority in *RMGO* rejected this approach as out-of-step with *Bruen* and difficult to administer. *See id.*

1339, 1344 (10th Cir. 2025) (stating that "[t]he challenged law [in *RMGO*] is 'an aged-based condition or qualification on the sale of arms' . . . because the law regulates the 'selling and purchasing [of] firearms,' and such 'commercial restrictions' are presumptively lawful" (quoting *RMGO*, 121 F.4th at 119-20, 122-27), *cert. denied*, 146 S. Ct. 907 (2025)). This begs the question: If a law that requires individuals to wait *years* before purchasing a firearm constitutes a presumptively lawful condition and qualification on the commercial sales of arms, then why wouldn't a targeted seven-day waiting period (applicable only to those who have not availed themselves of New Mexico's shall issue licensing regime) qualify as well? The obvious answer is that it does.

It comes as no surprise then that courts across the country (including this Court) have held that waiting periods are presumptively constitutional commercial regulations. *See Ortega*, 741 F. Supp. 3d at 1076-84 (concluding that Section 30-7-7.3 is a presumptively constitutional commercial regulation); *RMGO*, 701 F. Supp. 3d at 1136 ("Because [the challenged waiting-period law] imposes a condition on the commercial sale of a firearm, the Act is presumptively lawful under *Heller*[.]"); *accord Silvester*, 843 F.3d at 829 (Thomas, C.J., concurring) ("As a longstanding qualification on the commercial sale of arms under [*Heller*], a ten-day waiting period is presumptively lawful."). Indeed, the First Circuit just recently concluded as such regarding Maine's virtually identical three-day waiting period. *See Beckwith*, 2026 WL 914624.

In light of the foregoing, the only question is whether Plaintiffs can overcome the waiting period's presumptive constitutionality. They cannot. To overcome a law's presumptive constitutionality, a challenger must show that the law has "abusive ends." *RMGO*, 121 F.4th at 122 (citing *Bruen*, 597 U.S. at 38 n.9). In other words, the challenger must show that the law's purpose is wrongful or improper, as opposed to legitimate. *See id*. at 124. In *RMGO*, the Tenth Circuit held

22

that the Colorado law setting 21 as the minimum purchase age for firearms was not abusive because it imposed a nondiscretionary condition or qualification on the commercial sale of arms aimed at ensuring that guns are used by law-abiding, responsible persons. *Id.* at 122-23. In reaching this conclusion, the Court took note of the fact that many other states had similar minimum age laws, as well as evidence presented by the defendants demonstrating that those younger than 21 were more likely to use firearms irresponsibly given their lack of brain development and maturity. *See id.* at 126-27.

This Court should reach the same conclusion here. First, it is undisputed that the waiting period is objectively applied uniformly to all firearm purchasers who do not fit within an enumerated exception. *See* § 30-7-7.3; *Ortega*, 741 F. Supp. 3d at 1085. Second, Defendants have "adduce[d] significant evidence that waiting period laws may help reduce this tidal wave of gun violence." *Ortega*, 741 F. Supp. 3d at 1096. For example, one peer-reviewed study concluded that waiting periods reduce gun homicides by roughly 17%. *Id.* (citing Luca, *supra* note 9); *accord* UMF No. 17. And the State's chosen 7-day waiting period falls comfortably within the span of waiting periods enacted by jurisdictions across the nation. *See* UMF No. 15; *Ortega*, 121 F.4th at 1161 (Matheson, J., dissenting); *cf. RMGO*, 121 F.4th at 124 (noting that many other states set 21 as the minimum age to purchase a firearm or subset of firearms). Accordingly, it cannot be said that New Mexico's waiting period has "abusive ends." It is, therefore, constitutional without reference to *Bruen*'s second step. *See RMGO*, 121 F.4th at 127.

### 3.    The majority's preliminary decision in *Ortega* does not require a different result

Admittedly, the majority in *Ortega* rejected the foregoing arguments when it held that Plaintiffs were likely to succeed in their challenge to the waiting period and were entitled to a preliminary injunction. Normally, this would constitute the law of the case. *See Fish v. Schwab*,

23

957 F.3d 1105, 1140 (10th Cir. 2020); *but see, e.g.*, *Pitt News v. Pappert*, 379 F.3d 96, 104-05 (3d Cir. 2004) (Alito, J.); *McQueary v. Conway*, 614 F.3d 591, 599 (6th Cir. 2010). However, this does not mean that this Court is strictly bound by the *Ortega* majority's preliminary conclusions. "Unlike vertical stare decisis, . . . 'the [law of the case doctrine] is a flexible one that allows courts to depart from erroneous prior rulings, as the underlying policy of the rule is one of efficiency, not restraint of judicial power.'" *Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1046 (D.N.M. 2014) (Browning, J.) (quoting *Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 823 (10th Cir. 2007), *aff'd*, 813 F.3d 912 (10th Cir. 2015)). Thus, as this Court has explained, "[d]istrict courts [may] depart from an appellate court's ruling on the same case . . . when the decision was clearly erroneous and would work a manifest injustice." *Mocek*, 3 F. Supp. 3d at 1046 (quoting *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000)).

As relevant here, a panel's failure to follow binding precedent justifies a departure from the law of the case. *See, e.g.*, *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426-27 (3d Cir. 2008) (noting the court would not have to follow the law-of-the-case doctrine if a prior opinion clearly erred by disregarding binding precedent); *Pope v. Sec'y, Florida Dept. of Corr.*, 752 F.3d 1254, 1264 n.3 (11th Cir. 2014) ("[I]t would be manifestly unjust to apply to a material issue a legal principle that is clearly erroneous in light of binding authority."); *cf. Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996) ("[W]hen faced with an intra-circuit conflict, a panel should follow earlier, settled precedent over a subsequent deviation therefrom.").

Respectfully, the *Ortega* majority failed to follow binding precedent—justifying a departure from the law of the case here. In *RMGO*, the Tenth Circuit held that a law is a presumptively lawful commercial regulation if it regulates "sellers and purchasers," even though it applies uniformly to a large subset of the population and simply requires purchasers to wait. 121

F.4th at 119-20. That is precisely what the waiting period does. It follows that the *Ortega* majority was obligated to reach the same conclusion as *RMGO*. *See United States v. Baker*, 49 F.4th 1348, 1358 (10th Cir. 2022) (Holmes, J.) ("Unless and until the holding of a prior decision is overruled by the Supreme Court or by the en banc court, that holding is the law of this Circuit regardless of what might have happened had other arguments been made to the panel that decided the issue first." (cleaned up)); *see generally* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175, 1177 (1989) (explaining that courts must apply both the outcome and the mode of analysis of prior decisions).

The *Ortega* majority's reasoning is plainly incompatible with *RMGO*. First, the majority said the waiting period is not a presumptively lawful commercial regulation because it is "not tailored to commercial sales" since it is "imposed on many non-commercial transfers, while many commercial transfers are excluded." *Ortega*, 148 F.4th at 1146.[15] But, as Judge Matheson pointed out in his dissent, the same could be said (and *was* said) of the minimum age law in *RMGO*. *Id.* at 1158-59 (Matheson, J., dissenting); *see* Brief of Plaintiffs-Appellees at 19, *RMGO*, 121 F.4th 96 (arguing that the law was not a commercial regulation because it "prohibit[ed] non-commercial as well as commercial sales"). Both laws apply to private sales, and both laws exclude gifts and sales to federally licensed firearm dealers and law enforcement. So, how is one presumptively constitutional and the other not? The majority could not say.

The *Ortega* majority also asserted the waiting period "is not a condition because it cannot be met by any action, and it is not a qualification because it is universally applicable." *Id.* at 1147.

---

[15] As Judge Federico later pointed out, the majority's examples of hypothetical "non-commercial conduct," such as "a collector *selling* firearms to a museum collection" "plainly involve commercial conduct." *Ortega*, 162 F.4th at 1060 (Federico, J., dissenting from denial of rehearing en banc) (citing *Ortega*, 148 F.4th at 1146) (emphasis added). This is yet another reason why the *Ortega* majority's holding was clearly erroneous and should not be followed.

25

According to the majority, the waiting period is "just an artificial delay on possession," which does not satisfy its definition of "condition,"[16] and requiring people to simply wait does not "qualify" them to use a firearm like a shall issue licensing regime does. *Id.* But as Judge Matheson again pointed out, the same could be said (and *was* said) of the law in *RMGO*, which made virtually all 18-to-20-year-olds wait *years* to purchase a firearm. *Id.* at 1159 (Matheson, J., dissenting); *see* Brief of Plaintiffs-Appellees at 19-20, *RMGO*, 121 F.4th 96 (arguing that the law did not impose a true "condition" or "qualification" because young adults could not "jump through any hoop" but could only wait); Oral Argument at 18:30-20:20, *RMGO*, 121 F.4th 96 (similar). While New Mexico's waiting period applies to people over the age of 21, it is significantly narrower in that it only imposes a seven-day wait and allows *anyone* (over 21) to get an exemption by obtaining a concealed carry license. *See* § 30-7-7.1(A), (H)(2). How is a law that imposes a *years*' long wait on virtually all 18-to-20-year-olds "presumptively lawful," but a law that imposes a mere one-week wait only on those who have not availed themselves of New Mexico's shall-issue licensing process not? Again, the majority could not say.[17]

---

[16] Notably, the First Circuit just rejected this very argument, concluding that it is "based on an overly narrow understanding of that which can be described as a 'condition.'" *Beckwith*, 2026 WL 914624, at *6 n.5. But even "accepting for the sake of argument [this] premise that a condition is something one must be able to take action to satisfy," the First Circuit explained, "we do not see why the act of successfully waiting for seventy-two hours before taking delivery of a purchased firearm does not qualify." *Id.*

[17] The majority did not address Defendants' argument that the waiting period satisfies even the more restrictive definition of "condition" or "qualification" since it allows individuals to exempt themselves by obtaining a concealed carry permit. *See* Defendants/Appellees' Corrected Answer Brief at 29-30 [Doc. 36]. In other words, individuals *can* satisfy a "condition" that shows they are "qualified" to receive a newly purchased firearm immediately. The majority's failure to address this compelling argument does not require this Court to do the same on remand. *See Kerns v. Bd. of Commissioners of Bernalillo Cnty.*, 2015 WL 7873783, at *16 (D.N.M. Nov. 19, 2015) (Browning, J.) (declining to apply law of the case doctrine when appellate panel did not consider specific issue).

26

The majority's attempt to distinguish *RMGO* is factually and legally flawed. The majority asserted its holding was not foreclosed by *RMGO* because it supposedly "did not grapple with the full scope of arguments defining conditions and qualifications that [the Court] face[d] here, and declined to reach the issues that are most pertinent in this case." *Ortega*, 148 F.4th at 1148. But as explained earlier, the Court indisputably *was* confronted with the same arguments in *RMGO*, and it "reached" (i.e., rejected) them when it concluded the law was presumptively constitutional. 121 F.4th at 119-21, 28. In any event, as Judge Matheson pointed out: "*RMGO*'s holding 'is the law of this Circuit *regardless of what might have happened had other arguments been made to the panel that decided the issue first*.'" *Ortega*, 148 F.4th at 1159 (Matheson, J., dissenting) (quoting *Baker*, 49 F.4th at 1358). Respectfully, the majority did not heed this fundamental principle, and its "sidestep" of *RMGO* all but overrules it. This Court should decline to follow suit.

The *Ortega* majority's decision also irreconcilably conflicts with *RMGO*'s "abusive ends" analysis. Applying *RMGO*'s logic, the waiting period does not serve abusive ends because: (1) it "sets a narrow, objective, and definite standard that applies uniformly to all potential sellers and buyers"; (2) it is "aimed at ensuring guns are held by law-abiding, responsible persons," as demonstrated by substantial evidence demonstrating it can significantly reduce gun violence; and (3) a large number of jurisdictions have adopted similar laws. *Ortega*, 121 F.4th at 1160-61 (Matheson, J., dissenting) (quoting *RMGO*, 121 F.4th at 122-23).

The *Ortega* majority all but ignored this analysis. The majority instead summarily concluded that Plaintiffs could overcome any presumptive constitutionality because "waiting periods are neither longstanding nor widespread practices, and diverge from history and tradition." *Id.* at 1148-49. But, as Judge Matheson pointed out, *RMGO* "squarely held that under *Bruen* step one, conditions and qualifications on commercial sale do not implicate the Second Amendment's

27

plain text, obviating any need to show that such a law has a historical analogue under *Bruen* step two." *Ortega*, 148 F.4th 1134 n.8 (Matheson, J., dissenting) (citing *RMGO*, 121 F.4th at 121, 127-28). Likewise, *RMGO* "held that a condition or qualification need not be 'longstanding' to be presumptively lawful." *Ortega*, 148 F.4th 1134 n.8 (Matheson, J., dissenting) (citing *RMGO*, 121 F.4th at 120-21).

The *Ortega* majority also asserted that Plaintiffs could overcome any presumptive constitutionality simply because the waiting period has a broad application and is purportedly "justified only by assuming that citizens cannot be trusted with their own rights." *Id.* at 1149 n.7. But as Judge Matheson again pointed out, the same could be said (and *was* said) of the law at issue in *RMGO*, which applied without regard to individual characteristics. *See Ortega*, 148 F.4th 1134 n.9 (Matheson, J., dissenting); Brief of Plaintiffs-Appellees at 21, *RMGO*, 121 F.4th 96 (arguing that the Colorado law was not like shall issue licensing regimes "because it sweeps into its ambit law-abiding and non-law-abiding 18-to-20-year-olds alike"). Although the waiting period may apply to more people, it only imposes a seven-day wait and it broadly exempts *anyone* with a concealed carry permit. So how is it that only the less restrictive law is "abusive"? There is no principled answer.

In sum, the *Ortega* majority clearly erred by disregarding and inaccurately distinguishing the Tenth Circuit's binding decision in *RMGO*, and it would be manifestly unjust to perpetuate this error and strike down New Mexico's common-sense legislation that will save dozens of New Mexicans from gun violence every year. Rather, this Court "should follow earlier, settled precedent over a subsequent deviation therefrom." *Haynes*, 88 F.3d at 900 n.4. Therefore, this Court should grant summary judgment in Defendants' favor, notwithstanding *Ortega*. *See Ortega*, 162 F.4th at 1063 (Federico, J., dissenting from denial of rehearing en banc) (stating that "*RMGO* remains the

28

law of the circuit until the Supreme Court says otherwise") (citing *Haynes*, 88 F.3d at 900 n.4); *Pardini*, 524 F.3d at 426-27; *Pope*, 752 F.3d at 1264 n.3; *Mocek*, 3 F. Supp. 3d at 1046.

### B.     *Bruen* step two

Plaintiffs' Second Amendment challenge also fails because the law is consistent with the principles that underpin our tradition of firearm regulation. Under *Bruen*'s second step, the government must "justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 597 U.S. at 24. Some courts initially took this to impose a difficult burden on governments to prove that every modern-day firearm regulation could be traced back to a widespread and distinctly similar body of firearm regulations from the 18th and 19th centuries. However, the Supreme Court subsequently clarified this "misunderst[anding]," explaining, "These precedents were not meant to suggest a law trapped in amber. . . . [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791. Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Rahimi*, 144 S. Ct. at 1897-98 (cleaned up). As Justice Barrett explained more fully in her concurrence:

> *Bruen* emphasized that 'analogical reasoning' is not a 'regulatory straightjacket.' To be consistent with historical limits, a challenged regulation need not be an updated model of a historical counterpart. Besides, imposing a test that demands overly specific analogues has serious problems. To name two: It forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.' And it assumes that founding-era legislatures maximally exercised their power to regulate, thereby adopting a 'use it or lose it' view of legislative authority. Such assumptions are flawed, and originalism does not require them. "Analogical reasoning" under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold.

*Rahimi*, 144 S. Ct. at 1925 (Barrett, J., concurring) (cleaned up).

Therefore, the Court clarified, "the appropriate analysis involves considering whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition."

29

*Rahimi*, 144 S. Ct. at 1898 (citing *Bruen*, 597 U.S. at 26-31) (emphasis added). In other words, "[t]he law must comport with the principles underlying the Second Amendment, but it need not be a 'dead ringer' or a 'historical twin.'" *Id.* (quoting *Bruen*, 597 U.S. at 30). To determine this, a court must ask "whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Id.* (quoting *Bruen*, 597 U.S. at 29 & n.7). "Why and how the regulation burdens the right are central to this inquiry." *Id.*

As *Rahimi* made clear, courts can use reasoning by analogy in every Second Amendment challenge. *See Duncan v. Bonta*, 133 F.4th 852, 872 (9th Cir. 2025). However, some cases may require an even broader lens. In *Bruen*, the Supreme Court explained that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders." 597 U.S. at 27. "Fortunately, the Founders created a Constitution—and a Second Amendment—intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs." *Id.* at 27-28 (cleaned up). Thus, "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach" to analogical reasoning. 597 U.S. at 27; *see Duncan*, 133 F.4th at 872.

This approach applies here. The issues that Section 30-7-7.3 primarily seeks to address (i.e., impulsively purchasing a firearm to commit a homicide or suicide) involve both "unprecedented societal concerns" and "dramatic technological changes." For starters, "impulsive gun homicides were much less prevalent at the time of the founding and in the century that followed." *RMGO*, 701 F. Supp. 3d at 1141; *see* [Doc. 15-7 at 10-47 (detailing history of gun homicides in America)]. The same goes for impulsive gun suicides. It was rare for someone to take their own life with a firearm around the time of the Founding. *See* UMF No. 32. Likewise, societal

30

attitudes surrounding suicide have changed. At the Founding, suicide was viewed through a moral or religious lens that attributed it to the work of the devil and addressed it after the fact by penalizing those who died by suicide. *See* UMF Nos. 35-37. Over time, however, society's understanding of mental illness and suicide evolved, *see* UMF No. 38, and recent empirical research has shown that means restriction, such as waiting periods, can reduce suicides. *See* UMF Nos. 18-20, 39-40.

In addition to these unprecedented societal concerns, there have been "dramatic technological changes" due to mass production and sales of firearms. "[F]irearms were not as readily available for purchase . . . at the time of the founding and in the century that followed." *RMGO*, 701 F. Supp. 3d at 1141. As Professor Robert Spitzer notes:

> No "Guns-R-Us" outlets existed in the 1600s, 1700s, or most of the 1800s. Rapid, convenient gun sales processes did not exist in the U.S. until the end of the nineteenth century, when mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get. . . . When the adverse consequences of the spread of cheap handguns began to be felt, states enacted numerous anti-gun carry restrictions in the late 1800s and early 1900s.

[Doc. 15-1 at 6]; *accord Silvester*, 843 F.3d at 827 ("Before the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one. As a purely practical matter, delivery took time."). In other words, "[t]hough delay has not always been associated with government regulation, the ability to immediately exercise Second Amendment rights has no foundation in history." *Silvester*, 843 F.3d at 831 (Thomas, C.J., concurring). Accordingly, the Court should apply an even more nuanced and flexible approach when using reasoning by analogy under *Bruen* step two here.

Four broad categories of laws—taken either individually or together—demonstrate that New Mexico's waiting period is consistent with the principles that underpin our nation's regulatory

tradition given their "how" (i.e., temporarily delaying or outright prohibiting the transfer or possession of a firearm) and "why" (i.e., to avoid gun violence): intoxication laws, licensing regimes, group-based restrictions, and surety laws.[18]

### 1.    Intoxication laws

As Professor Spitzer explained, "[f]rom the 1600s through the early 1900s, at least 30 states regulated, restricted, and punished inebriation in connection with the ownership or use of weapons. These regulations included at least 20 states that criminalized the carrying or use of firearms when intoxicated." [Doc. 15-1 at 11]. Two district courts found this sufficient to establish a "historical tradition of regulating the carrying and use of firearms by intoxicated individuals." *RMGO*, 701 F. Supp. 3d at 1144; *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 211-12; *see generally Antonyuk v. James*, 120 F.4th 941, 971-72 (2d Cir. 2024) (explaining that even a few instances of historically comparable regulations can be sufficient to meet *Bruen*'s second step, particularly in the absence of evidence that the regulations' lawfulness was disputed). And these courts concluded that intoxication laws are proper analogues for waiting period laws because they "both work to prevent individuals in a temporary impulsive state from irresponsibly using a firearm." *RMGO*, 701 F. Supp. 3d at 1144, at **17-18; *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 211-12. As the Vermont district court put it:

> These restrictions on firearm use associated with alcohol are an apt historical analogue for Vermont's waiting period. In both cases, the relevant legislature identifies a period during which it believes that firearms pose an extreme risk to public safety. It then mandates that individuals refrain from carrying or using firearms until those people can exercise their Second Amendment rights safely and effectively.

---

[18] Defendants understand this Court is likely bound by *Ortega* with regard to the majority's rejection of intoxication laws and licensing regimes; Defendants make the arguments below primarily to preserve them for appeal.

*Id.* at 212. This Court should conclude the same.

### 2. Licensing regimes

Historical licensing regimes further confirm that waiting periods are consistent with the principles that underpin our nation's regulatory tradition. Professor Spitzer presented hundreds of examples of historical licensing laws. *See* [Doc. 15-1  at 17-36]. These laws are proper analogues for waiting period laws "because they support that the Founders and Reconstruction generation would have accepted a modest delay on the delivery of a firearm in order to ensure that those receiving a firearm are law-abiding, responsible citizens." *RMGO*, 701 F. Supp. 3d at 1145. As one court explained, "Waiting periods are similar to 'shall-issue' licensing regimes in that they require that an action be taken—delivery of the purchased firearm—after a defined requirement is met" and they "do not necessarily prevent 'law-abiding, responsible citizens' from exercising their Second Amendment right[s]." *Id.* (quoting *Bruen*, 142 S. Ct. at 2138 n.9); *accord Beckwith*, 2026 WL 914624, at **7-8 (observing that Maine's waiting period "resembles 'shall-issue' licensing laws"). And, as another observed, "[b]oth allow for background checks and mandate delay so the government can ensure that the individuals acquiring firearms are, in fact, law-abiding and responsible citizens." *Vermont Fed'n of Sportsmen's Clubs*, 741 F. Supp. 3d at 212. This Court should reach the same conclusion.

### 3. Group-based restrictions

As this Court previously concluded, group-based firearm restrictions support the constitutionality of waiting periods. After conducting an exhaustive overview of historical laws identified by Professor Spitzer and other caselaw and sources cited by the parties, this Court concluded that our nation has "a deeply rooted historical tradition of restricting and even outright prohibiting the sale of firearms to large groups out of a fear that some among those groups might

use those firearms to do harm in society." *Ortega*, 741 F. Supp. 3d at 1085-89. And while this Court recognized that many of these laws were odious and racist, it observed that "the Supreme Court has not suggested that courts may analogize only to those regulations that would not be viewed as discriminatory or unconstitutional today" and rejecting them on this basis "would result in an inversion of the *Bruen* test: rather than assessing whether a modern regulation is consistent with founding-era Constitutional understanding, the Court would be required to judge founding-era regulations against modern Constitutional interpretations." *Ortega*, 741 F. Supp. 3d at 1093. This conclusion was correct.

True, the *Ortega* majority disagreed and essentially held that historical laws "categorically den[ying] access to firearms by freedmen or black slaves, Native Americans, and other 'disfavored' ethnic or cultural groups" can never be relied upon simply because these groups "did not possess the same rights in the Founding era as more favored classes." 148 F.4th at 1153-54. However, the Tenth Circuit has since relied on similar pre-founding English laws and colonial laws disarming Catholics and loyalists to "reveal [a] key principle underpinning our Nation's history of firearm regulation: legislatures may disarm those believed to pose a risk of future danger." *United States v. Harrison*, 153 F.4th 998, 1021-32 (10th Cir. 2025).[19] In so holding, the Court found that historical legislatures could look "backward *and* forward" in making this determination. *Id.* In other words, historical laws disarming Catholics and loyalists demonstrate that modern day legislatures can disarm groups based, not only on past behavior, but on the fear that they may pose a future danger. *Id.*

---

[19] Defendants do not attach copies of these laws to the instant motion given the Tenth Circuit's robust citation and discussion of them in *Harrison*. However, Defendants would be happy to provide them to the Court if it would be helpful to its analysis.

New Mexico's waiting period fits neatly within this historical tradition of disarming those believed to pose a risk of future danger. Just like this Court previously concluded, these historical laws and the waiting period are both aimed at "decreas[ing] the chance that gun purchasers [and users] will use purchased firearms to commit acts of violence against others in society." *Ortega*, 741 F. Supp. 3d at 1089; *accord Harrison*, 153 F.4th at 1027 (observing that these historical laws were aimed at "preventing dangerous people from possessing firearms"). And the waiting period does "not burden the right 'beyond what was done at the founding,'" because these founding-era regulations "allowed for a complete ban" on "broad swaths of the population, whereas the Waiting Period Act provides only for a brief delay before the firearm may be purchased" and "imposes only a misdemeanor offense on those found to have violated its restrictions." *Ortega*, 741 F. Supp. 3d at 1090 (quoting *Rahimi*, 144 S. Ct. at 1898). Accordingly, this Court should reaffirm its original decision based on historical laws disarming Catholics and loyalists. *See Fish*, 957 F.3d at 1141 (stating that the law-of-the-case doctrine does not bind subsequent proceedings when the "there is new and different evidence" (cleaned up)); *Mocek*, 3 F. Supp. 3d at 1046 (stating that district courts may depart from an appellate court's ruling on the same case "when controlling authority has subsequently made a contrary decision of the law applicable to such issues" (quoting *McIlravy*, 204 F.3d at 1035)).

### 4.    Surety laws

Lastly, surety laws support the waiting period's constitutionality under *Bruen* step two. These laws, were "a form of preventive justice," that "authorized magistrates to require individuals suspected of future misbehavior to post a bond." *Rahimi*, 602 U.S. at 695 (cleaned up). These restrictions could last for months at a time; failure to post a bond was punishable by jail, and breaking the peace after posting the bond forfeited it. *Id.* at 696-97. Surety laws, like the waiting

35

period, "provided a mechanism for preventing violence *before it occurred*." *Id.* at 697 (emphasis added). The burdens imposed are likewise similar: sureties were temporary, just like the waiting period. *Compare id.*, *with* § 30-7-7.3. In fact, the waiting period imposes a substantially lesser burden: whereas sureties could last for months, *see Rahimi*, 602 U.S. at 696-97, the waiting period only lasts seven days. *See* § 30-7-7.3. And surety laws addressed keeping and carrying arms generally, *see Rahimi*, 602 U.S. at 696-97, whereas the waiting period does not prevent those who—like Plaintiffs—already possess arms from keeping and bearing them. *See Ortega*, 741 F. Supp. 3d at 1075 n.7 (noting that the waiting period only affects the sale and transfer of a firearm, "not the possession of the purchased firearm"). Surety laws, therefore, demonstrate that New Mexico's waiting period is consistent with the principles underpinning this Nation's history and tradition of firearm regulation.[20]

### CONCLUSION

For the foregoing reasons, the Court should grant summary judgment in Defendants' favor.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel*
**KYLE P. DUFFY**
*Deputy General Counsel*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

***Attorneys for Governor Michelle Lujan Grisham***

---

[20] Without question, *Ortega* presents no barrier to this Court upholding Section 30-7-7.3 under *Bruen* step two based on these laws, as they were not relied on at the preliminary injunction stage. *See Fish*, 957 F.3d at 1141 (stating that the law-of-the-case doctrine does not bind subsequent proceedings when the "there is new and different evidence" (cleaned up)).

36

/s/ Edward L. Marshall
Billy J. Jimenez
Edward L. Marshall
Nick D. Nunez
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
505.490.4825
bjimenez@nmdoj.gov
emarshall@nmdoj.gov
nnunez@nmdoj.gov

**Attorneys for Attorney General Raúl Torrez**

## CERTIFICATE OF SERVICE

I hereby certify that on April 20, 2026, I filed the foregoing via the CM/ECF filing system,

which caused all counsel of record to be served by electronic means.


Respectfully submitted,

/s/ Holly Agajanian
Holly Agajanian

37