# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

| | |
|---|---|
| SAMUEL ORTEGA and REBECCA SCOTT,<br><br>Plaintiffs,<br><br> v.<br><br>MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico,<br><br>Defendants. | No. 24-CV-0471-JB-SCY |

## PLAINTIFFS' OPPOSITION TO DEFENDANTS' JOINT MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ........................................................................................................................... 1

PLAINTIFFS' RESPONSE TO DEFENDANTS'  STATEMENT OF MATERIAL FACTS ...... 2

ARGUMENT ................................................................................................................................... 9

    I.    This Court Is Bound By The Tenth Circuit's Holding ........................................................ 9

    II.    The Tenth Circuit Correctly Concluded That The Act Is Unconstitutional.................. 18

        A.    The Act Restricts Conduct Covered By The Second Amendment's Plain Text....... 18

        B.    The Act Is Fundamentally Inconsistent With Historical Tradition.......................... 21

CONCLUSION.............................................................................................................................. 24

## TABLE OF AUTHORITIES

**Cases**

*Andrews v. State*,
50 Tenn. 165 (1871)...................................................................................................... 20

*B&L Prods., Inc. v. Newsom*,
104 F.4th 108 (9th Cir. 2024) ....................................................................................... 21

*Bay v. Anadarko E&P Onshore LLC*,
73 F.4th 1207 (10th Cir. 2023) ..................................................................................... 10

*Beckwith v. Frey*,
No. 1:24-cv-384 (D. Me. Nov. 12, 2024) ....................................................................... 7

*CTS Corp. v. Waldburger*,
573 U.S. 1 (2014).............................................................................................................. 3

*District of Columbia v. Heller*,
554 U.S. 570 (2008)................................................................................................. 20, 24

*In re City of Phila. Litig.*,
158 F.3d 711 (3d Cir. 1998)............................................................................................ 11

*Kerns v. Bd. of Comm'rs of Bernalillo Cnty.*,
2015 WL 7873783 (D.N.M. Nov. 19, 2015) ........................................................... 13, 15

*McIlravy v. Kerr-McGee Coal Corp.*,
204 F.3d 1031 (10th Cir. 2000) ............................................................................... 11, 12

*McRorey v. Garland*,
99 F.4th 831 (5th Cir. 2024) ......................................................................................... 20

*Md. Shall Issue, Inc. v. Moore*,
116 F.4th 211 (4th Cir. 2024) ....................................................................................... 21

*Mocek v. City of Albuquerque*,
3 F.Supp.3d 1002 (D.N.M. 2014) ................................................................................. 12

*N.Y. State Rifle & Pistol Ass'n v. Bruen*,
597 U.S. 1 (2022)..................................................................................................... *passim*

*Nat'l Ass'n for Gun Rts. v. Polis*,
--- F.4th ----, 2026 WL 1098395 (10th Cir. Apr. 23, 2026)............................... 15, 16

*NRA v. Bondi*,
133 F.4th 1108 (11th Cir. 2025) ................................................................................... 20

*Ortega v. Grisham*,
148 F.4th 1134 (10th Cir. 2025) ............................................................................... *passim*

*Ortega v. Grisham*,
162 F.4th 1056 (10th Cir. 2025) ...................................................................................... 1

*Pardini v. Allegheny Intermediate Unit*,
524 F.3d 419 (3d Cir. 2008)........................................................................................... 11

*People v. Bickston*,
154 Cal.Rptr. 409 (Cal. App. Dep't Super. Ct. 1979) ............................................... 23

*Reese v. ATF*,
127 F.4th 583 (5th Cir. 2025) ....................................................................................... 20

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) ................................................................................. 10, 16

*Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*,
490 U.S. 477 (1989)......................................................................................................... 11

*Silvester v. Harris*,
41 F.Supp.3d 927 (E.D. Cal. 2014)................................................................................. 6

*State v. Mendoza*,
920 P.2d 357 (Haw. 1996)................................................................................................ 6

*United States v. Alvarez*,
142 F.3d 1243 (10th Cir. 1998) ................................................................................ 12, 17

*United States v. Daniels*,
101 F.4th 770 (10th Cir. 2024) ...................................................................................... 16

*United States v. Knipp*,
138 F.4th 429 (6th Cir. 2025) ........................................................................................ 20

*United States v. Pirtle*,
2003 WL 27385324 (D.N.M. May 19, 2003)...................................................................... 12

*United States v. Rahimi*,
602 U.S. 680 (2024).......................................................................................................... 22

*Universitas Educ., LLC v. Avon Cap., LLC*,
124 F.4th 1231 (10th Cir. 2024) .................................................................................... 10

**Statutes and Rule**

720 Ill. Comp. Stat. 5/24-3(A)(g) ..................................................................................... 3

Colo. Rev. Stat. §18-12-115 ............................................................................................ 3

Fla. Stat. §790.0655(1)(a) ............................................................................................... 3

Fla. Stat. §790.0655(2)(c) ............................................................................................... 3

Md. Code Ann., Pub. Safety §5-101(r) ........................................................................... 3

Md. Code Ann., Pub. Safety §5-123(a) ........................................................................... 3

Minn. Stat. §624.7132, subd.4 ........................................................................................ 3

R.I. Gen. Laws §11-47-35 ............................................................................................... 3

Vt. Stat. Ann. tit. 13, §4019a ......................................................................................... 3

N.M. L.R. 56.1(b) ........................................................................................................... 2

**Other Authorities**

Greg Adomaitis, *N.J. Gun Association Calls Berlin Woman's Death an "Absolute Outrage"*, NJ.com (June 5, 2015), https://perma.cc/D5JP-EW9Z ........................................... 8

Brief of Brady Center to Prevent Gun Violence, *Ortega v. Grisham*, No. 24-2121 (10th Cir. Dec. 19, 2024), Dkt.56 ........................................................ 22

Corrected Answer Brief, *Ortega v. Grisham*, No. 24-2121 (10th Cir. Dec. 9, 2024), Dkt.38 ........................................................ 21

Declaration of Andrea Beckwith, *Beckwith v. Frey*, No. 1:24-cv-384 (D. Me. Nov. 12, 2024), Dkt. 1-1 ................................................ 7

Declaration of Adam Hendsbee, *Beckwith v. Frey*, No. 1:24-cv-384 (D. Me. Nov. 12, 2024), Dkt. 1-4 ................................................ 8

Declaration of James White, *Beckwith v. Frey*, No. 1:24-cv-384 (D. Me. Nov. 12, 2024), Dkt. 1-3 ................................................ 7

*Duration of Suicidal Crises*, Harv. Sch. Pub. Health (2026), https://perma.cc/YRN5-RYPY .............................................................................. 2

Greg Eghigian, *A "Sickness of Our Time": How Suicide First Became a Research Question*, Psychiatric Times (Apr. 27, 2018), https://perma.cc/2GVC-Y62K ........................ 8

*Genesis* 4:8 .................................................................................................................... 22

HB129 Fiscal Impact Report (Feb. 13, 2024), https://perma.cc/6UQN-B736 ................................................................................. 3

David B. Kopel, *Background Checks for Firearms Sales & Loans: Law, History, and Policy*, 53 Harv. J. Legis. 303 (2016) .......................................................... 8

Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 PNAS 12,162 (2017)................................................................................................ 4

Alexander Murray, *Suicide in the Middle Ages*, Synergy (2012), https://perma.cc/9BCL-5H25 ............................................................................................. 8

RAND, *The Effects of Waiting Periods* (Jan. 29, 2026), https://perma.cc/8KN5-SJ8F ................. 4

Randolph Roth, *American Homicide* (2009) ............................................................... 6, 8

Leonardo Tondo, *Brief History of Suicide in Western Cultures*, *in A Concise Guide to Understanding Suicide* (Stephen H. Koslow et al. eds., 2014)................................................. 8

**INTRODUCTION**

Shortly after the mandate in this case returned from the Tenth Circuit—which issued a published opinion "holding that the [Waiting Period Act] is unconstitutional," *Ortega v. Grisham*, 148 F.4th 1134, 1156 (10th Cir. 2025), and denied en banc rehearing in a 10-2 vote, *Ortega v. Grisham*, 162 F.4th 1056 (10th Cir. 2025)—this Court was crystal clear: "THE COURT WILL HAVE TO DO EXACTLY WHAT THE TENTH CIRCUIT SAYS." Dkt.102 at 1. And, as this Court later acknowledged in writing, "the Tenth Circuit has determined [the Act] to be unconstitutional as it pertains to individuals who have passed a background check." Dkt.97 ¶1. The only thing left for this Court to do is enter final judgment consistent with that holding.

New Mexico has other ideas. Despite purporting to give "all due respect to" the Tenth Circuit, the state asks this Court to "grant summary judgment in Defendants' favor"—the Tenth Circuit's decision in Plaintiffs' favor "notwithstanding." Dkt.109 at 2, 28. That is stunning. This is not a case where the law has changed since the court of appeals' decision issued. Nor is it a case where a party that lost on appeal in a tentative ruling has marshaled new evidence to address an issue the appellate court left open for remand. New Mexico is just openly imploring this Court to defy the Tenth Circuit. This Court should reject out of hand that invitation to flout higher law. As this Court has already acknowledged, repeatedly, on the record, the die is cast: The Tenth Circuit has made its decision, and basic principles of federal-court practice compel this Court to apply that decision faithfully and fully, whether New Mexico (or this Court) agrees with it or not.

If New Mexico continues to think that the Tenth Circuit got it wrong, it can appeal the final judgment this Court is duty-bound to enter and then take a run at persuading the full Tenth Circuit to change its 10-2 vote. And if that fails, New Mexico can seek Supreme Court review. What New Mexico cannot do is ask this Court to under-rule the Tenth Circuit. This Court should deny New Mexico's motion for summary judgment and grant Plaintiffs' cross-motion.

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF MATERIAL FACTS**

As a threshold matter, Plaintiffs dispute that facts about "[g]un violence in the United States and New Mexico" or the "[e]ffectiveness of waiting periods" have any bearing upon the relevant constitutional analysis (even if, contrary to fact, there were any constitutional analysis left for this Court to do in the wake of the Tenth Circuit's decision). *Contra* Dkt.109 at 3, 6 (formatting altered). While such facts might matter if means-end scrutiny applied, the Supreme Court has emphatically rejected "means-end scrutiny in the Second Amendment context." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 19 (2022). That said, for completeness, Plaintiffs offer the following response to the state's factual statement, in correspondingly numbered paragraphs. As that response shows, even if the factual narrative advanced by New Mexico were relevant—and it is not—it is divorced from the record in this case in important ways.

1-4.    Not disputed.

5.    New Mexico does not "refer with particularity to [a] portion[] of the record" supporting the facts asserted in this paragraph. *Contra* L.R. 56.1(b). The cited source canvasses the results of various international studies that interview individuals who unsuccessfully attempted suicide, without distinguishing between suicides committed with firearms and suicides committed by other means. And what the cited source says about suicide more generally refutes the state's point. *See Duration of Suicidal Crises*, Harv. Sch. Pub. Health (2026), https://perma.cc/YRN5-RYPY (stating that "one-third of suicide decedents under age 18 experienced a crisis within 24 hours of taking their life," and that "[t]he proportion with a crisis declined with age").

6-9.    Not disputed.

10.    Plaintiffs dispute New Mexico's characterization of federal law as a "loophole." Plaintiffs further dispute that "House Bill 129's Fiscal Impact Report" is a reliable indicator of

2

"legislative intent." *Contra* Dkt.109 at 5 & n.7.  Legislative "intent is discerned primarily from the statutory text." *CTS Corp. v. Waldburger*, 573 U.S. 1, 12 (2014).  To the extent the Fiscal Impact Report is relevant, Plaintiffs call the Court's attention to the following passage on page 4:

> Analysis from the Office of the Attorney General suggests legislation like HB129, which imposes a mandatory waiting period on firearm possession following a federal instant background check, raises constitutional concerns.  This is especially pertinent in light of the Supreme Court's rulings in D.C. v. Heller (2008) and New York SRPAI v. Bruen (2022) ….

HB129 Fiscal Impact Report (Feb. 13, 2024), https://perma.cc/6UQN-B736.

11-14.  Not disputed.

15.  Plaintiffs dispute that the existence of other recently enacted state laws is material to the constitutional analysis.  Plaintiffs also dispute that the Waiting Period Act "falls comfortably within" any tradition these other laws can be said to establish.  Dkt.109 at 23; *see Ortega*, 148 F.4th at 1150.[1]

16.  This paragraph cites the Poliquin Declaration (Dkt.20-2) at pages 5-6 for the proposition "that waiting period laws cause large and statistically significant reductions in homicide."  But another of New Mexico's sources—"RAND's meta-analysis of waiting period studies," which the state relies on in paragraph 19—affirmatively refutes this point.  Of the

---

[1] Several of the cited state laws limit the waiting period to certain types of firearms. *See, e.g.*, R.I. Gen. Laws §11-47-35 ("pistol[s] or revolver[s]"); Minn. Stat. §624.7132, subd.4 ("pistol[s] or semiautomatic military-style assault weapon[s]"); Md. Code Ann., Pub. Safety §§5-101(r) (defining "regulated firearm"), 5-123(a) (prescribing cooling-off period for "regulated firearm[s]").  By contrast, New Mexico's law applies to all firearms purchases.  Separately, one of New Mexico's cited state laws recognizes an exception for purchasers certified in hunting safety and seeking to buy a rifle or shotgun. *See* Fla. Stat. §790.0655(2)(c).  This Act does not.  Another cited state law allows law enforcement to waive the waiting period upon finding that the purchaser is facing a threat to himself or his family. *See* Minn. Stat. §624.7132, subd.4.  But this Act brooks none of those exceptions.  Finally, the seven-day cooling-off period mandated by New Mexico is more than twice as long as the periods mandated by several of the cited laws. *See, e.g.*, Colo. Rev. Stat. §18-12-115 (3 days); Fla. Stat. §790.0655(1)(a) (3 days); 720 Ill. Comp. Stat. 5/24-3(A)(g) (72 hours); Vt. Stat. Ann. tit. 13, §4019a (72 hours).

3

"[e]leven studies evaluat[ing] the relationship between waiting-period laws and homicides or violent crime," multiple studies "found that waiting-period laws increased homicides," and several of the studies that RAND deems "methodologically stronge[st]" "found uncertain effects." RAND, *The Effects of Waiting Periods* (Jan. 29, 2026), https://perma.cc/8KN5-SJ8F.  As the white paper goes on to explain, that is unsurprising:  "[T]he majority of prohibited possessors who perpetrate gun violence acquire their firearms from social acquaintances or the black market; thus, a large portion of violent gun crime is unlikely to be affected through [cooling-off period] mechanism[s]."  *Id.*  If anything, the white paper notes, "waiting-period laws may have the unintended consequence of delaying needed self-protection."  *Id.*

17.     This paragraph cites the Poliquin Declaration (Dkt.20-2) at page 5 for the proposition that "waiting periods reduce gun homicides by roughly 17%."  That language appears nowhere in the Poliquin Declaration.  And while the quoted language does appear in Michael Luca et al., *Handgun Waiting Periods Reduce Gun Deaths*, 114 PNAS 12,162 (2017), that study expressly limits its findings to measuring the effect of *handgun* waiting periods, *cf. id.* at 12,165.  So, even if this fact were material—and it is not—it would only highlight the lack of evidence supporting New Mexico's decision to subject rifle- and shotgun-purchases to a cooling-off period.

18.     This paragraph cites the Poliquin Declaration (Dkt.20-2).  The Poliquin Declaration acknowledges that "[r]ecent research" "using newer statistical methods" shows "that waiting period laws" have "no statistically significant effect" for people over age 34.  Dkt.20-2 at 6.

19.     This paragraph cites "RAND's meta-analysis of waiting period studies" to support New Mexico's view that cooling-off periods reduce gun suicides.  As noted above, *see supra* ¶16, this white paper refutes New Mexico's position as to the relationship between cooling-off periods and homicide.  And even as to the relationships between cooling-off periods and suicide, although

New Mexico accurately quotes from the white paper's "Summary" section, the subsequent "in Depth" section repeatedly refutes New Mexico's position.  For example, the "in Depth" section notes that "for some people, waiting periods may serve only to delay attempting suicide rather than preventing it."  *Id.*  The "in Depth" section also acknowledges that "most firearms are purchased by individuals who already own a firearm," and that "[f]or those who already own guns, a waiting period may have little or no effect on suicide risk."  *Id.*  Finally, although the RAND meta-analysis suggests that some waiting period laws could be justified on the grounds of "provid[ing] law enforcement with opportunities to investigate possible straw purchases," *id.*, that potential justification is unavailable to New Mexico, because the Act's seven-day cooling-off period is not tied to the amount of time it takes to complete a background check.

20.     This paragraph again relies on Luca et al., which, as noted *supra* (at ¶17), could not support a cooling-off period applied to rifle or shotgun purchases.

21-25.  These paragraphs purport to adduce facts establishing that "[r]apid, convenient gun sales processes" represent an "unprecedented societal concern[] or dramatic technological change[]."  But just because "[n]o 'Guns-R-Us' outlets existed in the 1600s" does not mean that firearm use was not widespread at the Founding.  It plainly was, as New Mexico concedes.  *See* Dkt.109 at 8 ("[H]ousehold ownership of firearms was common.").  In all events, these paragraphs do not aid New Mexico.  Even accepting the state's theory that the widespread availability of firearms emerged "in the 1870s and 1880s" when "mass production techniques, improved technology and materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get," Dkt.109 at 8, the critical point remains:  No state embraced a mandatory cooling-off period until well into the latter end of the twentieth century.  Instead, as

New Mexico admits, states responded either with "carry restrictions," Dkt.15-1 ¶10,[2] or with rudimentary background-check regimes.[3]  (Although New Mexico asserts that "[n]o organized system of gun waiting periods and background checking could feasibly exist until the modern era," Dkt.109 at 8, it does not contest that states and other jurisdictions began doing so in the 1920s and 1930s.)

26-31.  These paragraphs purport to adduce facts establishing that homicides by firearm represent an "unprecedented societal concern[] or dramatic technological change[]."  But setting aside New Mexico's made-for-litigation theory about the "Glorious Revolution of 1688-1689" and the "patriotic fellow feeling within the British empire" and "greater trust in" the Crown that supposedly "surge[d]" right around the time of the Boston Tea Party, Dkt.109 at 8, not even New Mexico seriously argues that homicide is a novel problem.  Nor could it, because New Mexico's own expert witness has written that, in the 17th century, the "peacetime murder rates for adult colonists … ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States today."  Randolph Roth, *American Homicide* 27 (2009); *see also infra* ¶C.  New Mexico just argues that, instead of firearms, colonists with murderous intentions more frequently resorted to implements like "whips, sticks, hoes, shovels, axes, or knives."  Dkt.109 at

---

[2] New Mexico states that jurisdictions responded to increased gun availability with "anti-gun carry *and other* restrictions."  Dkt.109 at 8 (emphasis added) (citing Dkt.15-1 at 6).  But the cited source says only that states responded with "anti-gun carry restrictions."  Dkt.15-1 at 6.

[3] In 1923, California imposed a one-day waiting period to facilitate a rudimentary background check.  *See Ortega*, 148 F.4th at 1150.  Of the other jurisdictions cited in paragraph 15, the District of Columbia came next, with a 1932 law guaranteeing the D.C. police 42 hours to conduct a background investigation of the purchaser.  No state legislature expressly embraced a waiting period for cooling-off purposes until 1996.  *See Silvester v. Harris*, 41 F.Supp.3d 927, 962 (E.D. Cal. 2014), *rev'd on other grounds*, 843 F.3d 816 (9th Cir. 2016), *reversal abrogated by Bruen*, 597 U.S. 1, *as recognized in Baird v. Bonta*, 81 F.4th 1036, 1043 (9th Cir. 2023); *cf. State v. Mendoza*, 920 P.2d 357, 368 (Haw. 1996) (in 1996, justifying Hawaii's waiting-period law solely on the grounds that it facilitates "background checks"); *see also infra* p.23.

9. Yet New Mexico "br[ings] to bear" no evidence suggesting that colonists would have tolerated a cooling-off period for purchasing whips, hoes, or shovels for fear that those with murderous intentions would misuse these implements. *Bruen*, 597 U.S. at 26-27.

32-41. These paragraphs purport to adduce facts establishing that suicides by firearm represent an "unprecedented societal concern[] or dramatic technological change[]." But these paragraphs do not dispute that suicide itself is not a new societal problem. Quite the contrary, these paragraphs acknowledge that suicide was a common enough occurrence that Founding-era governments passed laws addressing it. *See also infra* ¶D. And these paragraphs affirmatively concede that, until "the twentieth century," no government responded to the societal problem of suicide with laws "limiting access to suicidal means," Dkt.109 at 10; instead, governments responded with laws "criminaliz[ing]" suicide, *id.*

42-48. Not disputed.

\*         \*         \*

Plaintiffs also set forth the following additional facts pursuant to Local Rule 56.1:

A.      Plaintiffs respectfully incorporate by reference the statement of undisputed material facts from their cross-motion for summary judgment. *See* Dkt.110 at 4-8.

B.      Defendants cite a declaration filed in a different lawsuit as "evidence that waiting period laws cause large and statistically significant reductions in homicides." Dkt.109 at 6. To the extent declarations filed in other lawsuits are relevant, Plaintiffs direct the Court's attention to declarations filed in *Beckwith v. Frey*, No. 1:24-cv-384 (D. Me. Nov. 12, 2024), which vividly prove RAND's point that "waiting-period laws may have the unintended consequence of delaying needed self-protection," *supra* ¶16. *See Beckwith*.Dkt.1-1 (generally discussing experience of domestic-violence survivor); *Beckwith*.Dkt.1-3 ¶¶6-7 (highlighting harms to individuals facing

7

threats to themselves or their families); *Beckwith*.Dkt.1-4 ¶9 (similar).  And these are far from the only reputable sources proving the real danger of denying law-abiding citizens facing imminent threats of violence the means to defend themselves to which they are constitutionally entitled.  *See, e.g.*, Greg Adomaitis, *N.J. Gun Association Calls Berlin Woman's Death an "Absolute Outrage"*, NJ.com (June 5, 2015), https://perma.cc/D5JP-EW9Z; David B. Kopel, *Background Checks for Firearms Sales & Loans: Law, History, and Policy*, 53 Harv. J. Legis. 303, 309-10 (2016).

C.    "Throughout most of the seventeenth century, the murder rate among unrelated adults in Europe's North American colonies surpassed the worst rates the United States experienced in the twentieth century."  Roth, *supra*, at 27.  "The surviving records indicate that peacetime murder rates for adult colonists—that is, rates that include only killings that took place outside the bounds of warfare—ranged from 100 to 500 or more per year per 100,000 adults, ten to fifty times the rate in the United States today."  *Id.*  "[B]y today's standards the colonies remained homicidal for decades after the initial years of settlement."  *Id.*

D.    Although a lack of reliable data makes it difficult to calculate historic suicide rates with any degree of precision, suicides have occurred with sufficient frequency to have been recognized as a societal problem for thousands of years.  *See, e.g.*, Greg Eghigian, *A "Sickness of Our Time": How Suicide First Became a Research Question*, Psychiatric Times (Apr. 27, 2018), https://perma.cc/2GVC-Y62K; Alexander Murray, *Suicide in the Middle Ages*, Synergy (2012), https://perma.cc/9BCL-5H25; Leonardo Tondo, *Brief History of Suicide in Western Cultures*, *in A Concise Guide to Understanding Suicide* (Stephen H. Koslow et al. eds., 2014) ("During the 17th and 18th centuries suicide was sufficiently common in England as to be called *la maladie anglaise* (the English disease) by the French.") (PDF available at https://perma.cc/AU3L-QRBG).

## ARGUMENT

### I.    This Court Is Bound By The Tenth Circuit's Holding.

Last August, the Tenth Circuit published a precedential opinion in this case "holding that the [Waiting Period Act] is unconstitutional." *Ortega*, 148 F.4th at 1156. Despite that clear "holding"—and the fact that federal district courts do not sit in judgment of federal courts of appeals—New Mexico urges this Court to hold the opposite. Though the Tenth Circuit held clearly and unequivocally that the Act "burden[s] the right to keep and bear arms," *Ortega*, 148 F.4th at 1145, New Mexico asks this Court to hold that "Section 30-7-7.3 does not infringe on conduct protected by the Second Amendment's plain text," Dkt.109 at 14 (formatting altered); *see id.* at 14-21. Though the Tenth Circuit held clearly and unequivocally that the Act "falls far short of a presumptively constitutional law" because "[i]t is not limited to commercial sales, and it does not fit with other known conditions and qualifications in this category," *Ortega*, 148 F.4th at 1146, New Mexico asks this Court to hold that "Section 30-7-7.3 is a presumptively constitutional commercial regulation," Dkt.109 at 21 (formatting altered); *see id.* at 21-23. Though the Tenth Circuit held clearly and unequivocally that "Plaintiffs would overcome any presumption of constitutionality" even if (contrary to its holding) such a presumption applied, *Ortega*, 148 F.4th at 1149, New Mexico asks this Court to hold that "Plaintiffs cannot overcome this presumption," Dkt.109 at 21 (formatting altered). And though the Tenth Circuit held clearly and unequivocally that the Act is inconsistent with our Nation's historical tradition of firearm regulation because it effectively "declare[s] the entire population of New Mexico presumptively dangerous to themselves or others only because they want to acquire firearms," and therefore is decidedly *un*like "its supposed historical analogues," *Ortega*, 148 F.4th at 1151, New Mexico asks this Court to hold that the Act "is consistent with the principles that underpin our tradition of firearm regulation," Dkt.109 at 29; *see id.* at 29-36.

None of that is open to this Court to do.  As Plaintiffs explained in their cross-motion, Dkt.110 at 9, "[a]n inferior court has no power or authority to deviate from the mandate issued by an appellate court."  *Universitas Educ., LLC v. Avon Cap., LLC*, 124 F.4th 1231, 1242 (10th Cir. 2024).  As Plaintiffs also explained in their cross-motion, Dkt.110 at 9, the "mandate consists of" not only the "instructions to the district court at the conclusion of the opinion," but "the entire opinion that preceded those instructions."  *Bay v. Anadarko E&P Onshore LLC*, 73 F.4th 1207, 1217 (10th Cir. 2023).  In short, now that the Tenth Circuit's mandate has issued, this Court "has no power or authority to deviate from" the Tenth Circuit's "opinion."  *See* Dkt.110 at 9.

New Mexico makes the remarkable claim that the Tenth Circuit's opinion in this case "holding that the [Act] is unconstitutional," *Ortega*, 148 F.4th at 1156, "does not control here," Dkt.109 at 2.  The state makes two arguments in support of that surprising assertion.  Neither is correct.  First, New Mexico argues that this Court is free to ignore the Tenth Circuit's holdings on the plain-text and presumption-of-lawfulness issues because, in the state's view, those holdings "run[] headlong into" "earlier, settled precedent"—namely, *Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96 (10th Cir. 2024).  Dkt.109 at 2.  Second, New Mexico argues that this Court is free to ignore the Tenth Circuit's holding on the historical-tradition issue because, in the state's view, the Tenth Circuit did "not rel[y]" on historical "[g]roup-based restrictions" or "[s]urety laws" in its opinion.  Dkt.109 at 33-36 & n.20.  The former assertion is wrong as a matter of law.  The latter assertion is wrong as a matter of law and fact.

Start with the former.  New Mexico's position seems to be that if a lower court thinks that the mandate it is bound to follow is inconsistent with "earlier" circuit precedent, then it can simply elect to follow the "earlier" precedent, even though the later decision provides the law of the case.  Dkt.109 at 2, 12, 24-27.  That is exactly backwards.  To be sure, the mandate rule gives way "when

10

controlling authority has *subsequently* made a contrary decision of the law applicable to such issues." *McIlravy v. Kerr-McGee Coal Corp.*, 204 F.3d 1031, 1035 (10th Cir. 2000) (emphasis added). But there is no precedent for the notion that a district court can ignore a later-in-time decision from the court of appeals *that forms the mandate on remand* just because it thinks that mandate is in tension with an earlier precedent. Quite the opposite. Even outside the law-of-the-case context, the most-on-point authority of a higher court is what controls. "If a precedent of [a higher court] has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the [lower court] should follow the case which directly controls, leaving to [the higher court] the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/Am. Exp., Inc.*, 490 U.S. 477, 484 (1989). And that rule of priority applies *a fortiori* when the decision "which directly controls" was issued in *the same case*. Dkt.110 at 9 (citing mandate rule cases).

The state cites a handful of out-of-circuit cases supposedly in support of the proposition that district courts may ignore the mandate when they think that the mandate-creating panel "fail[ed] to follow binding precedent." Dkt.109 at 24. But that is decidedly not what the state's cited cases say. Instead, those cases stand merely for the proposition that, in extraordinary circumstances, "*one panel of an appellate court*" may "reconsider questions that another panel has decided on a prior appeal in the same case." *Pardini v. Allegheny Intermediate Unit*, 524 F.3d 419, 426 (3d Cir. 2008) (emphasis added) (quoting *In re City of Phila. Litig.*, 158 F.3d 711, 717 (3d Cir. 1998)). The law of the Tenth Circuit is the same. Like its sister circuits, the Tenth Circuit has recognized the possibility that one *Tenth Circuit panel* could lawfully depart from a prior decision by another *Tenth Circuit panel* in an extraordinary case where doing so is necessary to avoid a "clearly erroneous" result or "a manifest injustice." *McIlravy*, 204 F.3d at 1035. But that

11

is no help to New Mexico.  After all, this Court is not a Tenth Circuit panel.  So, while the Tenth Circuit may have left open the possibility that "exceptionally narrow" circumstances may allow *it* to depart from *its own* precedent without expressly overruling it, *id.*,[4] that says nothing about whether *a district court* can depart from *the court of appeals' mandate*.  And, as Plaintiffs have explained, the answer to that question is a resounding no.  *See* Dkt.110 at 9; *see also, e.g.*, *United States v. Pirtle*, 2003 WL 27385324, at *2 (D.N.M. May 19, 2003) ("While Defendant argues the Tenth Circuit's decisions were wrong, this Court does not have the authority to ignore binding precedent.  These arguments will therefore be rejected.").

Unable to cite any case in which the Tenth Circuit (or any federal court of appeals) has *ever* countenanced the sort of district-court insubordination the state implores this Court to commit, New Mexico claims that this Court has already crossed that Rubicon in a prior opinion.  While this Court is obviously the best judge of its own opinions, suffice it to say that the state is quite wrong.  *Contra* Dkt.109 at 24, this Court did not decide in *Mocek v. City of Albuquerque*, 3 F.Supp.3d 1002 (D.N.M. 2014), that it could ignore *the Tenth Circuit's mandate* (let alone that it could do so because it thought the Tenth Circuit was wrong).  Instead, this Court decided that law of the case did not bind it to *its own* earlier interlocutory orders.  *Id.* at 1012; *id.* at 1067.  The Court was well within its power to do so.  As the Court (correctly) recognized, while law of the case usually prevents courts from unwinding their own *final* determinations, "district courts generally remain free to reconsider their earlier interlocutory orders."  *Id.* at 1046.  But, at the risk of repetition, district courts cannot reconsider courts of appeals' decisions.

---

[4] As far as Plaintiffs can tell, the Tenth Circuit has never availed itself of this leeway, and the state does not cite any case in which the Tenth Circuit actually did so.  That makes sense.  "[W]hile courts may often pay lip service to the clearly erroneous/manifest injustice exception, they rarely, if ever, invoke it."  *United States v. Alvarez*, 142 F.3d 1243, 1247 (10th Cir. 1998).

Even if, contrary to reality, a district court *could* elide the mandate rule and reconsider a court of appeals' holding based on its conclusion that the mandate-creating panel "failed to follow binding precedent," Dkt.109 at 24, this would be the absolute last case in which to apply that (nonexistent) rule. This is not a situation where the losing party has come forward on remand with new evidence or novel arguments that did not make it into the record on appeal. *But cf., e.g.*, *Kerns v. Bd. of Comm'rs of Bernalillo Cnty.*, 2015 WL 7873783 (D.N.M. Nov. 19, 2015) (Browning, J.) (noting that the Tenth Circuit's prior conclusion would remain highly persuasive even if that were the case). Quite the opposite: As New Mexico admits, it "agreed to … us[e]" at "summary judgment" "the evidence submitted at the preliminary injunction stage." Dkt.109 at 13. And, consistent with that agreement, New Mexico now presses the *exact* same evidence and arguments it made at the preliminary-injunction stage—which is the *exact* same evidence and arguments that the Tenth Circuit panel expressly rejected (and the *exact* same evidence and arguments that the full court implicitly rejected by voting against rehearing).

A few examples (of many) illustrate the point:

| New Mexico's Motion for Summary Judgment (Dkt.109) | *Ortega v. Grisham*, 148 F.4th 1134 (10th Cir. 2025) |
|---|---|
| Page 15: "Plaintiffs do not, and cannot, demonstrate that the waiting period regulates conduct protected by the plain text of the Second Amendment," because "the waiting period by its express terms only applied to the 'sale' and 'transfer' of firearms." | Pages 1144-45: "New Mexico's argument that limitations on firearm sales or transfers do not implicate the Second Amendment's plain text is wrong. … A blanket waiting period prevents a citizen from possessing a firearm for a flat period and is an infringement on the right to bear arms. It must be scrutinized as one." |
| Pages 15-16: Using dictionary definitions to argue that "keep arms" means "retain arms." | Page 1143 n.3: "New Mexico points to dictionary definitions of 'keep' and 'bear' that do not include acquisition. But dictionary definitions of those terms, in isolation, cannot denote the preexisting right's bounds that the text sought to concretize." |

| | |
|---|---|
| Page 20: "[E]ven if the plain text *did* protect the purchase or acquisition of firearms as a general matter, it certainly does not protect the *immediate* acquisition of new firearms," because "[b]efore the age of superstores and superhighways, most folks could not expect to take possession of a firearm immediately upon deciding to purchase one." | Page 1150 n.8: "New Mexico also argues that a waiting period is no less burdensome than typical delivery periods in the era before FedEx, online ordering, and modern shipping methods.  That comparison is unpersuasive." |
| Page 22:  The Act "constitutes a presumptively lawful condition and qualification on the commercial sales of arms." | Page 1147: "A seven-day waiting period is not a 'condition' on a sale any more than the price of a firearm is. … Nor is it a qualification." |
| Page 23:    "[I]t cannot be said that New Mexico's waiting period has 'abusive ends.'" | Page 1149 n.7:   "A supposed condition or qualification that applies as broadly as this one, put toward an end that is justified only by assuming that citizens cannot be trusted with their own rights, is put toward an abusive end." |
| Pages 31-32:   "Four broad categories of laws—taken either individually or together—demonstrate that New Mexico's waiting period is consistent with the principles that underpin our    nation's    regulatory    tradition    …    intoxication laws, licensing regimes, group-based restrictions, and surety laws." | Pages 1150-55 & n.11:    "New Mexico contends that a variety of firearm restrictions are analogous to [the Act]:  intoxication laws, license and permitting regimes; and targeted group bans on firearm carry of possession. …. Amici  …  suggest another category of historical analogues:  Surety Laws."  "None of those laws imposed a burden on the entire population," or "treat[ed] *all* those seeking a firearm as unusually dangerous." |

And that is not the half of it.  The specific arguments New Mexico is raising in support of its request for this Court to defy the Tenth Circuit are all arguments that the state raised in the Tenth Circuit—and the Tenth Circuit rejected.  New Mexico argues here that "the *Ortega* majority was obligated to reach the same conclusion as *RMGO*" about whether the Act "is a presumptively lawful commercial regulation."  Dkt.109 at 24-25.  It made the same argument on appeal, insisting that "*RMGO* forecloses the conclusion that the Second Amendment is burdened by a waiting period" and instead required the Tenth Circuit to hold that the Act is "a presumptively lawful condition or qualification … on a commercial sale."   148 F.4th at 1148.  The Tenth Circuit

14

disagreed.  As the Tenth Circuit explained in *Ortega*, *RMGO* "declined to reach the issues that are most pertinent in this case."  *Id.*  More to the point, the *Ortega* majority held that its "decision … accords with *RMGO*," *id.*—and then the full Tenth Circuit denied the state's en banc petition, which highlighted the very same professed inconsistency, by a 10-2 vote.  New Mexico is certainly free to continue to think the Tenth Circuit's holding here conflicts with *RMGO*.  But that does not make this Court any less bound by it.  *Contra* Dkt.109 at 24-25.[5]

New Mexico's efforts to manufacture a conflict between *Ortega* and *RMGO* are thus irrelevant at this juncture.  They are also wrong, as a recent Tenth Circuit opinion underscores. *Contra* Dkt.109 at 21-23, a law is not a condition or qualification on commercial sales just because it might affect commercial sales.  What matters is whether the restriction regulates *how* a firearm can be sold commercially, or *who* can buy a firearm commercially.  As the Tenth Circuit made clear just last month, a regulation is not a presumptively lawful *condition* on the commercial sale of firearms "if the regulation 'ha[s] nothing to do with the [conduct's ] commercial nature.'" *Nat'l Ass'n for Gun Rts. v. Polis*, --- F.4th ----, 2026 WL 1098395, at *9 (10th Cir. Apr. 23, 2026) (alterations original) [hereinafter *NAGR*].  That holding is entirely consistent with *Ortega*.  *See* 148 F.4th at 1146 ("A waiting period cannot solely be a qualification on commercial sales if it applies equally to non-commercial conduct"); *see also* Dkt.110 at 12 (further noting that a lapse of time is not a condition in all events).  It is consistent with *RMGO* too.  What the Court held

---

[5] New Mexico argues in a footnote that the Tenth Circuit's condition-or-qualification holding is not "law of the case" because *Ortega* purportedly "did not address [its] argument that the [Act] satisfies" the "definition of 'condition' or 'qualification'" the majority (correctly) applied. Dkt.109 at 26 n.17.  That is wrong.  Law of the case does not turn on whether a court of appeals explicitly addresses a specific argument; if the appellate court resolves an issue, that resolution binds on remand.  The reason the Tenth Circuit's opinion did not form law of the case on the state-law issue in *Kerns*, 2015 WL 7873783, was that the Tenth Circuit did not address the state-law issue *at all*.  *Id.* at *16.

made Colorado's law there a "condition or qualification on the sale of arms" was that it regulated *who* could purchase a firearm—*i.e.*, only people 21 and older. *RMGO*, 121 F.4th at 119-20. New Mexico's law does not change *who* can buy or sell arms, or *how* they can buy or sell them. Rather, like the unconstitutional regulation in *NAGR*, it simply regulates "firearm *possession*." *NAGR*, 2026 WL 1098395, at \*9 (emphasis in original). "[N]o matter" who the buyer is or "how" she "acquires" her gun, she must wait seven days to possess it. *Id.*

Put differently, applying this Act does not turn on who the buyer or seller is (as was the case in *RMGO*). Nor does it turn on how a transaction occurs (as it would if the law "distinguish[ed] between commercial and non-commercial" applications). *Ortega*, 148 F.4th at 1146. "The sale happens regardless, and the waiting period is just an artificial delay on possession." *Id.* at 1147. And even if New Mexico tried to contend that the Act is a qualification because it *qualifies* purchasers who have successfully waited seven days, *but see id.*, that would get New Mexico nowhere, as it would just beg the question of whether a qualification blanketly "declar[ing] the entire population of New Mexico presumptively dangerous to themselves or others only because they want to acquire firearms" is abusive. *Id.* at 1151; *see Bruen*, 597 U.S. at 38 n.9 (noting that presumptively constitutional laws are nonetheless unconstitutional if "put toward abusive ends"). Such a blanket assumption is obviously abusive, as the Tenth Circuit rightly held. *Ortega*, 148 F.4th at 1149 n.7. (It is also inconsistent with *United States v. Daniels*, 101 F.4th 770, 778 (10th Cir. 2024), a case predating *RMGO*.)

That leaves the state's claim that the Tenth Circuit's historical-tradition holding does not bind this Court because the Tenth Circuit supposedly did not consider analogies to historical group-based restrictions or surety laws. Dkt.109 at 32 n.18, 36 n.20. The state even goes so far as to deem it "[w]ithout question" that neither group-based restrictions nor surety laws were "relied

on at the preliminary injunction stage." Dkt.109 at 36 n.20. That is demonstrably false. The Tenth Circuit expressly considered both sets of alleged analogues, and it expressly rejected both. *See Ortega*, 148 F.4th at 1151 n.11 (deeming "[s]urety laws" "easily distinguishable"); *id.* at 1153-54 (holding group-based restrictions disanalogous because "the justifying principle used to identify who qualified as dangerous differed from the law before us").

One final point. The Tenth Circuit did not "h[o]ld that historical laws 'categorically den[ying] access to firearms by freedmen or black slaves, Native Americans, and other "disfavored" ethnic or cultural groups' can never be relied upon" as historical analogues. *Contra* Dkt.109 at 34 (quoting *Ortega*, 148 F.4th at 1153-54). It held that such laws had fundamentally different "whys" and "hows" than this Act. New Mexico simply ignores that holding. Indeed, New Mexico reprises its argument that this Act disarms only those "believed to pose a risk of future danger," Dkt.109 at 35, without even mentioning that the Tenth Circuit held in no uncertain terms that no historical principle allows states to deem *everyone* "a risk of future danger" simply because they want to buy a firearm, *see Ortega*, 148 F.4th at 1153 ("New Mexico cannot justify a populace-wide burden using only class-based foundations."). "Without question," Dkt.109 at 36 n.20, this Court is bound by that holding too.

\*        \*        \*

When a party does "nothing more than a replay of the same performance before a different [judicial] audience," "it is almost axiomatic" that the prior decision will control, "apparent sincerity of counsel" notwithstanding. *United States v. Alvarez*, 142 F.3d 1243, 1247-48 (10th Cir. 1998). When the prior decision was rendered by a higher court in the very case at hand, the controlling effect *is* axiomatic. After New Mexico failed to persuade the Tenth Circuit panel of its position and then failed to persuade the full Tenth Circuit to vacate the panel's decision, its only

17

option was to seek Supreme Court review—not to ask this Court to effectively under-rule the Tenth Circuit on remand. An avowed effort by a state to secure overt appellate-court nullification is, as far as Plaintiffs are aware, unprecedented (as it should be). It deserves a precedential rebuke.

## II.    The Tenth Circuit Correctly Concluded That The Act Is Unconstitutional.

Even if they were not foreclosed by the mandate and precedent, New Mexico's arguments would fail. The Waiting Period Act restricts conduct covered by the Second Amendment's plain text. It is not a condition or qualification on the commercial sale of arms. And it is badly out of step with our Nation's historical tradition of firearm regulation. *See* Dkt.110 at 9-15.

### A.    The Act Restricts Conduct Covered By The Second Amendment's Plain Text.

The Tenth Circuit correctly rejected all of New Mexico's efforts to evade Second Amendment scrutiny.

At the outset, New Mexico misunderstands *Bruen*'s textual inquiry. The question is not whether "the plain text of the Second Amendment cover[s] acquiring or purchasing firearms, and if so," whether "it cover[s] the immediate acquisition of commercially sold firearms." *Contra* Dkt.109 at 15 (emphasis omitted). It is whether the challenged regulation frustrates the ability to keep and bear arms. And, here, the answer is plainly yes: Plaintiffs would like to take possession of firearms ("Arms") to have ("keep") and carry ("bear") them, but the Act precludes them from doing so for seven days. That is all that matters for purposes of *Bruen*'s threshold inquiry; *how* New Mexico restricts that conduct comes into play only at the historical-tradition stage.[6]

*Bruen* itself makes that clear. There, the Supreme Court described the "proposed course of conduct" of the two individual plaintiffs (Koch and Nash) as "carrying handguns publicly for

---

[6] *Contra* Dkt.109 at 15 and 19, *Bruen* did not say (let alone "hold") that shall-issue licensing regimes do not implicate the Second Amendment's text. What *Bruen* explained is that shall-issue licensing regimes generally pass historical muster at the historical-tradition stage—as the above-the-line text accompanying *Bruen*'s footnote 9 illustrates. *See Bruen*, 597 U.S. at 38-39.

self-defense." 597 U.S. at 32. That framing is notable for two reasons. First, the law they challenged barred them from obtaining concealed-carry permits, not from carrying handguns. Yet the Court focused on whether the *ultimate* conduct in which they wanted to engage (carrying firearms in public) fell within the plain text, not whether the specific thing New York would not let them do (obtain a concealed-carry permit) did. So too here: The question the Court should ask under Supreme Court precedent is whether the *ultimate* conduct Plaintiffs want to engage in (having and carrying a firearm) falls within the plain text, not whether the specific thing New Mexico will not let them do (have the firearm within seven days of purchasing it) does. And, on that score, the answer is plainly yes: Having and carrying a firearm is covered by the plain text.

*Bruen*'s framing is also notable because Koch and Nash were not entirely prohibited from carrying handguns publicly for self-defense. Nash had a "license [that] permitted him 'to carry concealed for purposes of off road back country, outdoor activities similar to hunting,' such as 'fishing, hiking & camping etc.'" *Id.* at 15-16. And Koch had an even broader "restricted license permitting him to carry a handgun outside the home" not only "for hunting and target shooting," but "to and from work" as well. *Id.* at 16. What Koch and Nash wanted was to be able to carry outside the home "in ANY LOCATION typically open to and frequented by the general public" without having "to demonstrate a unique need for self-defense." *Id.* But, again, the Supreme Court did not approach the textual inquiry by asking whether the plain text confers the right to carry a handgun "in any location typically open to and frequented by the general public, without having to demonstrate a unique need for self-defense"; it asked "whether the plain text of the Second Amendment protects Koch's and Nash's proposed course of conduct—carrying handguns publicly for self-defense." *Id.* at 32. So too here. The textual question is not whether the plain text "cover[s] the immediate acquisition of commercially sold firearms." *Contra* Dkt.109 at 15, 20.

As *Bruen* itself shows, the question focuses on the citizen's conduct—and frames the conduct at its most essential level, without overlaying the challenged restriction on it. A contrary view would leave the threshold inquiry covering virtually nothing, as nearly all laws restricting arms-bearing conduct will regulate something more specific than keeping and bearing arms simpliciter.

Trying another tack, New Mexico argues (at 16-17) that *acquiring* arms and *retaining* arms are two different things, and only the latter is covered by the plain text. But the argument that the Framers meant to protect the rights only of those who were fortunate enough to already have arms when the Second Amendment was ratified finds zero support in text or precedent (let alone historical tradition). *District of Columbia v. Heller* not only noted that the phrase "'Keep arms,' was simply a common way of referring to possessing arms" at the Founding, 554 U.S. 570, 583 (2008), but also invoked Founding-era sources demonstrating that "keep arms" was understood to embrace *taking* possession as well as maintaining them, *see id.* at 583 n.7. *See also, e.g.*, *Andrews v. State*, 50 Tenn. 165, 178 (1871) ("[T]h[e] right of keeping arms" "necessarily involve[s] the right to purchase and use them."). That is why, *contra* Dkt.109 at 16, courts have coalesced around the conclusion that "the Second Amendment's text presumptively protects the act of selling or transferring a firearm." *United States v. Knipp*, 138 F.4th 429, 435 (6th Cir. 2025). "[A]lthough the Second Amendment's text does not spell out the right to obtain firearms, it nonetheless 'covers' that right." *Id.* at 434.[7]

---

[7] New Mexico relies on dictum from *McRorey v. Garland*, 99 F.4th 831 (5th Cir. 2024), *see* Dkt.109 at 16, but that dictum has since been repudiated by the Fifth Circuit in a case New Mexico does not cite. *See Reese v. ATF*, 127 F.4th 583, 590 (5th Cir. 2025) ("[T]he Second Amendment 'covers' the conduct [of] []commercial purchases[]."). New Mexico also quotes a concededly vacated Eleventh Circuit case, *see* Dkt.109 at 16, without disclosing that it was later replaced with an opinion that specifically *omits* the quoted language. *Cf. NRA v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) (en banc); *id.* at 1171 (Brasher, J., dissenting) (noting full court's agreement that "the right to keep and bear arms extends to the purchase of firearms").

Finally, New Mexico suggests that this Court should look to *B&L Productions, Inc. v. Newsom*, 104 F.4th 108 (9th Cir. 2024), *Maryland Shall Issue, Inc. v. Moore*, 116 F.4th 211 (4th Cir. 2024) (en banc), and other cases that (according to New Mexico) support holding that restricting firearm acquisition implicates the Second Amendment's text only if it "rise[s] to the level of a functional prohibition or meaningful constraint on the right to keep and bear arms.'" Dkt.109 at 17-80.  There are many problems with this argument, not least that it is contrary to how *Bruen* itself approached the textual inquiry.  *See supra* pp.18-20.  And, even more to the point, the Tenth Circuit has already spurned New Mexico's offer to resurrect a "limited means-end scrutiny" within the *Bruen* framework.  *See Ortega*, 148 F.4th at 1144.  That conclusion is binding on this Court—and it is correct.

### B.    The Act Is Fundamentally Inconsistent With Historical Tradition.

As Plaintiffs' cross-motion for summary judgment explains, the historical record on cooling-off-period laws is so one-sided that Plaintiffs would prevail even if *they* bore the burden of proving that Act is *not* consistent with historical tradition.  Dkt.110 at 13-15.  New Mexico's submission now confirms that the state has nothing new; its prior suggestion that it was waiting to unveil some never-before-considered historical analog was nothing but empty litigation posturing. *Cf.* Dkt.110 at 15.  All New Mexico offers are the same four historical analogs—intoxication laws, licensing regimes, group-based restrictions, and surety laws, Dkt.109 at 32-36—the Tenth Circuit already rejected.  *See supra* pp.14, 16-17.

In a too-late, and much too-little, attempt, New Mexico claims that "'unprecedented societal concerns' and 'dramatic technological changes'" require "a more nuanced approach" to *Bruen*'s historical-tradition analysis.  Dkt.109 at 30.  It made these arguments to the Tenth Circuit. *See* Corrected Answer Brief at 34-35 & n.12, *Ortega*, No. 24-2121 (10th Cir. Dec. 9, 2024), CA10.Dkt.38.  Its *amici* expanded on those arguments.  *See* Brief of Brady Center to Prevent Gun

21

Violence at 11-12, *Ortega*, No. 24-2121 (10th Cir. Dec. 19, 2024), CA10.Dkt.56 ("The Act requires such a nuanced approach: it is intended to address the unprecedented societal scourge of gun suicides and impulsive gun violence—calamities not prevalent during the Founding and Reconstruction Eras."). The Tenth Circuit rejected them. For good reason: *Bruen*'s "more nuanced approach" is not a "blank check." *Bruen*, 597 U.S. at 27, 30. The additional nuance means, at most, that a court should look to when the new societal concern emerged, or to when the dramatic technological change happened, and assess how society responded in the immediate aftermath. If a societal concern emerged in 1900 and society soon thereafter settled on a consensus response, *Bruen*'s "more nuanced approach" does not allow a state to invent an entirely different response in the year 2024. But that is precisely what New Mexico tries to do here.

Consider the first purportedly "unprecedented societal concern" New Mexico identifies: "impulsive gun homicides." Dkt.109 at 30. Even assuming *arguendo* that people with homicidal intentions did not resort to firearms until after the Industrial Revolution facilitated the mass manufacture of firearms, impulsive homicides have plainly been a problem for millennia and were extremely common during the Founding generation. *See supra* p.8; *see also Genesis* 4:8. Yet no one at the Founding ever "address[ed]" the "problem[]" of impulsive homicides by imposing a cooling-off period on the murderous arms then in vogue. *United States v. Rahimi*, 602 U.S. 680, 692 (2024). Instead of seeking to prevent impulsive homicides by delaying the People's access to Arms, Founding-era lawmakers sought to deter impulsive homicides with criminal sanctions. *But see Bruen*, 597 U.S. at 29-30 & n.7 ("Analogical reasoning requires judges to apply faithfully the balance struck by the founding generation to modern circumstances.").

Moreover, even under New Mexico's telling, impulsive gun homicides did become a problem by "the 1870s and 1880s" when "mass production techniques, improved technology and

22

materials, and escalating marketing campaigns all made guns relatively cheap, prolific, reliable, and easy to get." Dkt.109 at 8. But no state embraced a mandatory cooling-off period for another hundred years, until 1979, when California advanced that position in litigation. *See People v. Bickston*, 154 Cal.Rptr. 409, 410 (Cal. App. Dep't Super. Ct. 1979); *see also supra* n.3 (noting that state legislatures did not embrace a cooling-off theory until the 1990s). On the contrary, for the first hundred years of mass-manufactured firearms, the consensus for safeguarding against impulsive gun homicide was to impose "carry restrictions," Dkt.15-1 at 6, and/or rudimentary background-check regimes, *see supra* pp.5-6. A state cannot "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms" by relying on a solution first invented over a century after a problem emerged. *Bruen*, 597 U.S. at 19.

The same goes for the state's second purportedly "unprecedented societal concern": "impulsive gun suicides." Dkt.109 at 30. New Mexico forthrightly concedes that there were plenty of laws on the books to address the problem of suicide at the time of the Founding (indeed, since the Middle Ages), but none of them "limit[ed] access to suicidal means." Dkt.109 at 10; *see also supra* p.8. A concern that has long been addressed is not unprecedented. What is more, even if impulsive gun suicides did not become prevalent until the *early* "twentieth century," Dkt.109 at 10, no one ever thought to impose a cooling-off-period until the *late* twentieth century.

That remains true regardless of whether public health experts have more recently "evolved" to understand suicide "as a manifestation of medical and psychological anguish." Dkt.109 at 10, 31. That evolution does not make suicide a new societal problem; at most, it means that society now prefers a new solution. But a mere preference for a new solution is not a free ticket out of *Bruen*'s historical inquiry; that would substitute *Bruen*'s "more nuanced approach" with the same

23

interest-balancing that *Bruen* expressly interred.  "The Second Amendment 'is the very *product* of an interest balancing by the people' and it 'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense."  *Bruen*, 597 U.S. at 26. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in" *Bruen*'s "analogical inquiry."  *Id.* at 29.  And no historical response to suicide posed anything remotely comparable to the burden on the right of armed self-defense that this Act poses.

Finally, New Mexico identifies "mass production and sales of firearms" as a "dramatic technological change[.]" Dkt.109 at 31.  This change was already in the rearview mirror by the time the twentieth century arrived, yet no state advanced a cooling-off theory like this Act until 1979.  Neither "drama[]" nor "nuance[]" allows a state to respond to a century-old development with a novel burden on its citizen's Second Amendment rights.  "[T]he enshrinement of constitutional rights necessarily takes certain policy choices off the table."  *Heller*, 554 U.S. at 636.  Although "[t]he Constitution leaves" New Mexico "a variety of tools for combating" the problems of firearm violence and suicide, *id.*, a seven-day cooling-off period is not one of them.

## CONCLUSION

The Court should deny New Mexico's motion and grant Plaintiffs'.

24

Respectfully submitted this 11th day of May 2026.

Carter B. Harrison IV
**Harrison & Hart, LLC**
924 Park Ave SW, Suite E
Albuquerque, NM 87102
(505) 303-1835
carter@harrisonhartlaw.com

*s/Matthew D. Rowen*
Matthew D. Rowen
**Clement & Murphy PLLC**
706 Duke Street
Alexandria, VA 22314
(202) 742-8900
matthew.rowen@clementmurphy.com

Michael D. McCoy
**Mountain States Legal Foundation**
2596 South Lewis Way
Lakewood, CO 80227
(303) 292-2021
mmccoy@mslegal.org

Joseph G.S. Greenlee
**National Rifle Association of America**
11250 Waples Mill Rd
Fairfax, VA 22030
(703) 267-1161
jgreenlee@nrahq.org

***Attorneys for Plaintiffs***