**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

**SAMUEL ORTEGA, and**
**REBECCA SCOTT,**

**Plaintiffs,**

**vs.** **No. 1:24-cv-00471-JB-SCY**

**MICHELLE LUJAN GRISHAM, in her official capacity as Governor of the State of New Mexico, and RAÚL TORREZ, in his official capacity as Attorney General of the State of New Mexico,**

**Defendants.**

**DEFENDANTS' JOINT REPLY IN SUPPORT**
**OF MOTION FOR SUMMARY JUDGMENT**

Governor Michelle Lujan Grisham and Attorney General Raúl Torrez (collectively, "Defendants"), by and through their respective counsel of record, hereby submit their reply in support of the Joint Motion for Summary Judgment (the "Motion") [Doc. 109]. As grounds for this reply, Defendants state as follows:

**INTRODUCTION**

Plaintiffs continue to insist that the *Ortega* majority's preliminary, divided ruling is the final word on New Mexico's waiting period that stands to save dozens of New Mexican lives every year. Not so. The majority itself acknowledged its conclusion was only a "preliminary" one, *Ortega v. Lujan Grisham*, 148 F.4th 1134, 1139 (10th Cir. 2025), and its reasoning cannot be squared with binding Tenth Circuit authority that this Court *is* strictly obligated to follow under principles of stare decisis. Plaintiffs offer no persuasive explanation for why this Court must follow the *Ortega* majority's "sidestep," 148 F.4th 1158 n.8 (Matheson, J., dissenting), of controlling precedent or

why the well-recognized and important exceptions to the mandate rule should suddenly vanish here.

Defendants do not ask this Court to "defy" the Tenth Circuit, as Plaintiffs assert. They simply ask the Court to faithfully apply the very exceptions the Tenth Circuit has repeatedly reaffirmed—exceptions grounded in ensuring fidelity to controlling law and preventing manifest injustice. This long-standing caselaw makes clear that when an appellate decision is clearly erroneous to the point it would be unjust to follow, or when there has been an intervening change in precedent or different evidence on remand, a district court may depart from an interlocutory ruling. Not just one, but all three of these circumstances apply here. As such, Defendants respectfully request that this Court uphold New Mexico's lifesaving waiting period.

**REPLY IN SUPPORT OF STATEMENT OF UNDISPUTED MATERIAL FACTS**

Plaintiffs' response to Defendants' undisputed material facts ("UMFs") mostly consists of *legal* argument, which cannot create a dispute of material *fact*. As explained in more detail below, what little factual support they provide to rebut is either inaccurate or immaterial.

5. Plaintiffs claim Defendants somehow violate D.N.M.LR-Civ. 56.1(b) even though the cited webpage clearly and concisely summarizes several studies that demonstrate that "the acute period of heightened risk for suicidal behavior is often only minutes or hours long." *Duration of Suicidal Crises*, Harvard Sch. of Pub. Health, https://hsph.harvard.edu/ research/means-matter/means-matter-basics/duration-of-suicidal-crises/ (last visited May 13, 2025). Plaintiffs' complaints about the methodologies and limits of some of these studies is immaterial and does not negate the fact that New Mexico has a reasonable basis for concluding that many suicides committed with firearms are impulsive acts that can be ameliorated with a waiting period. *See Rocky Mountain Gun Owners v. Polis*, 121 F.4th 96, 127 (10th Cir. 2024) ("*RMGO*") (surveying

evidence in support of Colorado minimum age law to determine if the law was "*designed* to ensure only that those who 'keep and bear' arms in Colorado are, in fact, law-abiding, responsible persons" (quoting *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 38 n.9 (2022)) (emphasis added)). In any event, Plaintiffs conveniently omit the first part of the quoted portion of the source that they claim "refutes" Defendants' point, which actually says: "*At least* one-third of suicide decedents under age 18 experienced a crisis within 24 hours of taking their life[.]" Harvard Sch. of Pub. Health, *supra* note 1.

10. Plaintiffs' splitting hairs over semantics is immaterial. And while Plaintiffs cite caselaw interpreting *federal* laws, they fail to address Defendants' authority that New Mexico courts consider fiscal impact reports in discerning legislative intent. *See Voter Reference Found., LLC v. Balderas*, 616 F. Supp. 3d 1132, 1208 n.11 (D.N.M. 2022) (Browning, J.) (stating that "the rules of statutory construction that New Mexico state courts apply" when interpreting a state law).

15. Again, Plaintiffs' semantics argument does not create a genuine dispute of material fact. Contrary to Plaintiffs unsupported assertion, binding Tenth Circuit law definitively demonstrates that the existence of similar laws in other jurisdictions is relevant to courts' "abusive ends" analysis. *See RMGO*, 121 F.4th at 124. And while some state laws may have exceptions and more limited applications, the fact remains that there are at least a dozen other jurisdictions with waiting periods on the books and that New Mexico's is significantly shorter than several of these laws. *See, e.g.*, Cal. Penal Code § 26815(a); Haw. Rev. Stat. § 134-2(a); D.C. Code § 22-4508.

16. Plaintiffs' attempt to manufacture a controversy about whether waiting periods definitively cause large and statistically significant reductions in homicide is immaterial. Contrary to Plaintiffs' assertion, Defendants did not cite Professor Poliquin's declaration "for the proposition 'that waiting period laws cause large and statistically significant reductions in homicide'" [Doc.

112 at 9]; Defendants cited it for the proposition that "*[t]here is substantial evidence* that waiting period laws cause large and statistically significant reductions in homicides." [Doc. 109 at 6 (emphasis added)]. Though Plaintiffs highlight some studies that suggest otherwise, this does not negate the fact that there are peer reviewed studies that support the waiting period's effectiveness. *See* UMF No. 17. Moreover, Plaintiffs' reliance on the RAND meta-analysis to support their position to the contrary is misleading at best. Rather than rely on Plaintiffs' piecemeal quote, the Court should look at the source, which says: "While the direction of effects varied across studies (two found that waiting-period laws increased homicides), *the four methodologically stronger studies* either found uncertain effects *or that mandatory purchase delays significantly reduced total or firearm homicides*." *The Effects of Waiting Periods*, RAND (Jan. 29, 2026), https://www.rand.org/research/gun-policy/analysis/waiting-periods.html (emphases added).

17. Plaintiffs concede that a peer-reviewed study included in the cited declaration of Professor Poliquin concluded that "waiting periods reduce gun homicides by roughly 17%." [Doc. 20-2 at 13]. Plaintiffs' complaint that the study did not include rifles and shotguns does not create a genuine dispute since they fail to provide any evidence suggesting that rifle and shotgun waiting periods are ineffective. *See White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir. 1995) (nonmoving party may not rely upon unsupported allegations in opposing properly supported motion for summary judgment). In any event, this "dispute" is irrelevant since Plaintiffs here have only attempted to buy handguns. *See* UMF No. 46.

18. Plaintiffs' "disputes" miss the mark yet again. While they highlight a single study that found "no statistically significant effect of waiting periods on gun suicides" for "older adults," this same study still found "that the presence of a purchase delay decreases the incidence of firearm

suicide by a modest *yet statistically significant* 3.3%" for the overall adult population, and confirms that gun suicides are often impulsive acts. [Doc. 20-2 at 28, 33 (emphasis added)].

19. As explained above, the RAND meta-analysis' passing suppositions about how waiting periods may not be a panacea for gun homicide and suicide is immaterial. The undisputed fact remains that four "methodologically stronger studies either found uncertain effects *or that mandatory purchase delays significantly reduced total or firearm homicides*" and five "methodologically stronger studies" found reductions in suicides or firearm suicides. RAND, *supra* (emphasis added).

20. As explained above, Plaintiffs' complaints about a single study's focus on handguns does not create a genuine dispute of material fact.

21-25. Plaintiffs' strawman argument does not create a genuine dispute of material fact. Defendants do not dispute that many households used muskets and other primitive firearms at the Founding. Rather, their point is that individuals now have access to rapid, convenient gun sales. *See* UMF Nos. 21-25. Plaintiffs provide no evidence to refute this point. *See White*, 45 F.3d at 360. Moreover, Plaintiffs' qualms over when waiting periods first emerged and their underlying purposes are irrelevant under binding Tenth Circuit law. *See RMGO*, 121 F.4th at 121.[1]

26-31. Another strawman. Defendants do not claim that homicide, or even firearm homicide, is "new." Rather, they claim (with supporting evidence) that firearm homicide was not a widespread societal issue at the time of the Founding. *See* UMF Nos. 26-31. And while Plaintiffs

[1] It should also be noted that New Mexico's cited source *does* demonstrate (albeit indirectly) that jurisdictions enacted more than just carry restrictions in response to increased gun sales in the late 1800s and early 1900s. *See* [Doc. 15-1 at 6 (citing Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 Law & Contemp. Probs. 55 (2017)]; Spitzer, *supra*, at 59-69 (listing other types of restrictions and regulations). Further, Plaintiffs' parenthetical point fails to explain how early twentieth-century background check systems were equivalent to the modern, organized system now in place.

may assert this is a "made-for litigation theory," [Doc. 112 at 12] they fail to provide any evidence to dispute this. *See White*, 45 F.3d at 360.[2] Further, their point about whether "colonists would have tolerated a cooling-off period for purchasing whips, hoes, or shovels" is a red herring. New Mexico's waiting period does not apply to these instruments—which, unlike guns, are not specifically designed to kill.

32-41. Yet another strawman. Defendants do not claim that suicide is a "new societal problem"—only that *firearm* suicide was not a widespread societal issue at the Founding and that the Founders had a limited understanding of the causes of suicide in general. *See* UMF Nos. 32-41. Plaintiffs fail to provide any evidence to the contrary. *See White*, 45 F.3d at 360.

**RESPONSE TO STATEMENT OF ADDITIONAL UNDISPUTED MATERIAL FACTS**

Defendants submit that the following "additional undisputed material facts" ("AUMFs") submitted by Plaintiffs are unsupported or immaterial:

B. In accordance with the parties' agreement, Defendant has only relied on declarations that were submitted at the preliminary injunction stage. *See* [Docs. 15-1, 15-1, 20]. The Court should disregard the new declarations Plaintiffs now attempt to bring into the record from *Beckwith v. Frey*., 766 F. Supp. 3d 123 (D. Me. 2025)—*which was reversed on appeal*. If it declines to do so, it should also consider the affidavits submitted by the defendants in that case, which refute Plaintiffs' points. *See, e.g.*, Affidavit of John Donohue, *Beckwith*, 766 F. Supp. 3d 123 (No. 1:24-cv-384). At any rate, Plaintiffs' arguments about the "danger of denying law-abiding

[2] Plaintiffs' reliance on general murder rates in the 1600s is misplaced. For starters, they were not specific to *firearm* homicides. Moreover, those extreme homicide rates subsided well before the Founding. *See* Randolph Roth, *American Homicide* 27 (2009) ("As soon as political stability was established on a contested frontier . . . rates for all types of homicide fell.").

citizens facing imminent threats of violence the means to defend themselves" are immaterial since Plaintiffs already own multiple handguns. *See* UMF No. 44.

C. Defendants do not dispute that Professor Roth stated this. However, as explained earlier, this is immaterial.

D. Again, Defendants do not dispute that suicides have occurred "for thousands of years." Rather, as explained earlier, the undisputed evidence shows that firearm suicide was not a widespread societal issue around the time of the Founding and that the Founders had a limited understanding of the causes of suicide in general.

## DISCUSSION

### I. This Court is not strictly bound by the Tenth Circuit's divided, preliminary decision

As anticipated, Plaintiffs continue their effort to elevate the *Ortega* majority's preliminary ruling as an ironclad decision from which this Court cannot for any reason deviate else be deemed "insubordinate." [Doc. 112 at 15-24]. Plaintiffs are mistaken. "There are well-recognized exceptions to both the law of the case doctrine and the mandate rule." *Grigsby v. Barnhart*, 294 F.3d 1215, 1218 (10th Cir. 2002) (cleaned up). These exceptions are "important in their own right." *United States v. MacKay*, 610 Fed. Appx. 797, 799 (10th Cir. 2015) (Gorsuch, J.).

Plaintiffs do not, as they cannot, dispute this as a general matter.[3] Rather, they claim that these exceptions simply do not apply to a district court's ability to deviate from an appellate court's interlocutory decision—calling it a "nonexistent" rule. [Doc. 112 at 18-19]. The only thing "nonexistent" is Plaintiffs' authority to the contrary.[4] As noted, this Court has already recognized

[3] They suggest the Tenth Circuit has never applied these exceptions to its own decisions. [Doc. 112 at 18]. They are mistaken. *See, e.g.*, *Kennedy v. Lubar*, 273 F.3d 1293, 1299 (10th Cir. 2001).

[4] Plaintiffs' cited cases generally discussing the mandate rule do not help them, as the parties did not invoke any of the rule's "well-recognized" exceptions. *See Friends of the Floridas v. United*

circumstances in which "[d]istrict courts [may] depart from an appellate court's ruling on the same case." *Mocek v. City of Albuquerque*, 3 F. Supp. 3d 1002, 1046 (D.N.M. 2014). Plaintiffs respond by simply claiming that this Court did not mean exactly what it said because it was only concerned with revisiting its own ruling. [Doc. 112 at 18]. That may be so, but that does not make this Court's recognition any less true. *See United States v. Rodriguez-Velarde*, 162 F.3d 1175 (10th Cir. 1998) (recognizing circumstances in which "a district court may depart from the mandate of an appellate court"); *MacKay*, 610 Fed. Appx. at 799 (affirming district court's departure from mandate under exception); *Moulds v. Bullard*, 452 Fed. Appx. 851, 854 (11th Cir. 2011) (approving of district court not following mandate that was clearly erroneous). Whether Plaintiffs accept it or not, the "reality" [Doc. 112 at 19] is that district courts have the discretion to depart from an appellate court's interlocutory decision.

## II. This Court should apply the well-recognized exceptions to the mandate rule

Of course, just because this Court *can* deviate from the *Ortega* majority's preliminary ruling does not necessarily mean that this Court *should* do so. Defendants recognize that the exceptions to the law of the case and mandate rule are "exceptionally narrow" for good reason. *Mocek*, 3 F. Supp. 3d at 1046. As such, Defendants do not invoke them lightly. But as previously explained, this case satisfies not just one, but *all three* of these exceptions. First and foremost, the *Ortega* majority's decision was clearly erroneous in light of *RMGO* and blindly following it to strike down a vital public safety measure would be manifestly unjust. [Doc. 113 at 13-21]. Second, the Tenth Circuit has since made a contrary decision of law regarding historical group-based

---

*States Bureau of Land Mgmt.*, 746 F. Supp. 3d 1039, 1166 (D.N.M. 2024) (Browning, J.) ("Cases are not authority for propositions not considered."). Plaintiffs' reliance on caselaw dealing with stare decisis is even farther off field. *See Mocek*, 3 F. Supp. 3d at 1046 ("Unlike vertical stare decisis, however, the [law of the case doctrine] is a flexible one that allows courts to depart from erroneous prior rulings[.]" (cleaned up)).

firearm restrictions in *United States v. Harrison*, 153 F.4th 998 (10th Cir. 2025), that supports this Court's initial conclusion under *Bruen* step two. [Doc. 113 at 33-35]. Lastly, the waiting period is supported by additional historical analogues that Defendants did not rely on at the preliminary injunction stage. [Doc. 113 at 35-36].

While Plaintiffs may find it "surprising" [Doc. 112 at 16] that Defendants ask this Court to apply these "well-recognized" and "important" exceptions in the interest of justice, they give this Court no good reason to conclude otherwise. First, they assert that Defendants present the "*exact* same evidence" they presented at the preliminary-injunction stage." [Doc. 112 at 19]. Not so. Defendants previously relied on "laws involving intoxicated persons and licensing regimes," [Doc. 15 at 16] and this Court found a historical tradition based on certain group-based sales restrictions. *See Ortega v. Lujan Grisham*, 741 F. Supp. 3d 1027, 1086-93 (D.N.M. 2024). In addition to these historical analogues, Defendants now rely on surety laws and laws disarming Catholics and loyalists. *See* [Doc. 109 at 33-36].[5]

True, the *Ortega* majority addressed surety laws in a footnote[6] and similar group-based restrictions. 148 F.4th at 1151 n.11, 1153-54. However, the former discussion is dicta because *no party* relied on surety laws and the latter has since been undermined by controlling precedent. *See*

[5] Although the parties agreed to use "the evidence submitted at the preliminary injunction stage," [Doc. 109 at 13], these historical analogues are legal authority that may be raised at any point in the litigation. *See United States v. Mitchell*, 160 F.4th 169, 189 (5th Cir. 2025).

[6] In essence, the *Ortega* majority rejected surety laws simply because they were not a historical twin of the waiting period. But the Supreme Court has made clear that this is error. *See Rahimi*, 602 U.S. at 691-92, 701; *Harrison*, 153 F.4th at 1030' *United States v. Perez-Garcia*, 96 F.4th 1166, 1191 (9th Cir. 2024). The Supreme Court was also careful not to "suggest that the Second Amendment prohibits the enactment of laws banning the possession of guns by categories of persons thought by a legislature to present a special danger of misuse." *Rahimi*, 602 U.S. at 698; *cf. Vincent v. Bondi*, 127 F.4th 1263, 1266 (10th Cir. 2025) (rejecting argument that the Second Amendment requires an individualized inquiry before a person may be disarmed).

*United States v. Morgan*, 150 F.4th 1339, 1345 n.3 (10th Cir. 2025) ("[T]he amicus is not a party, and we ordinarily decline to consider arguments raised only by an amicus[.]" (cleaned up)); *see generally id.* (relying on historical laws disarming Catholics and loyalists). Thus, this Court would be within its rights to reaffirm its preliminary decision that the waiting period survives *Bruen* step two based on these additional historical analogues. *See Bay v. Anadarko E&P Onshore LLC*, 73 F.4th 1207, 1216 (10th Cir. 2023) ("The law of the case doctrine does not apply to dicta—statements in an opinion that are unnecessary for its disposition." (cleaned up)).

Plaintiffs also suggest that this Court should not find Defendants' arguments persuasive because "the Tenth Circuit rejected" them. [Doc. 112 at 20-21]. This circular argument is unavailing. While it is true the two judges in the *Ortega* majority rejected much of Defendants' arguments, three judges reached another conclusion—at least regarding *Bruen* step one. *See Ortega*, 148 F.4th at 1156 (Matheson, J., dissenting); *Ortega v. Lujan Grisham*, 162 F.4th 1056, 1057 (10th Cir. 2025) (en banc) (Federico, J., joined by Moritz, J., dissenting).[7] As previously discussed, these judges persuasively explain how the *Ortega* majority's opinion cannot be reconciled with earlier, binding precedent. [Doc. 109 at 21-29; Doc. 113 at 13-21]. Plus, the *Ortega* majority did not have the opportunity to address the specific historical laws disarming Catholics and loyalists at issue in *Morgan*, 150 F.4th 1339, nor did it meaningfully consider surety laws given the parties' lack of briefing. Accordingly, this Court should not shy away from independently analyzing the issues now before it in the interests of justice. *See Mocek*, 3 F. Supp. 3d at 1046.[8]

---

[7] It is likely Judges McHugh and Bacharach would fall into the latter camp as well. *See RMGO*, 121 F.4th at 142 (McHugh, J., concurring); *United States v. Morgan*, 150 F.4th 1339, 1344 (10th Cir. 2025).

[8] This includes analyzing whether the waiting period satisfies even the *Ortega* majority's overly restrictive definitions of "condition" or "qualification" since it allows individuals to exempt themselves by obtaining a concealed carry permit. As previously explained, the *Ortega* majority

Relatedly, Plaintiffs imply that the full Tenth Circuit rejected Defendants' arguments "by a 10-2 vote." [Doc. 112 at 21]. This assumption is both unfounded and likely wrong. For starters, it is unknown how many judges voted in favor of rehearing en banc; the en banc decision merely states that the "poll [to rehear en banc] did not carry." *Ortega*, 162 F.4th at 1056 (en banc). That two judges decided to publicize their dissentals does not, *ipso facto*, mean that only two judges voted against rehearing. *See* Michael E. Solimine, *Due Process and En Banc Decisionmaking*, 48 Ariz. L. Rev. 325, 326 (2006). Perhaps more importantly, "a judge's decision to vote against en banc rehearing is not necessarily an endorsement of the panel decision." Bobby R. Baldock, et al., *Strategic Considerations for Going en banc in the Tenth Circuit*, 100 Denver L. Rev. 325, 336 (2023); *see also id.* at 340-41 (discussing the "myriad reasons" judges may vote to deny rehearing en banc that are unrelated to the merits). While the per curiam opinion is silent, Judge Federico's dissent suggests that the decision was motivated in large part by the possibility that the Supreme Court may shed light on pertinent issues—not by a belief that the *Ortega* majority got it right. *Ortega*, 162 F.4th at 1057 (Federico, J., dissenting). Thus, this Court should put little, if any, weight into the denial of rehearing en banc. *See Harris v. Luckey*, 918 F.2d 888, 893 (11th Cir. 1990) (stating that "attempting to attach precedential weight to a denial of rehearing en banc" is "untenable").

Plaintiffs' reliance on *Nat'l Ass'n for Gun Rights v. Polis*, 173 F.4th 1317 (10th Cir. 2026) (*NAGR*), is similarly misplaced. There, the district court held that a law "prohibiting the possession" of certain firearms and kits was a commercial regulation because it "pertain[ed] to prior purchases." *NAGR*, 173 F.4th at 1331. The majority disagreed, stating:

---

never addressed this issue. *See* [Doc. 109 at 26 n.17]. But even if it implicitly rejected it, such a conclusion is clearly erroneous even under the *Ortega* majority's own logic. *See Ortega*, 148 F.4th at 1147 (distinguishing waiting periods from shall-issue licensing regimes).

> As we recently explained, a regulation is not a condition or qualification on the commercial sale of firearms if the regulation "ha[s] nothing to do with the [conduct's] commercial nature." . . . [The plaintiff] would risk violating [the law] even if he had received this firearm parts kit as a gift from a friend. This provision has nothing to do with the commercial nature of the prior transaction. Because a regulation of firearm *possession* is not a condition or qualification on the commercial sale of firearms, the district court abused its discretion in denying Plaintiffs' motion for a preliminary injunction on this basis.

*NAGR*, 173 F.4th at 1332 (quoting *Ortega*, 148 F.4th at 1147). In other words, a law that regulates *possession* of a firearm that could have been received as a gift is not a commercial regulation. That has no bearing here since the waiting period does not regulate possession and excludes gifts. *See Ortega*, 148 F.4th at 1146 (recognizing that the waiting period excludes gifts); *Ortega*, 741 F. Supp. 3d at 1075 n.7 (rejecting argument that the waiting period regulates possession).

Even assuming, *arguendo*, Plaintiffs' reimagining of Tenth Circuit caselaw was accurate, this Court should still uphold the waiting period. Plaintiffs claim that "[w]hat matters is whether the restriction regulates *how* a firearm can be sold commercially, or *who* can buy a firearm commercially." [Doc. 112 at 21]. According to Plaintiffs, the Colorado law in *RMGO* satisfies this test because "it regulated who could purchase a firearm—i.e., only people 21 and older," whereas the waiting period fails because it "does not turn on who the buyer or seller is" nor "does it turn on how a transaction occurs." [Doc. 112 at 22]. This is obviously incorrect. The waiting period *does* turn on who the buyer is: it only applies to those who are not federal firearms licensees, law enforcement, concealed carry licensees, or immediate family members. *See* § 30-7-7.1(H). And it *does* turn on how a transaction occurs: it excludes transactions that occur without the exchange of money or other consideration (i.e., non-commercial transactions) and requires a 7-day wait. *See Ortega*, 148 F.4th at 1146; *Commercial*, Black's Law Dictionary (12th ed. 2024) (defining "commercial" as "[o]f, relating to, or involving the selling of goods or services for profit"). So

even under Plaintiffs' test, the waiting period qualifies as a presumptively constitutional commercial regulation.

Lastly, Plaintiffs argue that the *Ortega* majority did not categorically reject the group-based restrictions this Court initially cited in an apparent effort to reconcile the majority's decision with *Morgan*, 150 F.4th 1339. [Doc. 112 at 23]. It is true, the majority initially distinguished these laws because they were "class-based," whereas the waiting period is supposedly "populace-wide." *Ortega*, 148 F.4th at 1153.[9] But then the majority went on to say "[i]t would be a category error" to "rely on them to inform our understanding of the right's coverage today." *Ortega*, 148 F.4th at 1154. As explained, the Tenth Circuit has since reached the opposite conclusion when it relied on laws disarming Catholics and loyalists to "reveal [a] key principle underpinning our Nation's history of firearm regulation: legislatures may disarm those believed to pose a risk of future danger." *Harrison*, 153 F.4th at 1021-32; *see also id.* at 1028 (noting that this "may allow greater regulation than would an approach that employs means-end scrutiny" (cleaned up). This more recent controlling authority supports this Court's initial analysis and justifies a departure from the *Ortega* majority's preliminary mandate.

In sum, Plaintiffs fail to provide any good reason why this Court should not conclude that the *Ortega* majority's *Bruen* step one analysis is clearly erroneous in light of *RMGO* and would be manifestly unjust to follow, or that the waiting period survives *Bruen* step two in light of different historical analogues and subsequent binding caselaw. Consequently, Defendants respectfully

[9] Respectfully, this characterization is clearly erroneous, as the law applies to those who are not federal firearms licensees, law enforcement, immediate family, or concealed carry licensees. *See* § 30-7-7.1(H). In theory, *every* New Mexican over 21 could exempt themselves by obtaining a concealed care license. Thus, contrary to Plaintiffs' assertions, the waiting period does not "deem *everyone* 'a risk of future danger' simply because they want to buy a firearm." [Doc. 112 at 23]; *see Ortega*, 148 F.4th at 1160 (Matheson, J., dissenting).

request this Court uphold the waiting period under the "well-recognized" and "important" exceptions to the mandate rule. *Grigsby*, 294 F.3d at 1218; *MacKay*, 610 Fed. Appx. at 799.

**III. This Court's initial conclusion was correct**

As previously discussed (at length), this Court got it right the first time. *See generally* [Doc. 52; Doc. 62; Doc. 109]. Plaintiffs' remaining arguments to the contrary are unavailing. First, Plaintiffs say this Court misunderstood *Bruen*'s textual inquiry and argue the Court should instead ask "whether the challenged regulation frustrates the ability to keep and bear arms." [Doc. 112 at 24] Notably, Plaintiffs cannot point to a single court that has adopted this illogic—they rely solely on a strained reading of *Bruen*. *See* [Doc. 112 at 24-26]. Plaintiffs fail to mention that the First Circuit just rejected this very "artificially narrow" framing of the scope of the claim in *Bruen*. *Beckwith v. Frey*, 171 F.4th 560, 568 n.3 (1st Cir. 2026). The First Circuit also comprehensively explained why Plaintiffs' desired analysis is inconsistent with instructions from the Supreme Court. *See id.* at 569. Plaintiffs give this Court no reason to reach another conclusion.

Next, Plaintiffs claim this Court mistakenly distinguished between "acquiring" and "retaining" (i.e., "keeping") arms when it determined that the waiting period does not infringe on the Second Amendment's plain text. [Doc. 112 at 26]. Suffice it to say, this Court has already persuasively explained why Plaintiffs are wrong. *See Ortega*, 741 F. Supp. 3d at 1069-77; *see also* [Doc. 62 at 2-8 (addressing same arguments)].[10] Contrary to Plaintiffs' assertion, courts have not "coalesced" around a different conclusion. [Doc. 112 at 26]; *see, e.g.*, *Beckwith*, 171 F.4th at 568; *B & L Productions, Inc. v. Newsom*, 104 F.4th 108, 117 (9th Cir. 2024), *cert. denied*, 145 S. Ct.

[10] Contrary to Plaintiffs' assertions, this Court did not engage in any "means-end scrutiny" when contemplated when a purchase restriction rose to the level of a meaningful constraint on the Second Amendment's plain text; it faithfully reconciled Supreme Court precedent. *See Ortega*, 741 F. Supp. 3d at 1071.

1958 (2025). And while it is true courts are not unanimous on this point, it is notable that the single case Plaintiffs rely on itself cited *RMGO* as reaching the opposite conclusion. [Doc. 112 at 26 (citing *United States v. Knipp*, 138 F.4th 429, 434 (6th Cir. 2025)]. This Court is bound to "follow [this] earlier, settled precedent over a subsequent deviation therefrom." *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996).

Lastly, Plaintiffs take issue with the notion that the Court should apply a "more nuanced" approach to *Bruen*'s historical-tradition analysis. [Doc. 112 at 27-30]. As an initial matter, the *Ortega* majority did not express any opinion on this "more nuanced" approach—contrary to Plaintiffs' suggestion. Plaintiffs are also wrong about the additional nuance only allowing courts to analogize to laws that were enacted in the "immediate aftermath" of the new societal concern or technological change. They cite no authority for this overly restrictive view—which runs headlong into the Supreme Court's clear direction that the law is not "trapped in amber." *Rahimi*, 144 S. Ct. at 1897-98; *id.* at 1925 (Barrett, J., concurring); *Duncan v. Bonta*, 133 F.4th 852, 873 (9th Cir. 2025) (en banc) (discussing "more nuanced" approach). And while Plaintiffs assert that the more nuanced approach doesn't apply simply because homicide and suicide isn't new, they do not dispute that *impulsive gun* homicides and suicides did not become a widespread societal issue until relatively recently. *See* UMF Nos. 26-41. The same goes for mass production and sales of firearms. *See* UMF Nos. 21-25. It follows that this Court should apply *Bruen*'s "more nuanced" approach, and in doing so, reaffirm that the waiting period is consistent with the history and tradition. "Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Rahimi*, 144 S. Ct. at 1897-98.

**CONCLUSION**

For the foregoing reasons, the Court should grant the Motion.

Respectfully submitted,

*/s/ Holly Agajanian*
**HOLLY AGAJANIAN**
*Chief General Counsel*
**KYLE P. DUFFY**
*Deputy General Counsel*
490 Old Santa Fe Trail, Suite 400
Santa Fe, New Mexico 87501
(505) 476-2200
Holly.agajanian@exec.nm.gov
Kyle.duffy@exec.nm.gov

***Attorneys for Governor Michelle Lujan Grisham***

*/s/ Edward L. Marshall*
Billy J. Jimenez
Edward L. Marshall
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
505.490.4825
bjimenez@nmdoj.gov
emarshall@nmdoj.gov

***Attorneys for Attorney General Raúl Torrez***

**CERTIFICATE OF SERVICE**

I hereby certify that on June 1, 2026, I filed the foregoing via the CM/ECF filing system, which caused all counsel of record to be served by electronic means.

Respectfully submitted,

*/s/ Holly Agajanian*
Holly Agajanian